**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUNDAGE-BONE CONCRETE PUMPING, INC., | ) ) | Case No. 010-10758 ABC |
| EIN:  84-0972141 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No. 010-10760 EEB |
| JLS CONCRETE PUMPING, INC. | ) | |
| EIN:  84-0972141 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**MOTION AND MEMORANDUM SEEKING THE APPOINTMENT
OF A CHAPTER 11 TRUSTEE**

### I.   INTRODUCTION

Wells Fargo Bank, N.A. ("WF Bank"), Wells Fargo Equipment Finance, Inc. ("WFEFI") and Wachovia Financial Services, Inc. a/k/a First Union Commercial Corporation ("Wachovia") (collectively, "Wells Fargo"), holders of secured claims in excess of $139 million, by and through its counsel, Holland & Hart LLP and Lane Powell PC, seek in this motion (the "Trustee Motion") appointment of a Chapter 11 trustee in the Debtors' bankruptcy cases pursuant to 11 U.S.C. § 1104(a) "for cause" or because the appointment of a trustee is in "the interests of creditors, equity security holders and other interests of the estates."[1]  This Motion is supported by the Declaration of Jeffrey E. Brandlin ("Brandlin Decl.").

---

[1] Wells Fargo also is filing a Motion for the Apointment of an Examiner With Expanded Powers ("Examiner Motion") together with the Declaration of Deborah R. Ward ("Ward Decl."). Both the Examiner Motion and the Ward Decl. provide further support and background information
(continued . . .)

A. <u>Summary of Grounds for Appointment of a Trustee.</u>

The Brundage Bone four person board of directors (the "BB Board") includes two former managers and two current senior managers of the Debtors with each faction holding competing personal agendas and interests as memorialized in Brundage Bone May of 2009 Amended By-Laws (the "2009 By-Laws"). The conflicted and self interested BB Board has caused the Debtors to pursue a restructuring plan with Aurora Resurgence that places the insiders' interests ahead of the substantial interests of the Debtors creditors by locking in directors on the BB Board unless and until the personal guaranties of Mr. Brundage and Mr. Bone, Sr. are released. <u>See</u> Brandlin Decl. ¶¶ 7, 11-13 & 20 and discussion *infra.* at pp. 4 - 7. The interests of the Debtors' insiders have apparently remained paramount to those of the creditor body, and in this way, the Debtors have not acted as a fiduciary.

*Over the past 14 months* (the "Lenders' Forbearance Period") the Debtors have demonstrated a significant inability and unwillingness to implement the changes necessary to successfully restructure their business operations *despite the significant legal and financial concessions made <u>by thirteen</u> of the Debtor's secured creditors (collectively the "Lenders")[2] in carefully synchronized forbearance and standstill agreements* and in spite of the Debtors' engagement at the Lenders' request of Cloyses Partners ("Cloyses"). Brandlin Decl. ¶18 and

---

(. . . continued)
relevant to the Trustee Motion. Additionally, Wells Fargo is filing a Motion For Adequate Protection and Objection to the DIP Financing. Accordingly, where appropriate reference has been made to those separate pleadings.

[2] These lenders include those holding security interests or leases in the Debtor's equipment and other personal property. There are an additional three creditors that hold security interests only in real property. See Exhibit B to Brandlin Decl.

2

discussion *infra*. at pp. 7 - 10.  The Debtors' current senior management has repeatedly prepared grossly inaccurate financial projections requiring significant and ongoing amendments resulting in frequent cash crises during the Lenders' Forbearance Period. Brandlin Decl. ¶19 and discussion *infra.* at pp.7 & 10. The Debtors have failed to reduce their G&A expenses in line with their significant and ongoing declining gross revenue (an estimated 60%+ decline since 2007), falling EBITDA (an estimated decline of 83% since 2007). Brandlin Decl. ¶ ¶ 10 & 16. The Debtors also has failed to take the necessary major steps of closing unprofitable locations and abandoning unused or underused equipment. Brandlin Decl. ¶17.

Contrary to the Debtors' agreement with the Lenders in the various forbearance agreements to keep the Lenders *meaningfully* informed on an ongoing basis of their business plans and negotiations to restructure and finance the business, the Debtors' Current Management was neither candid nor forthcoming as to its significant three months of negotiations concerning a proposed sale plan with the private equity firm Aurora Resurgence Management LLC ("Aurora"). See Declaration of Deborah R. Ward in Support of Motion for the Appointment of an Examiner ¶ ¶ 9-10.  The proposed Aurora plan arising from these exclusive negotiations benefit the Debtor's former and current management through the: 1) attempted release of the former owners, Jack Brundage ("Brundage") and Dale Bone Sr. ("Bone Sr."), on their significant personal guaranties; 2) the required retention of the current management; 3) the required retention of equity interests by the new investor and current management; and 4) either the strip down of Lenders collateral to liquidation values which are not supportable even in today's depressed market or the return of the equipment (the "Aurora Plan").  Brandlin Decl. ¶20 & Ex. J: Aurora Plan.

      B.      <u>Debtors' First Day Motions, Including the DIP Financing Motion Evidence the Priority Given to Self Interested Management Over Creditors</u>.

In furtherance of these personal agendas, the Debtors and Aurora have filed a DIP Financing Motion and several first day motions (the "First Day Motions") which seek relief that is not feasible, is not in the best interests of the Debtors $236 million in creditors and which substantially defies the guidance given in Colorado's local rules in several respects. The agenda of the First Day Motions is to rush the Court to approve transactions that will hopelessly bind the Debtors' estates to the Aurora Plan or some similar plan to the detriment of these estates. These First Day Motions place the Debtors' businesses at risk and are further proof of the management's self interest and failure to act as a fiduciary to creditors which will restructure the Debtor in an orderly manner for the benefit of the Debtors' creditors. Wells Fargo, as well as other Lenders, have repeatedly offered to continue to work with the Debtors outside of bankruptcy with a CRO but the Debtors' management has continually ignored these requests seeking instead to pursue their self interest with Aurora Resurgence. Contrary to what was represented in the Debtors' First Day Motions, and although Wells Fargo recently served notice of default on the Debtors, Wells Fargo has continued discussions in good faith with the Debtors seeking to cooperate in the interim use of cash collateral and potential DIP financing in the context of a contemplated bankruptcy filing while reserving its rights to seek a trustee or an examiner. <u>See</u> Ward Decl. ¶ 2-11. As a result of the foregoing, the Lenders do not have any confidence in the Debtors, their Current Management or the BB Board to make the proper and necessary restructuring decisions or to protect their creditors' interests. The filing and content of the recent First Day Motions provide further evidence of management's disregard of the interests

of the Lenders and the estates and their pursuit of their respective personal agendas.  See Ward Decl. ¶ 2-11. Brandlin Decl. ¶21.

In sum, based on the millions of dollars owed to the Lenders and the other creditors, the Debtors' current significant defaults with Wells Fargo and the other Lenders under the forbearance agreements and their respective loan documents, the pressing operational and financial issues that the Debtors face in the current economic environment which they are unwilling or unable to address, the Debtors' locked up and self-interested Board, the complete abdication of the Debtors' fiduciary duties as reflected in the First Day Motions, the likely significant Lender opposition to the Debtors' Proposed Plan (or similar plans) and the First Day Motions and the significant attendant increased costs and expenses of reorganization and risks to the Debtors' business resulting from legal battles between self-interests managers and the creditors of these estates, it is clear that cause exists for the appointment of a trustee. Additionally, it is clear that under these circumstances the benefits of the appointment of a trustee clearly outweigh the associated administrative costs of appointing a trustee as well as any other detriments.  Accordingly and as more fully detailed below and in the Brandlin Declaration, this Court has grounds under both the "for cause" standard and the "best interests of creditors" standard of 11 U.S.C. §1104(a) to grant Wells Fargo's Trustee Motion.

## II.     FACTUAL BACKGROUND

A.     History, Organization and Ownership of Brundage Bone.

1.     In General.  Brundage-Bone Concrete Pumping, Inc. ("Brundage Bone"), which is the largest provider of concrete pumping equipment rental and operation in the U.S., was organized in 1984 by Jack W. Brundage ("Brundage") and Dale G. Bone ("Bone Sr.").

5

Brandlin Decl. ¶ 2. JLS Concrete Pumping, Inc. ("JLS") is a wholly owned subsidiary of the Brundage Bone operating in California and Nevada.  Since its inception, the Debtors have grown primarily through an aggressive acquisition strategy.  The Debtors currently operate 23 branches with 100 locations, the majority of which are located in the West and Southwest.  Brandlin Decl. ¶ 3.  Brundage Bone is a Colorado S Corporation and JLS is a California Corporation Brandlin Decl. ¶ 4.

      2.  <u>Stock Ownership and Redemption and Other Payments to Shareholders</u>. Brundage and Bone, Sr. have always held the majority of the Brundage Bone shares and they currently jointly hold approximately 53% of the Brundage Bone voting stock.[3]  Brandlin Decl. ¶4.  Since 2005 Brundage and Bone, Sr. have received over $30 million in stock redemption payments, including $7 million paid in 2007 and $8 million paid in 2008.  Brandlin Decl. ¶9 and Exhibit D: Summary of Shareholder Payments.  Thereafter, during a period of continuing financial decline the Debtors commenced making payments to Brundage and Bone, Sr. in the amount of $20,000 per month each.  The Debtors have described these payments totaling $480,000 per year as Board member payments or compensation without further justification or description to the Lenders though neither Brundage nor Bone, Sr. currently hold senior management positions with the Debtor.  Brandlin Decl. ¶ 9.

      3.  <u>Current Senior Management of the Debtor and its Subsidiary, JLS</u>.  In 2007, the Debtor appointed Bruce Young ("Young") as the Debtors' President and CEO.  John Hudek ("Hudek") is the Debtors' current CFO, Dale C. Bone is VP of Equipment Sales ("Bone

---

[3] Included in the approximately 41,026 in total shares are approximately 1300 shares that are non- voting shares.

6

Jr."), Randy Waterman ("Waterman") is the COO of Non-Union Operations and Jeffrey L. Switzer ("Switzer") is the CEO of JLS (collectively the foregoing will be referred to as the "Current Senior Management"). Brandlin Decl. ¶ 4. The Current Senior Management along with a few of the Debtors' other managers' hold approximately 47% of the voting stock. Brandlin Decl. ¶ 4.

4. <u>Debtor's Debt Structure.</u> The Debtors have a total of seventeen (17) secured lenders, including the thirteen (13) Lenders (including Wells Fargo entities) that hold interests in the Debtors' personal property (primarily equipment).[4], Brandlin Decl. ¶ 7, and Ex. B: Summary of Debt owed to Lender. The total debt owing to the Lenders is approximately $216 million for equipment loans. Id. WF Bank is the Debtors' operating lender and together with WFEFI and Wachovia is owed in excess of $139 million. Additionally, the Debtors owe other unsecured creditors approximately $3.1 million and the remaining secured creditors are owed an additional approximately $3.3 million. Brandlin Decl. ¶ 7, Ex. B. Brundage and Bone, Sr. are guarantors of substantially all of the approximately $216 million owing to the Lenders, however, none of the Current Management have guaranteed the Lenders' Debts. Brandlin Decl. ¶ 6, ¶ 12 & ¶ 13. In sum, this is a secured lender case in which the majority of both the secured and unsecured debt is held by the Lenders, with Wells Fargo holding the largest single claim.

5. <u>Board Deadlock and May 2009 Amended By-Laws</u>. Brundage and Bone, Sr. are two of the four members of the BB Board with Young and Switzer currently serving in

---

[4] A few of the Lenders are lessors under equipment leases, but the majority of the lenders hold the collateral as secured creditors under security agreements. Some of the Lenders hold real estate collateral and there are a few secured creditors that hold only real estate collateral.

7

the other two Board positions.  Brandlin Decl. ¶ 8.  The 2009 By-Laws have hopelessly deadlocked the Debtors' Board between two factions: one made up of Brundage and Bone, Sr. whose primary interests are obtaining a release on their guaranties; and the other made up of Current Senior Management whose interests are in continuing to manage and own the Debtor. Brandlin Decl. ¶ ¶ 11-13 and Ex. E thereto: Amended By-Laws.  The 2009 Bylaws prohibit amendment of several key provisions until the *later of* Brundage and Bone, Sr. either being released on their guaranties or ceasing to own shares of the Debtors' stock, including the following: 1) the number of board members (i.e. four); 2) the appointment of Brundage as Chairman of the Board and Bone, Sr. as Vice Chairman of the Board. Brandlin Decl. ¶ 11 and Exhibit E thereto.  These special provisions of the 2009 By-Laws (the "Special Provisions"), which were amended at a time of financial decline and declared Lender defaults, insure that the Board cannot function properly as a disinterested fiduciary acting on behalf of these Debtors' estates. Brandlin Decl. ¶ 13.  Outside independent directors—or even an odd number of directors—are locked out until Brundage and Bone, Sr.'s guaranty exposure is resolved. Id.  In short, the Special Provisions shackle the BB Board and prevent it from stewarding the Company through its financial challenges, free of deadlocks or the improper considerations of their respective personal interests. Id.  Instead, the Debtors' restructuring efforts continue to be led by two Founder/Directors and two members of Current Senior Management whose goals are in direct conflict with the best interests of the creditors. Additionally, as more fully set forth below, the Current Senior Management has been unable or unwilling to take the steps necessary to restructure the business focusing instead on preserving their own interests at the expense of the Lenders.

8

6.      <u>Debtors' Declining Financial Performance</u>.  Since 2007, the Debtors revenues have declined from $221MM to its current FY 2010 estimate of $83MM, ***<u>a decline of over 60%</u>***.  Brandlin Decl. ¶10.  EBITDA has decreased even more rapidly from $46.8MM in 2007 to the company's current estimate for 2010 of $8.4 (a decline of nearly 83%, ***before*** considering any of the substantial administrative expenses Brundage Bone will incur in this Chapter 11 case).  <u>Id.</u>  Following the Debtor's default to Wells Fargo in late 2008 and early 2009 Wells Fargo required that the Debtor make its financial and business records available to their financial advisor, Brandlin & Associates. Brandlin & Associates had difficulty obtaining the necessary information and cooperation from the Current Senior Management. Brandlin Decl. ¶ 17.  Because of the Debtors' lack of candor and cooperation, Wells Fargo required that the Debtors hire a restructuring financial advisor and the Debtors hired Cloyses on February 2, 2009. <u>Id.</u> Cloyses' made several recommendations to the Debtors concerning their restructuring efforts and have provided the Lenders with certain otherwise previously withheld financial and business information. Cloyses assisted the company in developing a comprehensive financial reporting system, however, the Debtors' Current Senior Management clearly is responsible for the inaccuracy of the underlying information plugged into this system which has lead to seriously erroneous forecasts. Brandlin Decl. ¶ 17, Ex. F, Cloyses also set forth several strategies for reorganization of the Debtors based on the Current Senior Management's forecasting, but Current Senior Management obviously retains control over all the management decisions, including the decisions to place their interests over those of creditors. With this responsibility comes accountability.

9

       7.    <u>Repeated Failure to Meet Financial Projections During Lender Forbearance</u>.  The Debtors ran afoul of their equipment margins and ran out of availability under their borrowing base in the Fall of 2008.  Shortly thereafter, Wells Fargo entered into an initial letter agreement with the Debtor to insure ongoing operating financing pending further financial investigation and a more detailed forbearance agreement.  Based on the May 15, 2009, Cloyses Report and the Current Senior Management's financial forecasts, Wells Fargo entered into a Loan Restructuring and Forbearance Agreement with the Debtors in July of 2009 which provided for payment of projected monthly interest payments to Wells Fargo on the Wells Fargo Operating Line, provided for an over advance on the Wells Fargo operating line of up to $3 million and provided for payments of reduced lease payments to Wells Fargo on their respective equipment loans. (the "WF July Forbearance Agreements").  Brandlin Decl. ¶ 17 & 18 & Ex. G thereto: Forbearance Agreement.

      Throughout the negotiations concerning the various forbearance agreements Current Senior Management had adopted a strategy of making initial cuts and then trying to grow revenue without looking at further drastic measures to bring their financial performance within the realities of the current market. Brandlin Decl. ¶18.  Wells Fargo urged the Debtor to hire a CRO to insure that the steps necessary to preserve and restructure the business were taken, but the Debtor refused.  <u>Id.</u>  The other Lenders agreed to similar repayment terms on their equipment loans and entered into substantially contemporaneous forbearance agreements (collectively the July 2009 Forbearance Agreements") Brandlin Decl. ¶ 18.

      However, ***within a few weeks*** of the Lenders signing the July Forbearance Agreements, the Debtor informed the Lenders that their forecast was significantly flawed and that further

funding and financial and other concessions would be required in the near term. Brandlin Decl. ¶ 19. The Lenders again urged the Debtor to hire a CRO to make appropriate forecasts and to take the necessary actions to restructure and the Debtor again refused. In August of 2009, Cloyses outlined several restructuring strategies which included a reorganization plan with reduced payments to the Lenders while the market improved. Brandlin Decl. ¶20, Exhibit I August 15, 2009 Business Plan. Cloyses Document. Instead of timely making the necessary difficult decisions concerning branch closures and the release of the significant amounts of unused or underutilized equipment to permit the Debtor to restructure, or negotiating in good faith with the Lenders, the Debtor began significant negotiations with Aurora Resurgence concerning a plan which would: 1) release Brundage and Bone, Sr. on their guaranties; 2) preserve the jobs of Current Senior Management; 3) retain equity for the benefit of the new equity investor and the Current Senior Management; and 4) pay less than liquidation values to the Lenders or alternatively return their equipment (i.e. the Proposed Plan). Brandlin Decl. ¶ 20 and Exhibit J thereto: Aurora Plan. The Debtors used a desktop appraisal which understates even the liquidation values of collateral to justify the proposed payments to lender under the Proposed Plan.[5] Brandlin Decl. ¶ 20. While the Debtors had been engaged in negotiations with Aurora since September and had granted them exclusivity rights, the Lenders were not informed of the terms of the Proposed Plan until mid December of 2009. See Ward Decl. ¶ ¶ 9-10. In September of 2009, the Debtors faced a cash crisis and Wells Fargo entered into an amendment to the Wells Fargo July 2009 Forbearance Agreement granting the Debtor further financial

---

[5] Wells Fargo's appraisals are in progress and should be completed within the next few weeks.

11

concessions. Brandlin Decl. ¶ 10.  In October of 2009 all of the Lenders entered into amended forbearance agreements providing for further significant financial concessions. (collectively the "October Forbearance Agreements").  Brandlin Decl. ¶ 19.  Since then the Debtors have repeatedly and significantly revised forecasts without adequate explanation and with large fluctuations in key numbers. Id.  In December of 2009, Wells Fargo provided a short extension of the forbearance terms until January 15, 2010 and provided terms for a go forward restructuring plan with a CRO.  Brandlin Decl. ¶ 19.  When the Debtors did not timely respond to the request for the appointment of a CRO, Wells Fargo sent notice of default on January 13, 2010 ("Notice of Default"). Brandlin Decl. ¶ 20; Ward Decl. ¶ 12.  Since sending its Notice of Default, Wells Fargo has continued to provide funding for essential items such as payroll, its funding has been on a more restricted basis, and it has required specific justifications for payment amounts. Brandlin Decl. ¶ 21; Ward Decl. ¶ 13.  The Debtors have not been forthcoming in their post default funds requests and tried to slip certain undisclosed and unjustified payments through without description or explanation.  Ward Decl. ¶ 12.

    8. <u>DIP Financing</u>.  When it became clear that a bankruptcy might be imminent, Wells Fargo and its counsel tried to initiate discussions with the Debtors concerning the use of cash collateral and DIP financing.  The Debtors never initiated any good faith discussions on these issues and instead has proposed the onerous terms of the proposed DIP financing with Aurora which are not supported by the Lender or in the best interests of the Debtors or the Debtors' creditors.

### III. ARGUMENT

A. Appointment of a Chapter 11 Trustee is Appropriate Under the Facts and Circumstances of this Case.

1. Standards for the Appointment of a Trustee- In General. The facts justifying the appointment of a Chapter 11 trustee are determined on a case by case basis and must be proven by the moving party through clear and convincing evidence sufficient to overcome the initial presumption that the debtor remain in possession. In re Cardinal Industries, Inc., 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990). In re H & S Transportation Co., Inc., 55 Bankr. 786 (Bankr. M.D. Tenn. 1982); In re Lowenschuss, 171 F.3d 673, 685 (9th Cir. 1999). However, where the moving party has met one of the two standards for the appointment of a Chapter 11 trustee set forth in Section 1104(a) the appointment of a Chapter 11 trustee is appropriate.

Section 1104(a)(1) provides for the appointment of a Chapter 11 trustee for "cause" including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after commencement of the case. 11 U.S.C. § 1104(a)(1). The four enumerated grounds set forth in Section 1104(a)(1) are not exclusive grounds for the appointment of a trustee for cause. In re Marvel Entertainment Group, Inc., 140 F.3d 463, 472 (3rd Cir. 1998), *quoting*, Dalkon Shield, 828 F.2d at 242. Courts also have found "cause" exists in instances where, as here, there are management and corporate governance conflicts, where there is self dealing at the expense of the creditors and where the Debtor's management has consistently failed to meet its own operating projections or otherwise lost the support and confidence if its major creditors. See e.g., In re Marvel Entertainment Group, Inc., 140 F.3d at 472-74 (irreconcilable conflicts between debtor and creditors constitutes conflict); In re Cajun Elec. Power Coop., Inc.("Cajun Electric"), 69 F. 3d 746 (5th Cir. 1995), *reh'g granted*

*and result reversed*, 74 F. 3d 599 (5th Cir. 1996) (conflict between interests of cooperative member-customers and the interests of creditors justified appointment of trustee); In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988) (failure to keep adequate records and questionable transaction between Debtor and affiliates); In re Embrace Sys. Corp., 178 B.R. 112 (Bankr. W.D. Mich. 1995)(conflicts and self dealing by debtor's principals; In re: Colorado-Ute Elec. Ass'n, Inc., 120 B.R. 164 (Bankr. D. Colo 1990) (board conflict and lack of creditor confidence); Ionosphere Clubs, Inc., 113 B.R. 164 (Bankr. S.D.N.Y. 1990)("Eastern Airlines")(failure to meet projections and inability to proffer a workable business plan); In re Cardinal Industries, Inc. 109 B.R. 755 (Bankr. S.D. Oh. 1990) (loss of confidence in the debtor's management); In re State Capital Corp., 51 Bankr. 400 (Bankr. M.D. Florida 1985) (gross mishandling of affairs of debtor). The appointment of a Chapter 11 trustee is mandatory under § 1104(a)(1) if a court finds that "cause" exists. In re Colorado-Ute Elec. Ass'n, Inc., 120 B.R. at 173.

Section 1104(a)(2) provides for the appointment of a Chapter 11 trustee if such an appointment is "in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).  In re PMH Corp., 116 B.R. 644, 647 (Bankr.N.D.Ind.1989).  If the Court determines that this standard has been met it has discretion to order the appointment of a trustee; however, it is said that the in determining whether a trustee should be appointed under the best interest standard, courts "eschew rigid absolutes and look to the practical realities and necessities," In re Ionosphere Clubs, Inc., 113 B.R. at 168, *citing* In re Hotel Associates, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

14

> 2. <u>Cause Exists for the Appointment of a Trustee Where As Here There Is Self Dealing, Repeated Failure to Meet Forecasts and a Loss of Confidence of the Lenders</u>.
>
> > a. The Debtors are Unable or Unwilling to Fulfill Their Fiduciary

Duties. The essence of being a Chapter 11 debtor-in-possession is being able to fulfill the duties of a fiduciary which includes the duty to protect and preserve the Debtor's property for the benefit of the creditors and refrain from "acting in a manner which could damage the estate, or hinder a successful reorganization of the business." See Eastern Airlines, 133 B.R. at 169, *citing*, In re Thurmond, 41, B.R. 464, 465 (Bankr. D. Or. 1983); see also In re Devers, 759 F.2d 751, 754 (9th Cir. 1985); In re Four Score Broadcasting, Inc., 77 B.R. 404, 407 (Bankr. W.D. N.Y. 1987). The Debtors have repeatedly shown their inability to fulfill these duties in the manner proscribed by the Bankruptcy Code as shown by the self-interested and self-dealing BB Board as evidenced by the 2009 By-Laws, the payment of millions of dollars to the Debtors' former owners while the Debtors financial performance was deteriorating and the pursuit of the Aurora Plan and the First Day Motions without meaningful disclosures or good faith negotiations with the Lenders who have worked with the Debtors over the past 14 months. Additionally, as the Debtors' financial crisis worsened, the Debtors' Current Management failed to take proper and reasonable steps to preserve and protect the Debtors' assets and the interests of the Debtors and their creditors. The filing of the First Day Motions and the terms of the proposed DIP Financing without negotiating in good faith with Wells Fargo or other Lenders willing to provide use of cash collateral or DIP Financing on more favorable terms shows that the Debtor is determined to pursue the personal agendas of its insiders at all costs and off of the backs of the Creditors. The

15

lack of Lender support for the First Day Orders and the likely Aurora Plan will cause the Debtor's business to suffer irreparable harm.

        b. <u>The Debtors Current Management has Repeatedly Failed to Prove its Abilities to Manage Through a Reorganization</u>.  As detailed in the Brandlin Declaration, these Debtors have repeatedly and significantly missed the mark on their financial projections.  Within a few weeks of the thirteen Lenders signing up on the July 2009 Forbearance Agreements the Debtors were making major changes to their financial and cash flow forecasts, seeking additional significant financial and other concessions from the Lenders and asking for emergency cash funding for essential expenses from Wells Fargo.  This pattern has repeated itself on numerous occasions over the past 14-month forbearance period.  Additionally, the Debtors have not made meaningful attempts to restructure by shedding unprofitable locations or unused or underutilized equipment (i.e. 30-50% of their equipment) and have instead relied on trying to increase revenue or hope that the market for their services will improve.  These failures have contributed to the Debtors' declining revenue and EBITA which have spiraled downward at an alarming rate.  The Court in Eastern Airlines found that cause existed under similar circumstances to those described above stating:

> The Debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses being sustained by the estate mandate that this Court order the appointment of a trustee for cause, including . . . incompetence" under Code § 1104(a)(1).

<u>Eastern Airlines</u>, 113 B.R. at 170.  <u>See also</u> <u>In re Pied Piper Casuals, Inc</u>., 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984) (creditors should not be asked to bear the risks that debtor's projections, already destroyed in March, April and May, will somehow occur).

16

c.      The Debtors have Lost the Good Will and Confidence of the Lenders Through Their Self Dealing, Lack of Competence and Lack of Candor. Over the past fourteen (14) months **thirteen** lenders holding substantially all of the $236 million of liabilities have worked in tandem and in good faith to try and preserve the value of these Debtors despite their many problems. In December after months of difficulties in getting relevant and meaningful information concerning the Debtors' business plans, the Lenders were presented with the Aurora Plan, which the Debtors now appear determined to pursue despite other viable alternatives. These facts together with the clearly conflicted and gridlocked interests of the Board and the Debtors failures in making meaningful efforts to restructure have resulted in the loss of all of the Debtor's good with Wells Fargo as well as the other Lenders. Like Wells Fargo, these other Lenders (if given adequate time to respond) will likely oppose many of the First Day Motions including the onerous terms of the DIP Financing as well as the terms of the Aurora Plan. The potential business and actual costs of such a fight will be substantial that will cause the Debtors' business harm. In several instances the Courts have found the lack of confidence of and the conflict with significant estate creditors to constitute "cause" justifying the appointment of a trustee. For example, in Cajun Electric the Court found that where conflict goes beyond the healthy conflicts that often exist between debtors and creditors or where parties "begin working at cross purposes" cause exists for the appointment of a trustee. See Cajun Electric, 74 F. 3d at 600 (adopting dissent at 69 F.3d at 751). Similarly, in Marvel Entertainment Group, Inc., 140 F.3d at 472-73 the Court found that where the debtor in possession was "unable to resolve conflicts with the estate" cause existed. In Cardinal Industries, the Court found that a combination of facts collectively caused the loss of confidence of creditors in the debtors'

17

management and that such "crisis of confidence" is cause which required the appointment of a trustee.

The facts of this case are very similar to the those found in In re Colorado-Ute Electric Association, 120 B.R 164, 175-176, where the Colorado Bankruptcy Court appointed a trustee based on the conflicts between the debtor and its board of directors, the incompetence of the debtor's management in restructuring the debtor and the lack of confidence of the creditors in the debtor's ability to reorganize stating:

> In sum, the Court finds cause to appoint a trustee pursuant to Section 1104(a). The Court cannot envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members. In addition, the Court is deeply concerned that due to management and the board's lack of business acumen, they cannot conduct the required independent evaluation of proposals and recommendations made by the hired professional or by interested suitors.

In re Colorado Ute, 120 B.R. at 176.

Similarly, this Court should find that cause exists and appoint a Chapter 11 trustee.

      B.      The Interests of Creditors Also Require Appointment of a Chapter 11 Trustee.

Even if the Court does not find that "cause" exists to appoint a trustee pursuant to Section 1104(a)(1), it may still order the appointment of a trustee in this case pursuant to Section 1104(a)(2), where the appointment is in the best interests of creditors and the overall administration of the debtor's estate. Among the factors the courts consider in evaluating whether this test is met are: 1) the confidence (or lack thereof) of the creditors and the business community has in the present management; 2) the benefits derived by the appointment of a trustee balanced against the cost and other detriments; 3) the debtor in possession's past and

18

present performance and the prospects for reorganization; and 4) the trustworthiness of the debtor. In re Colorado Ute, 120 B.R. at 176; In re Ionosphere Clubs, Inc., 113 B.R. at 168 (citations omitted). Consideration of these factors as applied to the facts of this case clearly show that the benefits of appointing a trustee outweigh the costs or other detriments to such an appointment making the appointment in the best interests of the estate. In Colorado-Ute the Bankruptcy Court relied on two primary factors: 1) the need for a "capable and objective party in control of the debtor in whom the parties will have confidence. . ."; and 2) the reduced costs associated with the appointment of an independent party in whom the creditors have confidence and which will result in more willingness to work with the Debtors and less confrontation and litigation. In re Colorado Ute, 120 B.R. at 176. These factors are present in this case and justify the appointment of a trustee under Section 1104(a)(2).

## IV. CONCLUSION

Under the facts and legal authorities set forth above, cause exists for the appointment of a trustee and such an appointment is in the interests of creditors and the estate. Wells Fargo respectfully requests that the Court appoint a trustee so that the Debtors may be reorganized.

Dated January 20, 2010

Respectfully submitted,
*s/ Jack L. Smith*
Jack L. Smith, #2640
Risa L. Wolf-Smith, #15835
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, Colorado 80201-8749
Telephone: (303) 295-8246; Facsimile: (303) 975-5394
E-Mail: jsmith@hollandhart.com
**ATTORNEYS FOR WELLS FARGO BANK, N.A., WELLS FARGO EQUIPMENT FINANCE, INC., AND WACHOVIA FINANCIAL SERVICES, INC. A/K/A FIRST UNION COMMERCIAL CORPORATION**

## C<small>ERTIFICATE</small> O<small>F</small> S<small>ERVICE</small>

I certify that on January 20, 2010 I served a copy of the foregoing document to the following by

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Fax
☒ Electronic Service by LexisNexis File & Serve

Harvey Sender, Esq.
David V. Wadsworth, Esq.
Sender & Wasserman, P.C.
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264

Michael J. Pankow, Esq.
Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, Colorado  80202-4432

John F. Young, Esq.
Markus Williams Young
    & Zimmermann, LLC
1700 Lincoln Street, Suite 4000
Denver, Colorado  80203

Leo M. Weiss
Office of the United States Trustee
999 18th Street, Suite 1551
Denver, Colorado 80202-2415

*s/ Susanne Johnson*

4708399_1.DOC