## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUNDAGE-BONE CONCRETE | ) | Case No. 010-10758 ABC |
| PUMPING, INC., | ) | |
| EIN: 84-0972141 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No. 010-10760 EEB |
| JLS CONCRETE PUMPING, INC. | ) | |
| EIN: 84-0972141 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF JEFFREY E. BRANDLIN IN SUPPORT OF WELLS
## FARGO'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

Jeffrey E. Brandlin declares as follows:

1.      I am the founder and the chief executive of Brandlin & Associates Accountancy Corporation ("B&A"). My firm and I specialize in providing professional financial consulting services to lenders, creditors, shareholders, and investors whose interests are affected by businesses in distressed financial circumstances.   These services include due diligence engagements related to crucial financial decisions, and the reorganization and restructuring of problem credit situations. I am a certified public accountant and in 2004, I became a Certified Insolvency and Restructuring Advisor ("CIRA") by the Association of Insolvency and Restructuring Advisors (the "AIRA"). In 2008, I obtained the Credential of Certified in Financial Forensics ("CFF") from the American Institute of Certified Public Accountants (the "AICPA"). Attached as Exhibit A is a true and correct copy of my Curriculum Vitae. B & A has been retained by Wells Fargo Bank, N.A. ("WFB"), Wells Fargo Equipment Finance, Inc. and Wachovia Financial Services, Inc. a/k/a First Union Commercial Corporation (collectively, "Wells Fargo") to assist them with respect to their secured claims and equipment leases with the Debtors. I have personal knowledge of the facts set forth herein and am competent to testify.

2.      Brundage-Bone Concrete Pumping, Inc. ("BBCP" or the "Company")[1] is the largest provider of concrete pumping equipment rental and service in the U.S. Concrete pumps are used to pump concrete under pressure through a boom and hose directly to the appropriate location. The Company estimates that concrete pumping is used in over 30% of all concrete placements and that it has a 15% share of the national market, 10 times larger than its closest competitor. In addition, the Company also acts as an equipment dealer and parts supplier.

3.      The Company services all major construction end-markets, including residential and non-residential real estate and infrastructure projects. It operates 23 branches with 100 established locations throughout the country. The branches are decentralized, with regional and executive management providing only strategic oversight and equipment coordination. Recently, the Company moved its national headquarters from Kent, Washington to Denver, Colorado.

4.      BBCP was founded in 1984 by Jack Brundage and Dale Bone. It is today an S corporation organized under the laws of Colorado. Mr. Brundage and Mr. Bone are the Company's chairman and vice-chairman, respectively, and 2 of the company's 4 directors. Together, they hold stock representing approximately 53% ownership of the voting stock of the Company. In 2007 the Debtor appointed Bruce Young ("Young") as the Debtor's President and CEO. John Hudek ("Hudek") is the Debtor's current CFO, Dale C. Bone is VP of Equipment Sales ("Bone Jr."), Randy Waterman ("Waterman") is the COO of Non-Union Operations and Jeffrey L. Switzer ("Switzer"), is the CEO of JLS (collectively the foregoing will be referred to as the "Current Senior Management"). Bruce Young, and Jeff Switzer are its other 2 directors. Each is also a shareholder, and their shares along with the shares of the other current managers of the Company constitute approximate 47% of the voting shares of the Company.

5.      BBCP's national prominence is the product of an aggressive roll-up acquisition strategy, resulting in more than 50 acquisitions, with 31 occurring since 2000. Since 1999, the Company has acquired companies with revenues of nearly $75MM, which is nearly equal to BBCP's current revenue level. This aggressive expansion was not achieved without substantial cost. Although it acquired market share, new customers and additional concrete pumping equipment and other assets, it also acquired and assumed substantial equipment lease and equipment debt liabilities.

6.      As additional payment assurance to the Undersecured Equipment Lenders , and in some cases as an inducement to consent to BBCP's assumption of these loans and leases owing from the acquired companies, Mr. Brundage and Mr. Bone each personally guaranteed all of BBCP's equipment loans and leases (the "Brundage/Bone Personal Guarantees"). Today, while the Company leads the market, owning more than 800 concrete pumping vehicles at approximately 100 locations, it also is heavily burdened with long-term debt, owing 13 different secured lenders (collectively, the "Undersecured Equipment Lenders ") more than $201 million in equipment loan debt (the "Secured Equipment Debt"). In addition, BBCP has 27 leases with 5 different

---

[1] The Debtor JLS Concrete Pumping, Inc. is a close affiliate of BBCP and conducts all the Company's California concrete pumping operations.

2

lessors. Attached as Exhibit B is a schedule of this Secured Equipment Debt by lender and details of each of the leases by lessor which I obtained from the Company.

7.      Attached is the Company's most recent balance sheet, dated October 31, 2009 (see copy attached as Exhibit C) total liabilities of $229 million. The amount of the Secured Equipment Debt, swollen by new equipment purchases and these numerous acquisitions, dwarf's the Company's other liabilities.  By comparison, the Company's trade payables at the filing of this case are approximately $12 million and its other secured debt consists of 1) $4.1 owing on the operating line of credit with Wells Fargo Bank (secured primarily by its working capital) and 2) $12 million of secured real estate loans.

8.      For a time, the substantial financial risk taken on to fuel BBCP's rapid expansion paid off.  As a result of this strategy, combined with unprecedented growth in construction activity during this same period, BBCP's revenue grew rapidly from FY1993 through FY2007.  By 2007 Mr. Brundage and Mr. Bone were prepared to personally capitalize on their company's growth and they began to transition the Company's management duties and their ownership to new managers and shareholders, primarily Bruce Young (the current CEO), John Hudek (the current CFO), and Jeffrey L. Switzer, the CEO of the Company's California affiliate, JLS Concrete Pumping, Inc. ("JLS").

9.      Attached as Exhibit D is the Company's schedule of distributions and stock redemption payments made to BBCP's shareholders.  This schedule shows that during the period from October 31, 1995 to March 31, 2009, Dale Bone and Jack Brundage received combined stock redemption payments in excess of $33.0 million and other distributions of at least $18.7 (the "Founder Wrongful Dividends").  As a result of these stock redemptions to the founders, the Company's new senior managers and substantial shareholders (Bruce Young, John Hudek and Jeffrey Switzer) were able to increase their percentage ownership of the Company (the "New Management Equity Increase").  Thereafter, during a period of continuing financial decline the Debtors commenced making payments to Brundage and Bone Sr. in the amount of $20,000 per month each. The Debtors have described these payments totaling $480,000 per year as Board member payments or compensation without further justification or description to the Lenders though neither Brundage nor Bone currently hold senior management positions with the Debtor.

10.     Unfortunately, during this period BBCP and its operations did not fare as well as its senior management team and its founders.  Revenues peaked in 2007 and thereafter, the Company's revenues steeply declined as the U.S. residential and commercial real estate business nearly collapsed. Since 2007, BBCP's revenue has declined from $221MM to its current FY 2010 estimate of $83MM, *__a decline of over 60%__*.  EBITDA has fallen at an even faster rate, decreasing from $46.8MM in 2007 to the company's current estimate for 2010 of $8.4 (a decline of nearly 83%, *before* considering any of the substantial administrative expenses BBCP will incur in this Chapter 11 case).  As its operations faltered a troubling picture emerges of a distressed Company paying out its desperately needed cash resources to its founders, for not only their benefit but also the benefit of its current senior management, whose equity stake increased as a result of these dividends.

3

105727.0910/1799668.1

11.    Apart from this troubling self-dealing with the Company's shrinking cash resources during a growing financial distress, a variety of other management and governance issues have plagued the Company's restructuring efforts, leaving it with continuing and escalating operating losses as well as a correspondingly greater decline in EBITDA than in revenue. The Company's existing four member Board breaks down into two entrenched, self-interested two-man factions, but with the same leadership that implemented the failed expansion strategy. First, Jack Brundage and Dale Bone--the Board chairman and vice-chairman--are the Company's founders, the recipients of substantial avoidable stock redemption and other payments and the personal guarantors of the $216.0MM Secured Debt. These directors have imbedded in the governance documents of the Company their adverse personal interests in exiting the Company without repaying their Founder Wrongful Dividends or honoring their Brundage/Bone Personal Guarantees. On May 6, 2009, the Company adopted Amended and Restated Bylaws (the "Amended Bylaws"), a copy of which is attached hereto as Exhibit E. Article 7.0 of the Amended Bylaws provides as follows:

## ARTICLE 7.0
## Special Provisions

**7.1   Duration.**    The provisions of this Article 7.0 shall be applicable until the latter [sic] of (i) Jack W. Brundage and Dale G. Bone ceasing to own shares of the corporation's common stock, or (ii) Jack W. Brundage and Dale G. Bone ceasing to be personal guarantors or otherwise personally obligated for the payment of any corporation financings or other corporation obligations or liabilities. The date of the latter of the events referenced in the preceding sentence occurs is referred to herein as the "termination date."

**7.2   Appointment of Chairman and Vice Chairman.**    Until the termination date, if Jack W. Brundage is serving on the corporation's board of directors, Jack W. Brundage shall be appointed chairman of the board of directors of the corporation. Until the termination date, if Dale G. Bone is serving on the corporation's board of directors, Dale G. Bone shall be appointed vice chairman of the board of directors of the corporation.

**7.3   Consent to Amendments.**    Until the termination date, the following provisions of these bylaws may not be amended or repealed without the written consent of Jack W. Brundage and dale G. Bone: Section 1.7 [shareholder quorum and voting], Section 2.2 [the number of seats on the Board must remain 4], Section 2.8[filling vacancies on Board], Section 2.9 [governing meetings], Section 2.10 [noticing a special Board meeting], Section 2.11 [Board meeting quorum and manner of acting], Section 4.1 [general provisions governing appointment of officers], Section 4.3 [removal and resignation of officers], Section 4.4 [office of chairman], section 4.5 [office of vice chairman], Section 4.6 [office of president/chief executive officer], Section 4.12 [Board control of officer compensation], Article 5.0 [indemnification of officers and directors], Article 7.0

[the "Special Provisions" protecting the personal interests of Jack Brundage and Dale Bone], and Section 8.4 [amendment of the Company's Bylaws].

12.     The opposing Board faction is comprised of the two other directors: BBCP's CEO, Bruce Young, and JLS' CEO, Jeffrey Switzer. Unlike Brundage and Bone, neither of these directors are personal guarantors of the $216 MM Secured Equipment Debt. Neither is directly benefited by the "Special Provisions." However, both were directly and personally benefited by the Founder Wrongful Dividends, which resulted in a New Management Equity Increase to each of these directors. Their personal interests are not disinterested and aligned with the Company's interest in recovering these payments and maximizing the recovery of the estate's creditors. Instead, the Special Provisions cause them to be personally invested in freeing themselves of Brundage's and Bone's continuing control of the Board, preserving their senior management positions on a go-forward basis and protecting their New Management Equity Increase--all by forcing the Undersecured Equipment Lenders to grant third party releases of the Brundage/Bone Personal Guarantees and by pursuing a plan of reorganization to accomplish these personal goals at the expense of the estate and its major unsecured creditors.

13.     The Special Provisions make it so the Board cannot function properly as a disinterested fiduciary acting on behalf of this estate. Outside independent directors—or even an odd number of directors—are locked out until the exposure of the founders, Jack Brundage and Dale Bone Sr., on their guaranties of the Secured Equipment Debt is resolved. In short, the Special Provisions shackle the Board and prevent it from stewarding the Company through its financial challenges, free of deadlocks or the improper considerations of the personal interest. Instead, the Company's restructuring effort continues to be led by two Founder/Directors two Manager/Directors whose goals are in direct conflict with the best interests of the creditors.

14.     The pre-bankruptcy experiences, negotiations and discussions between the Company and its Undersecured Equipment Lenders will further illustrate the lack of a disinterested Board and senior management. To date, even at the recommendation of their own financial advisors to "operate the company in a manner as though it were under Chapter 11 oversight . . . "the Company has been unable (or unwilling) to significantly downsize and restructure its operations in order to realign its fixed and variable costs to the current reduced demand for its goods and services and corresponding revenue realities. The Company's EBITDA decline and operating losses have instead increased at a greater pace than its revenue declines.

15.     By early 2009, this lack of attention to the Company's restructuring needs had reached a crisis level and the Company was out of cash and availability on its WFB Line of Credit to continue its operations. As an emergency relief measure, WFB agreed to provide a $3.0 million overadvance facility (the "Overadvance Facility"). However, this concession alone was not nearly enough to address the Company's unfolding cash crisis.

16.     The Board's aggressive acquisition campaign left a bloated Company, with massive long-term debt service needs, unable to function in the new environment of reduced demand for its goods and services. Based upon my professional experience in assisting companies with cost cutting and right-sizing measures, a company like BBCP should carry general and administrative

5

expense ("G&A") in line with its overall revenue. However, BBCP has not done that and as revenue and EBITA have declined steeply. G&A has remained relatively flat and has increased as a percentage of revenue. In 2004 BBCP reported revenues reported revenues of $87 Million of G&A of $19 million or 22% of revenues. In 2010 BBCP's G&A is projected to be $25 million or 29% of its revenues of $84.9 million. In other words, the Company is burdened with over $6.3 million of excess G&A. Likewise, in 2004, when BBCP reported revenues of $87 million, cost of sales was $58 million or 67% of revenues. In 2010, BBCP is projecting cost of goods sold of $66 million or 78%, resulting in additional incremental costs of almost $10 million. My conclusion is that the Company is burdened with too many fixed and variable expenses.

17.    Following the Debtor's default and cash flow problems to Wells Fargo Bank in the late 2008 Wells Fargo required that the Debtor make its financial and business records available to their financial advisor, Brandlin & Associates. Brandlin & Associates had difficulty obtaining the necessary information and cooperation from the Current Senior Management. Thereafter, the Lenders suggested that the Debtor retain its own financial advisor. After strongly resisting the lenders' suggestion that the Company retain a financial consultant, the Board relented and selected and retained Cloyses Partners. I met and spoke with Cloyses representatives on several occasions and was informed the Company's Board and management posed a challenge because they were factionalized (Jack Brundage and Dale Bone, on the one hand, and Bruce Young and John Hudek, on the other). The Company's senior management lacked work out experience and believed the Company's financial problems were a product of the market and would have to ultimately solved by improvements in the market: a real estate development recovery would materialize within a three or four year term and so the Company wanted its lenders to agree to long-term restructuring leaving the Company largely intact, awaiting the day when its poor-performing locations would become net contributors to vastly improved financial performance. On May 15, 2009, Cloyses prepared an initial letter outlining its assessment of the Company's viability and restructuring needs (the "Cloyses Assessment") and reflecting this management preference. The Cloyses Assessment, however, goes on to make 5 recommendations (1) that BBCP be managed as though it were under chapter 11 oversight; (2) review the compensation and related duties and responsibilities of the founding shareholders; (3) combine the Seattle and Denver offices; (4) delineate the roles of management and the board; and (5) accelerate the pace of discussions with outside investors. A true and correct copy of this Cloyses Assessment is attached hereto as Exhibit F. I believed that recommendation (1) was particularly on point. To date, BBCP had made some cuts in their cost structures, but not the draconian cuts warranted by a business in "free fall." I expected that leases would be rejected, excess equipment would be mothballed or stored, branches would be evaluated and marginal locations would be closed, employee reductions would be stepped up, compensation would be cut again, founders' compensation would be eliminated, among other things. Likewise the lenders and lessors felt strongly about all the recommendations, enough so, that they included them as part of the forbearance agreement entered into in July, 2009. This reference is in Recital L of the Wells Fargo Loan Restructuring and Forbearance Agreement, dated July 24, 2009 (the "Forbearance Agreement"):

Borrower has requested that Bank, WFEFI and the Other Lenders (collectively, the "Lenders") provide Borrower with a further period of forbearance with respect to the Existing Defaults, as well as certain extensions of loan maturities as provided herein (the "Loan Maturity Extensions"), monthly payment reductions (the "Payment Reductions"), conditional default interest waivers (the "Conditional Default Interest Waivers") and various other accommodations (collectively, the "Accommodations") as set forth in this Agreement (including the Bank's agreement to extend the Overadvance Facility provided in the Prior Agreements in support of Borrower's continuing operations during the Forbearance Period, as defined below).   In return for these Accommodations, Borrower has assured Wells Fargo and the Other Lenders that it will adopt a work plan (the "Work Plan" as defined in Exhibit C) to implement the five recommendations for the improvement of operations and its restructuring efforts contained in the Cloyses Assessment of May 15, 2009.  Borrower has further assured Wells Fargo and the Other Lenders that it will formulate and implement a business plan (the "Business Plan" as defined in Exhibit C) during the Forbearance Period that will identify alternatives for the full cure of the Existing Defaults and options for the repayment in full of the Wells Fargo Loans, the Other Equipment Lender Loans and the Other Lender Equipment Leases on or before the expiration of the Forbearance Period or at the earliest time when such repayment will be feasible.  Borrower will undertake steps in the Business Plan that will include measures to enhance net revenues and implement further cost savings and right-sizing measures (including, if appropriate, closure of unprofitable branch locations, suspension of distributions to shareholders, limitations on executive and bonus compensation, and staff and management personnel changes and reductions).  The Plan will also include Borrower's best efforts to locate new sources of capital (debt and/or equity), strategic partnerships, sales, acquisitions or other transactions to expedite and facilitate Borrower's prompt repayment of the Loans.

A copy of the Forbearance Agreement is attached hereto as Exhibit G.

18.     Cloyses submitted a report to the lenders on July 15, 2009, a copy of which is attached as Exhibit H on the "Work Plan" outlined in their May 15, 2009 memo. The report outlines annualized cost savings of approximately $4.0 million.  There were no references to rejected leases, closed branches, significantly reduced headcount, etc.  There seemed to be more of an emphasis on revenue enhancement, which in my opinion, should not have been their focus.  The Company's optimistic revenue forecasts on which the Work Plan and Forbearance Agreement was based proved to be inaccurate.  Approximately 4 or 5 weeks after the forbearance was executed, BBCP was reporting on its 13 Week Cash Flow reports that that the Company could not meet even the reduced lender payment levels under the Forbearance Agreement.  In October, the lenders agreed to further reduce the level of payments to them and insisted that unjustifiable payments to Brundage and Bone cease.  The lenders again urged the Company to retain a CRO to rectify forecasting errors and otherwise expertly direct its attorneys and consultants on restructuring matters and provide the Board with an objective, disinterested  assessment of the Company's best measures for building a consensus with its lenders and restructuring either with or without a Chapter 11 process.  Again, the Board and senior management refused this request.  In the weeks that have followed, the Company has continued to provide inaccurate forecasts

105727.0910/1799668.1

showing adequate cash resources when in fact the Company was in need of still further lender accommodations. For instance during this time frame, BBCP through its financial advisors advised WF that their new insurance carrier required a letter of credit (LC's) or they would not issue insurance to BBCP. BBCP did not have adequate availability under its line of credit to issue these new LC's. During our discussions with Cloyses, we found out that BBCP had been talking with its new carrier for weeks and maybe even months before they alerted WF that it would need to issue this LC. Yet, two or three days prior to the deadline Cloyses approached us and asked that we assist is solving this problem. Fortunately we were able to come up with a solution, but only at the 11th hour. During the week of January 11, 2010, BBCP was reporting availability of $400 or $500 thousand on its 13 week cash flow report. Also during that week the CFO called and notified WF that he did not have enough cash to pay his payroll for that week. WF agreed to clear those funds in spite of the notice from the CFO. Issues such as these were the basis for the lenders to insist on a CRO to help BBCP manage the restructuring while the other members of the management team focused on operations.

19. In approximately August of 2009 the Debtor submitted their business pursuant to the Forbearance Agreement. On August 31, 2009 Cloyses referring to the Debtor's Business Plan outlined several restructuring strategies which included a reorganization plan with reduced payments to the Lenders while the market improved. The Debtor's Business Plan proposes a steep write off and forgiveness of indebtedness of $144 million (the "Write off") based on a "desk top" equipment appraisal the Company commissioned to determine the *forced liquidation value* of equipment. See Exhibit I: Business Plan and Cloyses Memo Attached as Exhibit J is a draft Plan of Reorganization (the "Aurora Resources Plan"). The Aurora Business Plan was submitted by the Company to Wells Fargo in about mid December even though the Company had been in discussions with Aurora for three months and had not been informing Wells Fargo of the substance of the negotiations or that they granted Aurora Resources exclusivity rights. Both the Business Plan and the Aurora Resources Plan reflect the Board and senior management's adherence to their personal interests and objectives at the expense of the interests of the significant secured creditors of this estate (the Undersecured Equipment Lenders being the holders of substantially all of the Company's unsecured debt). The current Board and management continue to condition restructuring of the Company on the Equipment Write Off, their personal retention of substantial equity, the release of Brundage/Bone Personal Guarantees and the release of the exposures relating to the Founder Wrongful Dividends. They continue to refuse to appoint a Chief Restructuring Officer as requested by all the Undersecured Equipment Lenders and the Company's operations have continued their decline and its current cash resources are unable to defray its operating expenses and pay the required level of adequate protection payments the Undersecured Equipment Lenders. In December of 2009 Wells Fargo provided a short extension of the forbearance terms until January 15, 2010 and provided terms for a go forward restructuring plan with a CRO. When the Debtors did not timely respond to the request for the appointment of a CRO Wells Fargo sent notice of default on January 13, 2010.

20. Since the declaration of default Wells Fargo has continued to provide funding for essential items such as payroll, its funding has been on a more restricted basis and it has required specific justifications for payment amounts. The Debtor has not been forthcoming in its post default funds requests and tried to slip certain undisclosed and unjustified payments through

8

without description or explanation. Wells Fargo has made significant attempts to discuss cash collateral and DIP Financing and ongoing funding with the Company, but the Company has failed to negotiate these issues in good faith. Under these circumstances, a trustee is necessary to restore creditor confidence in the restructuring process and to eliminate the Board dysfunction, the Current Management's inability or unwillingness to manage through a restructuring process and the interjection of the insider's personal interests which are at odds with the interests of the estate and the Company's creditors.

I declare under penalty of perjury the foregoing declaration is true and correct.

DATED:  January 19, 2010

Jeffrey E. Brandlin

9