UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUNDAGE-BONE | ) | Case No. 10-10758-ABC |
| CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | Case No. 10-10760-ABC |
| JLS CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | *Jointly Administered Under* |
| Debtor. | ) | *Case No. 10-10758 ABC* |

**MOTION FOR INTERIM AND FINAL ORDERS APPROVING DEBTOR-IN-POSSESSION FINANCING, USE OF CASH COLLATERAL AND ADEQUATE PROTECTION**

BRUNDAGE-BONE CONCRETE PUMPING, INC. ("Brundage-Bone" or "Borrower") and JLS CONCRETE PUMPING, INC. ("JLS") (Brundage-Bone and JLS are hereinafter sometimes collectively referred to as the "Debtors"), by and through their counsel, Sender & Wasserman, P.C., hereby submit their Motion for Interim and Final Orders Approving Debtor-in-Possession Financing, Use of Cash Collateral and Adequate Protection. In support of the Motion, the Debtors state as follows:

**Introduction**

1. On January 25, 2010, the Debtors and Wells Fargo Bank, National Association ("Wells Fargo" or "Bank") reached agreement as to both an interim and final debtor in possession financing agreement. By this Motion, the Debtors seek interim approval (the "Interim Order") and final approval (the "Final Order") of a debtor in possession loan facility with Wells Fargo on the terms and conditions set forth in the term sheet discussed in more detail below. This loan facility will preserve the Debtors' business for the benefit of all parties.

**Debtors' Operations and Need for Post-Petition Financing and DIP Lender's Willingness to Lend**

2. On January 18, 2010 (the "Petition Date"), Brundage-Bone filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). Brundage-Bone continues to operate its business as a debtor in possession. On January 18, 2010,

JLS also filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code and continues to operate its business as a debtor in possession. JLS is a wholly-owned subsidiary of Brundage-Bone.

3. Brundage-Bone, together with JLS, is the largest provider of concrete pumping equipment and operators in the United States. The Debtors provide concrete pumping equipment to commercial and residential customers on primarily a short-term hourly rental basis. In addition to their core concrete pumping services, Brundage-Bone is an authorized dealer of Putzmeister concrete pumps and parts. Brundage-Bone also sells spare parts and service to other concrete pumping companies.

4. Prior to the Petition Date, Brundage-Bone maintained its primary banking relationship with Wells Fargo, including a revolving line of credit (the "Line of Credit") which, as of January 18, 2010, had an outstanding balance of approximately $11,000,000 (including standby letters of credit supporting the Debtors' commercial insurance deductible obligations), equipment lines of credit in the amount of approximately $35,500,000, and various term loans in the amount of approximately $6,400,000 (collectively, the "Wells Fargo Loans"). The Debtors also have loans and leases with 20 other lending and leasing institutions representing approximately $250 million in aggregate obligations (collectively with the Wells Fargo Loans, the "Outstanding Loans").

5. Since the onset of the worldwide financial crisis in 2008, the Debtors have seen their annual revenues decline from over $200 million for fiscal year 2008 to under $120 million for fiscal year 2009. As revenues declined, the Debtors worked diligently to reduce operating and administrative costs.

6. Notwithstanding their efforts at cost reductions and efficiencies, the Debtors were unable to meet various fixed coverage ratios and other payment term provisions under their Outstanding Loans. In July 2009, the Debtors entered into various restructuring and forbearance agreements with their lenders, including Wells Fargo (collectively, the "Forbearance Agreements"). Pursuant to the Forbearance Agreements, the Debtors' lenders under the Outstanding Loans agreed to forbear from exercising remedies under the Outstanding Loans until December 31, 2009, while the Debtors attempted to formulate and implement a business plan to enhance net revenues and implement costs savings and right-sizing measures. The Debtors attempted to obtain amendment from its prepetition lenders that would continue a forbearance period until February 1, 2010. As a prerequisite to any one lender granting the extension, certain lenders conditioned their willingness upon all other lenders agreeing to the same extension. The Debtors were unable to obtain all necessary consents during the short period allowed and the forbearance period expired by its terms.

7. The Debtors have been funding operations since the Petition Date pursuant to a Stipulated Order Authorizing Consensual Use of Cash Collateral, Granting Adequate Protection and Authorizing Retention of Cash Management Systems entered by the Court on January 21, 2010 (Docket No. 45).

2

## Summary of Material Provisions

8. A copy of the Binding Term Sheet Regarding DIP Loan Facilities, Agreement for Use of Cash Collateral and Adequate Protection (the "DIP Term Sheet") is attached hereto. A summary of its material terms follows:

(a) <u>Interim Borrowing Limit</u>. An interim DIP credit facility (the "Interim Facility") of up to a maximum amount equal to the sum of (i) excess availability set forth in the Borrower's most recently delivered Borrowing Base Certificate under the Existing Credit Agreement (as defined below), and (ii) $1,000,000 (the "Interim Facility"), convertible upon approval at the Final Hearing to a Final facility (the "Final Facility") and upon the satisfaction of all of the terms and conditions set forth herein. The issuance of any new stand-by letters of credit under the Interim or Final Facilities is not anticipated; however, drawings under any of the stand-by letters of credit issued and outstanding under the Existing Credit Agreement (as defined below) shall be considered post-petition advances under the Interim Facility. Letter of credit fees shall be paid current through advances under the Interim Facility. The Interim Facility will continue to provide credit facilities substantially on the terms set forth in the Existing Credit Agreement (as defined below) as in effect on January 25, 2010.[1] *DIP Term Sheet* at 1.

(b) <u>Maximum Borrowing Available on a Final Basis</u>. Upon the satisfaction of all terms and conditions herein (including court approval at the Final Hearing), the Interim Facility shall be deemed converted to the terms and conditions described below as the "Final Facility". The Final Facility will continue to provide credit facilities substantially on the terms set forth in the Existing Credit Agreement (as defined below) as in effect on the date hereof[2], and substantially on the terms set forth in the Interim Facility, but with an increase in the maximum amount to reflect the rollup of amounts due under the Existing Credit Facility. The Interim Facility and the Final Facility shall be collectively referred to herein as the "Credit Facilities" and the loan documentation executed in connection therewith shall be collectively referred to as the "DIP Documents." *DIP Term Sheet* at 1-2.

(c) <u>Use of Cash Collateral</u>. Borrowing capacity under the Interim Facility will be supplemented by amounts made available to the Borrower through use of cash collateral under the terms of a Cash Collateral Order containing protections to the Bank normally found in such Orders, including ,but not limited to, replacement liens on post petition accounts receivable and spare parts inventory. The use of

---

[1] As of the date hereof, the Existing Credit Agreement includes a Revolving Line of Credit with a $3,000,000 Overadvance Facility having a balance of $3,516,930.34 and issued Standby Letters of Credit of $7,450,000. The Credit Facilities contemplate an increase in the Overadvance Facility from $3,000,000 to $4,000,000.

[2] As of the date hereof, the Existing Credit Agreement includes a Revolving Line of Credit with a $3,000,000 Overadvance Facility having a balance of $3,516,930.34 and issued Standby Letters of Credit of $7,450,000. The Interim Facility contemplates an increase of the Overadvance Facility from to $3,000,000 to $4,000,000.

       cash collateral will be tied both to the Borrower's Budget[3] and to the Borrowing Base (defined below), and shall include, but not be limited to, deposits for post-petition use of credit cards. *DIP Term Sheet* at 2.

(d) <u>Purpose</u>. The Credit Facilities will be used for (a) in the case of the Interim Facility, ongoing working capital needs, all in accordance with and as limited by the Borrower's Budget; (b) in the case of the Final Facility,(i) ongoing working capital needs, including but not limited to, the payment of court-approved professional fees and expenses, incurred during the Borrower's chapter 11 case (the "Bankruptcy Case"), arising after the Petition Date, all in accordance with and as limited by the Borrower's Budget; and (ii) payment in full of all amounts outstanding under the Existing Credit Facility (as defined below). *DIP Term Sheet* at 2.

(e) <u>Loan Availability</u>. Advances under the Interim Facility would be limited to the lesser of (i) the maximum amount of the Interim Facility or (ii) the sum of (a) 80% of the eligible pre-petition and post-petition accounts receivable of each of Borrower and JLS Concrete Pumping, Inc. ("JLS"), (b) 50% of the value of Borrower's spare parts inventory (exclusive of work in process and inventory which is obsolete, unsaleable or damaged) as deemed eligible by Bank, provided, however, the Bank will not change its valuation methodology for spare parts inventory prior to the final hearing, and (c) $4,000,000, less (d) such reserves to be reasonably established by Bank, and less (e) the outstanding balance of any revolving loans, letters of credit or other related obligations extended under the "Line of Credit" provisions contained in that certain Credit Agreement dated as of June 25, 2008 by and between Borrower and Bank (as amended, restated or otherwise modified from time to time, the "Existing Credit Agreement")[4] and (f) less the outstanding balance of the loans under the Interim Facility ("Borrowing Base"). Eligibility shall be determined in each case on terms consistent with those set forth in the Existing Credit Agreement. Value shall be defined as the lesser of cost or market provided, however, the Bank will not change its valuation methodology for spare parts inventory prior to the final hearing.

Advances under the Final Facility would be limited to the lesser of (i) the maximum amount of the Final Facility or (ii) the sum of (a) 80% of the eligible accounts receivable of each of Borrower and JLS, (b) 50% of the value of Borrower's spare parts inventory (exclusive of work in process and inventory

---

[3] Such budget to be consistent with the Debtor's 13 Week Budget accompanying its Motion Seeking Expedited Entry of Orders, excluding, however, the $200,000 proposed loan fee to Aurora/Commercial Finance Services 110 LLC set forth therein.

[4] The Bank and Borrower are also parties to Loan Restructuring and Forbearance Agreement, dated as of July 24, 2009, as amended by that certain First Amendment to Loan Restructuring and Forbearance Agreement, dated as of October 16, 2009, (the "First Amendment") and Second Amendment dated as of December 31, 2009 ("Second Amendment") (collectively, the "Forbearance Agreement"). The term "Existing Credit Agreement" includes amendments provided for in the Forbearance Agreement the First Amendment and the Second Amendment. Defaults existing under the Existing Credit Agreement as of the Petition Date (the "Existing Prepetition Defaults") shall not constitute defaults under the Credit Facilities.

which is obsolete, unsaleable or damaged) as deemed eligible by Bank, less (c) such reserves to be reasonably established by Bank, and less (d) the aggregate outstanding balance of any loans, letters of credit or other obligations then outstanding under the Final Facility. Eligibility shall be determined in each case on terms consistent with those set forth in the Existing Credit Agreement. Value shall be defined as cost. *DIP Term Sheet* at 2-3.

(f) <u>Security</u>. All obligations to Bank under the Credit Facilities would be secured by first priority liens upon all of Borrower's and JLS's prepetition and postpetition existing and future acquired assets and the proceeds and products thereof of the same character and category as are subject to the existing pre-petition security interests (the "Prepetition Liens") securing the Bank's prepetition Line of Credit, Letter of Credit and Overadvance Facilities, including, without limitation, all prepetition and postpetition accounts receivable, inventory, rolling stock, machinery and equipment, real property, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, general intangibles (including tax refunds, customer deposits and security deposits), intellectual property and investment property and that certain real property supporting the Overadvance Facility as defined in the Existing Credit Agreement, pursuant to 11 U.S.C. § 364 (d)(1); pursuant to 11 U.S.C. § 364 (c)(1), a super priority administrative claim; pursuant to 11 U.S.C. § 364 (c)(2), a first priority lien against all unencumbered assets (or assets encumbered by avoidable liens) of the Borrower and JLS; and pursuant to 11 U.S.C. § 364 (c)(1), a subordinate lien against all remaining assets of the Borrower and JLS (excluding all avoidance actions arising under chapter 5 of the Bankruptcy Code or otherwise). *DIP Term Sheet* at 3.

(g) <u>Closing Date</u>. The closing on the Interim Facility will take place immediately upon entry of an Interim Order the Interim Facility (the "Interim Order"), in form satisfactory to Lender. The Final Facility shall close immediately upon entry of the Final Order approving the Final Facility, in form satisfactory to Lender. Both the Interim and Final Orders shall include findings of good faith pursuant to Section 364(e). *DIP Term Sheet* at 3.

(h) <u>Maturity Date</u>. The Interim Facility will mature on the earlier of (i) entry of the Final Order approving the Final Facility; (ii) the Effective Date of a confirmed Plan of Reorganization, (iv) the date on which the Bankruptcy Court approves a sale of all or substantially all of the Borrower's and JLS's assets pursuant to Section 363 of the Bankruptcy Code, (v) the date that is 45 days after the Petition Date if the Final Order shall not have been entered by the Bankruptcy Court on or before such date, and (vi) the date of any accelerated maturity due to an event of default under the Interim Facility.

The Final Facility will have a Maturity Date on the earlier of (i) the date that is 180 days after the Petition Date; (ii) the Effective Date of a confirmed Plan of Reorganization; (iii) the date on which the Bankruptcy Court approves a sale of

        all or substantially all of the Borrower's and JLS's assets pursuant Section 363 of the Bankruptcy Code; and (iv) the date of any accelerated maturity due to an event of default under the Final Facility. *DIP Term Sheet* at 3-4.

(i)     <u>Facility Fees</u>. Upon entry of the Interim Order, the Borrower will pay the Bank a fully-earned and non-refundable facility fee of $25,000 . Upon the entry of the Final Order, the Borrower will pay the Bank a fully-earned and non-refundable facility fee of $75,000. *DIP Term Sheet* at 4.

(j)     <u>Interest Rate</u>. A fully-floating interest rate equal to daily LIBOR, based on a one month tranche, plus 4.5%. *DIP Term Sheet* at 4.

(k)     <u>Terms and Conditions</u>. The DIP Documents shall contain representations and warranties, covenants, and events of default substantially similar to those set forth in the Existing Credit Agreement, and other provisions acceptable to Bank, including the following:

    1.     Not later than the third business day of each week (and not later than the Closing Date with respect to the week in which the Closing Date occurs), Borrower shall provide to Bank (a) a copy of a budget (such budget, with modifications proposed by the Borrower and approved from time to time by the Bank, the *"Budget"*) in form and substance consistent with the Budget currently provided to Bank, reflecting anticipated weekly cash receipts and expenditures for the succeeding 13 weeks, (b) a copy of a variance report (the *"Variance Report"*) reflecting variances in each line item as set forth in the Budget of actual cash receipts and disbursements for the preceding week and the percentage variance for such actual results from those reflected in the Budget for the preceding week, and a written explanation of such variance, (c) a borrowing base certificate, and (d) a detailed listing of all pre-petition and post-petition accounts payable.

    2.     The DIP Documents shall contain Events of Default required by the Bank, including, without limitation: (i) the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a chapter 7 case, (ii) the entry of an order granting any other claim super-priority status or a lien equal or superior to that granted to the Bank in Pre and Postpetition Collateral, (iii) the filing of any pleading seeking to stay, reverse, vacate or otherwise modify any of the DIP Documents without the prior written consent of the Bank, (iv) a Final financing Order is not entered within 45 days after the Petition Date, (v) the failure of Borrower to pay (a) interest or fees when due under the Credit Facilities and such default shall continue for two business days, or (b) principal, if any, when due, (vi) the failure of Borrower to comply with any negative covenants or any other obligation or provision of the DIP Documents, (vii) the consolidation or combination of Borrower with any other person (other than Borrower) except pursuant to a confirmed plan of reorganization as contemplated in

6

the plan of reorganization, (viii) the failure of Borrower to perform or comply with any term or covenant of the DIP Documents and such default shall continue unremedied for a period of 10 calendar days, (ix) any representation warranty, or financial information provided by Borrower shall be incorrect or misleading in any material respect when made, (x) a variance in a weekly Budget of more than 15%; (xi) the Borrower or JLS seeking the extension of the exclusivity period unless otherwise consented to by Bank in writing in its sole discretion; (xii) the entry of an contested order in the Bankruptcy Case granting relief from the automatic stay of 11 U.S.C. § 362 to any party in interest or holder or holders of a lien or security interest on any portion of Bank's prepetition collateral or postpetition collateral (collectively, "Bank's Collateral") or on any assets of Borrowers' necessary to the continuing operations and ability to perform the Budget and repay the DIP Facilities allowing such party to foreclose or otherwise realize upon such liens or security interests, (xiii) the sale of Bank's Collateral (other than Inventory in the ordinary course of Borrower's business) without final and indefeasible payment to Bank of the total Prepetition Obligations defined below) in cash or other immediately available funds and (xiv) there occurs a material adverse change in the assets, business, financial condition, income or prospects of the Borrower and JLS since the Petition Date.

3. Upon the occurrence of an Event of Default, the Bank shall be entitled to a hearing on motion for relief from the automatic stay on 10 days notice so that Bank may immediately terminate the Interim Facility, cease making all postpetition advances to Borrower, and, exercise all rights available to Bank under the DIP Documents.

4. Borrower shall provide Bank with all information and reports required by the DIP Documents, and such other periodic financial and collateral reporting, annual financial statements, monthly and quarterly internally-prepared financial statements, annual financial projections, and periodic borrowing base certificates, receivables agings and inventory reports as may be requested by the Bank.

5. Borrower shall maintain insurance with insurance carriers (reasonably acceptable to Bank) against such risks and in such amounts as is customary for similar businesses, naming Bank as mortgagee/loss payee.

6. Restrictions on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens, affiliate transactions, and capital expenditures (excluding the transaction with Borrowers affiliate, B&B Rentals).

7. Borrower shall continue and maintain its existing cash management system(s), existing as of the Petition Date (hereafter defined) to continue postpetition on terms acceptable to Lender.

8. Bank shall have the right to conduct future periodic appraisals and field examinations of the collateral, at Borrowers' expense (in an amount not to exceed $50,000.00).

9. **The Final Facility shall be in lieu and instead of any surcharge of the expenses of the administration of the Bankruptcy Case to Bank as a secured creditor pursuant to 11 U.S.C. §§ 506(c), 552(b) or otherwise, and no expense of administration shall be prior to or on a parity with the total obligations under the Interim Facility.**

10. No sale, lease or other disposition of Bank's Collateral outside of the sale of Inventory in the ordinary course of Borrower's business (an "Asset Sale") shall be requested or consummated without Bank's prior written consent. From the proceeds of any Asset Sale, Borrower shall immediately pay, or cause to be paid, to Bank all of the net proceeds of such Asset Sale.

11. In the event the Maturity Date occurs before the entry of a Final Order due to the approval of a DIP facility by a new DIP lender, the new DIP Lender will be required to pay Bank an amount equal to (i) the balance then owing under the Existing Credit Agreement and (ii) the balance then owing on the Interim Facility. In addition, Lender will be entitled to either substitute Letters of Credit or Cash Collateral for any outstanding Letters of Credit issued under the Existing Credit Agreement. In consideration of the foregoing, Lender will release liens on the inventory, accounts and the real estate pledged under the terms of the Forbearance Agreement.

12. **Borrower and JLS shall agree, and fully support the inclusion of provisions in the Final Order, that release the Bank from any and all claims by the Borrower or JLS had or may have had against the Bank as of the Petition Date.**

13. Borrower and JLS shall agree, and fully support findings in the Final Order, that (i) the balance of loans and letters of credit under on the Line of Credit facility and Letter of Credit sub-facility of the Existing Credit Agreement outstanding as of the Petition Date (the "Prepetition Obligations") constitute a valid, binding and enforceable obligation owed to Bank by Borrower and (ii) Bank's liens on and security interests in the Collateral existing as of the Petition Date (the "Prepetition Collateral") are fully and properly perfected and have a first priority over all other liens, interests or rights in and to such Prepetition Collateral except for

>>Permitted Liens. The Interim Order shall provide other parties in interest a 25 day period within which to file objections to the above findings.
>
>14. Under no circumstances may the Borrower use the funds advanced to the Borrower or proceeds of the Bank's collateral to pursue any claims or litigation against the Bank, including any carve out for professional fees to pay any reasonable professional fees and expenses incurred in connection with asserting any claims or causes of action against the Bank or any of its Affiliates and/or challenging or raising any defense with respect to the Borrower's Obligations under this Agreement and/or the Loan Documents or any lien with respect thereto. The foregoing shall not be construed as a consent to the allowance of any reasonable fees and expenses referred to above and shall not affect the right of the Bank to object to the allowance and payment of such amounts.
>
>*DIP Term Sheet* at pp. 4-7.

(l) <u>Documentation</u>. The Interim Facility and Final Facility will be subject to the negotiation and execution of a satisfactory addendum to the Existing Credit Agreement, consistent with the terms hereof and satisfactory to the Bank, together with related security agreements, notes, guarantees, bankruptcy court orders and any other DIP Documents as shall be requested by the Bank. The Interim Facility and Final Facility will be consistent in form and substance to the Existing Credit Agreement, but updated to reflect conditions representative of an ongoing bankruptcy case, including, for example, the deletion of financial covenants and certain other covenants to be agreed upon by the parties. *DIP Term Sheet* at 7.

(m) <u>Conditions Precedent to Closing of Credit Facilities</u>. Closing of the Interim Facility shall be conditioned upon satisfaction of the following conditions precedent and other conditions customary to transactions of this type, or reasonably required by the Bank:

>1. All necessary consents and approvals to the financings shall have been obtained from the Bankruptcy Court regarding acceptable loan documentation, including the Interim Order which shall be entered no later than Tuesday, January 26, 2010, or such later date as may be agreed to by the Bank. The Interim Order shall be in form and substance satisfactory to the Bank and shall either contain a finding that Bank is extending the credit of good faith or be a final, non-appealable order.
>
>2. Preparation, execution and delivery of definitive documentation (the "Definitive Documentation") satisfactory to the Bank no later than January, 28, 2010, or such other later date as is agreed to by the Bank.
>
>3. Except for the existing bankruptcy proceedings, the absence of any litigation not stayed in the Bankruptcy Court or other proceeding the result

>                of which would reasonably be expected to have a material adverse effect on the Borrower or JLS.
>
>        4.      The absence of any material changes in governmental regulations or policies affecting the Borrower, JLS or the Bank prior to the Closing Date.
>
>        5.      With respect to the collateral securing the amounts outstanding under the Existing Credit Agreement, the Bank shall be provided adequate protection in the form of a replacement lien on post petition collateral of the same class and category together with the protections of Section 364(c)(1)(2) and (3).
>
>        *DIP Term Sheet* at 7.

(n)     <u>Expenses and Indemnification</u>.  The Borrower will pay the Bank's reasonable legal and other out-of-pocket expenses incurred in connection with the negotiation, preparation and execution of any of the DIP Documents.  Documentation shall contain enforcement expense and indemnification provisions for the benefit of the Bank.  *DIP Term Sheet* at 8.

(o)     <u>Other</u>. Substantially all other terms and conditions described in the Existing Credit Agreement shall be incorporated into the DIP Documents, updated to reflect conditions representative of a debtor in possession case, and with customary carve-outs, exceptions and qualifications and certain other carve-outs and exceptions to be agreed.  The aggregate amount of any carve-out shall not exceed $1.0 million.  *DIP Term Sheet* at 8.

## The DIP Financing Agreement Should be Approved

9.      The Debtors have been unable to obtain other credit under Bankruptcy Code § 364(a) or (b).  As a result, any post-petition financing needs to provide a lender with liens and superpriority claims pursuant to Bankruptcy Code §§ 364(c)(1) and (2).  Under the circumstances, the Interim Facility and Final Facility easily satisfy applicable law and the Interim Order and Final Order should be approved.

10.     In making the decision to enter into the DIP Financing Agreement, the Debtors' business judgment is entitled to deference.  A debtor's authority to operate its business

> necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. . . . The discretion to act with regard to planning business activities is at the heart of the debtor's power. . . . Business judgments should be left to the board room and not to this Court.

*In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).  Pursuant to *Simasko* and similar precedent, the Debtors may exercise reasonable business judgment in negotiating the terms of loans such as the DIP Facility, and to make the trade offs necessary to complete a deal.

10

11. The Debtors' decision to obtain the post-petition financing represents an exercise of their sound business judgment in the continued operation of their businesses and the beginning of the process to consummate a reorganization plan. The proposed loan is the mechanism that is most likely to allow the Debtors to operate efficiently in bankruptcy, increase the value of their assets, and reorganize.

12. The deference normally afforded a debtor's business judgment is appropriately heightened at the commencement of a case like this. Reorganization "is the ultimate goal of Chapter 11." *MBank Dallas N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987). The Debtors' efforts "are not only to be encouraged, but also their efforts during the administration of the proceeding or measured in light of that [goal]." *Id*. Because the proposed post-petition financing preserves values and furthers a reorganization, the Debtors' decision to proceed with financing should be approved.

### Certain Specific Loan Provisions Are Appropriate in These Cases

13. As indicated above, the terms of the proposed financing calls for waiver of section 506(c) surcharge claims against Wells Fargo. Such a waiver is appropriate in these cases because Wells Fargo is basing its credit decision in significant part upon the Budget. The section 506(c) waiver ensures that off-budget expenses do not threaten Wells Fargo's collateral position contrary to negotiated loan terms.

14. In addition, the proposed financing calls for a waiver of prepetition claims against Wells Fargo. Similar waivers were provided by the Debtors under the prepetition forbearance agreements and therefore any such claims were already waived as of the Petition Date.

15. These provisions, like the others in the DIP Term Sheet were a condition of Wells Fargo providing the necessary funding.

### Conclusion

16. For the foregoing reasons, the Debtors submit that the proposed lending described herein in the best interest of the estates, complies with § 364 of the Bankruptcy Code, and should be approved.

Dated this 25th day of January, 2010.

            SENDER & WASSERMAN, P.C.

            */s/ David V. Wadsworth*
            _____
            Harvey Sender, #7546
            John B. Wasserman, #10011
            David V. Wadsworth, #32066
            Matthew T. Faga, #41132
            1660 Lincoln Street, Suite 2200
            Denver, Colorado 80264
            (303) 296-1999; (303) 296-7600 (fax)
            dvw@sendwass.com
            *Attorneys for the Debtors*