# ADDENDUM TO CREDIT AGREEMENT
# [DEBTOR IN POSSESSION FINANCING]

**between:**
**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
**as Bank,**

**and**

**BRUNDAGE-BONE CONCRETE PUMPING, INC.,**
**as debtor and debtor-in-possession and as Borrower,**

**and**

**JLS CONCRETE PUMPING, INC.,**
**as debtor and debtor-in-possession and as a grantor of Liens and a guarantor,**

**dated as of**
**March __, 2010**

**$15,000,000**

# TABLE OF CONTENTS

Page

ARTICLE I      CREDIT TERMS ................................................................................. 4

Section 1.1      THE REVOLVING LOANS ......................................................4
Section 1.2      LIMITATIONS ON BORROWINGS ........................................4
Section 1.3      LETTER OF CREDIT SUBFEATURE .....................................5
Section 1.4      BORROWING AND REPAYMENT............................................6
Section 1.5      PURPOSE ....................................................................................6
Section 1.6      INTEREST AND FEES................................................................6
Section 1.7      COLLECTION AND ADMINISTRATION ................................7
Section 1.8      COLLATERAL AND SUPER PRIORITY TREATMENT OF
                  CLAIMS .....................................................................................7

ARTICLE II      REPRESENTATIONS AND WARRANTIES....................................8

Section 2.1      LEGAL STATUS OF BORROWER.............................................8
Section 2.2      LEGAL STATUS OF JLS ...........................................................8
Section 2.3      AUTHORIZATION AND VALIDITY ........................................9
Section 2.4      NO VIOLATION .........................................................................9
Section 2.5      LITIGATION...............................................................................9
Section 2.6      CORRECTNESS OF FINANCIAL STATEMENTS AND
                  FORECASTS ..............................................................................9
Section 2.7      ACKNOWLEDGEMENT OF PREPETITION OBLIGATIONS...................9
Section 2.8      ADVERSE FACT.......................................................................10
Section 2.9      TAXES.......................................................................................10
Section 2.10      PERMITS, FRANCHISES ........................................................10
Section 2.11      ERISA .......................................................................................10
Section 2.12      ENVIRONMENTAL MATTERS ...............................................10
Section 2.13      REAL PROPERTY COLLATERAL ..........................................11
Section 2.14      RECITALS ................................................................................11

ARTICLE III      CONDITIONS ................................................................................. 11

Section 3.1      CONDITIONS OF INITIAL EXTENSION OF CREDIT ............................11
Section 3.2      CONDITIONS OF EACH EXTENSION OF CREDIT ...................................13

ARTICLE IV      AFFIRMATIVE AND NEGATIVE COVENANTS......................... 13

Section 4.1      PUNCTUAL PAYMENTS.........................................................13
Section 4.2      FINANCIAL STATEMENTS ....................................................13
Section 4.3      COMPLIANCE...........................................................................14
Section 4.4      INSURANCE.............................................................................14
Section 4.5      LOSSES ....................................................................................14
Section 4.6      BOOKS AND RECORDS..........................................................14
Section 4.7      DISPOSITION OF ASSETS .....................................................15
Section 4.8      ACCOUNTS ..............................................................................15
Section 4.9      FACILITIES ..............................................................................15
Section 4.10      EQUIPMENT ............................................................................15
Section 4.11      TAXES AND OTHER LIABILITIES........................................15
Section 4.12      LITIGATION.............................................................................16

i

| Section 4.13 | NOTICE TO BANK | 16 |
|---|---|---|
| Section 4.14 | APPRAISALS | 16 |
| Section 4.15 | TRANSACTIONS | 16 |
| Section 4.16 | FEES AND EXPENSES | 16 |
| Section 4.17 | FURTHER ASSURANCES | 17 |
| Section 4.18 | INVENTORY | 17 |
| Section 4.19 | GOVERNMENT LIENS | 17 |
| Section 4.20 | BANK MEETINGS | 18 |
| Section 4.21 | LIENS | 18 |
| Section 4.22 | INDEBTEDNESS | 18 |
| Section 4.23 | LOCATIONS OF INVENTORY AND PUMPING EQUIPMENT | 18 |
| Section 4.24 | ACCOUNTS | 18 |
| Section 4.25 | CHANGE OF BUSINESS | 19 |
| Section 4.26 | INVOICE PRACTICES | 19 |
| Section 4.27 | ADDITIONAL COLLATERAL | 19 |
| Section 4.28 | EXAMINATION AND INSPECTION | 19 |
| Section 4.29 | BANK ACCOUNTS | 19 |
| Section 4.30 | RELEASES OF PREPETITION CLAIMS | 19 |
| Section 4.31 | SURCHARGE WAIVER | 21 |
| Section 4.32 | ADVERSE ACTION | 21 |
| Section 4.33 | ADDITIONAL BANKRUPTCY CASE MATTERS | 21 |
| Section 4.34 | RESTATEMENT | 22 |
| ARTICLE V | EVENTS OF DEFAULT | 23 |
| Section 5.1 | EVENTS OF DEFAULT | 23 |
| Section 5.2 | REMEDIES | 24 |
| ARTICLE VI | MISCELLANEOUS TERMS, CONDITIONS, AND JURY WAIVER | 24 |
| Section 6.1 | JURY TRIAL WAIVER | 24 |
| Section 6.2 | COUNTERCLAIMS | 24 |
| Section 6.3 | JURISDICTION | 24 |
| Section 6.4 | NO WAIVER BY BANK | 25 |
| Section 6.5 | NOTICES | 25 |
| Section 6.6 | SEVERABILITY | 26 |
| Section 6.7 | ENTIRE AGREEMENT, AMENDMENTS, WAIVERS, ASSIGNMENT | 26 |
| Section 6.8 | DISCHARGE OF DEBTORS/RELEASE OF BORROWING BASE COLLATERAL | 26 |
| Section 6.9 | USAGE; GENDER | 26 |
| Section 6.10 | GOVERNING LAW | 26 |
| Section 6.11 | REVIVAL AND REINSTATEMENT OF OBLIGATIONS | 27 |
| Section 6.12 | USURY PROTECTION | 27 |
| Section 6.13 | ASSIGNMENT | 27 |
| Section 6.14 | COUNTERPART EXECUTION | 27 |
| Section 6.15 | INDEMNIFICATION | 28 |
| Section 6.16 | NO SUBORDINATION | 28 |
| Section 6.17 | PAYMENTS AND DELIVERIES | 28 |

105727.0910/1802196.14

Section 6.18    NO SET-OFF ...........................................................................................28
Section 6.19    NO CONFLICT .........................................................................................28
Section 6.20    WASHINGTON NOTICE ........................................................................28

Exhibit A – Definitions
Exhibit B – Form of Borrowing Base Certificate

Schedule 2.5 – Litigation
Schedule 2.8 – Adverse Fact
Schedule 2.9 – Taxes
Schedule 4.6 – Location of Books and Records
Schedule 4.23 – Location of Inventory
Schedule 4.29 – Bank Accounts

105727.0910/1802196.14

ADDENDUM TO CREDIT AGREEMENT
[DEBTOR IN POSSESSION FINANCING]

This Addendum to Credit Agreement [Debtor in Possession Financing] (this "Addendum"), dated as of March __, 2010, is entered into by and among BRUNDAGE-BONE CONCRETE PUMPING, INC., a Colorado corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("Borrower"), JLS CONCRETE PUMPING, INC., a California corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("JLS"), and WELLS FARGO BANK, NATIONAL ASSOCIATION ("Bank") with reference to the below recitals:

RECITALS

A.     Capitalized terms used and not defined herein, shall have the meanings given to them in Exhibit A attached hereto.

B.     Prior to the Petition Date, Borrower and Bank, entered into the Prepetition Credit Agreement.  In connection with the Prepetition Credit Agreement, Bank provided Borrower with the following credit accommodations:

i.     Line of Credit.  A line of credit in the maximum principal amount of Twenty Three Million Seven Hundred Thousand Dollars ($23,700,000.00) (the "Line of Credit") which is evidenced by that certain Revolving Reducing Note with attached Addendum to Promissory Note (Prime/Libor Pricing Adjustments) executed by Borrower in favor of Bank in the amount of the Line of Credit and dated as of June 25, 2008 (the "Line of Credit Note").  As of the Petition Date, the outstanding principal obligation owing under the Line of Credit Note was $3,516,930.43 (exclusive of the Letter of Credit Subfeature), plus accrued but unpaid interest.  Pursuant to the Letter of Credit Subfeature under the Line of Credit, Bank or an affiliate has issued one or more letters of credit which remain outstanding (each, a "Letter of Credit" and collectively, "Letters of Credit").  As of the Petition Date there were $7,450,000.00 in issued and outstanding Letters of Credit under the Letter of Credit Subfeature. Letters of Credit issued under the Letter of Credit Subfeature are subject to an Application and Agreement for Standby Letter of Credit dated as of June 18, 2007, as amended from time to time (the "Letter of Credit Agreement").  The Line of Credit has matured and the Bank is under no obligation to make further loans, advances and other financial accommodations to the Borrower under the Line of Credit.

ii.     Equipment Line of Credit.  A line of credit in the maximum principal amount of Thirty Four Million Dollars ($34,000,000.00) (the "Equipment Line of Credit") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of the Equipment Line of Credit and dated as of April 7, 2006, as amended or modified from time to time (the "Equipment Line of Credit Note").  As of the Petition Date, the outstanding principal amount under the Equipment Line of Credit Note is $23,663,500.00, plus accrued but unpaid interest.

   iii. <u>Term Loan A</u>.  A term loan in the original principal amount of Seven Million Eight Hundred Twelve Thousand Five Hundred Dollars ($7,812,500.00) ("Term Loan A") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan A and dated as of April 7, 2006, as amended from time to time (the "Term Loan A Note").  As of the Petition Date, the outstanding principal amount under the Term Loan A Note is $4,006,076.00, plus accrued but unpaid interest.

   iv. <u>Term Loan B</u>.  A term loan in the original principal amount of Fifteen Million Dollars ($15,000,000.00) ("Term Loan B") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan B and dated as of March 10, 2005, as amended or modified from time to time (the "Term Loan B Note").  As of the Petition Date, the outstanding principal amount under the Term Loan B Note is $7,858,072.00, plus accrued but unpaid interest.

   v. <u>Term Loan C</u>.  A term loan in the original principal amount of Two Million One Hundred Thousand Dollars ($2,100,000.00) ("Term Loan C") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan C and dated as of January 5, 2006 (the "Term Loan C Note").  To secure repayment of Term Loan C Note, Borrower executed a Deed of Trust and Assignment of Rents and Leases, which was recorded on January 5, 2006 under Clark County, Nevada Auditor's File No. 20060105-0005725 ("Term Loan C DOT").  As of the Petition Date, the outstanding principal amount under the Term Loan C Note is $1,962,600.00, plus accrued but unpaid interest.

   vi. <u>Term Loan D</u>.  A term loan in the original principal amount of One Million One Hundred Seventy Seven Thousand Five Hundred Dollars ($1,177,500.00) ("Term Loan D") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan D and dated as of June 25, 2008 (the "Term Loan D Note").  To secure repayment of Term Loan D Note, Borrower executed a Deed of Trust and Assignment of Rents and Leases, which was recorded on June 14, 2006 under Riverside County, California Auditor's File No. 2006-0430126 ("Term Loan D DOT").  As of the Petition Date, the outstanding principal amount under the Term Loan D Note is $1,177,500.00, plus accrued but unpaid interest.

   vii. <u>Term Loan E</u>.  A term loan in the original principal amount of One Million One Hundred Four Thousand Dollars ($1,104,000.00) ("Term Loan E") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan E and dated as of June 25, 2008 (the "Term Loan E Note").  To secure repayment of Term Loan E Note, Borrower executed a Deed of Trust and Assignment of Rents and Leases, which was recorded on June 14, 2006 under King County, Washington Auditor's File No. 20060614001202 (the "Term Loan E DOT").  As of the Petition Date, the outstanding principal amount under the Term Loan E Note is $1,032,000.00, plus accrued but unpaid interest.

   viii. <u>Term Loan F</u>.  A term loan in the original principal amount of Seven Hundred Ninety Five Thousand Dollars ($795,000.00) ("Term Loan F") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan F and dated as of February 12, 2007 (the "Term Loan F Note").  To secure repayment of Term Loan F Note, Borrower executed a Deed of Trust and Assignment of Rents and Leases, which

2

was recorded on February 12, 2007 under Ada County, Idaho Auditor's File No. 107020765 (the "Term Loan F DOT"). As of the Petition Date, the outstanding principal amount under the Term Loan F Note is $696,407.62, plus accrued but unpaid interest.

       ix.    <u>Term Loan G</u>. A term loan in the original principal amount of One Million Six Hundred Fifty Thousand Dollars ($1,650,000.00) ("Term Loan G") which is evidenced by that certain promissory note executed by Borrower in favor of Bank in the amount of Term Loan G and dated as of February 18, 2008 (the "Term Loan G Note"). To secure repayment of Term Loan G Note, Borrower executed a Deed of Trust and Assignment of Rents, which was recorded on February 27, 2008 under Multnomah County, Oregon Auditor's File No. 2008-029471 (the "Term Loan G DOT"). As of the Petition Date, the outstanding principal amount under the Term Loan G Note is $1,579,400.00, plus accrued but unpaid interest.

       C.    Performance of all the Prepetition Obligations are secured by the personal property collateral described in the Security Agreements.

       D.    Borrower and Bank executed a Letter Agreement dated as of February 17, 2009 and the Initial Forbearance Agreement, whereunder Borrower agreed to grant Bank Liens on certain real estate located in Arizona, Missouri and Texas to secure all of the Prepetition Obligations (the "Additional Real Estate Collateral"). Pursuant to the terms thereof, Borrower executed three Deeds of Trust encumbering the Additional Real Estate Collateral (the "Additional Deeds of Trust").

       E.    [Reserved.]

       F.    Borrower and JLS commenced the Bankruptcy Cases and retain possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

       G.    The Bankruptcy Court entered the Interim Financing Order in the Bankruptcy Cases pursuant to which Borrower was authorized to incur indebtedness to Bank and Bank has provided advances and other financial accommodations to Borrower after the Petition Date secured by assets and property of the Debtors. The loans, advances and other financial accommodations extended by Bank to the Debtors during the period between the Petition Date and the entry of the Final Financing Order are governed by the terms of the Interim Financing Order and the Term Sheet.

       H.    The Final Financing Order provides that as a condition to the provision of continued loans, Advances and other financial accommodations to be extended by Bank to the Debtors, the Debtors shall execute and deliver this Addendum.

       I.    Bank has agreed to provide loans, Advances and other financial accommodations to the Debtors on the terms and conditions set forth in this Addendum. The DIP Loan Documents and the Financing Order shall govern loans, Advances and other financial accommodations extended by Bank to the Debtors following the entry of the Final Financing Order.

J.      Except as provided in Section 6.8, the Prepetition Obligations shall continue to be governed by the terms of the Prepetition Financing Agreements all of which shall remain in full force and effect; (ii) this Addendum shall in no way modify or impair the rights of Bank under the Prepetition Financing Agreements and all Prepetition Obligations shall remain due and owing in accordance with the terms of the Prepetition Financing Agreements and as provided by applicable law; and (iii) the Prepetition Obligations shall continue to bear interest at the rates set forth in the Prepetition Notes.

K.      The August 2004 Term Loan shall continue to be governed by the terms of the August 2004 Term Loan Agreements, all of which shall remain in full force and effect; (ii) this Addendum shall in no way modify or impair the rights of Bank under the August 2004 Term Loan Agreements and obligations of the Borrower and Guarantors shall remain due and owing in accordance with the terms of the August 2004 Term Loan Agreements and as provided by applicable law; and (iii) the August 2004 Term Loan shall continue to bear interest at the rates set forth in the August 2004 Term Loan Agreements.

L.      Each and all of the documents, agreements, instruments and other filings referenced herein shall mean such documents, agreements, instruments and filings as the same may be amended, restated or modified by Bankruptcy Orders.

NOW, THEREFORE, in consideration of the mutual conditions and agreements herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

<u>ARTICLE I</u>
<u>CREDIT TERMS</u>

Section 1.1    <u>THE REVOLVING LOANS</u>.  Subject to the terms and conditions hereof, (a) Bank agrees to make a revolving loan to Borrower after the entry of the Final Financing Order in an amount not to exceed the Revolving Loan Commitment (the "DIP Loan"). Borrower's obligation to repay Advances under the DIP Loan shall be evidenced by a promissory note dated as of March ___, 2010 (the "DIP Line of Credit Note"), all terms of which are incorporated herein by this reference.

Section 1.2    <u>LIMITATIONS ON BORROWINGS</u>.  Outstanding Advances under the DIP Loan will be limited to the lesser of (i) the Revolving Loan Commitment, or (ii) the sum of (a) 80% of the Eligible Accounts Receivable of each of Borrower and JLS existing as of the Petition Date and Eligible Accounts Receivable coming into existence thereafter, (b) 50% of the value of Borrower's spare parts inventory (exclusive of work in process and inventory which is obsolete, unsaleable or damaged) as deemed eligible by Bank, and (c) $4,000,000, less the sum of (x) such reserves to be reasonably established by Bank, and (y) the Borrowing Base Obligations.  The value of the spare parts inventory shall be calculated at the lesser of cost or market value.

As used herein, "Eligible Accounts Receivable" shall consist solely of trade accounts created in the ordinary course of Borrower's or JLS' business, upon which the right to receive

4

payment is absolute and not contingent upon the fulfillment of any condition whatsoever, and in which Bank has a perfected security interest of first priority, and shall not include:

(i)     any account which is more than ninety (90) days old from invoice date;

(ii)     that portion of any account for which there exists any right of setoff, defense or discount (except regular discounts allowed in the ordinary course of business to promote prompt payment) or for which any defense or counterclaim has been asserted;

(iii)     any account which represents an obligation of any state or municipal government or of the United States government or any political subdivision thereof (except accounts which represent obligations of the United States government and for which the assignment provisions of the Federal Assignment of Claims Act, as amended or recodified from time to time, have been complied with to Bank's satisfaction);

(iv)     any account which represents an obligation of an account debtor located in a foreign country;

(v)     any account which arises from the sale or lease to or performance of services for, or represents an obligation of, an employee, affiliate, partner, member, parent or Subsidiary of Borrower or JLS;

(vi)     that portion of any account, which represents interim or progress billings or retention rights on the part of the account debtor;

(vii)     any account which represents an obligation of any account debtor when twenty percent (20%) or more of Borrower's or JLS' accounts from such account debtor are not eligible pursuant to (i) above;

(viii)     that portion of any account from an account debtor which represents the amount by which Borrower's or JLS' total accounts from said account debtor exceeds twenty-five percent (25%) of Borrower's or JLS's total accounts;

(ix)     any account deemed ineligible by Bank when Bank, in its sole discretion, deems the creditworthiness or financial condition of the account debtor to be unsatisfactory.

Section 1.3   LETTER OF CREDIT SUBFEATURE.  All Letters of Credit issued under the Prepetition Credit Agreement shall also be deemed to have been issued hereunder.  Each draft paid by Bank under a Letter of Credit shall be deemed an Advance under the DIP Loan and shall be repaid by Borrower in accordance with the terms and conditions of this Addendum applicable to such Advances; provided, however, that if Advances under the DIP Loan are not available, for any reason, at the time any draft is paid by Bank, Borrower shall immediately pay to Bank the full amount of such draft, together with interest thereon from the date such amount is paid by Bank to the date such amount is fully repaid by Borrower at the rate of interest applicable to Advances under the DIP Loan.  In such event Debtors agree that Bank, in its sole

105727.0910/1802196.14

discretion, may debit any deposit account maintained by the Debtors with Bank for the amount of any such draft.

Section 1.4    BORROWING AND REPAYMENT.  Upon the Maturity Date (whether by acceleration or otherwise) of any of the Postpetition Obligations evidenced by the DIP Loan Documents and without the necessity of any further Bankruptcy Order,  Bank shall be entitled to immediate payment of such Postpetition Obligations and, subject to the provisions of Section 362 of the Bankruptcy Code, to enforce the remedies provided for hereunder under the DIP Loan Documents and applicable law all as more fully set forth in the Financing Orders, as applicable.

Borrower may from time to time during the term of the DIP Loan borrow, partially or wholly repay its outstanding borrowings, and reborrow, subject to all of the limitations, terms and conditions contained herein or in the DIP Line of Credit Note; provided, however, that the total outstanding borrowings under the DIP Loan shall not at any time exceed the limitations on borrowing set forth on Section 1.2.

Section 1.5    PURPOSE.  The DIP Loan will be used for (i) ongoing working capital needs of the Debtors, including but not limited to, the payment of court-approved Professional fees and expenses, incurred during the Bankruptcy Cases, arising after the Petition Date, all in accordance with and as limited by the Budget; and (ii) payment in full of all amounts outstanding on the Interim Facility and Line of Credit Obligations.  The initial Advance under the DIP Loan shall be used to pay all amounts outstanding on the Interim Facility and the Line of Credit Obligations.

Section 1.6    INTEREST AND FEES.

(a)    Interest.  The outstanding principal balance of the Revolving Loans shall bear interest at the rate of interest set forth in the DIP Line of Credit Note and the amount of each drawing paid under any Letter of Credit shall bear interest from the date such drawing is paid to the date such amount is fully repaid by Borrower at the same rate.

(b)    Computation and Payment.  Interest shall be computed on the basis of a 360-day year, actual days elapsed.  Interest shall be payable at the times and place set forth in the DIP Line of Credit Note.

(c)    Collection.  Borrower authorizes Bank to collect all principal, interest, fees and Bank Expenses due under DIP Loan by charging Borrower's deposit account number 4159666544 with Bank, the Collection Accounts or any other deposit account maintained by Debtors with Bank, for the full amount thereof.  Should there be insufficient funds in any such deposit account to pay all such sums when due, the full amount of such deficiency shall be immediately due and payable by Borrower.

(d)    Letter of Credit Fees.  Borrower shall pay all letter of credit fees to Bank as established under the Prepetition Financing Agreements or otherwise determined in accordance with Bank's standard fees and charges then in effect.

6

105727.0910/1802196.14

(e)    Facility Fees.  Upon entry of the Interim Financing Order, Borrower paid Bank a fully-earned and non-refundable facility fee of $25,000.  Upon the entry of the Final Financing Order, Borrower will pay Bank an additional fully-earned and non-refundable facility fee of $75,000.

Section 1.7    COLLECTION AND ADMINISTRATION.

(a)    Cash Management Systems.  Debtors shall continue to maintain existing cash management system(s) established with Bank prior to the Petition Date consistent with the provisions of any Cash Management Order.  Debtors will maintain existing cash management system(s) with Bank until such time as all Postpetition Obligations have been repaid.

(b)    Lockboxes and Collection Accounts.  Debtors shall operate in accordance with existing lockbox agreements and cash collateral account agreements with Bank and/or additional agreements as Bank may require to establish and maintain one or more lockbox accounts or cash collateral accounts for the benefit of the Bank (each such lockbox or cash collateral account, a "Collection Account").  Debtors shall direct and cause all existing and future account debtors, customers or others owing payment obligations to such party to pay all sums directly into the Collection Account and shall cause all relevant checks, credit card receivables, and any other cash collections constituting proceeds of Collateral to be made payable to, or deposited in, such Collection Account.  Without in any way limiting Debtor's obligations pursuant to the preceding sentence, Debtors shall deposit directly into the Collection Account all cash proceeds of Collateral received by them in violation or contradiction of this Section within one (1) business day after discovery of such violation or contradiction by a Responsible Officer of the Borrower.  Debtors shall have no right of withdrawal from the Collection Accounts so long as Bank has any obligation to make Advances under the DIP Loan Documents or any Postpetition Obligations remain outstanding.  Debtors, in executing this Addendum, each acknowledge that funds deposited into a Collection Account will or may be commingled with funds of the other Debtor, and may be used in accordance with the terms of this Addendum regardless of the original source of such funds.

Section 1.8    COLLATERAL AND SUPER PRIORITY TREATMENT OF CLAIMS.

(a)    Each Debtor reaffirms and ratifies all security interests granted in the Prepetition Financing Agreements and related security agreements, deeds of trust, pledge agreements, and other loan documents, and confirms that said security interests and Prepetition Liens continue to secure the Prepetition Obligations.

(b)    As security for all the Postpetition Obligations, Borrower and JLS each hereby grant to Bank (i) a first priority Lien upon and security interest in all of Borrower's and JLS's prepetition and postpetition existing and future acquired assets and the proceeds and products thereof of the same character and category as are subject to the Prepetition Liens securing the Prepetition Obligations; (ii) a priming Lien against the Borrowing Base Collateral, pursuant to 11 U.S.C. § 364(d)(1); (iii) pursuant to 11 U.S.C. § 364(c)(2), a first priority Lien against all unencumbered assets of Borrower and JLS; and (iv) pursuant to 11 U.S.C. §

7

364(c)(1), a subordinate Lien against all remaining assets of Borrower and JLS (in each case excluding Avoidance Claims).

(c)     The Postpetition Obligations and the other DIP Loan Documents will have superpriority status over any and all other administrative expenses pursuant to Section 364(c)(l) of the Bankruptcy Code ("Superpriority Status"), subject only to the Carve-Out.  "Carve-Out" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the office of the United States Trustee under Section 1930(a) of Title 28 of the United States Code plus interest at the statutory rate, (b) administrative expenses that have priority under Section 726(b) of the Bankruptcy Code, (c) after the occurrence and during the continuance of an Event of Default, the payment of, to the extent allowed at any time, whether by interim order, procedural order or otherwise, unpaid fees and expenses incurred at any time by persons or firms retained by the Debtors pursuant to Sections 327, 328 or 363 of the Bankruptcy Code and any Committee in an aggregate amount for all such persons and firms not to exceed $1,000,000, and (d) all other payments to Bank which are both consented to by the Debtors and approved by the Bankruptcy Court.  Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, Debtors shall be permitted to pay, subject to the Budget, compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §330 and §331, as the same may be due and payable, and the same shall not reduce the Carve-Out.  For the avoidance of doubt, the Carve-Out shall not be used to pay any Professional fees and expenses incurred in connection with any Adverse Action.  The foregoing shall not be construed as a consent to the allowance of any reasonable fees and expenses referred to above and shall not affect the right of Bank to object to the allowance and payment of such amounts.

ARTICLE II
REPRESENTATIONS AND WARRANTIES

Each of the Debtors jointly and severally makes the following representations and warranties to Bank, on the date of this Addendum and as of each Advance, which representations and warranties shall survive the execution of this Addendum and shall continue in full force and effect until the full and final payment, and satisfaction and discharge of all obligations of Debtors to Bank.

Section 2.1   LEGAL STATUS OF BORROWER.   Borrower is a Subchapter-S corporation, duly organized and existing and in good standing under the laws of the state of Colorado, and is qualified or licensed to do business (and is in good standing as a foreign corporation, if applicable) in all jurisdictions in which such qualification or licensing is required or in which the failure to so qualify or to be so licensed could have a Material Adverse Effect on Borrower.

Section 2.2   LEGAL STATUS OF JLS.   JLS is a California corporation, duly organized and existing and in good standing under the laws of the state of California, and is qualified or licensed to do business (and is in good standing as a foreign corporation, if applicable) in all jurisdictions in which such qualification or licensing is required or in which the failure to so qualify or to be so licensed could have a Material Adverse Effect on JLS.  JLS has no Subsidiaries.

8

Section 2.3   AUTHORIZATION AND VALIDITY.  This Addendum and each of the DIP Loan Documents have been duly authorized, and upon their execution and delivery in accordance with the provisions hereof will constitute legal, valid and binding agreements and obligations of Borrower and  JLS, enforceable in accordance with their respective terms.

Section 2.4   NO VIOLATION.  The execution, delivery and performance by the Debtors of each of the DIP Loan Documents do not violate any provision of any law or regulation, or contravene any provision of the Articles of Incorporation, Certificate of Incorporation, or By-Laws of the Debtors, or result in any breach of or default under any contract, obligation, indenture or other instrument to which either Debtor is a party or by which either Debtor may be bound.

Section 2.5   LITIGATION.  Except as provided in Schedule 2.5 attached hereto, there are no pending, or to the best of Debtors' knowledge threatened, actions, claims, investigations, suits or proceedings by any governmental authority or administrative agency which could have a Material Adverse Effect.

Section 2.6   CORRECTNESS OF FINANCIAL STATEMENTS AND FORECASTS. All financial statements delivered to Bank, (a) are complete and correct and present fairly the financial condition of Debtors, (b) disclose all liabilities of Debtors that are required to be reflected or reserved against under generally accepted accounting principles, whether liquidated or unliquidated, fixed or contingent, and (c) have been prepared in accordance with generally accepted accounting principles consistently applied.  All forecasts and projections supplied to Bank were prepared in good faith, adequately disclosed all relevant assumptions and were reasonable when made in light of the facts then known and the circumstances at the time.  There is no fact known to either Debtor which could reasonably be expected to have a Material Adverse Effect and which has not been fully disclosed to the Bank.

Section 2.7   ACKNOWLEDGEMENT OF PREPETITION OBLIGATIONS.  As of the Petition Date, (i) the Prepetition Obligations were due and outstanding pursuant to the Prepetition Credit Agreement in the principal amount of not less than $52,942,485.96 in the aggregate, all of which Prepetition Obligations are unconditionally owing by Borrower to Bank, without offset, defense or counterclaim of any kind, nature and description whatsoever; (ii) neither Borrower nor any of its Subsidiaries has any defense to, set off, counterclaim or other basis to challenge the Prepetition Obligations; (iii) the Prepetition Obligations are secured by valid, perfected Liens, on all of the Prepetition Collateral; (iv) the Prepetition Liens encumbering the Prepetition Collateral are not avoidable in any way; (v) performance of all the Prepetition Obligations are cross collateralized and secured by all of the Prepetition Collateral; and (vi) the Prepetition Obligations and the Prepetition Liens are not subject to subordination in favor of any other Person on any basis except as specifically provided in the Prepetition Credit Agreement or in any Intercreditor Agreement; provided, however, that this acknowledgment, confirmation and agreement shall not impair prohibit or otherwise affect any Committee's or other non-Debtor party in interest's right to prosecute an Adverse Action subject to the terms of this Addendum and subject to the Financing Orders. The Final Financing Order shall contain a provision that

9

requires that any party in interest commence an Adverse Action within 100 days of the entry of the Final Financing Order or be forever barred from commencing such an action.

Section 2.8      ADVERSE FACT.   Except as provided in Schedule 2.8 attached hereto, no event has occurred which could be reasonably anticipated to have a Material Adverse Effect since the Petition Date.  No fact is known to either Debtor, as of the date hereof, which has had or might in the future have a Material Adverse Effect on the business, properties or financial condition of either Debtor which has not been previously disclosed to Bank by Debtors.

Section 2.9      TAXES.  Except as provided in Schedule 2.9, Debtors have filed or have caused to be filed all tax returns which are required to be filed by it pursuant to all applicable federal, state, and local laws, regulations or orders.  Except as provided in Schedule 2.9, Debtors have made, or made provision for the payment of all taxes (other than any taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves have been provided on the books of the Debtors), which have or may have become due pursuant to said returns or otherwise or pursuant to any assessment of either Debtor; provided, however, Debtors shall not be required to pay prepetition taxes until so required by a Bankruptcy Order or in accordance with a confirmed Plan of Reorganization. Neither Debtor has knowledge of any pending assessments or adjustments of its income tax payable with respect to any year.

Section 2.10     PERMITS, FRANCHISES.  Debtors possess, and will hereafter possess, all permits, consents, approvals, franchises and licenses required and rights to all trademarks, trade names, patents, and fictitious names, if any, necessary to enable it to conduct the business in which they are now engaged in compliance with applicable law.

Section 2.11     ERISA.   Debtors are in compliance in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended or recodified from time to time ("ERISA"); neither Debtor has violated any provision of any defined employee pension benefit plan (as defined in ERISA) maintained or contributed to by Debtors (each, a "Plan"); no Reportable Event as defined in ERISA has occurred and is continuing with respect to any Plan initiated by Debtors, Debtors have met their minimum funding requirements under ERISA with respect to each Plan; and each Plan will be able to fulfill its benefit obligations as they come due in accordance with the Plan documents and under generally accepted accounting principles.

Section 2.12     ENVIRONMENTAL MATTERS.   Except as disclosed by Debtors to Bank in writing prior to the date hereof, Debtors are in compliance in all material respects with all applicable federal or state environmental, hazardous waste, health and safety statutes, and any rules or regulations adopted pursuant thereto, which govern or affect any of Debtors' operations and/or properties, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Resource Conservation and Recovery Act of 1976, and the Federal Toxic Substances Control Act, as any of the same may be amended, modified or supplemented from time to time, None of the operations of Borrower or JLS are the subject of any federal or state investigation evaluating whether any remedial action involving a material expenditure is needed

10

to respond to a release of any toxic or hazardous waste or substance into the environment. Debtors have no material contingent liability in connection with any release of any toxic or hazardous waste or substance into the environment.

Section 2.13   REAL PROPERTY COLLATERAL.  Except as disclosed by Debtors to Bank in writing prior to the date hereof, with respect to any real property collateral required hereby:

(a)     All taxes, governmental assessments, insurance premiums, and water, sewer and municipal charges, and rents (if any) which previously became due and owing in respect thereof have been paid as of the date hereof.

(b)     There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to any such lien) which affect all or any interest in any such real property and which are or may be prior to or equal to the lien thereon in favor of Bank.

(c)     None of the improvements which were included for purpose of determining the appraised value of any such real property lies outside of the boundaries and/or building restriction lines thereof, and no improvements on adjoining properties materially encroach upon any such real property.

(d)     There is no pending, or to the best of Debtors' knowledge threatened, proceeding for the total or partial condemnation of all or any portion of any such real property, and all such real property is in good repair and free and clear of any damage that would materially and adversely affect the value thereof as security and/or the intended use thereof.

Section 2.14   RECITALS.  The recitals are true and correct in all material respects.

ARTICLE III
CONDITIONS

Section 3.1   CONDITIONS OF INITIAL EXTENSION OF CREDIT.  The obligation of Bank to extend any credit contemplated by this Addendum is subject to the fulfillment to Bank's satisfaction of all of the following conditions:

(a)     Final Financing Order.  (i) Each Bankruptcy Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice of the hearing to consider entry of the Final Financing Order has been given.

(ii) After the entry of the Final Financing Order, the obligations owing under the DIP Loan will constitute allowed administrative expense claims in the Bankruptcy Cases having Superpriority Status, subject only to the Carve Out.

(iii) After the entry of the Financing Orders, the Postpetition Obligations will be secured by a valid and perfected Lien on all of the Postpetition Collateral and such Lien shall

11

have the priorities set forth in the applicable Financing Order and the other DIP Loan Documents.

(iv)  The Financing Orders (with respect to the period on and after entry of the applicable Financing Order), as the case may be, are in full force and effect and have not been reversed, stayed, modified, varied or amended without the consent of Bank.

(v)  Notwithstanding any failure on the part of Bank to perfect, maintain, protect or enforce any Lien in the Postpetition Collateral granted pursuant to the DIP Loan Documents or the Financing Orders, the Financing Orders (when entered) shall independently and automatically, and without further action by any Person perfect such Postpetition Liens against the Postpetition Collateral.

(b)    <u>Absence of Default</u>.  No Default or Event of Default shall have occurred under the Interim Facility and be continuing.

(c)    <u>Documentation</u>.   Bank shall have received, in form and substance satisfactory to Bank, each of the following, duly executed (unless Bank waives delivery of such item as a requirement to extend credit):

(i)      This Addendum;
(ii)     The DIP Line of Credit Note;
(iii)    Corporate Resolution: Borrowing (Borrower);
(iv)     Certificate of Incumbency (Borrower);
(v)      Continuing Guarantee (JLS);
(vi)     Security Agreement  (Borrower);
(vii)    Security Agreement (JLS);
(viii)   Corporate Resolution: Guarantee and Pledge of Collateral (JLS);
(ix)     Certificate of Incumbency (JLS); and
(x)      Such other documents as Bank may require under any other Section of this Addendum.

(d)    <u>Financial Condition</u>.   No event shall have occurred that will have a Material Adverse Effect on the financial condition or business of Borrower or JLS since the Petition Date, nor shall there have been any material decline in the market value of any Collateral.

(e)    <u>Insurance</u>.   Debtors shall have delivered to Bank evidence of insurance coverage on all Debtors' property, in form, substance, amounts, covering risks and issued by companies satisfactory to Bank, and where required by Bank, with loss payable endorsements in favor of Bank, including without limitation, policies of fire and extended coverage insurance covering all real property collateral required hereby, with replacement cost and mortgagee loss payable endorsements, and such policies of insurance against specific hazards affecting any such real property as may be required by governmental regulation or Bank.

105727.0910/1802196.14

Section 3.2    <u>CONDITIONS OF EACH EXTENSION OF CREDIT</u>.  The obligation of Bank to make each extension of credit requested by Borrower hereunder shall be subject to the fulfillment to Bank's satisfaction of the each of the following conditions:

(a)    <u>Financing Order</u>. The Final Financing Order shall be in full force and effect.

(b)    <u>Absence of Default</u>.  No Default or Event of Default shall have occurred under the DIP Loan Documents and be continuing.

(c)    <u>Financial Condition</u>.  No event shall have occurred that will have a Material Adverse Effect in the financial condition or business of Borrower or JLS since the Petition Date, nor shall there have been any material decline in the market value of any Collateral.

ARTICLE IV
AFFIRMATIVE AND NEGATIVE COVENANTS

Each Debtor covenants that so long as Bank remains committed to extend credit to Borrower pursuant hereto, or any liabilities (whether direct or contingent, liquidated or unliquidated) of either Debtor to Bank under the DIP Loan Documents or the Financing Orders remain outstanding, and until payment in full of all obligations of Borrower subject hereto, Borrower shall, unless Bank otherwise consents in writing:

Section 4.1    <u>PUNCTUAL PAYMENTS</u>.  Punctually pay all principal, interest, fees or other liabilities due under the DIP Loan Documents and Financing Orders, at the times and place and in the manner specified therein, and immediately upon demand by Bank, the amount by which the outstanding principal balance of any credit subject hereto at any time exceeds any limitation on borrowings applicable thereto.

Section 4.2    <u>FINANCIAL STATEMENTS</u>.  Provide to Bank and the Committee all of the following, in form and detail satisfactory to Bank:

(a)    not later than 120 days after and as of the end of each fiscal year, an annual consolidated unaudited financial statement of Borrower and JLS, prepared by Borrower and JLS, to include balance sheet, income statement, statement of cash flow;

(b)    not later than 30 days after and as of the end of each month , a consolidated financial statement of Borrower and JLS, prepared by Borrower, to include a balance sheet, an income statement and statement of cash flow;

(c)    [Reserved];

(d)    not later than 15 days after and as of the end of each month, a report prepared by Borrower, and certified by an officer of Borrower, containing a specific list of all pumping equipment of Borrower, identifying any Lien holders with respect thereto and

13

describing respective locations, year of manufacture, unit number, boom size, original cost, net book value, insured value and such other information as Bank may reasonably require with respect to the collateral securing Borrower's Indebtedness to Bank;

(e)     contemporaneously with each annual and monthly financial statement of Borrower required hereby, a certificate of a Responsible Officer of Borrower that said financial statements are accurate and that there exists no Event of Default nor any condition, act or event which with the giving of notice or the passage of time or both would constitute an Event of Default;

(f)     from time to time such other information as Bank may reasonably request, including without limitation, copies of rent rolls and other information with respect to any real property collateral required hereby;

(g)     not later than the third business day of each week, (i) a copy of the Budget for the succeeding 13 weeks, (ii) a Variance Report, (iii) a borrowing base certificate in the form attached hereto as <u>Exhibit B</u>, and (iv) agings of all prepetition and postpetition accounts receivable and payables of Debtors for the previous reporting calendar week in the same form as was provided to the Bank prior to the Petition Date.

Section 4.3     <u>COMPLIANCE</u>.     Preserve and maintain all licenses, permits, governmental approvals, rights, privileges and franchises necessary for the conduct of its business; and comply, and cause each of its Subsidiaries to comply, with the provisions of all documents pursuant to which it is organized and/or which govern its continued existence and with the requirements of all laws, rules, regulations and orders of any governmental authority applicable to Borrower or its Subsidiaries, and/or each such entity's business.

Section 4.4     <u>INSURANCE</u>.  Maintain and keep in force insurance of the types and in amounts customarily carried in lines of business similar to that of Borrower or such Subsidiary, including but not limited to fire, extended coverage, public liability, flood, property damage and workers' compensation, with all such insurance carried with companies and in amounts satisfactory to Bank, and deliver to Bank from time to time at Bank's request schedules setting forth all Insurance then in effect.

Section 4.5     <u>LOSSES</u>.     Promptly notify Bank in writing of any loss, damage, investigation, action, suit, proceeding or claim occurring after the Petition Date relating to a material portion of the Collateral or which could reasonably be expected to result in a Material Adverse Effect.

Section 4.6     <u>BOOKS AND RECORDS</u>.     Maintain, adequate books and records in accordance with generally accepted accounting principles consistently applied. The Debtors' books and records concerning accounts and its chief executive office are and shall be maintained only at the address set forth in Schedule 4.6, except Debtors may change such locations or open a new place of business after using their reasonable efforts to notify Bank within thirty (30) days prior to such change of location or opening of a new place of business but in no event less than five (5) Business Days prior thereto.

14

Section 4.7    DISPOSITION OF ASSETS.   Neither Debtor, shall directly or indirectly: (a) sell, lease, transfer, assign, abandon or otherwise dispose of any part of the Collateral or any material portion of its other assets (other than a Permitted Disposition with all proceeds, less customary costs of sale, realized from such sales to be immediately delivered to Bank upon consummation of each such sale) or (b) consolidate with or merge with or into any other entity, or permit any other entity to consolidate with or merge with or into Borrower or JLS or (c) form or acquire any interest in any firm, corporation or other entity.

Section 4.8    ACCOUNTS.   With respect to each account deemed an Eligible Account Receivable, except as reported in writing to the Bank, no Responsible Officer of either Debtor has knowledge that any of the criteria for eligibility are not or are no longer satisfied and that the eligibility criteria will not continue to be satisfied.  All statements made and all unpaid balances and other information appearing in the invoices, agreements, proofs of rendition of services and delivery of goods and other documentation relating to the accounts, and all confirmatory assignments, schedules, statements of account and books and records with respect thereto, are true and correct and in all material respects what they purport to be.  Each account is based on an actual and bona fide sale and delivery of Inventory or rendition of services to its customers, made by the Debtors in the ordinary course of their business; all inventory being sold and the accounts created are the exclusive property of Debtors and are not and shall not be subject to any Lien, consignment arrangement, encumbrance, security interest or financing statement whatsoever, invoices evidencing such account are in the name of the Debtors; and the customers of the Debtors have accepted the inventory or services, owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense, counterclaim or contra, except for disputes and other matters arising in the ordinary course of business.

Section 4.9    FACILITIES.   With respect to the facilities of each Debtor, keep all properties useful or necessary to its business in good repair and condition, ordinary wear and tear excepted,  and from time to time make necessary repairs, renewals and replacements thereto so that such properties shall be fully and efficiently preserved and maintained.

Section 4.10    EQUIPMENT.   With respect to the equipment of each Debtor, the Debtors shall each keep the equipment in the condition it was in as of the Petition Date, ordinary wear and tear and casualty loss excepted.

Section 4.11    TAXES AND OTHER LIABILITIES.   Each Debtor shall pay and discharge when due any and all indebtedness, obligations, assessments and taxes, both real or personal, including without limitation federal and state income taxes and state and local property taxes and assessments, except (a) such as Debtors may in good faith contest or as to which a bona fide dispute may arise, and (b) for which Debtors have made provision, to Bank's satisfaction, for eventual payment thereof in the event  either Debtor is obligated to make such payment provided, however, Debtors shall not be required to pay prepetition taxes until so required by a Bankruptcy Order or in accordance with a confirmed Plan of Reorganization.

Section 4.12   **LITIGATION**.  Promptly give notice in writing to Bank of any litigation pending or threatened against either Debtor with a claim in excess of $250,000.00.

Section 4.13   **NOTICE TO BANK**.  Promptly (but in no event more than five (5) days after the occurrence of each such event or matter) give written notice to Bank in reasonable detail of: (a) the occurrence of any Event of Default, or any condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default; (b) any change in the name or the organizational structure of Borrower or JLS; (c) the occurrence and nature of any Reportable Event or Prohibited Transaction, each as defined in ERISA, or any funding deficiency with respect to any Plan; or (d) any termination or cancellation of any insurance policy which Borrower or JLS is required to maintain.

Section 4.14   **APPRAISALS**.  The Debtors shall reimburse Bank for the cost of the equipment appraisal anticipated by Section 14 of the Forbearance Agreement. From time to time upon the request of Bank, each Debtor agrees to permit Bank to perform periodic appraisals and field examinations of the Collateral and to reimburse Bank for the costs and expenses relating thereto in an amount not to exceed $50,000.00 in any calendar year.

Section 4.15   **TRANSACTIONS**.  Debtors shall not individually or jointly, directly or indirectly:

(a)   lend or advance money or property, guarantee or assume Indebtedness of, or invest (by capital contribution or otherwise) in any Person;

(b)   declare, pay or make any dividend, redemption or other payment or distribution on account of any shares of any class of stock or other equity interests of any Debtor now or hereafter outstanding;

(c)   make any payment of the principal amount of or interest on any Indebtedness owing by any Debtor, to any officer, director, shareholder, or affiliate of any Debtor;

(d)   make any loans or advances or any other payments whatsoever to any officer, director, employee, shareholder or affiliate of any Debtor;

(e)   enter into any purchase, loan, exchange of property, sale, lease or other transaction with any officer, director, employee, shareholder or affiliate of any Debtor on terms that are less favorable to the Debtor than those which might be obtained at the time from Persons who are not an officer, director, employee, shareholder or affiliate of the Debtors; or

(f)   make any payment of fees to any officer, director, employee, shareholder or affiliate of any Debtor other than payment of compensation to employees in the ordinary course of business in accordance with Bankruptcy Orders.

Section 4.16   **FEES AND EXPENSES**.  Debtors shall pay, on Bank's demand, all out-of-pocket costs, expenses, filing fees and taxes payable in connection with the preparation,

16

execution, delivery, recording, administration, collection, liquidation, enforcement and defense of Postpetition Obligations, Bank's rights in the Collateral, the DIP Loan Documents, and the Financing Orders, and all other agreements or documents contemplated herein or related hereto, including, without limitation, the reasonable costs, disbursements and fees of in-house and outside counsel to Bank incurred in connection with the Postpetition Obligations, the DIP Loan Documents, and the Financing Orders.

Section 4.17   FURTHER ASSURANCES.  At the request of the Bank, at any time and from time to time, at Debtors' sole expense, each Debtor shall, execute and deliver or cause to be executed and delivered to the Bank, financing statements, amendments, financing documents and security and other agreements as Bank may reasonably require and such other agreements, documents and instruments, including waivers, consents, subordination agreements from mortgagees or other holders of security interests or Liens, landlords or bailees, and do or cause to be done such further acts as the Bank, in its discretion, deems necessary or desirable to create, preserve, perfect or validate any security interest of Bank in the Collateral and otherwise to effectuate the provisions and purposes of this Addendum.  Debtors hereby authorize Bank to file financing statements or amendments against the Debtors in favor of Bank with respect to the Collateral.

Section 4.18   INVENTORY.  Debtors shall safeguard, protect and hold all inventory for the Bank's account and not dispose of inventory except in the ordinary course of its business as herein provided.  Upon the sale, exchange, or other disposition of inventory, as herein provided, the security interest in the inventory provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, trade accounts receivable, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition.  As to any such sale, exchange or other disposition, Bank shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.  Irrespective of the Bank's perfection status in any and all of the general intangibles of the Debtors including, without limitations, any patents, trademarks, copyrights or licenses with respect thereto, each Debtor hereby irrevocably grants for and on behalf of itself to the Bank, a royalty free license to sell, or otherwise dispose of or transfer of the inventory upon the occurrence of a Event of Default.

Section 4.19  GOVERNMENT LIENS.   Notwithstanding the foregoing, if any garnishment shall be issued or any Lien shall be filed or claimed thereunder (a) for post Petition Date taxes due to any Governmental Authority, or (b) which in the Bank's good faith determination might create a valid obligation having priority over the Bank's security interest in the Collateral, such Lien or claim shall not be deemed to be a Permitted Lien hereunder and Borrower shall promptly pay such tax and remove the Lien of record or discharge the garnishment; provided, however, that Borrower may post a bond for the payment of such tax.  If Borrower fails to pay such tax and remove such Lien, post a bond, or discharge such garnishment promptly, then at Bank's election, Bank may (i) create a reserve in such amount as it may deem appropriate in its good faith business judgment, or (ii) upon the occurrence of an Event of Default, imminent risk of seizure or garnishment, filing of any priority Lien, claim, forfeiture, or

17

sale of the Collateral, pay such taxes on the Debtors behalf, and the amount thereof shall be added to the Postpetition Obligations secured by the Collateral and due on demand.

Section 4.20   BANK MEETINGS.  Each Debtor will participate, and will cause each of its Responsible Officers to be available to participate, in meetings with Bank periodically during each year, which meeting(s) shall be held with such frequency and at such places as may be reasonably requested by the Bank.

Section 4.21   LIENS.  Neither of the Debtors shall mortgage, assign, pledge, transfer or otherwise permit any Lien, to exist on, or to become enforceable against, any of the property, assets or undertaking of the Debtors, including, without limitation, the Collateral, whether now owned or hereafter acquired, except for Permitted Liens.

Section 4.22   INDEBTEDNESS.   Neither Debtor shall assume, incur or otherwise become liable upon or with respect to any Indebtedness or guarantee of Indebtedness at any time; provided, that, Debtors may become liable with respect to any Permitted Indebtedness if, at the time of the incurrence of such Permitted Indebtedness after the Petition Date, no Event of Default would result therefrom.

Section 4.23   LOCATIONS OF INVENTORY AND PUMPING EQUIPMENT. Neither Debtor shall move any inventory from any location disclosed to Bank on Schedule 4.23 other than in the ordinary course of business; provided, that, the Debtors may at any time remove or add additional locations set forth on Schedule 4.23 (or otherwise updated from time to time after the Effective Date by delivery of an amended or revised Schedule 4.23 acceptable to the Bank) upon three (3) days prior written notice to Bank and provided Bank has not delivered to the Debtors a notice asserting that the Debtors' moving the inventory, in the reasonable opinion of the Bank, could reasonably be expected to have a Material Adverse Effect.   Debtors acknowledge that Bank may not consider spare parts inventory at any such additional location for which Bank has delivered such notice to be eligible spare parts inventory unless, if applicable, appropriate reserves are imposed or landlord waivers reasonably satisfactory to Bank have been delivered in respect of such location.

Neither Debtor shall move any pumping equipment from any location disclosed to the Bank on    the report most recently provided to the Bank under Section 4.2(d), other than in the ordinary course of business. Neither of the Debtors shall move pumping equipment from one state to another without first providing the Bank at least three (3) days prior written notice and provided the Bank has not delivered to the Debtors a notice asserting that the proposed moving of such pumping equipment, in the reasonable opinion of the Bank, could have an adverse impact on perfection of the Bank's Lien on such equipment or its ability to enforce such Lien.

Section 4.24   ACCOUNTS.  Neither Debtor shall compromise, adjust or extend the time for payment of any accounts forming part of the Collateral or grant any discounts, allowances or credits thereon, in each case, other than (i) in the normal course of business or pursuant to Section 4.6, (ii) if such accounts are guaranteed as to payment by means of a letter of credit, surety bond or in any other manner reasonably satisfactory to the Bank, where such letter of credit or a surety bond is issued or confirmed by, and payable at, banks having a place of

business in the United States of America acceptable to Bank in its sole and reasonable discretion, (iii) if, in the opinion of the Debtors, acting reasonably, an extension of the payment date may permit further payment of otherwise delinquent accounts.

Section 4.25   CHANGE OF BUSINESS.   Subject to the Financing Orders, neither Debtor shall (except as permitted herein) alter or modify its corporate existence, re-incorporate or enter into or engage in any business, operation or activity which is materially different from the businesses being conducted by each Debtor as at the date of this Addendum other than any activity related, ancillary or complementary to such businesses (whether or not such activity is carried on as at the date of this Addendum).

Section 4.26   INVOICE PRACTICES.   Neither Debtor shall change its practices in effect on the date of this Addendum with respect to the invoicing and collection of accounts except after prior consultation with the Bank.

Section 4.27   ADDITIONAL COLLATERAL.   Except for the Permitted Liens and subject to the Financing Orders, each Debtor is, or will be, at the time Collateral is acquired by it, the owner of or have the requisite rights in the Collateral with full right to pledge, sell, consign, transfer and create a security interest therein and thereon, free and clear of any and all claims, security interests, or Liens in favor of others.

Section 4.28   EXAMINATION AND INSPECTION.   Upon reasonable notice, Bank shall have the right at any time or times hereafter during the Debtors' usual business hours, or during the usual business hours of any third party having control over either Debtor's books, to inspect the each Debtor's books in order to verify the amount or condition of, or any other matter relating to, the Collateral or either Debtor's financial condition.   Bank also shall have the right at any time or times hereafter during either Debtor's usual business hours to inspect, examine and appraise the inventory, the equipment and other Collateral and to check and test the same as to quality, quantity, value and condition.

Section 4.29   BANK ACCOUNTS.   A complete and accurate list of all bank accounts maintained by each Debtor with any bank or other financial institution as of the Effective Date is set forth on Schedule 4.29 (or as otherwise updated from time to time after the Effective Date by delivery of an amended or revised Schedule 4.29 acceptable to the Bank).

Section 4.30   RELEASES OF PREPETITION CLAIMS.

(a)   Effective upon entry of the Final Financing Order and subject to the terms of the Financing Orders, each Debtor acknowledges, confirms and agrees that it has no defense, counterclaim, offset, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of each Debtor's liability to repay Bank or to seek affirmative relief or damages of any kind or nature from Bank.   Each Debtor, together with all its successors, assigns, subsidiaries and affiliates (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges Bank (including in its capacity as pre-petition lender) and all of each of such party's past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of

them (collectively, "Released Parties") of and from any and all past, present, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct or indirect, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Prepetition Credit Agreement, Prepetition Obligations and the transactions and loan documents contemplated hereby, and all other agreements, certificates, instruments and other documents and statements related to any of the foregoing. Effective upon the execution hereof, and notwithstanding any failure of any Debtor to satisfy any of the conditions precedent set forth herein, the Releasing Parties hereby agree that, without any further act, Bank, together with each of its officers, directors, employees, counsel, agents, and attorneys in fact, are fully and forever released and discharged from any and all claims for damages or losses to the Releasing Parties (whether these damages or losses are known or unknown, foreseen or unforeseen, or patent or latent) including, without limitation, tort claims, demands, actions and causes of action of any nature, whatsoever arising under or relating to the Prepetition Credit Agreement, Prepetition Obligations, or any of the transactions related thereto, prior to the date hereof. Solely to the extent California law is applicable, the Releasing Parties waive application of California Civil Code Section 1542 and certify that they have read the following provisions of California Civil Code Section 1542:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b)    Each Releasing Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any claim released, remised and discharged by any Released Party pursuant to this Section 4.30. If any Releasing Party violates the foregoing covenant, the Releasing Parties agree to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

(c)    Notwithstanding any other term or provision contained herein, nothing contained in this Section 4.30 shall impair, prohibit, or otherwise affect any Committee's or other non-Debtor party in interest's right to prosecute an Adverse Action except to the extent such right may be limited by the terms of the Financing Orders.

Section 4.31   SURCHARGE WAIVER.  In accordance with and to the extent permitted by the Financing Orders, each Debtor hereby waives any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

Section 4.32   ADVERSE ACTION.   Under no circumstances may the Debtors use Advances or proceeds of the Collateral to pursue any Adverse Action.  The foregoing shall not be construed as a consent to the allowance of any reasonable fees and expenses referred to above and shall not affect the right of Bank to object to the allowance and payment of such amounts.

Section 4.33   ADDITIONAL BANKRUPTCY CASE MATTERS.

(a)   Promptly after the same is available, Debtors shall furnish or cause to be furnished to counsel for Bank all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of either Debtor with the Bankruptcy Court or served upon the United States Trustee in the Bankruptcy Cases or other non-confidential material documents distributed by or on behalf of either Debtor to any Committee. Without limiting the generality of the foregoing, Debtors shall promptly advise and provide reasonable access to, and discuss with, Bank and its counsel any and all material information and developments in connection with any proposed Plan of Reorganization or substantial asset sale, including, without limitation, any letters of intent, commitment letters or engagement letters received by either Debtor, any asset valuation and disclosure statement, and any other event or condition which is reasonably likely to have a material effect on either Debtor or the Bankruptcy Cases.

(b)   Debtors shall not incur, create, assume, suffer or permit any claim or Lien or encumbrance against either Debtor or any of its property or assets in any Bankruptcy Cases (other than the claims specifically referred to in the Financing Orders but only to the extent therein described) to be pari passu with or senior to the interest and claims of Bank against either Debtor, or apply to the Bankruptcy Court for authority to do so, except to the extent permitted herein.

(c)   All fees or expenses of Professionals at any time shall be paid pursuant to a Bankruptcy Order approving the allowance and payment of such fees and reimbursement of such expenses, or establishing procedures for such payments or approval of such fees and reimbursement.

(d)   Debtors shall not request, seek or consent to, and shall oppose and contest (unless otherwise consented to by Bank), any modification, stay, vacation or amendment of any Financing Order or the DIP Loan Documents.

(e)   Until such time as all Postpetition Obligations have been paid in full, except as otherwise expressly provided by the Financing Orders, Debtors shall not seek or support any approval of the granting of any priority for any administrative expense, secured claim or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative priority expenses of the kind specified in sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) or 726) which is equal or superior to the priority in

21

respect of the Postpetition Obligations unless otherwise expressly consented to by Bank in writing.

    (f)    Prior to the date on which the Borrowing Base Obligations have been paid in full in cash and any commitment of Bank to provide Advances or any other financial accommodation hereunder has been terminated, Debtors shall not pay any administrative priority expenses except for (i) those types of expenses contemplated under the Budget, and (ii) the allowed fees and expenses of Professionals as provided for in the Financing Orders.

    (g)    The Debtors shall not make any payments or transfers of any property on account of claims asserted by any vendors of either Debtor for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Court.

    (h)    Debtors shall not return any inventory to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court.

    (i)    Upon and in the event of the termination of Bank's commitment to make Advances or provide financial accommodations hereunder, unless Bank has received the full and final payment and satisfaction of all Borrowing Base Obligations (other than the Contingent Obligations that have been collateralized to the satisfaction of the Bank), neither Debtor shall request or support any request for the use of Collateral or Cash Collateral pursuant to Section 363 of the Bankruptcy Code or other applicable law, under any circumstance without Bank's further express, written consent.

    (j)    Neither Debtor shall file a Plan of Reorganization and related disclosure statement with the Bankruptcy Court unless such disclosure statement and Plan of Reorganization provides for the indefeasible payment in full to Bank of all Borrowing Base Obligations (other than the Contingent Obligations that have been cash collateralized to the satisfaction of the Bank) on the effective date of such Plan of Reorganization, or otherwise provides treatment of the Borrowing Base Obligations under the Plan of Reorganization in a manner satisfactory to Bank in its sole discretion.

    Section 4.34   RESTATEMENT.  Except as set forth in Section 6.8, this Addendum does not extinguish or otherwise impair the obligations, including, without limitation, obligations for the payment of money outstanding under the Prepetition Financing Agreements, the August 2004 Term Loan Agreements and related loan documents, or discharge or release the obligations or the Liens or priority of any mortgage, pledge, security agreement or any other security therefor, which shall continue without interruption and in full force and effect.  For avoidance of doubt, except as set forth in Section 6.8 (i) the Prepetition Obligations shall be governed by the terms, conditions and agreements set forth in the Prepetition Financing Agreements and related loan documents, (ii) August 2004 Term Loan shall be governed by the terms, conditions and agreements set forth in the August 2004 Term Loan Agreements and related loan documents and (iii) nothing expressed or implied in this Addendum shall be construed as a release or other discharge of either Debtor or any other obligor from any of their obligations or liabilities under the Prepetition Financing Agreements, August 2004 Term  Loan Agreements, or any of the

security agreements, deeds of trust, pledge agreements, guaranties, or other loan documents executed in connection therewith.

ARTICLE V
EVENTS OF DEFAULT

Section 5.1   <u>EVENTS OF DEFAULT</u>.   The occurrence of any of the following shall constitute an "Event of Default" under this Addendum:

(a)      the failure of Borrower to pay (i) interest, fees, or other amounts when due under the DIP Loan Documents or Financing Orders and such default shall continue for two business days, or (ii) principal, if any, when due;

(b)      the entry of an order dismissing either of the Bankruptcy Cases or converting either of the Bankruptcy Cases to a chapter 7 case;

(c)      the entry of an order granting any other claim Superpriority Status or a Lien equal or superior to that granted to Bank in Prepetition Collateral and Postpetition Collateral;

(d)      the filing of any pleading seeking to stay, reverse, vacate or otherwise modify any of the Term Sheet, DIP Loan Documents or the Financing Orders without the prior written consent of the Bank;

(e)      the failure of Borrower or JLS to comply with any negative covenants or any other obligation or provision contained in any DIP Loan Document or in any Financing Order;

(f)      the consolidation or combination of Borrower with any other Person (other than JLS) except pursuant to a confirmed Plan of Reorganization as contemplated in the Plan of Reorganization;

(g)      the failure of the Debtors to perform or comply with any other term or covenant contained in any of the DIP Loan Documents or any Financing Order and such default shall continue unremedied for a period of 10 calendar days;

(h)      any representation, warranty, or financial information provided by Borrower, JLS or any Guarantor shall be incorrect or misleading in any material respect when made;

(i)      an aggregate negative variance in a weekly Budget of more than 15%;

(j)      either Borrower or JLS seeking the extension of the exclusivity period unless otherwise consented to by Bank in writing in its sole discretion;

105727.0910/1802196.14

(k)     the entry of a contested order in the Bankruptcy Case granting relief from the automatic stay of 11 U.S.C. § 362 to any party in interest or holder or holders of a Lien or security interest on any portion of Collateral or on any other assets of either Debtor without a finding that the assets which are the subject of such Bankruptcy Order are not necessary to a successful reorganization and the Debtor's continuing operations and ability to perform the Budget and repay the Borrowing Base Obligations, allowing such party to foreclose or otherwise realize upon such Liens or security interests;

(l)     the sale of Collateral (other than inventory in the ordinary course of the Debtor's business) without delivery of the net proceeds therefrom to the holders of the Liens thereon, in the order of priority of such Liens; or

(m)     there occurs an event that has a Material Adverse Effect.

Except as provided herein, any Event of Default arising under the Prepetition Credit Agreement shall not constitute an Event of Default under this Addendum.

Section 5.2     REMEDIES.  Upon the occurrence of an Event of Default under Section 5.1, Bank shall be entitled to a hearing on motion for relief from the automatic stay on 10 days notice so that Bank may exercise all rights and remedies available to Bank under the DIP Loan Documents, the Financing Order, and applicable law.

ARTICLE VI
MISCELLANEOUS TERMS, CONDITIONS, AND JURY WAIVER

Section 6.1     JURY TRIAL WAIVER.  EACH DEBTOR, ON THE ONE HAND, AND BANK, ON THE OTHER HAND, EACH WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INSTITUTED BY EITHER OF THEM AGAINST THE OTHER WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THE FINANCING DOCUMENTS, THE PREPETITION CREDIT AGREEMENT AND RELATED LOAN DOCUMENTS, THE OBLIGATIONS, THE PREPETITION OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY ANY DEBTOR OR BANK, OR IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN ANY DEBTOR AND BANK.  IN NO EVENT WILL BANK BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

Section 6.2     COUNTERCLAIMS.  Each Debtor waives all rights to interpose any claims, deductions, setoffs or counterclaims of any kind, nature or description in any action or proceeding instituted by Bank with respect to this Addendum, the Obligations, the Collateral or any matter arising therefrom or relating thereto.

Section 6.3     JURISDICTION.  Each Debtor and Bank hereby irrevocably submits and consents to the nonexclusive jurisdiction of the Bankruptcy Court with respect to any action or proceeding arising out of the DIP Loan Documents, the Postpetition Obligations, the Collateral or any matter arising therefrom or relating thereto, provided, however, subject to Bank obtaining a relief from automatic stay, nothing in this Addendum shall prohibit Bank from exercising self-

24

help remedies, foreclosing against the Collateral or obtaining provisional remedies, nor shall this Addendum prevent Bank from enforcing its rights against any Guarantor in any court having jurisdiction over such Guarantor; furthermore, the parties reaffirm their agreement to arbitrate any claim, dispute or controversy arising out of or related to the Prepetition Credit Agreement, and Prepetition Obligations in accordance with the terms of the Prepetition Credit Agreement. Any action or proceeding commenced by either Debtor against Bank with respect to this Addendum and the Postpetition Obligations will be litigated only in the Bankruptcy Court and Bank waives any objection based on forum non conveniens and any objection to venue in connection therewith.

Section 6.4    <u>NO WAIVER BY BANK</u>.  Bank shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights or remedies unless such waiver shall be in writing and signed by an authorized officer of the Bank.  A waiver by Bank of any right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy which Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

Section 6.5    <u>NOTICES</u>.    All notices, requests, and demands which any party is required or may desire to give to any other party under any provision of this Addendum must be in writing delivered to each party at the following address:

DEBTORS:    BRUNDAGE-BONE CONCRETE PUMPING, INC.
JLS CONCRETE PUMPING, INC.
6461 Downing Street
Denver, CO 80229

Copies to:

Sender & Wasserman
1660 Lincoln Street, Suite 2200
Denver, CO 80264
Attention: Harvey Sender, Esq.

Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO 80202
Attention: John L. Ruppert, Esq.

BANK:    WELLS FARGO BANK, NATIONAL ASSOCIATION
MAC P6101-142
1300 SW Fifth Ave., Ste. 1400
Portland, OR 97201

25

Copies to:

Lane Powell PC
1420 5th Avenue, Suite 4100
Seattle, WA 98101
Attention: Bruce Leaverton, Esq.

Or to such other address as any party may designate by written notice to all other parties. Legal notices in the bankruptcy case and otherwise shall also be served on bankruptcy counsel of record for the above-referenced parties.

Section 6.6    SEVERABILITY. If any provision of this Addendum is held to be invalid or unenforceable, such provision shall not affect this Addendum as a whole, but this Addendum shall be construed as though it did not contain the particular provision held to be invalid or unenforceable.

Section 6.7    ENTIRE AGREEMENT, AMENDMENTS, WAIVERS, ASSIGNMENT. The DIP Loan Documents contain the entire agreement of the parties as to the subject matter hereof, all prior commitments, proposals and negotiations concerning the subject matter hereof being merged therein. Neither this Addendum nor any provision in the DIP Loan Documents shall be amended, waived, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Bank and a Responsible Officer of the Debtors and approved by Bankruptcy Order. This Addendum shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns, except that any obligation of Bank under this Addendum shall not be assignable nor inure to the successors and assigns of any Debtor.

Section 6.8    DISCHARGE OF DEBTORS/RELEASE OF BORROWING BASE COLLATERAL. No termination of this Addendum shall relieve or discharge any Debtor of its Obligations, grants of Collateral, duties and covenants hereunder, under the DIP Loan Documents, or under the Prepetition Financing Agreements; provided, however, upon the indefeasible payment in full of the Borrowing Base Obligations (other than the Contingent Obligations that have been collateralized to the satisfaction of the Bank), Bank will release all of its Prepetition Liens and its Postpetition Liens on the Borrowing Base Collateral.

Section 6.9    USAGE; GENDER. All terms used herein which are defined in the UCC shall have the meanings given therein unless otherwise defined in this Addendum and all references to the singular or plural herein shall also mean the plural or singular, respectively.

Section 6.10    GOVERNING LAW. The validity of this Addendum and the other DIP Loan Documents, the construction, interpretation, and enforcement hereof and thereof, and the rights of the parties hereto and thereto with respect to all matters arising hereunder or thereunder or related hereto or thereto shall be determined under, governed by, and construed in accordance with the laws of the State of Washington and the Bankruptcy Code, to the extent applicable.

26

Section 6.11 <u>REVIVAL AND REINSTATEMENT OF OBLIGATIONS.</u>   If the incurrence or payment of the Obligations by the Debtors or the Guarantors or the transfer to Bank of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "<u>Voidable Transfer</u>"), and if Bank is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Bank is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of Bank related thereto, the liability of the Debtors or the Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

Section 6.12 <u>USURY PROTECTION.</u>   In no event shall the Debtors, upon demand by Bank for payment of any Obligations relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, Bank shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law.  If Bank ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full, any remaining excess shall be refunded to the Debtors.  This paragraph shall control every other provision hereof and of any other agreement made in connection herewith.

Section 6.13 <u>ASSIGNMENT.</u>   This Addendum is not saleable, assignable, transferable or subject to participation by the Debtors.  This Addendum is saleable, assignable, transferable, and subject to participation and syndication by the Bank, and any successor or assign thereof, in whole or in part, and upon such assignment, the duties and obligations of Bank shall be fully assumed, as to the whole or such part, by the successor or assign, and the Bank, and any successor or assign upon such assignment shall be fully relieved thereof, as to that whole or portion assigned; <u>provided</u>, <u>however</u>, prior to the occurrence of an Event of Default, Bank may not assign this Addendum, with respect to the Bank, to any Person located outside of the United States, without the prior written consent of the Debtors.  In relation to such assignment Bank may, but is not obligated, to act as agent for the lenders, including the Bank, if applicable, then holding an interest in this Addendum, any portion of advances made thereunder, and the security held therefore, all in the proportion assigned.  Subject to such person agreeing to maintain such on a confidential basis, Borrower authorizes and permits the Bank, and any other person who becomes a lender hereunder, to disclose to any purchasing lender, and any prospective purchasing lender, any and all financial information in the Bank's possession concerning the Debtors, and their affiliates, which has been delivered to Bank by or on behalf of the Debtors, pursuant to this Addendum, or which has been delivered to Bank by or on behalf of the Debtors in connection with the Bank's credit evaluation of the Debtors, and their affiliates, prior to entering into this Addendum.

Section 6.14 <u>COUNTERPART EXECUTION.</u>   This Addendum may be executed in any number of counterparts, and by Bank and each Debtor in separate counterparts, each of

105727.0910/1802196.14

which shall be an original, but all of which shall together constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Addendum by telecopy shall be effective as delivery of a manually executed counterpart.

Section 6.15   INDEMNIFICATION.  Each Debtor hereby agrees to indemnify and hold harmless Bank and its officers, directors, employees, attorneys and agents (each an "Indemnified Party") from, and holds each of them harmless against, any and all losses, liabilities, obligations, claims, actions, proceedings, demands, damages, penalties, costs and expenses (including attorney's fees) and any payments made by Bank pursuant to any indemnity provided by any such Person with respect to or to which any Indemnified Party could be subject insofar as such losses, liabilities, obligations, claims, actions, damages, penalties, disbursements, costs, fees or expenses arise with respect to the Financing Documents, including, without limitation, those which may arise from or relate to (a) any depository account and/or any and all agreements executed in connection with the foregoing; (b) the issuance of any Letters of Credit or any indemnities issued by Bank in connection therewith; (c) any and all claims or expenses asserted against Bank as a result of any Debtor's or any Guarantor's failure to comply with any authorization or any environmental pollution, hazardous material or environmental clean-up relating to the owned real properties; and (d) any claim or expense which results from any Debtor's or any Guarantor's operations and use of real property, which Bank may sustain or incur (other than solely as a result of the willful misconduct of the Indemnified Parties as finally determined by a court of competent jurisdiction), all whether through the alleged or actual negligence of such Person or otherwise, except and to the extent that the same results from the willful misconduct of such Indemnified Party as finally determined by a court of competent jurisdiction. Borrower hereby agrees that this indemnity shall be severable from and shall survive any termination of this Addendum, as well as the payment in full of the Obligations which may be due hereunder.

Section 6.16   NO SUBORDINATION.   Any reference in any of the DIP Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by any of the DIP Loan Documents to any Permitted Lien.

Section 6.17   PAYMENTS AND DELIVERIES.   Any payment, notice or delivery required to be made on a date that is not a Business Day shall be made on the next succeeding date that is a Business Day.

Section 6.18   NO SET-OFF.  Each Debtor shall make all payments hereunder without set-off, counterclaim or other deduction.

Section 6.19   NO CONFLICT.  In the event of a conflict between any provision in this Addendum or any other DIP Loan Document, the provisions of the Addendum shall govern.  In the event of any conflict between any provision in any DIP Loan Document and the Financing Order, the provisions of the Financing Order shall govern.

Section 6.20   WASHINGTON NOTICE.  **ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR**

28

ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

IN WITNESS WHEREOF, the undersigned have caused this Addendum to be duly executed as of the day and year first above written.

"BANK"                                        "DEBTORS"

WELLS FARGO BANK, NATIONAL            BRUNDAGE-BONE CONCRETE
ASSOCIATION                                   PUMPING, INC.

By:_____        By:_____
Name: Debbie Ward                   Name: _____
Title: Vice President/Principal     Title: _____

                                    JLS CONCRETE PUMPING, INC.

                                    By:_____
                                    Name: _____
                                    Title: _____

29

GUARANTORS' CONSENT, REAFFIRMATION AND GENERAL RELEASE

Each of the undersigned Guarantors of the Prepetition Obligations and other obligations of Brundage-Bone Concrete Pumping, Inc. to Bank hereby: (a) consents to the foregoing Addendum; (b) reaffirms his obligations under the Bank Loan Guaranties; (c) agrees and acknowledges that his obligations under his Guarantees extend to the Postpetition Obligations; (d) reaffirms his waivers of each and every one of the defenses to such obligations as set forth in Bank Loan Guarantees; (e) reaffirms that his obligations under the Bank Loan Guarantees are separate and distinct from the obligations of any other party under the Addendum and the DIP Loan Documents; and (f) agrees to join in and be bound to the following terms of the foregoing Addendum: (i) the General Release contained in Section 4.25; (ii) the provisions of Section 6.1 concerning jury waiver; (iii) the provisions of Section 6.3 concerning arbitration; (iv) the provisions of Section 6.3 concerning choice of law and venue; and (v) the provisions of Section 4.11 and 6.15 concerning attorney's fees and costs.


GUARANTORS


_____

Dale G. Bone


_____

Jack W. Brundage

EXHIBIT A

DEFINITIONS

"**Advances**" means collectively, (i) the advances made pursuant to Section 1.1 of this Addendum, and (ii) any drawings on Letters of Credit issued and outstanding under the Existing Credit Agreement as of the Petition Date, or issued by Bank thereafter.

"**Addendum**" shall have the meaning set forth in the introduction to this Addendum.

"**Adverse Action**" means (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination, finding or similar relief: (i) challenging or contesting the legality, validity, priority, amount or enforceability of the Obligations, or (ii) challenging or contesting the legality, validity, priority or enforceability, or seeking to invalidate, set aside, avoid or subordinate, in whole or in part, any Lien or interest in favor of Bank or in the Collateral, (b) a request to use the Cash Collateral without Bank's consent, except as provided herein, (c) any negotiation, solicitation or attempt to obtain postpetition loans or other financial accommodations (other than indebtedness permitted under the DIP Loan Documents or which would pay all the Borrowing Base Obligations in full) pursuant to Section 364(c) or (d) other than from Bank or such other party without Bank's consent, or (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Bank, or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns or successors, including without limitation any attempt to recover on an Avoidance Claim from any such party.

"**August 2004 Term Loan**" means the term loan described in the August 2004 Term Loan **Agreements**.

"**August 2004 Term Loan Agreements**" means, collectively, (a) Credit Agreement dated as of August 1, 2004 executed by Borrower, Guarantors and Bank, (b) Seven Hundred and Fifty Thousand Dollar ($750,000.00) Term Note dated as of August 1, 2004, executed by Borrower and Guarantors in favor of the Bank, (c) Deed of Trust recorded on June 14, 2006, under King County, Washington Auditor's File No.9407201689, (d) Modification of Deed of Trust recorded on September 14, 2004, under King County, Washington Auditor's File No.20040916001698, and (e) any of the security agreements, deeds of trust, notes, pledge agreements, guaranties, or other loan documents executed in connection therewith.

"**Avoidance Claims**" means claims, actions, and causes of action under sections 502(d), 542, 544, 547, 548, 550, or 551, and proceeds relating thereof or arising therefrom**,** but specifically excluding claims, actions, or causes of action under section 549 and any proceeds relating thereto or arising therefrom.

"**Bank**" shall have the meaning set forth in the introduction to this Addendum.

"**Bank Expenses**" means, (a) the cost of appraisals described in Section 4.14, and (b) the fees and expenses set forth in Section 4.16.

31

"**Bank Loan Guarantees**" shall mean Continuing Guarantees executed by the Guarantors and dated March 10, 2005.

"**Bankruptcy Cases**" shall mean, collectively, the cases commenced by Borrower and JLS under chapter 11 of the Bankruptcy Code before the Bankruptcy Court, jointly administered under Case No. 10-10758 ABC.

"**Bankruptcy Code**" shall mean title 11 of the United States Code together with all rules, regulations and interpretations thereunder or related thereto.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Colorado.

"**Bankruptcy Orders**" means the orders entered by the Bankruptcy Court in the Bankruptcy Cases and any notices and motions filed with the Bankruptcy Court relating to such orders.

"**Borrower**" shall have the meaning set forth in the introduction to this Addendum.

"**Borrowing Base Collateral**" shall mean, collectively, (i) all accounts of the Debtors, (ii) all inventory of the Debtors, and (iii) the Additional Real Estate Collateral.

"**Borrowing Base Obligations**" shall mean, at any given time, the sum of (i) the Line of Credit Obligations; (ii) the Postpetition Obligations; and (iii) adequate protection payments then due and unpaid to Bank under the terms of the Financing Order or any other Bankruptcy Order.

"**Budget**" shall mean the budget prepared by Borrower with the assistance of its financial advisor delivered to Bank, with modifications proposed by Borrower and approved from time to time by the Bank, in form and substance consistent with the budget provided to Bank, under the terms of the Forbearance Agreement reflecting anticipated weekly cash receipts and expenditures for the succeeding 13 week.

"**Business Day**" means any day except a Saturday, Sunday or any other day on which commercial banks in the state of Washington are authorized or required by law to close.

"**Cash Collateral**" means (a) "Cash collateral," as that term is defined in Section 363(a) of the Bankruptcy Code, in which Bank has, or any person has a Lien or interest, (b) all deposits subject to setoff rights in favor of Bank or any other person, and (c) all cash arising from the collection or other conversion to cash of the Prepetition Collateral, including from the sale or use of inventory and the collection of accounts receivable.

"**Cash Management Agreements**" shall mean any agreement between the Debtors and Bank relating to a deposit account maintained by the Debtors at Bank or any other financial institution.

32

"**Cash Management Orders**" shall mean any Bankruptcy Order that has a Cash Management Agreement within its scope.

"**Closing Date**" means the date of the making of the initial Advance (or other extension of credit) hereunder.

"**Collateral**" means all property and assets of the Debtors subject to the Prepetition Liens and Postpetition Liens.

"**Committee**" shall mean any official committee appointed in the Bankruptcy Cases pursuant to section 1102.

"**Contingent Obligations**" shall mean obligations owed to Bank resulting from contingent indemnification obligations, reimbursement obligations and costs or expenses incurred in connection with any Letters of Credit.

"**Debtors**" shall mean, collectively, Borrower and JLS.

"**Deeds of Trust**" means, collectively, (i) Term Loan C DOT; (ii) Term Loan D DOT; (iii) Term Loan E DOT; (iv) Term Loan F DOT; (v) Term Loan G DOT; and (vi) the Additional Deeds of Trust.

"**Default**" means any event or condition that with the giving of notice, the passage of any applicable cure or grace period, or both, would constitute an Event of Default.

"**DIP Loan Documents**" shall mean, collectively, this Addendum, the DIP Line of Credit Note, the Cash Management Agreements, the Letter of Credit Agreement, the  Letters of Credit, the DIP Letters of Credit and all notes, guarantees, security agreements, mortgages, deeds of trust, subordination agreements, and other agreements, documents and instruments now or at any time hereafter executed and/or delivered by the Debtors in connection with this Addendum, together with any and all amendments, supplements, modifications and reaffirmations thereto.

"**Effective Date**" means the date the Final Financing Order is entered in the Bankruptcy Cases.

"**Facility Fee(s)**" means the fees described in Section 1.6(e).

"**Final Financing Order**" shall mean an order, and related findings of fact and conclusions of law in support thereof, of the Bankruptcy Court entered in the Bankruptcy Cases after a final hearing pursuant to Bankruptcy Rule 4001(c)(2) authorizing on or after the Petition Date, the incurrence of Indebtedness by Debtors, the provision of loans, advances and other financial accommodations by Bank to Borrower, and the granting of Liens, interests, priority claims and other rights in favor of Bank pursuant to the DIP Loan Documents, pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code, in form and substance acceptable to Bank in its sole and absolute discretion, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of Debtors and Bank as may be required to approve such modifications, and that is not

subject to any stay or injunction pending any appeal or petition for certiorari, review, rehearing or reconsideration, or otherwise.

"**Financing Order(s)**" shall mean the Interim Financing Order, until such time as it is superseded by the Final Financing Order, at which time "Financing Order" will mean the Final Financing Order and such other orders, and related findings of fact and conclusions of law in support thereof, relating thereto or authorizing on or after the Petition Date, the incurrence of indebtedness by Borrower, the provision of loans, advances and other financial accommodations by Bank to Debtors, the granting of Liens, interests, priority claims and other rights in favor of Bank pursuant to the DIP Loan Documents, on an emergency, interim, final or other basis pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code as may be issued or entered in the Bankruptcy Cases, each and all in form and substance acceptable to Bank in its sole and absolute discretion.

"**Forbearance Agreement**" shall mean the Loan Restructuring and Forbearance Agreement, dated as of July 24, 2009, as amended by that certain First Amendment to Loan Restructuring and Forbearance Agreement, dated as of October 16, 2009, and that certain Second Amendment to Loan Restructuring and Forbearance Agreement, dated as of December 31, 2009.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any central bank.

"**Guarantors**" shall mean Dale G. Bone and Jack W. Brundage.

"**Indebtedness**" means (without duplication) (a) obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursements or other obligations in respect of letters of credit, banker acceptances, interest rate swaps, or other financial products, (c) all obligations or liabilities of others secured by a Lien on any asset of a Person, irrespective of whether such obligation or liability is assumed, (d) all obligations to pay deferred purchase price of assets (other than trade payable incurred in the ordinary course of business and repayable in accordance with customary trade practices), and (e) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any clauses (a) through (d) above.

"**Initial Forbearance Agreement**" shall mean the Forbearance Agreement, dated as of March 4, 2009, as amended by that certain First Amendment to Forbearance Agreement, dated as of March 31, 2009, that certain Second Amendment to Forbearance Agreement, dated as of May 31, 2009, that certain Third Amendment to Forbearance Agreement, dated as of June 23, 2009, and that certain Fourth Amendment to Forbearance Agreement, dated as of July 10, 2009.

"**Intercreditor Agreements**" shall mean, collectively, all agreements between Bank and other creditors having prepetition Liens on the Debtors' assets that relate to the priority and/or enforcement of such Liens.

"**Interim Facility**"  shall mean the loan extended by the Bank to the Borrower under the terms of the Interim Financing Order and the Term Sheet.

"**Interim Financing Order**" shall mean an order, and related findings of fact and conclusions of law in support of such order, of the Bankruptcy Court entered by the Bankruptcy Cases on January 26, 2010.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, Lien (statutory or other) or charge or preference or priority over assets or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Line of Credit Obligations**" shall mean the obligations of Borrower with respect to the Line of Credit described in Section 1.1 of the Prepetition Credit Agreement, including those arising with respect to the Letters of Credit issued under the Letter of Credit Subfeature. Obligations under the Other Bank Loans are not Line of Credit Obligations.

"**Material Adverse Effect**" means a material adverse effect on (i) the business operations or condition (financial or otherwise) of the Debtors taken as a whole, other than such effects attributable to the commencement or existence of the Bankruptcy Cases or prepetition claims, or (ii) the ability of the Debtors taken as whole to repay the Postpetition Obligations or otherwise perform its obligations hereunder or any DIP Loan Document; provided, however, that neither (i) the commencement or existence of the Bankruptcy Cases, nor (ii) the failure to pay any obligations that arose prior to the Petition Date shall constitute a Material Adverse Effect.

"**Maturity Date**" shall mean the earlier of (i) the date that is 180 days after the Petition Date; (ii) the effective date of a confirmed Plan of Reorganization; (iii) the date on which the Bankruptcy Court approves a sale of all or substantially all of the Borrower's and JLS' assets pursuant Section 363 of the Bankruptcy Code; and (iv) the date of any accelerated maturity due to an Event of Default under the DIP Loan Documents.

"**Obligations**" shall mean, collectively the Prepetition Obligations and the Postpetition Obligations.

"**Other Bank Loans**" shall mean (i) the Equipment Line of Credit; (ii) Term Loan A; (iii) Term Loan B; (iv) Term Loan C; (v) Term Loan D; (vi) Term Loan E; (vii) Term Loan F; (viii) Term Loan G; and (viii) the August 2004 Term Loan.

"**Permitted Disposition**" shall mean:

(a)    the sale of inventory in the ordinary course of business of the Debtors (including intercompany sales of inventory between Borrower and JLS in the ordinary course of business, consistent with past practices);

(b)    the sale, transfer or disposition of any assets of the Debtor that are (i) worn-out or obsolete, (ii) replaced in the ordinary course of business of the Debtors, and (iii) no longer used in the business of the Debtors;

(c)    pursuant to Bankruptcy Orders, to which Bank does not object, the sale or disposition of assets in which Bank has a Postpetition Lien that is junior to another Person by the Debtors pursuant to <u>Section 363</u> of the Bankruptcy Code, which may be accomplished by one or more individual sales or dispositions (whether by sales as going concerns or otherwise), <u>provided</u>, that all net proceeds realized from such sales to be immediately delivered to Bank upon consummation of each such sale;

(d)    pursuant to Bankruptcy Orders, to which Bank does not object, the sale or disposition of assets other than those referenced in clause (c) above in which Bank has a Lien, pursuant to <u>Section 363</u> of the Bankruptcy Code, which may be accomplished by one or more individual sales or dispositions (whether by sales as going concerns or otherwise), <u>provided</u>, that all net proceeds realized from such sales to be immediately delivered to Bank upon consummation of each such sale;

(e)    the incurrence of any Permitted Lien;

(f)    the liquidation, sale or disposition of cash equivalents in the ordinary course of business;

(g)    the write-off of accounts receivable overdue by more than ninety (90) days or the sale of any such accounts receivable for the purpose of collection, in each case in the ordinary course of business; and

(h)    the discount of accounts receivable in the ordinary course of business.

"**Permitted Indebtedness**" means:

(a)    Indebtedness incurred under this Addendum and the other DIP Loan Documents;

(b)    Indebtedness outstanding on the Petition Date;

(c)    Indebtedness between Borrower and JLS arising from intercompany sales of inventory between Borrower and JLS in the ordinary course of business, consistent with past practices;

(d)    Indebtedness in respect of appeal, bid, performance or surety or similar bonds, workers' compensation claims, of the Debtors in the ordinary course of business, including guarantees or obligations of the Debtors with respect to letters of credit supporting such bid, performance or surety bonds, workers' compensation claims (in each case other than for an obligation for money borrowed);

(e)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight

36

overdrafts) drawn against insufficient funds in the ordinary course of business; <u>provided</u>, <u>however</u>, that such Indebtedness is extinguished within ten (10) days of incurrence;

(f) Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(g) Indebtedness Debtors incurred in connection with the financing of insurance premiums in an aggregate amount at any time outstanding not to exceed the premiums owed under such policy; and

(h) unsecured Indebtedness of the Debtors not to exceed at any one time the amounts set forth in the Budget; <u>provided</u>, <u>that</u>, no Event of Default has occurred which is continuing or would result therefrom.

"**Permitted Liens**" shall mean:

(a) Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b) Liens in respect of property of the Debtors, which were incurred in the ordinary course of business and do not secure indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business and (i) which do not in the aggregate materially detract from the value of the property of the Debtors, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Debtors, taken as a whole, or (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(c) any unavoidable Lien in existence on the Petition Date;

(d) easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any real property, in each case whether now or hereafter in existence, not (i) securing indebtedness or (ii) individually or in the aggregate materially impairing the value or marketability of such real property;

(e) Liens arising out of judgments, attachments or awards not resulting in a an Event of Default and in respect of which the Debtors shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)     Liens imposed by law or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation; and

(g)     Postpetition Liens.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall mean the date of the commencement of the Bankruptcy Cases.

"**Plan of Reorganization**" shall mean a plan of reorganization and all documents related thereto filed in the Bankruptcy Cases pursuant to chapter 11 of the Bankruptcy Code.

"**Postpetition Collateral**" shall mean the real and personal property subject to the Postpetition Liens.

"**Postpetition Liens**" shall mean Liens on the Debtors' assets granted under Section 1.8(b) of this Addendum and under a Financing Order.

"**Postpetition Obligations**" shall mean all obligations of the Debtors to Bank arising under the DIP Loan Documents or the Financing Orders, but not including any obligations under the Other Bank Loans.

"**Prepetition Collateral**" shall mean real and personal collateral as described in the Security Instruments and existing as of the Petition Date.

"**Prepetition Credit Agreement**" shall mean that certain Credit Agreement, dated as of June 25, 2008, between Borrower and Bank, as amended, modified, supplemented and restated, including as modified by the Initial Forbearance Agreement and the Forbearance Agreement.

"**Prepetition Financing Agreements**" shall mean, collectively, the Prepetition Credit Agreement, the Bank Loan Guarantees, the Security Agreements, the Prepetition Notes, the Deeds of Trust, the Letter of Credit Agreements and any other agreements, instruments, and documents evidencing, securing, guaranteeing or otherwise relating to the Prepetition Collateral, or any other aspect of the transactions contemplated by the Prepetition Credit Agreement.

"**Prepetition Liens**" shall mean all Liens on and interests in the Prepetition Collateral created by the Security Instruments.

"**Prepetition Notes**" shall mean, collectively, (i) the Line of Credit Note; (ii) the Equipment Line of Credit Note; (iii) Term Loan A Note; (iv) Term Loan B Note; (v) Term Loan C Note; (vi) Term Loan D Note; (v) Term Loan E Note; (vi) Term Loan F Note; and (vii) Term Loan G Note.

"**Prepetition Obligations**" shall mean all of the Debtors' obligations to Bank under the Prepetition Financing Agreements.

"**Professionals**" shall mean attorneys, accountants, investment bankers, consultants, brokers, and any other professional, person, or entity retained under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code by Debtors or any Committee, or entitled to payment of compensation or reimbursement of expenses by Debtors or their estate for services to the Debtors or such Committee, excepting "ordinary course" professionals the retention and payment of which is permitted by separate motion and order before the Bankruptcy Court.

"**Responsible Officer**" shall mean the chief executive officer, president, chief financial officer or controller who is employed by a Person at the time of determination.

"**Revolving Loan Commitment**" shall mean the aggregate commitment of Bank to make Revolving Loans in the aggregate amount of Fifteen Million Dollars (US $15,000,000).

"**Revolving Loans**" shall mean the loans, Advances, or other accommodations extended by Bank from time to time under the DIP Loan.

"**Security Agreements**" means, collectively, (i) the Security Agreement – Equipment, dated March 31, 2002, executed by Borrower; (ii) the Continuing Security Agreement - Rights to Payment and Inventory, dated March 31, 2002, executed by the  Borrower; and (iii) the Third Party Security Agreement – Rights to Payment, dated May 30, 2006, executed by JLS.

"**Security Instruments**" shall mean, collectively, the Security Agreements, Deeds of Trust, and any other mortgage, debenture, deed of trust and other collateral document securing the Prepetition Obligations executed and delivered to Bank prior to the Petition Date.

"**Subsidiary**" means a corporation, partnership, limited liability company, or other entity in which a Person directly or indirectly owns or controls the shares of capital stock or other equity interests having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"**Term Sheet**" shall mean the Binding Term Sheet Regarding DIP Loan Facilities, Agreement For Use of Cash Collateral, Existing Borrowing Base Collateral, and Adequate Protection attached to the Interim Financing Order.

"**UCC**" means the Uniform Commercial Code, as in effect from time to time, of the State of Washington or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"**Variance Report**" shall mean a report to be delivered by Borrower to Bank, in form and substance satisfactory to Bank, on a weekly basis reflecting, without limitation, the following: the actual cash receipts and disbursements for the line items shown in the Budget for the preceding week and a written explanation of the percentage variance of such amounts from those set forth on the Budget for the preceding week.

EXHIBIT B

FORM OF BORROWING BASE CERTIFICATE

105727.0910/1802196.14

<u>SCHEDULE 2.5</u>

<u>LITIGATION</u>

1.      None.

105727.0910/1802196.14

## SCHEDULE 2.8

## ADVERSE FACT

1.      None.

SCHEDULE 2.9

TAXES

1.      None.

SCHEDULE 4.6

BOOKS AND RECORDS

**Denver Corporate**
6461 Downing St.
Denver, CO  80229

**Seattle Parts & Equipment Sales**
1037 Fourth Ave. North
Kent, WA  98032

**Denver Pumping**
6475 Downing St.
Denver, CO  80229

**Seattle Pumping**
1055 Fourth Ave. North
Kent, WA  98032

**Denver Parts**
981 E. 64th Ave.
Denver, CO  80229

**Seattle Parts**
1055 Fourth Ave. North
Kent, WA  98032

**Dallas**
2001 Hinton Drive
Irving, TX  75061

**Riverside**
590-A Main St.
Riverside, CA  92501

**Salt Lake City**
350 West 700 South
Pleasant Grove, UT  84062

**Houston**
4707 West O.S.T. Drive
Houston, TX  77013

**Portland**
1627 NE Argyle Dr.
Portland, OR  97211

**Austin**
101 Precision Dr.
Buda, TX  78610

**Phoenix**
1025 S. 48th Street
Tempe, AZ  85281

**Boise**
301 N. Cloverdale Rd.
Boise, ID  83713

**Springfield**
786 North Miller Ave.
Springfield, MO  65802

**Atlanta**
279 Pumpco Ct.
Forest Park, GA  30297

**Wichita**
3131 North Hillside
Wichita, KS  67219

**JLS Concrete Pumping**
2055 N. Ventura Ave.
Ventura, CA  93001

44

<u>SCHEDULE 4.23</u>

<u>LOCATIONS OF INVENTORY AND PUMPING EQUIPMENT</u>

1.      Inventory of the Debtors may currently be located at the following locations:

| Street | City | State | Zip Code |
|---|---|---|---|
| 6461 Downing St | Denver | CO | 80229 |
| 6475 Downing St. | Denver | CO | 80229 |
| 1037/1055 4th Ave North | Kent | WA | 98188 |
| 350 W 700 S | Pleasant Grove | UT | 84062 |
| 11412 62nd Ave E | Puyallup | WA | 98371 |
| 2001 Hinton Dr | Irving | TX | 75061 |
| 1025 S 48th St | Tempe | AZ | 85281 |
| 981 E 64th Ave | Denver | CO | 80229 |
| 3131 Hillside | Wichita | KS | 67219 |
| 1031 4th Ave North | Kent | WA | 98188 |
| 1627 NE Argyle | Portland | OR | 97211 |
| 19548 E 6th St | Tulsa | OK | 74108 |
| 19556 E 6th St. | Tulsa | OK | 74108 |
| 786 N Miller Ave | Springfield | MO | 65802 |
| 12200 S Sunnylane | Oklahoma City | OK | 73160 |
| 2410 E Gowan Rd | N Las Vegas | NV | 89030 |
| 2015 Ford Ave | Springdale | AR | 72764 |
| 4707 West OST | Houston | TX | 77015 |
| 101 Precision Dr | Buda | TX | 78610 |
| 3638 Range Rd. | Temple | TX | 76504 |
| 8908 Landers Rd N | Little Rock | AR | 72116 |
| 301 N. Cloverdale Rd | Boise | ID | 83713 |
| 910 Westview Drive | Iowa Falls | IA | 50126 |
| 3970 S 1540 E Circle | St George | UT | 84790 |
| 1930 Hinton Dr. | Irving | TX | 75061 |
| 5010 Speaker Road | Kansas City | KS | 66106 |
| 1983 Brown Avenue | Riverside | CA | 92509 |
| 19945 W. 157th St. | Olathe | KS | 66062 |
| 9802 NE Vancouver Way | Portland | OR | 97211 |
| 19564 E. 6th Street | Tulsa | OK | 74108 |
| 617 7th St. | Sulphur Sprgs | TX | 75482 |
| 7804 40th Ave. W | Mukilteo | WA | 98275 |
| 180 Beaver Ridge Ln | Poulsbo | Wa | 98370 |
| 614 S West Blvd. | Aberdeen | WA | 98520 |
| 1115 S. Clodfelter Rd. | Kennewick | WA | 99336 |

45

| 1420 Marvin Rd NE Ste C | Lacey | WA | 98516 |
| 5509 E. Cataldo Ave. | Spokane | WA | 99212 |
| 6050 Terminal Ave. #C | CO Sprgs | CO | 80915 |
| 3466 East County Rd 20C | Loveland | CO | 80537 |
| 1808 Pacific Ave. #4 | Cheyenne | WY | 82001 |
| 2217 Branding Iron | Silt | CO | 81652 |
| 38985 Spruce St. | Milner | CO | 80477 |
| 3747 Salt Creek Rd. | Casper | WY | 82601 |
| 2302 E. Daley St | Rawlins | WY | 82301 |
| 2760 Haines Ave. | Rapid City | SD | 57701 |
| 2740 Coulter Ln. | Gillette | WY | 82716 |
| 1070 S. Century Dr. | Ogden | UT | 84404 |
| 146 Good Neighbor Ln. | Etna | WY | 83118 |
| 207 W 3700 N | Hyde Park | UT | 84318 |
| 60 E 1100 North | Toole | UT | 84074 |
| 101 Conestoga Ct. | Kalispell | MT | 59901 |
| 3450 Cherry Ave., NE | Salem | OR | 97306 |
| PO Box 7547 | Eugene | OR | 97401 |
| 2888 SE Brookwood | Hillsboro | OR | 97123 |
| 2281 West Wetmore | Tucson | AZ | 85705 |
| 5346 S. Desert View Dr. | Apache Junction | AZ | 85520 |
| 6301 Oakland NE | Albuquerque | NM | 87113 |
| 6624 Morrill Rd. | Canutillo | TX | 79835 |
| PO Box 866 | Aztec | NM | 77410 |
| 55 S. lake Havasu Ave. | Lake Havasu | AZ | 86403 |
| 2105 Stephens | Joplin | MO | 64804 |
| PO Box 1135 | Cache | OK | 73527 |
| 7302 W. 19th St. | Lubbock | TX | 79407 |
| 2701 Givens St. | Amarillo | TX | 79108 |
| 6305 S Heron Rd. | Partridge | KS | 67566 |
| 1601 E. Schilling | Salina | KS | 67401 |
| 700 NE Hwy 24 #C. | Topeka | KS | 66608 |
| 21421 SE 219 Rd. | Jetmore | KS | 67854 |
| 590 A Main St. | Riverside | CA | 92501 |
| 590 A Main St. | Riverside | CA | 92501 |
| 8155 Chemical Rd. | Beaumont | TX | 77705 |
| 1196 Addison Ave. W | Twin Falls | ID | 83301 |
| 312 Eastland | Texarkana | AR | 71854 |
| 2290 1516N Lot 3 | Converse | TX | 78109 |
| PO Box 1033 | Elm Mott | TX | 76640 |
| 1819 Drillers Dr. | Bryan | TX | 77806 |

46

| 2625 Locust St. | Nashville | TN | 37207 |
| 5643 Old Millington Rd. | Millington | TN | 38053 |
| 1821 Central Commerce Ct. | Pflugerville | TX | 78660 |
| 1009 S. Lee Highway | Chattanooga | TN | 37311 |
| 11127 County Road 490 | Tyler | TX | 75706 |
| 279 Pumpco Ct. | Forest Park | GA | 30297 |
| 3460 S Cedar Ave | Fresno | CA | 93725 |
| 19137 S Hamilton Ave | Gardena | CA | 90248 |
| Across the street from 19137 S Hamilton Ave | Gardena | CA | 90248 |
| 2410 E Gowan Street | N. Las Vegas | NV | 89011 |
| 1630 Pellessier Rd | Colton | CA | 92324 |
| 12599 Stolter Ct Ste 2A | Poway | CA | 92064 |
| 23870 Pine St | Santa Clarita | CA | 91321 |
| 2055 N Ventura Ave | Ventura | CA | 93001 |
| 2209 Coy St | Bakersfield | CA | 93308 |
| 67-325 Mission Ct | Cathedral City | CA | 92234 |
| 42207 3rd St East | Lancaster | CA | 93535 |
| 14110 E LA Ave | Moorpark | CA | 93021 |
| 4115 Horizon Ln. | San Luis Obispo | CA | 93401 |
| 33320 Hwy 79 South | Temecula | CA | 92592 |

2.       In connection with the ordinary operations of the Debtors' business, pumping equipment routinely crosses state lines.  Furthermore, in connection with the Bankruptcy Cases, the Bankruptcy Court has the power to reject certain leases of the Debtors.  The rejection by the Bankruptcy Court of certain real property leases of the Debtors may require the Debtors to relocate pumping equipment to real property storage locations across state lines.  It is not practical for the Debtors to notify Bank of the movement of the pumping equipment across state lines at least three (3) days prior to such movement.  Bank and Debtors agree that notwithstanding anything contained in Section 4.23 of the Agreement to the contrary, Debtor shall satisfy its obligations in the second paragraph of Section 4.23 by providing to Bank a schedule of the branch to which such pumping equipment is assigned as of the last day of each calendar month on or before the fifteenth day of the next succeeding calendar month.

105727.0910/1802196.14

SCHEDULE 4.29

BANK ACCOUNTS

| Bank | Account Number | Description |
|------|----------------|-------------|
| Wells Fargo | 4159666536 | Denver Corporate Local Petty Checking Acct. |
| Wells Fargo | 4159666544 | Corporate Main Operating Acct. |
| Wells Fargo | 4121902308 | Collateral Acct. (Lockbox Deposit Acct.) |
| Wells Fargo | 4759610199 | Payroll Controlled Disbursement Clearing Acct. |
| Wells Fargo | 4759624919 | A/Pay Controlled Disbursement Clearing Acct. |
| Wells Fargo | 4758357578 | Kent, WA Local Petty Checking Acct. |
| Wells Fargo | 4125624759 | Health Insurance Acct. |
| Bank of America | 5043668310 | Receivables Acct. in Non-Wells Fargo Areas |
| JP Morgan Chase | 475055225 | United Health Care Medical Plan Funding Acct. |
| JP Morgan Chase | 475055233 | United Health Care FSA Plan Funding Acct. |
| JP Morgan Chase | 806024535 | DIP Financing Related Acct. (Unfunded) |
| JP Morgan Chase | 806024543 | DIP Financing Related Acct. (Unfunded) |
| City National Bank | 49035373 | JLS General Acct. |
| City National Bank | 49035381 | JLS Payroll Acct. |

105727.0910/1802196.14