## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUNDAGE-BONE | ) | Case No. 10-10758 ABC |
| CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No. 10-10760 ABC |
| JLS CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | *Jointly Administered Under* |
| Debtor. | ) | *Case No. 10-10758 ABC* |

---

## FIRST AMENDED DISCLOSURE STATEMENT DATED FEBRUARY 2, 2011 UNDER 11 U.S.C. § 1125 IN SUPPORT OF SECOND AMENDED PLAN OF REORGANIZATION FOR BRUNDAGE BONE CONCRETE PUMPING, INC.  AND JLS CONCRETE PUMPING, INC. DATED FEBRUARY 2, 2011

---

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, BUT IS BEING TRANSMITTED TO YOU IN CONNECTION WITH THE DEBTORS-IN-POSSESSION'S REQUEST THAT IT BE APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE TRANSMISSION OF THIS DISCLOSURE STATEMENT TO YOU IS NOT A SOLICITATION OF YOUR VOTE ON THE PLAN.**

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................6
        A.      Notice to Holders of Claims and Interests ...............................................6

II.     EXPLANATION OF CHAPTER 11 .............................................................7
        A.      Overview of Chapter 11 ............................................................................7
        B.      Plan of Reorganization ..............................................................................8

III.    HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS IN THE
        BANKRUPTCY CASES ................................................................................9
        A.      Information Provided Herein .....................................................................9
        B.      Overview ...................................................................................................9
                1.      Brundage-Bone's History ..............................................................9
                2.      Construction Market Activity ......................................................10
                3.      Brundage-Bone's Operations .......................................................11
                4.      Business Model ............................................................................13
                5.      Industry Overview .......................................................................13
                6.      Legal Proceedings .......................................................................14
                7.      Intellectual Property ....................................................................14
                8.      Management .................................................................................15
                9.      Business Organization and Ownership ........................................16
        C.      Events Leading to Chapter 11 Filings ....................................................16
                1.      Revenue Decline and Liquidity Crisis .........................................16
                2.      Business Plan Improvements ........................................................18
        D.      Significant Events Since Commencement of the Chapter 11 Cases.....................19
                1.      Stay of Litigation .........................................................................19
                2.      Postpetition Financing and Use of Cash Collateral .....................19
                3.      Sale of Excess Real Estate ...........................................................20
                4.      Additional Improvements to Case Flow .......................................21
                5.      Retention of CRG Partners Group, LLC as Chief Turnaround Officer.....21
                6.      Order Establishing ADR Procedures ............................................22
                7.      Motion to Establish Adequate Protection .....................................23
                8.      Assumption/Rejection of Equipment Leases and Surrender of Excess
                        Equipment ...................................................................................24
                9.      SunTrust Adversary Proceeding ..................................................25

IV.     THE BANKRUPTCY ESTATES....................................................................25
        A.      Assets ......................................................................................................25
                1.      Cash and Accounts Receivable....................................................25
                2.      Inventory .....................................................................................26
                3.      Machinery and Equipment............................................................26
                4.      Real Property ...............................................................................26
                5.      Covenants Not to Compete...........................................................26
                6.      Contingent Assets ........................................................................26
        B.      Liabilities ...............................................................................................27

|  | 1. | Secured Debt | 27 |
|  | 2. | Priority Claims and Secured Tax Claims | 27 |
|  | 3. | General Unsecured Claims | 28 |
|  | 4. | Executory Contracts and Unexpired Leases | 28 |

V. SUMMARY OF THE PLAN ................................................................28
- A. Plan Overview ............................................................................29
- B. Classification Overview ...............................................................30
- C. Unclassified Claims .....................................................................31
  - 1. DIP Facility Claim ..............................................................31
  - 2. Administrative Claims .........................................................31
    - a. Ordinary Course of Business Claims .............................32
    - b. Workers Compensation, Auto, and General Liability Insurance Claims ....................................................................32
    - c. Professional Fees ........................................................32
    - d. Section 503(b)(3)(D) Claims of Equipment Lenders ..........33
    - e. Section 503(b)(3)(D) Claim of CFS ...............................33
  - 3. Priority Tax Claims and Secured Tax Claims ...........................33
  - 4. Section 503(b)(9) Claims .....................................................34
- D. Classification and Treatment of Claims and Interests .....................34
  - 1. Summary of Claims .............................................................34
  - 2. Class 1 – Brundage-Bone – Equipment Lenders Claims ............36
  - 3. Class 2 – Brundage-Bone – Withdrawing Lenders Claims and CFS Secured Claim ..................................................................39
  - 4. Class 3 – Brundage-Bone – Real Estate Lenders Claims ............40
  - 5. Class 4 – Brundage-Bone – GMAC Equipment Creditor Claim ....40
  - 6. Class 5 – Brundage-Bone – General Unsecured Claims ..............40
    - a. Holders of Class 5 Claims .............................................40
    - b. Treatment of Class 5 Claims .........................................41
    - c. BB Unsecured Class 5 Note and BB Unsecured Class 5 Enhanced Note ..................................................................43
  - 7. Class 6 – Brundage-Bone – Intercompany Claims ....................43
  - 8. Class 7 – Brundage-Bone – Section 510(b) Claims ...................43
  - 9. Class 8 – Brundage-Bone – Equity Interests ...........................43
  - 10. Class 9 – JLS – Secured Claims ............................................44
  - 11. Class 10 – JLS – General Unsecured Claims ...........................44
  - 12. Class 11 – JLS – Intercompany Claims ..................................44
  - 13. Class 12 – JLS – Equity Interests .........................................44
- E. Settlement Provisions for Class 5 and Class 10 Claims ...................44
- F. Objections to Claims ...................................................................45
- G. Exculpation, Injunction and Term of Injunctions and Automatic Stay ................45
  - 1. Exculpation .......................................................................45
  - 2. Injunction .........................................................................45
  - 3. Claims Against Guarantors ..................................................46

VI. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........................46

A.  Operations Between the Confirmation Date and the Effective Date ....................46
B.  Sources of Consideration for Plan Distributions ................................................46
C.  Exit Facility........................................................................................................46
D.  New Notes...........................................................................................................47
E.  Restated Articles ................................................................................................50
F.  Amended and Restated Bylaws ..........................................................................51
G.  New Common Stock............................................................................................51
H.  Warrants.............................................................................................................52
I.  Shareholders' Agreement and New Board ........................................................53
J.  Management Employment Agreements...............................................................53
K.  2011 Equity Incentive Plan and Management Options.......................................54
L.  Brundage and Bone Lender Guaranties, and Guarantor Lock Up Agreement and
    Guarantor Forbearance Agreement...................................................................55
M.  Section 1145 and Other Exemptions...................................................................56
N.  Corporate Existence ...........................................................................................56
O.  BB Liquidating Trust ..........................................................................................56
P.  BB Unsecured Trust, BB Unsecured Class 5 Note and BB Unsecured Enhanced
    Class 5 Note .......................................................................................................57
Q.  Vesting of Assets in the Reorganized Debtor .....................................................58
R.  Cancellation of Interests ....................................................................................58
S.  Corporate Action.................................................................................................59
T.  Effectuating Documents and Further Transactions............................................59
U.  Discharge of Debtors ..........................................................................................60
V.  Exemption from Certain Transfer Taxes and Recording Fees.............................60
W.  Directors and Officers of the Reorganized Debtor .............................................60
X.  Employee and Retiree Benefits............................................................................61
Y.  Preservation of Rights of Action.........................................................................61

VII.  ACCEPTANCE OR REJECTION OF THE PLAN ........................................................62
A.  Class Acceptance Requirement...........................................................................62
B.  Cramdown ...........................................................................................................63

VIII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........63

IX.  LITIGATION...................................................................................................................63

X.  CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN.......................63
A.  Conditions to Effectiveness of the Plan ..............................................................63
B.  Extension of Effective Date .................................................................................65
C.  Effect of Non-Occurrence of Conditions to the Effective Date............................65

XI.  LIQUIDATION ANALYSIS...........................................................................................65

XII.  CERTAIN RISK FACTORS TO BE CONSIDERED .....................................................66

XIII.  CONFIRMATION OF THE PLAN..................................................................................67

|  | A. | Voting Requirements .................................................................68 |
|  | B. | Feasibility of the Plan and Projections ....................................68 |
|  | C. | Warrant Allocation and Credit Enhancement ............................69 |
|  | D. | Best Interests Test ...................................................................71 |
|  | E. | Confirmation Without Acceptance of All Impaired Classes – "Cramdown" ........72 |

XIV. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN...................73
|  | A. | Federal Income Tax Consequences to the Debtors.................74 |
|  |  | 1. Treatment of JLS.....................................................74 |
|  |  | 2. Termination of Subchapter S Corporation Status .....75 |
|  |  | 3. Consolidated Return.................................................75 |
|  |  | 4. Surrender of Equipment and Other Property .............75 |
|  |  | 5. Transfer of Equipment to Subsidiaries .....................76 |
|  |  | 6. Cancellation of Debt and Reduction of Tax Attributes ............77 |
|  |  | 7. Adjusted Tax Basis of Assets of Reorganized Brundage-Bone.............78 |
|  | B. | Federal Income Tax Consequences to Holders of Claims ....................79 |
|  |  | 1. General....................................................................80 |
|  |  | 2. U.S. Holders of Equipment Loan Claims .................81 |
|  |  | 3. U.S. Holders of General Unsecured Claims .............81 |
|  |  | 4. Definition of "Security"..........................................82 |
|  |  | 5. Federal Income Tax Treatment of the Secured Notes and Unsecured Notes ...............82 |
|  |  | 6. Market Discount......................................................82 |
|  |  | 7. Non-United States Persons ......................................83 |
|  |  | 8. Information Reporting and Backup Withholding .......83 |
|  | C. | Importance of Obtaining Professional Tax Assistance .........83 |
|  | D. | Reservation of Rights................................................................83 |

XV. RECOMMENDATIONS AND CONCLUSION ............................................84

Exhibit A     Debtors' Second Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code Dated February 2, 2011
Exhibit B     Excerpts from Schedules and Statement of Financial Affairs
Exhibit C     2008 Audited Financial Statements
Exhibit D     Organizational Chart
Exhibit E     POR Note Terms
Exhibit F     Calculation of AIG Equipment Lender Claim and WFEFI Equipment Lender Claim
Exhibit G     Preference Analysis
Exhibit H     Terms and Conditions of Employment Agreements
Exhibit I     Guarantor Lock Up Agreement
Exhibit J     Guarantor Forbearance Agreement
Exhibit K     Liquidation Analysis
Exhibit L     Operating Projections
Exhibit M     Calculation of Warrant Allocation and Risk Factors

I.      **INTRODUCTION**

Brundage-Bone Concrete Pumping, Inc. and JLS Concrete Pumping, Inc. (collectively, the "Debtors") submit this *First Amended Disclosure Statement in Support of the Second Amended Plan of Reorganization for Brundage-Bone Concrete Pumping, Inc., and JLS Concrete Pumping, Inc.* (as may be amended, the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the *Debtors' Second Amended Plan of Reorganization* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I.A of the Plan entitled "Defined Terms").

A.      **Notice to Holders of Claims and Interests**

The purpose of this Disclosure Statement is to enable creditors and interest holders of the Debtors whose Claims and Equity Interests are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT CAREFULLY.**

On _____, 2011, the Bankruptcy Court entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No entity entitled to vote on the Plan should rely upon any information relating to the Debtors, their businesses, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Debtors and their professionals.

After carefully reviewing this Disclosure Statement, including the attached exhibits and schedules, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by the Debtors' Notice, Claims

and Solicitation Agent, Epiq Bankruptcy Solutions, LLC, no later than 5:00 p.m., Mountain Time, on March 21, 2011.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if the requisite holders of Claims accept it.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M., MOUNTAIN TIME, ON MARCH 21, 2011.**

Pursuant to section 1128 of the Bankruptcy Code, the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on April 1, 2011 at 1:30 p.m., Mountain Time, in the Bankruptcy Court. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before March 21, 2011.

## II. EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs or liquidate its property and assets for the benefit of the debtor, its creditors, and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed.  Unless the Bankruptcy Court orders the appointment of a trustee, Bankruptcy Code sections 1107 and 1108 provide that a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession."

The filing of a chapter 11 petition also triggers the automatic stay under Bankruptcy Code section 362.  The automatic stay halts essentially all attempts to collect prepetition claims from the debtor or to otherwise interfere with the debtor's business or its bankruptcy estate, subject to certain specifically limited exceptions as set forth in the Bankruptcy Code.

Formulation of a plan of reorganization is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor.  Unless a trustee is appointed, only the debtor-in-possession may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period").  After the Exclusive Period has expired, a creditor or any other interested party may file a plan, unless the debtor files a plan within the Exclusive Period.  If a debtor does file a plan within the Exclusive Period, the debtor is given an additional 60 days (the "Solicitation Period") to solicit acceptances of its plan.  Bankruptcy Code section 1121(d) permits the Bankruptcy Court to extend or reduce the Exclusive Period and the Solicitation Period on a showing of adequate "cause."  The Debtors, by filing their Plan within the Exclusive Period, have the sole right to solicit acceptances of the Plan.

## B.    Plan of Reorganization

The debtor initially has the exclusive right to file a plan in the case.  The Debtors herein have done so by filing a Plan during the Exclusive Period.  After a plan has been filed, the holders of certain claims against, or equity interests in a debtor are permitted to vote on whether to accept or reject the plan.  Chapter 11 does not require that each holder of a claim against, or equity interest in, a debtor vote in favor of a plan in order for the plan to be confirmed.  At a minimum, however, if there is an impaired class of claims or interests under a plan, a plan must be accepted by a majority in number and two-thirds in amount of those claims or interests actually voting from at least one class of claims impaired under the plan.  The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and are therefore not entitled to vote.  A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class.  Modification for purposes of impairment does not include curing defaults and reinstating maturity.  Classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and interests accept a plan, the Bankruptcy Court may nonetheless still deny confirmation.  Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  A plan must also be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The Bankruptcy Court may confirm a plan even though fewer than all of the classes of impaired claims and interests accept it.  The Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b).  In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code section 1129(b), the Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class.  The proponent must also meet all applicable

requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)). Those requirements include that (i) the plan complies with applicable Bankruptcy Code provisions and other applicable law, (ii) the plan be proposed in good faith, and (iii) at least one impaired class of creditors or interest holders has voted to accept the plan.

### III. HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

#### A.      Information Provided Herein

Certain of the information set forth below has been provided by the Debtors, employees of the Debtors, and external sources. The Debtors used a combination of the information provided by these sources together with their own analyses regarding the impact of the Plan upon the rights and liabilities of the Debtors and all creditors of the estates. While the Debtors have attempted to provide information from sources believed to be reliable, the Debtors have not independently verified the accuracy of all of the information. The information contained herein has not been subject to an audit. Neither the Debtors nor their counsel represents or warrants the accuracy of discussions of past or future events.

#### B.      Overview

##### 1.      Brundage-Bone's History

Brundage-Bone was founded in 1984 and has grown organically and through acquisitions to be the largest concrete pumping company in the United States. In 2002, Brundage-Bone acquired JLS Concrete Pumping, Inc. in California. All references to Brundage-Bone herein include its wholly owned subsidiary, JLS Concrete Pumping, Inc.

As of the Petition Date, Brundage-Bone operated a fleet of in excess of 800 concrete pumps and related pumping equipment ranging in boom size from 16 to 70 meters, including trailer pumps, placing booms, Telebelts, laser screeds, and stone slingers, in more than 20 states, primarily in the western, southwestern, and southeast United States. Brundage-Bone employs over 600 individuals, of which approximately 130 work under union contracts. Brundage-Bone is a Subchapter-S corporation and has 34 shareholders comprised of current and former employees. Approximately 52% of Brundage-Bone is owned by the founders, Jack Brundage and Dale Bone, who are also guarantors of a substantial amount of the Debtors' debt.

Brundage-Bone's core business is the rental of concrete pumping equipment to general contractors and concrete finishing companies. Unlike most equipment rental companies, Brundage-Bone provides the equipment operator and the equipment most often returns to a "home base" nightly. Brundage-Bone does not contract to purchase, mix, or to deliver concrete and, therefore, is not at risk for materials or work product. The company most often rents its equipment on a per hour and per yard poured schedule customized to each market. Brundage-Bone has no work-in-progress and, therefore, does not use percentage-of-completion accounting and is rarely exposed to retainage risk.

The construction industry throughout most of the United States is highly seasonal and cyclical. Brundage-Bone typically earns the largest portion of its revenues from March through October. November through February are typically lower revenue months affected by weather and holidays. Construction cycles typically run from five to seven years and are greatly influenced by overall economic conditions, interest rates, unemployment, availability of credit, and cyclical sector expansion.

Brundage-Bone rents equipment to all construction end-markets, typically designated as residential, non-residential, and infrastructure. Residential is defined as single family homes and dwellings. Non-residential includes all commercial, industrial, and mixed use projects that are not government funded. Infrastructure projects are those publicly funded or the rare privately funded projects that are public projects in nature (dams, bridges, etc.). Since the decline in construction activity starting in 2007, Brundage-Bone has experienced a dramatic shift in its end market revenue mix from approximately 40% residential, 40% non-residential, and 20% infrastructure to approximately 25% residential, 25% non-residential, and 50% infrastructure.

In addition to providing concrete pumping equipment to contractors, Brundage-Bone actively sells concrete pumps, parts and service. These activities have historically represented a significant source of revenue for the company. However, there has been no active market for concrete pumps since 2008 and parts and service income have been greatly impacted by the significant slowdown in construction activity.

Over the last 26 years, and especially over the past 10 years, Brundage-Bone pursued a strategy of expanding its geographic footprint and acquired over 50 independent concrete pumping companies, including JLS in 2002. The company experienced very rapid growth, especially during the time period from 2003 to 2007 when core revenues grew from $86.8 million to over $200 million. As the construction economy grew, and with emphasis on the boom in housing, Brundage-Bone was able to expand its footprint from four states to 18 states primarily throughout high growth areas in the west and the southwest. The company's fleet of concrete pumping equipment increased as well and supported a revenue base in excess of $200 million per year.

## 2. Construction Market Activity

Beginning in early 2008, overall construction activity has experienced a dramatic decline.[1] The volume of construction across all end-markets has declined as the global economic environment has deteriorated and credit markets have been disrupted. Despite the cascade of negative news from the construction sector over that time period, emerging data in 2010 suggests that the residential construction market may be nearing the end of its decline, the infrastructure construction market is benefiting from new investment, and the decline in the non-residential construction sector may not be as severe or prolonged as the decline in the residential market.

In addition to recent encouraging data from the residential housing sector, historical analysis reveals that residential investment, including single-family, multi-family, and

---

[1] The source of the data set forth in Article III.B.2 is the Bureau of Economic Analysis.

remodeling activity, has already reached record low levels as a percentage of GDP. Furthermore, residential spending has historically recovered rapidly after reaching a cyclical low, having averaged a 15% compound annual growth rate ("CAGR") in the five years after reaching its last five cyclical low points.

While non-residential investment increased at a record pace through 2008, it occurred after a prolonged period of underinvestment. On a historical basis, non-residential investment is currently only slightly above its average of 3.61% of GDP. Given the current issues in the credit markets and an economic environment that remains sluggish, non-residential construction has slowed considerably from its highs of 2008. However, its peak, at 4.00% of GDP, was only 14% above its historical average, and stands in stark contrast to residential spending, which peaked at 31% above its historical average. Thus, any correction in nonresidential spending may be more modest and shorter in length than the correction in the residential market.

National investment in infrastructure is expected to increase at a 6.5% CAGR through 2012, with growth projected in every region of the United State. In the short-term, investment is expected to be driven in part by the American Recovery and Reinvestment Act ("ARRA"), and is likely to positively impact overall infrastructure construction activity in 2010 and 2011. Long-term, infrastructure building and repair is a national priority given years of underinvestment in the sector.

### 3. Brundage-Bone's Operations

Brundage-Bone utilizes a decentralized branch network to manage its core business. Branch level management has the primary responsibility of originating and performing concrete pumping services, while regional and executive management provide strategic oversight and equipment coordination. Brundage-Bone maintains local market focus through a branch network of 15 separate reporting units. The 15 units are located in the following markets: Denver, Colorado; Dallas, Texas; Houston, Texas; Austin, Texas; San Antonio, Texas; Ventura, California; Portland, Oregon; Kent, Washington; Pleasant Grove, Utah; Tempe, Arizona; Oklahoma City, Oklahoma; Tulsa, Oklahoma; Wichita, Kansas; Springfield, Missouri; and Atlanta, Georgia. Each branch manager has responsibility for sales and marketing efforts, concrete pumping operations and equipment service and maintenance. Regional and executive management monitor individual branch performance through a dedicated profit and loss statement and various performance measures, such as fleet utilization, revenue per yard and revenue per hour. Each branch has geographic coverage responsibilities and typically oversees multiple satellite facilities. By locating multiple facilities within a specific metropolitan area, Brundage-Bone is able to reduce costly and unproductive commuting time for its operators and equipment, while maximizing the availability of revenue-earning hours. The larger branches typically have a dedicated service facility, which is capable of performing all routine maintenance and replacement of consumables and wear parts. By performing all of the equipment service functions in-house, the Company is able to consistently service its equipment at a lower cost compared to using outside repair shops.

Brundage-Bone operates from 26 owned facilities and 56 leased facilities in twenty states. Owned facilities generally have office/shop/washout/fuel on site. Significant efficiencies

can be realized at locations that dispatch larger fleets if full service facilities are on-site. Leased facilities range from office and shop accommodations or, in many locations, are simple facilities or unimproved parking. Most of the leased facilities are subject to month-to-month rental agreements.

Brundage-Bone's expertise and industry reputation has allowed it to establish relationships with a number of top-tier general and concrete finishing contractors in each market. Although Brundage-Bone's top 15 customer base varies from year-to-year, it is largely composed of long-standing relationships with top-tier regional and national private contractors that look at Brundage-Bone as their preferred service provider. Historically, top 15 customers have accounted for approximately 10% of total sales, with its largest customer typically accounting for less than 3% of total sales.

As construction end-markets have slowed due to the depressed global economic environment, Brundage-Bone's equipment utilization rate has fallen from a high of approximately 90% in 2007 to currently under 50%.

Below is a summary of Brundage-Bone's operating results from 2006 through the third quarter of fiscal 2010 and an estimate of fiscal 2010 results. Brundage-Bone's operating results mirror the build-up in general construction through 2007. In 2008, concrete pumping revenues declined 10.9% as residential and nonresidential projects in the pipeline came to a close. The credit market crisis that gripped the nation during the fall of 2008 had a dramatic impact on new construction starts in 2009 and into 2010.

| Fiscal year 10/31 *($ in millions)* | 2006A | 2007A | 2008A | 2009A | Before year-end adjusting entries 2010 A |
|---|---|---|---|---|---|
| **Revenue:** | | | | | |
| Concrete pumping | 173.325 | 195.683 | 174.345 | 113.089 | 88.925 |
| Equipment sales | 10.617 | 14.549 | 14.997 | 1.078 | 2.450 |
| Other | 8.950 | 11.131 | 7.825 | 3.289 | .931 |
| Total Gross Revenue | 192.892 | 221.363 | 197.167 | 117.456 | 92.306 |
| | | | | | |
| **Cost of Sales:** | | | | | |
| Depreciation | 12.164 | 13.912 | 13.957 | 13.126 | 12.249 |
| Other COGS | 116.710 | 134.548 | 129.105 | 71.620 | 63.550 |
| Total cost of sales | 128.874 | 148.460 | 143.062 | 84.746 | 75.799 |
| Gross profit | 64.018 | 72.903 | 54.105 | 32.710 | 16.507 |
| | | | | | |
| **SG&A Expense:** | | | | | |
| Salaries / Benefits | 20.911 | 24.663 | 19.210 | 14.686 | 12.230 |
| Depreciation & Amortization | 1.295 | 1.417 | 1.598 | 1.535 | 1.408 |
| Other SG&A | 13.130 | 15.223 | 15.776 | 16.265 | 14.038 |
| Total SG&A | 35.336 | 41.303 | 36.584 | 32.486 | 27.676 |
| **EBIT** | 28.682 | 31.600 | 17.521 | 0.224 | (11.169) |

**Other Income and Expense:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Other income (expense) | 2.420 | (0.141) | (2.161) | 0.554 | (1.667) | |
| Interest expense | (13.072) | (17.020) | (15.357) | (10.902) | (2.482) | |
| Net Income | 18.030 | 14.439 | 0.003 | (10.124) | (15.319) | |

**EBITDAR Calculation:**

| | | | | | | |
|---|---|---|---|---|---|---|
| EBIT | 28.682 | 31.600 | 17.521 | 0.224 | (11.169) | |
| Deduct Equipment Sales | | | | | (2.450) | |
| Add back Equipment COGS | | | | | 5.623 | |
| Restructuring Chgs | | | | 4.300 | 2.905 | |
| Depreciation & Amortization | 13.459 | 15.329 | 15.555 | 14.661 | 13.657 | |
| **EBITDAR** | 42.141 | 46.929 | 33.076 | 19.185 | 8.566 | |

Brundage-Bone's pump operators in Washington and Oregon, and its pump operators and mechanics in California, are party to union contracts in each area. Collective bargaining agreements are in place with the International Union of Operating Engineers covering employees in California and Oregon. A collective bargaining agreement with the Laborers' International Union covers pump operators in Washington.

### 4.   Business Model

The most important operating metrics for Brundage-Bone are revenue per hour and utilization rate. Both metrics are affected by the type of work being performed (residential, non-residential, infrastructure), by the highly seasonal nature of the business, and by localized competitive conditions. In 2008, aggregate revenue per hour was in excess of $226.00. In 2009, aggregate revenue per hour had declined to $215.00. In October, 2010, revenue per hour was approximately $206.00.

A key factor in determining utilization is determining the target number of billable hours that represents 100% utilization of the pumping equipment. This metric is determined by an assessment based on a mix of the number of jobs that can realistically be serviced in a day; the amount of concrete to be pumped per customer; set-up and travel times, etc. Brundage-Bone has determined that an average of 5.5 billable hours per day per piece of equipment represents 100% utilization.

### 5.   Industry Overview

Currently there are two primary methods of placing concrete: (i) traditional methods: truck dumping, "crane and bucket" pours, or hand/wheelbarrow pours and (ii) concrete pumping. Traditional methods are labor and time intensive, requiring loading material into containers and hauling the container to the appropriate location. Once the concrete is placed, the container is then returned to the concrete mixer and filled again. With a concrete pump, the material is pumped under pressure through a boom and hose directly to the delivery point at a constant rate.

In a typical concrete pumping operation, the pumping company provides the skilled operator and a pump mounted truck. Trucks may be mounted with placing booms capable of extending as high as 70 meters. Operators position and stabilize the concrete pump with easy access to ready mix trucks. Ready mix trucks deliver concrete directly into the pump's hopper, where it is pumped to the placing boom and delivered by hose to the point of placement. The operator guides the placing boom throughout the operation by using remote radio controls. A member of the finishing crew controls the hose-end at the point of placement, and a team of finishers spread and finish the concrete. Concrete pumps are capable of emptying a ready mix truck loaded with 10 cubic yards of concrete in as little as 2.5 minutes, pumping material at 240 cubic yards per hour.

Contractors typically prefer to pump concrete rather than place it using the traditional methods of a bucket and crane or manually. Contractors put value in access, speed, safety and quality. Pumping concrete emphasizes each of these attributes:

> Access – Pumping provides placement of the pour when direct dumping is not an option or requires site work
> Speed – Pumping is faster than alternatives and can speed up the entire job (helping with sales and scheduling) leading to direct labor savings.
> Safety – Pumping reduces potential workplace injuries typical of crane and wheelbarrow based work
> Quality – Pumping produces a smooth, higher quality pour when compared to crane and bucket method.

### 6.  Legal Proceedings

The Debtors are involved from time to time in litigation arising in the ordinary course of business. In addition, the Debtors are defendants in several actions related to the collection of debts allegedly owed by the Debtors. A list of pending litigation as of the Petition Date is attached hereto as **Exhibit B** (the "Litigation Exhibit").

The Debtors also had approximately 60 open auto and general liability claims ("Tort Claims") as of the Petition Date (not all of which had proceeded to formal litigation). These Tort Claims arose primarily from traffic accidents involving trucks owned and driven by the Debtors' employees and from work-related injuries involving job-site accidents. In addition, the Debtors had approximately 24 open workers compensation claims that arose from employee job-site accidents (the "Workers Compensation Claims"). Pursuant to section 362(a) of the Bankruptcy Code, prosecution of the Tort Claims and Workers Compensation Claims is stayed by the commencement of the Chapter 11 Cases. In the Chapter 11 Cases, the Debtors filed a motion to establish alternative dispute resolution procedures with respect to the Tort Claims. That motion and the Bankruptcy Court's Order are discussed in more detail in Article III.D.6, hereof.

### 7.  Intellectual Property

The Debtors do not own any trademarks, service marks, copyright registrations or design patents.

8.      **Management**

Bruce Young, President & CEO.  Mr. Young managed the concrete pumping operations for Brundage-Bone from 2001-2007 after managing the Seattle operations, one of the firm's largest branches, from 1986-2001.  He joined Brundage-Bone in 1985 and has held a variety of positions in concrete pumping operations, sales and management.  Mr. Young represents 30-years of industry leadership experience.  Mr. Young is a Director of Brundage-Bone.

John Hudek, CFO, Secretary/Treasurer. Mr. Hudek joined Brundage-Bone in 1997, after 17 years with Wells Fargo Bank.  Mr. Hudek directs Brundage-Bone's overall financial strategy and provides extensive financial, management, and operational expertise.  His responsibilities including financial planning, forecasting and analysis, merger and acquisition analysis and negotiation, financing and capital structure, asset acquisition and capital investment analysis, investor/owner relations, tax and treasury.

Randy Waterman, COO, Non-Union Operations.  Mr. Waterman accepted this role after effectively managing the Regional Manager function for the southern region of Arizona, New Mexico, and Texas.  Waterman joined the Brundage-Bone management team in April of 1999 when Brundage-Bone acquired the national firm, Concrete Placement, Inc.  Mr. Waterman has been in the concrete pumping industry since 1980.

Jeffrey L. Switzer, COO, Union Operations.  Mr. Switzer manages Brundage-Bone's union operations in California, Oregon, and Washington.  Mr. Switzer started his career in the concrete pumping industry in 1973.  Mr. Switzer is a Director of Brundage-Bone.

Timothy Schieck, VP, Controller, Assistant Secretary/Treasurer.  Mr. Schieck joined Brundage-Bone in 1986.  Mr. Schieck began his accounting career in public accounting with Touche Ross.  Mr. Schieck manages all aspects of the company's accounting and financial record keeping, reporting and controls, and tax.

After commencing the Chapter 11 Cases, Brundage-Bone appointed William Snyder as Chief Turnaround Officer.  Mr. Snyder is a managing partner with CRG Partners Group, LLC ("CRG").  Mr. Snyder has extensive experience in interim management, particularly with companies in bankruptcy.  Mr. Snyder has served as a CRO/Examiner/Independent Professional in several other bankruptcy cases including, among others, *In re McCommas LFG Processing Partners, LP*, Case No. 07-32219 (Bankr. N.D. Tex. 2007); *In re Mirant Corporation*, Case No. 03-46590 (Bankr. N.D. Tex. 2003); *In re Cafeteria Operators, L.P. d/b/a Furr's Cafeteria*, Case No. 03-30179 (Bankr. N.D. Tex. 2003); *In re Data VoN, Inc.*, Case No. 02-38600 (Bankr. N.D. Tex. 2002); and *In re Denton County Electric Cooperative, Inc. d/b/a CoServe Electric*, Case No. 02-40665 (Bankr. N.D. Tex. 2002).  Prior to his engagement in this matter, Mr. Snyder was not affiliated with Brundage-Bone.

### 9. Business Organization and Ownership

Brundage-Bone is a Subchapter-S corporation organized in 1984 under the laws of the State of Colorado. Brundage-Bone has 34 shareholders comprised of current and former employees.

Approximately 52% of Brundage-Bone is owned by the founders, Jack Brundage and Dale Bone. The senior management team above owns approximately 22% of Brundage-Bone's common stock.

**Brundage-Bone acquired** JLS in 2002 and since that date it has been operated as a wholly-owned subsidiary, primarily in California and Nevada. JLS conducts its business operations in the same manner as Brundage-Bone; however, it does not own any pumping equipment and instead leases equipment from Brundage-Bone. Tax returns and financial statements for Brundage-Bone and JLS are prepared on a consolidated basis.

### C. Events Leading to Chapter 11 Filings

### 1. Revenue Decline and Liquidity Crisis

As indicated in Brundage-Bone's 2008 audited financial statements attached hereto as **Exhibit C** (the "Financial Exhibit"), since the global financial collapse in 2008, Brundage-Bone has seen its revenues decline from in excess of $200 million for fiscal year 2008 to under $100 million projected for fiscal year 2010. As revenues declined, Brundage-Bone worked diligently to reduce operating and administrative costs, but the steep decline in revenue had an immediate impact on Brundage-Bone's cash flow and created a liquidity crisis.

Brundage-Bone maintains its primary banking relationship with Wells Fargo Bank, N.A. ("Wells Fargo"). The company also has loans and leases with 17 other lending and leasing institutions (collectively, the "Lenders") that in the aggregate exceed $200 million. In July 2009, Brundage-Bone entered into various restructuring and forbearance agreements (collectively, the "Forbearance Agreements") with its Lenders. The Lenders agreed to forbear from exercising remedies under the outstanding loans and leases until December 31, 2009, while Brundage-Bone attempted to formulate and implement a business plan to enhance net revenues and implement further costs savings and right-sizing measures.

Pursuant to the requirements under the Forbearance Agreements, Brundage-Bone employed Cloyses Partners, LLC ("Cloyses"), financial restructuring advisors, to aid Brundage-Bone in identifying ways to restructure operations and balance sheet. With the help of Cloyses prior to the Petition Date, Brundage-Bone and its advisors explored several restructuring alternatives with the Lenders, including the sale of all or specific portions of Brundage-Bone's operations, a new debt or equity capital infusion, several refinancing options and a comprehensive restructuring of Brundage-Bone's balance sheet.

Brundage-Bone was also required by the Lenders to use its best efforts to locate new sources of capital, strategic partnerships, sales, acquisitions or other transactions to repay the outstanding loans and leases.  Beginning in August, 2009, Green Manning & Bunch, Ltd. ("Green Manning") initiated a marketing process for Brundage-Bone in which it pursued a broad marketing campaign on behalf of Brundage-Bone, exploring the possibility of new capital infusions or the sale of all or certain portions of Brundage-Bone's assets.  In addition, Green Manning explored refinancing possibilities with respect to the outstanding loans and leases.  In connection with this broad marketing process, Green Manning contacted approximately 120 parties, 27 of whom signed confidentiality agreements and received due diligence materials, including a confidential information memorandum.

In November 2009, Brundage-Bone began to negotiate the terms of a potential transaction with one of the private equity parties, including the terms of a plan of reorganization. In the meantime, Brundage-Bone and Wells Fargo continued in their attempts to negotiate a restructuring between Brundage-Bone and the Lenders in the bank group.

Brundage-Bone spent December 2009 and the beginning of January 2010 trying to negotiate the terms of the Wells Fargo restructuring proposal with the Lenders.  However, it became apparent that the restructuring proposal did not have the support of all of the other Lenders.  While these negotiations were occurring, and to give Brundage-Bone more time to make progress prior to the expiration of the Forbearance Agreements, Brundage-Bone attempted to obtain an amendment from each of the Lenders that would have continued the forbearance period until February 1, 2010.  As a prerequisite to any one Lender granting the extension of the forbearance period, certain Lenders that expressed a willingness to extend their forbearance made that agreement conditioned on all other Lenders agreeing to the same extension by February 14, 2010.  Brundage-Bone was unable to obtain the necessary consents of all of the Lenders during such a short period, and the forbearance period expired by its terms.

On January 15, 2010, the Debtors executed a Commitment Letter with Aurora Resurgence Management Partners LLC and Commercial Finance Service 110 LLC (hereinafter collectively "CFS") and a term sheet that set forth the terms pursuant to which CFS would provide debtor-in-possession financing (the "CFS DIP Financing"), which financing was subject to, among other things, the negotiation of loan documents, the negotiation of a plan of reorganization satisfactory to CFS and approval of the Bankruptcy Court.  The Commitment Letter purported to grant (a) a first priority lien on all of the Debtors' assets that were unencumbered as of January 15, 2010; and (b) a junior lien on all of the Debtors' assets that were encumbered as of January 15, 2010, for the fees and expenses incurred by CFS during a several month period prior to the Petition Date.  CFS has filed secured claims against the Debtors for fees and expenses incurred pursuant to the Commitment Letter in the aggregate amount of $1,172,544.71.  CFS asserts that such amount represents CFS's reasonable out-of-pocket costs and expenses incurred prior to the Petition Date subject to payment under the Commitment Letter.

As of the Petition Date, Brundage-Bone owned or leased in excess of 800 concrete pumps and related pumping equipment.  At the height of the construction boom in 2007, this fleet of equipment produced annual sales of almost $200 million.  Equipment debt and leased

equipment obligations also totaled in excess of $200 million and contractual debt service could only be maintained if annual pumping revenue was sustained at approximately $140 million or more. Moreover, the market for used equipment had become almost non-existent and Brundage-Bone could not sell excess equipment as utilization rates declined and pumping equipment became idled. Finally, Brundage-Bone had ceased paying principal and interest on notes payable to four former shareholders. Two of the former shareholders had filed lawsuits and one of the claimants was very close to receiving a default judgment with the ability to attach unencumbered assets. The steep decline in revenue and cash flow, coupled with the expired Forbearance Agreements and likelihood of significant litigation with Lenders and lessors, left Brundage-Bone unable to meet its contractual debt service obligations and the company was forced to seek Chapter 11 bankruptcy protection.

## 2.    Business Plan Improvements

In the summer of 2008, residential housing starts took a deep plunge as credit markets and employment levels showed signs of trouble. By September, 2008, the credit markets froze and companies were announcing large layoffs in the wake of troubles in the banking sector and on Wall Street. Prior to the Petition Date, the Management Team took several steps to reduce overhead and other controllable expenses as shown in the table below.

| *($ in millions)* | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| *Gross Revenue* | 221.363 | 197.167 | 117.456 | 92.306 |
| Variable Labor / Benefits | 58.847 | 53.103 | 31.333 | 23.107 |
| | 26.58% | 26.93% | 26.68% | 25.03% |
| G&A Salaries / Benefits | 21.813 | 17.843 | 13.728 | 12.230 |
| | 9.85% | 9.05% | 11.69% | 13.24% |
| All Other G&A Expense | 19.782 | 18.741 | 14.395 | 11.133 |
| *(Net of Restructuring Charges)* | 8.94% | 9.51% | 12.26% | 12.06% |

In 2008, Brundage-Bone initiated a series of management salary and benefit reductions, including freezing management salaries, freezing the redemption of Brundage-Bock stock owned by founders Brundage and Bone, and removing Brundage and Bone from the corporate payroll.

In 2009, Brundage-Bone embarked on an initiative to consolidate branch operations. The goal was to reduce overhead and to streamline branch office functions within geographic locales.

- Las Vegas, NV, office operations were consolidated to JLS at Ventura, CA. The Las Vegas branch was closed in June 2010.
- Fresno, CA, office operations were consolidated to JLS at Ventura, CA.
- Riverside, CA, office operations were consolidated to JLS at Ventura, CA.
- Iowa Falls, IA, office operations were consolidated to Wichita, KS.

- Little Rock, AR, office operations were consolidated to Springfield, MO.
- Portland dispatch functions were consolidated to Kent, WA.
- Boise, ID office operations were consolidated to Salt Lake City, UT.

Most significantly, in 2009 Brundage-Bone consolidated its split corporate offices from Kent, WA, to Denver, CO.   The consolidation of Payroll and Human Resources to Denver resulted in payroll savings in excess of $200,000 per year.

In addition, in June, 2008, Brundage-Bone sold its Kansas City operations to a local competitor.  The Kansas City operations had a history of marginal profitability and in many years recorded significant losses.  The Kansas City branch lost over $400,000 in 2007 and had lost over $500,000 in 2008 prior to sale.  As the residential markets started to collapse in 2008, the management team made the decision to sell or close the Kansas City location.  Brundage-Bone did not sell its non-union Kansas operations located in Wichita, KS.

Other cost-cutting actions:

- Headcount was reduced from over 1,200 employees to 650 employees at the time Brundage-Bone filed for Chapter 11 reorganization.
- Brundage-Bone's 401k match was suspended in early 2009, except to employees covered under collective bargaining agreements.
- Approximately $20,000/month in commercial and health insurance broker costs were saved by consolidating services to one insurance broker.
- A prominent EVP position was eliminated.
- A regional manager position was eliminated.

### D.   Significant Events Since Commencement of the Chapter 11 Cases

#### 1.   Stay of Litigation

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor.  This injunction will remain in effect unless otherwise modified by order of the Bankruptcy Court.

#### 2.   Postpetition Financing and Use of Cash Collateral

On February 10, 2010, the Debtors filed their Amended Motion for Final Order Approving Debtor-in-Possession Financing, Use of Cash Collateral and Adequate Protection (the "DIP Financing Motion").  Through the DIP Financing Motion, the Debtors sought approval of the $15,000,000 superpriority DIP Facility and DIP Credit Agreement with Wells Fargo.  The Bankruptcy Court entered a final Order approving the DIP Financing Motion, DIP Facility and DIP Credit Agreement on March 1, 2010.  As security for the DIP Facility, the Debtors granted Wells Fargo (a) a first priority lien upon and security interest in all of the Debtors' prepetition and postpetition existing and future acquired assets and the proceeds and products thereof of the same character and category as were subject to Wells Fargo's prepetition liens; (b) a priming lien

against Borrowing Base Collateral pursuant to section 364(d)(1) of the Bankruptcy Code; (c) a first priority lien against all unencumbered assets of the Debtors pursuant to section 364(c)(2) of the Bankruptcy Code; and (d) a subordinate lien against all remaining assets of the Debtors pursuant to section 364(c)(1) of the Bankruptcy Code (in each case excluding the claims under chapter 5 of the Bankruptcy Code).

Prior to the filing of the DIP Financing Motion and contemporaneously with the filing of the Petition, the Debtors filed a motion to approve the CFS DIP Financing.  Several of the Secured Creditors objected to the proposed CFS DIP Financing and it became apparent to the Debtors that it was unlikely to be approved over the objections of the Secured Creditors.  The DIP Facility provided by Wells Fargo contained better terms and was less expensive than the terms offered by CFS.  Despite CFS's representations that it would match the DIP Facility offered by Wells Fargo, CFS declined to do so.  The Debtors therefore, in the exercise of their sound business judgment, elected to go with the DIP Facility offered by Wells Fargo.

### 3.      Sale of Excess Real Estate

Brundage-Bone has listed for sale or is actively marketing ten properties with an estimated aggregate value of $5.0 million.  The following is a summary of the properties that are being marketed for sale:

- Irving, Texas – the Bankruptcy Court approved the Debtor's motion to sell the two Irving, Texas properties for $900,000 and the closing occurred in November 2010.

- Wichita, Kansas – the Bankruptcy Court approved the Debtor's motion to sell this property for $90,003 and the closing occurred on September 30, 2010.

- Kent, Washington – the Bankruptcy Court approved the Debtor's motion to sell this property for $1,800,000 and the closing occurred on October 28, 2010.

- Iowa Falls, Iowa - the Bankruptcy Court approved the Debtor's motion to sell this property for $250,000.00 and the closing occurred on November 18, 2010.

- St. George, Utah - the Bankruptcy Court approved the Debtor's motion to sell this property for $300,000.00 and the closing occurred on November 9, 2010.

- Kansas City, Kansas - the Bankruptcy Court approved the Debtor's motion to sell this property for $200,000.00 and the closing occurred on December 27, 2010.

- Tulsa, Oklahoma – the Bankruptcy Court approved the Debtor's motion to sell this property for $190,000 and the closing is expected to occur in February, 2011.

- Las Vegas, Nevada – the Bankruptcy Court approved the Stipulation for Relief from Stay Regarding Las Vegas Property with Wells Fargo Bank, N.A.

- Properties located in Puyallup, Washington and Riverside, California are currently listed for sale.

All sales proceeds remaining after payment of closing costs and broker commissions will be applied to the real estate mortgage encumbering the property or, if unencumbered, to the Debtors' outstanding indebtedness under the Wells Fargo Credit Facility.

### 4.    Additional Improvements to Cash Flow

- Consolidation or closure of operations in Portland, Las Vegas, Riverside, Boise, Iowa, and Montana, resulting in an estimated savings of $150,000/month.
- Restructure of the fleet vehicle lease portfolio with Enterprise Leasing reducing lease expense by approximately $35,000/month.
- Consolidation of wireless phone and data services reducing wireless expenses by an estimated $20,000/month.
- Renegotiation or termination of real estate leases reducing rent expense by $20,000/month.
- Ongoing termination of GPS contracts that, when completed, will reduce expense by an estimated $10,000/month.

### 5.    Retention of CRG Partners Group, LLC as Chief Turnaround Officer

On January 20, 2010, Wells Fargo filed motions in the Chapter 11 Cases seeking the appointment of an examiner and a chapter 11 trustee (respectively, the "Examiner Motion" and the "Trustee Motion"). The Debtors vigorously opposed the Examiner Motion and Trustee Motion. The parties resolved the dispute by agreeing to the appointment of a Chief Turnaround Officer (the "CTO") to perform the following duties:

- Perform a financial review of the Debtors.
- Prepare and review the Debtors' list of equipment to keep and reject and equipment sales, and identify cost reduction and operations improvement opportunities;
- Prepare and review possible reorganization plans and strategic alternatives for maximizing the debt repayment and enterprise value of the Debtors and/or the Debtors' businesses;
- Serve as the principal contact with the Debtors' creditors with respect to the Debtors' financial, operational, and reorganization matters;
- Perform such other services in connection with the reorganization of the Debtors and the preparation of the Debtors' Plan as may be reasonably necessary to advance the Debtors' reorganization efforts under Chapter 11 and the preparation, confirmation and consummation of a Plan;
- Manage and direct the Debtors' professionals in the reorganization process and coordinate their efforts and individual work product with the representatives of the Debtors' various stakeholders consistent with the Debtors' overall reorganization goals; and

- Develop the plan of implementation for the Debtors' revised business plan and Plan, and such other related forecasts and management presentations as may be required in connection with negotiations or by the Debtors for other corporate purposes.

The Debtors selected William Snyder of CRG as CTO.  Mr. Snyder was one of three candidates approved by Wells Fargo.  Mr. Snyder has served as CTO since March 23, 2010 and has performed each of the duties set forth above.

### 6.     Order Establishing ADR Procedures

As stated above, the Debtors had approximately 60 open auto and general liability claims ("Tort Claims") as the Petition Date (not all of which had proceeded to formal litigation).  These Tort Claims arose primarily from traffic accidents involving trucks owned and driven by the Debtors' employees and from work-related injuries involving job-site accidents.  Pursuant to section 362(a) of the Bankruptcy Code, prosecution of the Tort Claims is stayed by the commencement of the Chapter 11 Cases.

The Debtors maintain insurance policies with two insurers, Liberty Mutual Insurance Company ("Liberty") and Zurich North America ("Zurich"), which may provide coverage with respect to many of the Tort Claims.  The Debtors, however, have large deductibles on these policies which range up to $250,000 per occurrence.  In addition, the Debtors' deductible obligations and the costs of defense are backed by standby letters of credit issued by Wells Fargo for the benefit of the insurance companies.  These standby letters of credit (in the aggregate amount of $7.5 million) are reserved under the Wells Fargo Credit Facility.[2]  The Debtors' ability to draw on the line of credit under the Wells Fargo Credit Facility is directly tied to the outstanding letter of credit obligations.  To the extent Tort Claims are resolved, the Debtors may be able to reduce the letter of credit obligations and thereby create additional availability under the Wells Fargo Credit Facility for operation of the businesses.

In an effort to create both additional credit availability and a streamlined, cost-effective means of resolving the Tort Claims, on April 23, 2010, Brundage-Bone filed a motion with the Bankruptcy Court seeking to establish an alternative dispute resolution ("ADR") process (the "ADR Motion") with respect to the Tort Claims.  The ADR procedures as originally proposed were modified to reflect certain concerns and comments from Liberty, Zurich, Holders of three Tort Claims and the Bankruptcy Court.  On September 2, 2010, the Bankruptcy Court entered an Order approving and authorizing the Debtor to implement the approved ADR procedures in order to resolve the Tort Claims.  The ADR procedures provide that before obtaining relief from the automatic stay to pursue a Tort Claim in a non-bankruptcy forum, a claimant must in good faith participate with the Debtors in an offer exchange and mediation process. Recovery of any

---

[2] On September 2, 2010, Zurich drew $1,850,000 on one of the letters of credit, ostensibly to cover the anticipated losses associated with its insurance policies.  In addition, Zurich was holding an additional $150,000 in an escrow account.  The Debtor asserted that Zurich overestimated the potential losses and did not need to draw on the letter of credit since it was not due to expire.  The Debtor and Zurich have reached an agreement to settle their respective claims against one another.  Under the settlement, Zurich agreed to retain a total of $719,440 and assumed all liabilities for the Tort Claims that are covered under its policies and return to the Debtor $1,280,560.  A motion to approve this settlement was filed with the Bankruptcy Court on October 5, 2010, and the Bankruptcy Court approved the settlement on November 5, 2010.

settlement that is reached through the offer exchange or mediation process, or recovery of any judgment that is awarded after the automatic stay is lifted, shall (i) first be sought against the Debtors' applicable insurance policies, and (ii) to the extent the Debtors' insurance policies are not sufficient to pay the entire amount of such settlement or judgment (because of the Debtors' deductible obligations or otherwise), the Debtors and the Claimant shall enter into a stipulation granting the Claimant an Allowed General Unsecured Claim in the amount of any deficiency between the amount of such settlement or judgment and the insurance coverage.

## 7.       Motion to Establish Adequate Protection

On May 18, 2010, the Debtors filed a motion with the Bankruptcy Court seeking approval of its proposed adequate protection payments to the Equipment Lenders and Withdrawing Lenders (the "Adequate Protection Motion"). The Equipment Lenders and Withdrawing Lenders are collectively defined in the Adequate Protection Motion as the "Bank Group." Through the Adequate Protection Motion, the Debtors sought approval of adequate protection payments to consenting members of the Bank Group in exchange for the consenting members providing the following: (a) an agreement to accept the proposed adequate protection payments in lieu of any otherwise allowable administrative expense claim; (b) an express waiver and release of any administrative claim related to depreciation, adequate protection, or unpaid lease payments due under 11 U.S.C. § 365(d)(5), in connection with the use of the equipment financed and leased in the Chapter 11 Cases (but reserving administrative claims for post-petition damage to equipment on collateral other than that caused by ordinary use); and (c) to the extent the adequate protection payments are less than the monthly amounts due each consenting lender or lessor under their notes and leases, an agreement to add any postpetition deficiency amount to the total amount of allowed claims owed by the Debtors under the applicable note or lease. The Adequate Protection Motion describes the members of the Bank Group that consent to the above terms as the "First Group").

In addition, the Adequate Protection Motion contemplated that some members of the Bank Group (referred to as the "Second Group") would, in addition to the provisions set forth above, also agree to participate in and generally support the Debtors' reorganization efforts, including confirmation of the Plan, and (for equipment lessors) agree to any provisions in the Plan converting their equipment leases to secured debt.

The Adequate Protection Motion further contemplates differing adequate protection payments for members of the First Group and Second Group.

SunTrust Equipment Finance and Leasing Corporation ("SunTrust") consented to be treated as a member of the First Group under the Adequate Protection Motion. The Equipment Lenders together filed a Joint Response and Reservation of Rights to the Adequate Protection Motion. The Debtors and the Equipment Lenders negotiated a revised proposed order addressing the concerns raised by the Equipment Lenders, which order was filed with the Bankruptcy Court on June 18, 2010.

Four of the Withdrawing Lenders—Bank of America Leasing & Capital, LLC ("BofA"), General Electric Commercial Finance Corporation ("GE"), PNC Equipment Finance LLC

("PNC") and RBS Asset Finance, Inc. ("RBS")—filed objections to the Adequate Protection Motion. The Debtors, PNC and RBS negotiated a resolution of the objections filed by said lenders. The Bankruptcy Court held a hearing on the Adequate Protection Motion on July 14, 2010. After the hearing the Debtors and BofA resolved the objection filed by BofA. The Debtors submitted and the Bankruptcy Court approved in July 2010 revised proposed orders with respect to the Equipment Lenders, BofA, PNC, RBS, and SunTrust.

The objection filed by GE related only to the treatment of GE under the Adequate Protection Motion. None of the signed adequate protection orders provide any relief with respect to GE. The Debtors and GE reserve all rights with respect to the issues raised in the Adequate Protection Motion as to GE.

### 8. Assumption/Rejection of Equipment Leases and Surrender of Excess Equipment

Postpetition, the Debtors have assumed and rejected several leases, summarized as follows:

| Lessor | Property | Action |
|---|---|---|
| Enterprise Fleet Services | 103 motor vehicles | Rejected leases of 15 vehicles and assumed leases of remaining 88 vehicles at reduced amounts. |
| Gary Greenstreet et al. | Facilities in Lubbock, Texas | Rejected prepetition lease and entered into new lease for facility. |
| JJ Investments, LLC | Facilities in Twin Falls, Idaho | Rejected prepetition lease. |
| Williams Scotsman, Inc. | Trailers | Rejected prepetition lease and entered new lease. |
| Lewan & Associates | Copier supplies and service | Rejected prepetition servicing agreement. |
| Pitney Bowes | Mailing system equipment | Rejected prepetition lease. |
| Sprint/Nextel, Verizon and Advantage Telecom | Wireless telephone/data/internet services | Rejected prepetition wireless contracts. |
| Highland Interest, Inc. | Facilities in Bryan, Texas | Rejected prepetition month-to-month lease. |
| GMAC | 2007 Chevrolet Tahoe | Rejected prepetition lease. |

In addition, the Debtors stipulated to the rejection of their equipment leases with BofA and GE. The Debtors also did not oppose motions for relief from stay to repossess collateral filed by BofA, CBI, PNC, and RBS. The Debtors did not oppose the surrender of certain collateral to SunTrust. The disputed SunTrust collateral is discussed in more detail in Article III.D.9, below. The Debtors have surrendered or are in the process of surrendering each of the foregoing lender's and lessor's collateral.

### 9.     SunTrust Adversary Proceeding

On July 12, 2010, Brundage-Bone commenced an adversary proceeding against SunTrust seeking (a) to avoid liens asserted by SunTrust Equipment Lender against 19 concrete pumping trucks and preserve said liens for the Brundage-Bone Estate and (b) to avoid and recover preferential monetary transfers made by Brundage-Bone to SunTrust Equipment Lender in the 90 days prepetition.

In the adversary proceeding, Brundage-Bone asserts that SunTrust's claimed liens against the identified trucks were never properly perfected under applicable state law before the Petition Date and are therefore avoidable by Brundage-Bone under the strong-arm powers conferred by section 544(a) of the Bankruptcy Code. Brundage-Bone also seeks recovery of the value of the identified trucks on the Petition Date and recovery of all payments made by Brundage-Bone on account of the identified trucks in the 90 days before the Petition Date.

SunTrust filed its answer to the complaint in the adversary proceeding and asserted that it properly perfected its interest in the identified trucks and disputed that it received a preferential transfer. SunTrust filed a motion for partial summary judgment and Brundage-Bone filed a response. Subsequent thereto, the parties reached a settlement in principal contingent upon the confirmation of the Plan of Reorganization on or before April 29, 2011. In the interim, the parties agreed to hold the adversary proceeding in abeyance, which was approved by Order of the Bankruptcy Court on December 10, 2010.

## IV.THE BANKRUPTCY ESTATES

On the Petition Date, Brundage-Bone and JLS filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements"). The Schedules and Statements provide detailed information regarding the Debtors' finances that may assist holders of Claim and Equity Interests in evaluating the Plan. Copies of the Schedules and Statements (as well as all pleadings filed in the Chapter 11 Cases) are posted at http://chapter11.epiqsystems.com/brundagebone. The discussion contained herein generally summarizes the more detailed asset and liability information contained in the Debtors' Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("SOFA") on file with the Bankruptcy Court. Except as otherwise noted, all references are to the operations of the consolidated Debtors.

### A.     Assets.

#### 1.     Cash and Accounts Receivable.

As of the Petition Date, the Debtors had cash on hand or in their various bank accounts totaling $844,000.

In addition, the Debtors held accounts receivable on the Petition Date in the amount of $12.035 million. The Debtors' invoice terms are net 30 days. Approximately 72.0% of the accounts were within 60 days of invoice date at the Petition Date.

### 2.      Inventory

On the Petition Date, the Debtors held spare parts inventory having a book value totaling approximately $3.1 million.  The Debtors perform periodic physical inventory counts and therefore this estimate is subject to change.

### 3.      Machinery and Equipment.

The fixed assets of the Debtors consist principally of real property, fleet vehicles, and the concrete pumping equipment used in daily operations.  The net book value of those fixed assets as of the Petition Date was approximately $245,600,000.  The net book value of the concrete pumping equipment was approximately $210,000,000.  In 2009, the Debtors engaged Dickensheet & Associates for a "desk top" appraisal of its concrete pumping equipment. Dickensheet concluded the liquidation value was $98,149,575.  In 2009, Wells Fargo and the other secured equipment lenders and lessors engaged Hightower Construction Services and Taylor & Martin to value the equipment based upon a physical inspection of all, or nearly all, the Debtors' pumping equipment.  These appraisals reached the following conclusions as to value of the concrete pumping equipment: fair market value: $138,581,900; orderly liquidation value: $120,055,600; forced liquidation: $99,786,500.  Each of these valuations was based upon all of the equipment owned and leased by the Debtors prepetition, including equipment that has been surrendered postpetition.  The SOFA includes a list of the Debtors' owned machinery and equipment as of the Petition Date.

### 4.      Real Property

The SOFA includes a list of each of the Debtor's owned and rented facilities as of the Petition Date.  There are 22 owned and 55 leased facilities as of the date of this Disclosure Statement.

### 5.      Covenants Not To Compete

Brundage-Bone acquired over 50 concrete pumping companies during the past ten years. A covenant not to compete from the former owner(s) was almost always a part of the assets acquired.  At the Petition Date, Brundage-Bone owed approximately $.975 million of the acquisition cost to the former owners of these companies.

There are currently no covenants not to compete between the Debtors and its Managers or the former owners of the acquired companies.

### 6.      Contingent Assets

During the two year period from January 18, 2008 through January 18, 2010, Brundage-Bone distributed $8.054 million to its shareholders as dividends or advances for the repurchase of common stock.  The shareholders who received the majority of these distributions were Brundage and Bone.  Included in the $8.054 million was $.640 million outstanding at the Petition

Date in the form of advances to shareholders.  Also included in the $8.054 million was $1.432 million for the repurchase of common stock that was simultaneously funded with long term notes payable to two former shareholders, James Coons and Darin Sawyer.  Historically, Brundage-Bone repurchased the stock owned by terminated employees, either in cash or via a negotiated note payable.  Coons and Sawyer were both terminated in 2008.

**B.  Liabilities**

**1.  Secured Debt**

The Schedules list each of the Debtor's secured creditors.  As of the Petition Date, Brundage-Bone scheduled secured debt in the amount of $226,460,592.13.  JLS's sole secured creditor is Wells Fargo, which asserts an undisputed blanket lien against all of JLS's assets.

The collateral for Brundage-Bone's secured debt includes real property, motor vehicles, and concrete pumping vehicles and equipment.  The following lenders held security interests in Brundage-Bone's real property as of the Petition Date: Wells Fargo Real Estate Lender, GE Commercial Real Estate Lender, Loan Star Real Estate Lender, and M&I Marshall Real Estate Lender.  As of the Petition Date, the sole lender with a security interest in non-concrete pumping motor vehicles owned by Brundage-Bone was GMAC Equipment Creditor.

The following lenders held security interests in concrete pumping vehicles and equipment owned by the Debtors as of the Petition Date: AIG Equipment Lender, BofA Equipment Lender, CBI Leasing Equipment Lender, Comerica Equipment Lender, KeyBank Equipment Lender, Key Equipment Finance Equipment Lender, People's Capital Equipment Lender, PNC Equipment Lender, RBS Equipment Lender, SunTrust Equipment Lender, Wachovia Equipment Lender, Wells Fargo Equipment Lender and WFEFI Equipment Lender.

Postpetition, the Debtors stipulated to the surrender of the following vehicles and equipment:

| Equipment Lender | Collateral |
| --- | --- |
| BofA | 13 trucks/booms |
| CBI Leasing | 5 trucks/booms |
| PNC | 21 trucks/booms |
| RBS | 19 trucks/booms |
| SunTrust | 5 trucks/booms |
| GMAC | 2007 GMC Sierra motor vehicle |

**2.  Priority Claims and Secured Tax Claims**

There are no unpaid section 507(a)(4) prepetition wage claims.  As of the Petition Date, no employees of either Debtor were owed in excess of $11,725.00 and all unpaid wages owed on the Petition Date have been paid postpetition.

There are also no unpaid section 507(a)(5) employee benefit claims. The Debtors' health insurance benefit program through United Health is largely a self-funded plan with individual and aggregate stop loss provisions. The Debtors are satisfying all employee benefit claims in the ordinary course of operations and has obtained Bankruptcy Court authority to continue paying policy premiums and the company portion of claims during the bankruptcy case.

There are also no unpaid section 507(a)(8) unsecured tax claims. As of the Petition Date, the Debtors owed approximately $530,000 in accrued personal and real property taxes.

### 3.    General Unsecured Claims

Brundage-Bone scheduled $3,816,511.09 in unsecured obligations owing on the Petition Date. JLS scheduled $564,329.41 in unsecured obligations owing on the Petition Date; provided that in addition to this amount, there is an approximately $18,805,000 Wells Fargo Equipment Lender Deficiency Claim that is also a Deficiency Claim against Brundage-Bone. The unsecured debt owed by both Debtors as of the Petition Date was primarily owed to trade creditors. The foregoing does not account for unsecured deficiency claims held by the Debtors' secured creditors that are estimated to be in excess of $108,000,000.

### 4.    Executory Contracts and Unexpired Leases

The Schedules include a list of each of the Debtors' Executory Contracts and unexpired leases as of the Petition Date.

The Debtors' equipment lessors as of the Petition Date included AIG Equipment Lender, BofA Equipment Lender, GE Commercial Finance Equipment Lender, and WFEFI Equipment Lender.

### V. SUMMARY OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.**

**THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS. REFERENCE IS MADE TO THOSE DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.**

**THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS**

IN THE DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

IN THE EVENT THAT THE DEBTORS DO NOT HAVE SUFFICIENT CASH FLOW OR ARE UNABLE TO OBTAIN FINANCING NECESSARY TO KEEP THE BUSINESS OPERATING THROUGH THE CONFIRMATION DATE, THE DEBTORS MAY HAVE TO SHUT DOWN OPERATIONS OF THE BUSINESS. THE DEBTORS RESERVE THE RIGHT TO WITHDRAW ANY PLAN PRIOR TO CONFIRMATION AND IMMEDIATELY IMPLEMENT, WITH APPROPRIATE BANKRUPTCY COURT REVIEW AND APPROVAL, AN ORDERLY LIQUIDATION OF ALL OF THEIR ASSETS WITH DISTRIBUTIONS TO CREDITORS PURSUANT TO THE PROVISIONS OF THE BANKRUPTCY CODE.

### A.    Plan Overview

The Debtors' Plan provides for an extensive financial, organizational and tax restructuring designed to place the Reorganized Debtor's operations in the most favorable posture for the success of future operations. (Attached hereto as **Exhibit D** is a corporate organizational chart for the Reorganized Debtor, the BB Liquidating Trust and the BB Unsecured Trust.) The financial restructuring components of the Plan are primarily the product of extensive negotiations and collaborative efforts of the Debtors, CRG and the Equipment Lenders that are willing to refinance their Secured Claims and make their equipment collateral available to the Reorganized Debtor on favorable terms, given the Debtors' current inability to generate sufficient cash flow to provide secured debt service payments at market terms on needed equipment: Wells Fargo Equipment Lender, WFEFI Equipment Lender, Wachovia Equipment Lender (now part of Wells Fargo Equipment Lender) KeyBank Equipment Lender, Key Equipment Finance Equipment Lender, Comerica Equipment Lender and People's Capital Equipment Lender (collectively, the "Equipment Lenders").

According to the Debtors' experts, the difference between present value of the market terms required to "cram down" secured debt treatment on the Equipment Lenders and present value of the below market terms voluntarily consented to by the Equipment Lenders is approximately $15,930,744 (the "Present Value Shortfall"). To compensate the Equipment Lenders for this Present Value Shortfall, as part of the treatment of their Secured Claims, the Debtors have agreed to distribute Warrants to the BB Liquidating Trust for the benefit of the Equipment Lenders that are projected over the five-year term of the Plan to compensate the Equipment Lenders for the amount of the Present Value Shortfall. See Article XIII.C.

The Debtors are expected to recognize depreciation recapture ordinary income by reason of the transfer of certain items of equipment to the subsidiaries, BB Operating Subsidiary and BB Liquidating Subsidiary, in order to obtain a stepped-up income tax basis for those items of equipment. The stepped-up basis should, through greater depreciation deductions, help substantially improve the after-tax cash flow of the Reorganized Debtor during the five-year period following the effective date of the Plan. It is anticipated that the depreciation recapture

income, which will pass through and be allocated to the Debtor's shareholders in accordance with the Internal Revenue Code, will be offset by suspended losses of those persons who are Debtor's shareholders at the time of the recognition of the income.  After recognition of that income, the Reorganized Debtor will terminate its S election.

As is more particularly described in Article VI.L. below, to help secure the cooperation of Brundage and/or Bone in connection with the implementation of the Plan, the Equipment Lenders have entered into the Guarantor Forbearance Agreement.  Under this Guarantor Forbearance Agreement, the Equipment Lenders have agreed to release Brundage's and/or Bone's personal guarantees of the Debtors' loans in return for their agreement to cooperate with the Debtor in the implementation certain aspects of the Plan along with their agreement not to compete against the Reorganized Debtor's post bankruptcy operations.  As of the date hereof, Bone and the Equipment Lenders have executed the Guarantor Forbearance Agreement.

If the cooperation of Brundage and/or Bone is obtained, the Debtors have agreed to provide an enhanced distribution (in the form of either the Enhanced Note or beneficial interests in Warrants) on the Lender Deficiency Claims of the Equipment Lenders (as well as the Lender Deficiency Claims of any Withdrawing Lenders who join in the Guarantor Forbearance Agreement).  The Debtors' advisers estimate that the value of the Enhanced Notes and Warrants proposed are commensurate with the value of the cooperation of Brundage and/or Bone.  This same level of Enhanced Treatment is also available to the Holders of other Class 5 Claims and Class 10 Claims that properly elect to receive Class 5 Enhanced Treatment or Class 10 Enhanced Treatment.

The Plan is a compromise between and among the Debtors, the management team, the Equipment Lenders and Brundage and/or Bone, which makes available extensive and very favorable equipment financing on below market terms as well as tax benefits in the form of a stepped-up basis for the Reorganized Debtor's Retained Equipment and Excess Equipment.  The Debtors believe these two benefits are critical to the success of their reorganization efforts and will greatly enhance their ability to restructure their affairs and make the distributions to creditors contemplated under the Plan.  Attached hereto as **Exhibit E** is a summary of the principal terms of the Lender Secured Senior Term Loan, the Lender Secured Term Loan, the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note, including cross-references to the applicable definitions in the Plan.

### B.    Classification Overview

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders.  In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than DIP Facility Claims, Administrative Claims and Priority Tax Claims). The Debtors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes which contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes.

The Debtors believe that the Plan has classified Claims and Interests in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim or Interest may challenge the Debtors' classifications of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make modifications to the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a re-solicitation of the Plan.

### C.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, unclassified claims against the Debtors consist of the DIP Facility Claim, Administrative Claims, and Priority Tax Claims.  Based on the Debtors' books and records and the Debtors' projections for future expenses, the Debtors presently estimate that the amount of such Claims should not exceed $3,000,000 (including any unpaid professional fees and the Section 503(b)(3)(D) Claim of the Equipment Lenders.

### 1.    DIP Facility Claim

Wells Fargo's Allowed DIP Facility Claim shall be paid in full in Cash on the Effective Date and the standby letters of credit issued under the DIP Credit Agreement shall (if agreed to by the beneficiaries) be cancelled and returned to Wells Fargo in full, final, and complete satisfaction of such Claim, and the DIP Lender shall release any security interests that it may have pursuant to the DIP Credit Agreement.  The Debtors estimate the amount of the DIP Facility Claim as of the Effective Date will be $1,100,000.  The cancellation and return of the letters of credit contemplates the replacement of letters of credit by the Exit Facility Lenders.

### 2.    Administrative Claims

The Holder of any Administrative Claim must file with the Bankruptcy Court a request for allowance of such Administrative Claim no later than forty-five (45) days after the Effective Date.  Failure to file timely and properly serve the notice shall result in the Administrative Claim being forever barred and discharged.

Each Holder of an Allowed Administrative Claim shall be paid the amount of such holder's Allowed Administrative Claim, in Cash, on or before the Distribution Date, or shall receive such other treatment as agreed upon in writing by the Reorganized Debtor and such holder; *provided, however,* that an Administrative Claim representing a liability incurred in the ordinary course of business by the Debtors may be paid in the ordinary course of business by the Debtors.  All Allowed Professional Claims shall be paid by the Debtors or the Reorganized Debtor within ten (10) days after such Claim is Allowed by Final Order.

### a.     Ordinary Course of Business Claims

Administrative Claims for ongoing business operations will generally be paid in the ordinary course from funds received through operations or financed by the DIP Facility.  To the extent incurred but unpaid on the Effective Date of the Plan, such Claims will be paid as they come due according to their terms.

### b.     Workers Compensation, Auto, and General Liability Insurance Claims

The Debtors maintain insurance policies for general liability, auto liability, workers compensation and property with deductibles that are standard for companies in the Debtors' industry.  Deductibles for these three lines of insurance for open years are most often $250,000.00.  The Debtors are current on the payment of premiums on these policies as well as premiums for their umbrella and contractor's equipment policies.  The Debtors have authority to continue paying commercial insurance policy premiums during the bankruptcy case.

The Debtors are bound by the terms of the Workers Compensation, Auto, and General Liability policies with Zurich North America and Liberty Mutual to reimburse those insurance carriers for deductible payments that become due on claims.   The Debtors have caused irrevocable stand-by letters of credit to be issued to Zurich and Liberty Mutual per the terms of the policies to ensure the payment of deductible reimbursements to the carriers.

### c.     Professional Fees

The Debtors' costs of reorganization consist principally of professional fees incurred during the pendency of the Chapter 11 Cases.  Professional fees are being be paid on an ongoing basis pursuant to the Order Establishing Interim Compensation Procedure for Professionals entered January 21, 2010, resulting in an accrued liability for only part of the professional fee obligations to be paid at or after the Effective Date of the Plan or assumed by the Reorganized Debtor.  The professionals covered by this provision are the Debtors' attorneys, accountants and financial/management consultants and advisors, the CTO, the Committee's attorneys and financial consultants.    Since the Petition Date, the Debtors have paid professional fees of approximately $2,900,000 and as of November 30, 2010, it had accrued and unpaid professional fees of approximately $965,000 (all of which will be paid once the Bankruptcy Court approves the fees).  The Debtor accrues professional fees of approximately $150,000 per month.

Each professional who holds, or asserts, an Administrative Claim based upon compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date (including, without limitation, any compensation requested by a professional or any other entity for making a substantial contribution in the Chapter 11 case) shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice, an application no later than forty-five (45) days after the Effective Date.

#### d.      Section 503(b)(3)(D) Claims of Equipment Lenders

The Equipment Lenders—AIG Equipment Lender, Comerica Equipment Lender, KeyBank Equipment Lender, Key Equipment Finance Equipment Lender, People's Capital Equipment Lender, Wachovia Equipment Lender, Wells Fargo Equipment Lender, and WFEFI Equipment Lender—have each made a substantial contribution to the Chapter 11 Cases.  The Equipment Lenders participated in the DIP financing negotiations, the Adequate Protection Motion negotiations and drafting, and, most significant, Plan and Disclosure Statement negotiations and drafting.   These contributions have been invaluable to the Debtors' reorganization efforts.  As a result of these substantial contributions, each of the Equipment Lenders is entitled, pursuant to section 503(b)(3)(D) of the Bankruptcy Code, to allowance of an Administrative Claim for such contributions.  The Equipment Lenders assert the Administrative Claims that should be allowed under section 503(b)(3)(D) will total $875,000.  The Debtors have not received any detail with respect to such Claims and therefore take no position as to the reasonableness of the services provided or the amount claimed due.  The Debtors reserve all rights with respect to the allowance of any and all section 503(b)(3)(D) Claims and such Claims shall be subject to Bankruptcy Court approval after notice and a hearing.

#### e.      Section 503(b)(3)(D) Claim of CFS

CFS asserts that it is entitled to reimbursement as an administrative expense pursuant to Section 503(b)(3)(D) of the Bankruptcy Code in an aggregate amount of at least $2,217,669.42 (as of December 29, 2010) for its efforts in negotiating alternative debtor-in-possession financing and negotiating an alternative plan of reorganization.  The Debtors dispute that CFS made a "substantial contribution" to the Debtors' reorganization efforts of the type required by the Bankruptcy Code and controlling case law in the Tenth Circuit.  Furthermore, the amount requested is not reasonable and was not necessary under the circumstances.  CFS filed a motion seeking approval of an administrative expense claim on January 28, 2011 and the Bankruptcy Court has scheduled a hearing on the allowance of CFS's Administrative Expense Claim for March 28, 2011.  The Debtors plan to file an objection to CFS's Administrative Expense Claim. For purposes of the Plan, the CFS Administrative Expense Claim has been valued at $0.

To the extent CFS's Administrative Expense Claim is approved by the Bankruptcy Court, such claim shall be treated as an Allowed Administrative Claim and paid, in Cash, on or before the Distribution Date.

#### 3.      Priority Tax Claims and Secured Tax Claims

Accrued personal and real property taxes aggregated approximately $530,000 at the Petition Date.  In addition, there are unknown amounts that could become due to various government authorities for sales, use, and ad valorem taxes resulting from the ongoing registration of pumping related trucks and equipment.   The Debtors do business in different states and from time-to-time they are the subject of tax audits.  Such audits may result in additional claims; however, since the various state taxing authorities have not filed claims against the Debtors for unpaid taxes, the Debtors believe that any new-filed claims would be disallowed by the Bankruptcy Court.

Each Holder of an Allowed Priority Tax Claim or Holder of an Allowed Secured Tax Claim shall receive, on the later of the Effective Date or the date on which a Priority Tax Claim or a Secured Tax Claim becomes an Allowed Claim, one of the following, to be determined in the sole discretion of the Debtors, or the Reorganized Debtor, as applicable: (a) Cash in an amount equal to the amount of such Allowed Claim; (b) Cash in an amount agreed to by the Debtors or the Reorganized Debtor, as applicable, and such Holder; provided that such parties may further agree for the payment of such Allowed Claim at a later date; (c) in the sole discretion of the Debtors or the Reorganized Debtor, as applicable, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; or (d) such other treatment as the Debtors or the Reorganized Debtor, as applicable, and the Holder of a Priority Tax Claim or Holder of an Allowed Secured Tax Claim may otherwise agree; provided further that nothing contained herein shall impair the lien securing a Priority Tax Claim or Secured Tax Claim, but to the extent a Priority Tax Claim or Secured Tax Claim that is fully secured by equipment or real property that is not retained by the Reorganized Debtor or transferred to the BB Equipment Trust, the Holder of the Priority Tax Claim or Secured Tax Claim will be entitled to assert its Claim against the surrendered collateral and will not receive any cash in accordance with this Section 3 on account of its Priority Tax Claim or Secured Tax Claim.  Based on the Debtor' books and records the Debtor presently estimates that the amount of such Claims is $175,000.  Interest on Priority Tax Claims and Secured Tax Claims related to equipment and real property retained by the Reorganized Debtor shall be paid at the rate determined under applicable non-bankruptcy law.

### 4.        Section 503(b)(9) Claims

Section 503(b)(9) of the Bankruptcy Code provides priority treatment to claims for the value of goods received in the 20 days prior to the Petition Date.  To date, no section 503(b)(9) Claims have been filed.  To the extent Allowed, Section 503(b)(9) Claims are Administrative Claims that will be paid in full on the Effective Date.

### D.        Classification and Treatment of Claims and Interests

### 1.        Summary of Claims

All Claims and Interests (other than Administrative Claims, Allowed Priority Tax Claims, and DIP Financing Claims) are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan as follows:

| Class | Claim Against Brundage Bone | Status | Voting Right |
|-------|-----------------------------|--------|--------------|
| 1-A | AIG Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-B | Comerica Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-C | KeyBank Equipment Lender Claim | Impaired | Entitled to Vote |

| 1-D | Key Equipment Finance Equipment Lender Claim | Impaired | Entitled to Vote |
|---|---|---|---|
| 1-E | People's Capital Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-F | Wachovia Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-G | Wells Fargo Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-H | WFEFI Equipment Lender Claim | Impaired | Entitled to Vote |
| 2-A | BofA Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-B | CBI Leasing Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-C | GE Commercial Finance Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-D | PNC Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-E | RBS Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-F | SunTrust Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-G | CFS Secured Claim | Impaired | Entitled to Vote |
| 3-A | GE Commercial Finance Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-B | Loan Star Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-C | M&I Marshall Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-D | Wells Fargo Real Estate Lender Term Loan C Secured Claim | Impaired | Entitled to Vote |
| 3-E | Wells Fargo Real Estate Lender Term Loan D Secured Claim | Impaired | Entitled to Vote |
| 3-F | Wells Fargo Real Estate Lender Term Loan E Secured Claim | Impaired | Entitled to Vote |
| 3-G | Wells Fargo Real Estate Lender Term Loan F Secured Claim | Impaired | Entitled to Vote |
| 3-H | Wells Fargo Real Estate Lender Term Loan G Secured Claim | Impaired | Entitled to Vote |
| 3-I | Wells Fargo Real Estate Lender Term Loan H Secured Claim | Impaired | Entitled to Vote |
| 3-J | Wells Fargo Real Estate Lender Additional Secured Claim | Impaired | Entitled to Vote |
| 4 | GMAC Equipment Creditor Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |

| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

| Class | Claim against JLS | Status | Voting Right |
|-------|-------------------|--------|--------------|
| 9 | Secured Claims | Impaired | Entitled to Vote |
| 10 | General Unsecured Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Impaired | deemed to Reject |
| 12 | Equity Interests | Impaired | Deemed to Reject |

### 2.    Class 1 — Brundage-Bone — Equipment Lenders Claims

Class 1 includes the Allowed Claims of the Equipment Lenders: AIG Equipment Lender, Comerica Equipment Lender, KeyBank Equipment Lender, Key Equipment Finance Equipment Lender, People's Capital Equipment Lender, Wachovia Equipment Lender, Wells Fargo Equipment Lender, and WFEFI Equipment Lender.

The Plan provides for the creation of two Brundage-Bone subsidiaries: the BB Operating Subsidiary and the BB Liquidating Subsidiary. All of the Comerica Equipment and People's Capital Equipment will be retained by the Reorganized Debtor or the BB Operating Subsidiary (defined in the Plan as "Retained Equipment"). A description of the Retained Equipment is attached as Exhibit C to the Plan. The collateral of the remaining Holders of Class 1 Claims shall either be retained by the Reorganized Debtor or the BB Operating Subsidiary (also defined as "Retained Equipment") or transferred to the BB Liquidating Subsidiary (defined as "Excess Equipment"). A description of the Excess Equipment is attached as Exhibit B to the Plan.

Each Holder of a Class 1 Claim shall receive a Lender Secured Senior Term Note secured by a first priority security interest in the Retained Equipment subject to the Holder's security interest and payable in accordance with the definition of Lender Secured Senior Term Notes. In addition, the Lender Secured Senior Term Notes shall be secured by (a) a first priority lien on all of the Equipment Collateral held by the Reorganized Debtor and the BB Operating Subsidiary; (b) a second priority lien in all of the Equipment Collateral held at the BB Liquidating Subsidiary; (c) a lien junior in priority only to any lien held by the Exit Facility Lenders in the accounts receivable, chattel paper, rents, inventory and general intangibles of the Reorganized Debtors, the BB Operating Company and the BB Liquidating Subsidiary; (d) a first priority lien in all investment property including, but not limited to a pledge of all capital stock of the BB Operating Company; and (e) a first priority lien in all remaining personal property of the Reorganized Debtors, the BB Operating Subsidiary and the BB Liquidating Subsidiary not pledged to secure the Exit Facility Loans (the "Lender Secured

Senior Term Loan Collateral"). The principal amounts of the Lender Secured Senior Term Notes are as follows:

| Equipment Lender | Lender Secured Senior Term Note Amount[3] |
|---|---|
| AIG | $ 8,404,500[4] |
| Comerica | $ 3,857,500 |
| KeyBank | $ 9,059,700 |
| Key Equipment Finance | $ 4,170,600 |
| People's Capital | $ 2,703,300 |
| Wachovia | $ 5,728,100 |
| Wells Fargo | $ 9,184,200 |
| WFEFI | $30,831,000 |

The Holders of Class 1 Claims, with the exception of Comerica Equipment Lender and People's Capital Equipment Lender, shall also receive a Lender Secured Term Note secured by a first priority security interest in the Excess Equipment subject to the Holder's security interest. In addition, the Lender Secured Term Notes shall be secured by (a) a first priority lien on all of the Equipment Collateral held by the BB Liquidating Subsidiary; (b) a second priority lien in all of the Equipment Collateral held at the Reorganized Debtor and the BB Operating Subsidiary; (c) a lien junior in priority only to any lien held by the Exit Facility Lenders and the Lender Secured Senior Term Loan in the accounts receivable, chattel paper, equipment rentals, inventory and general intangibles of the Reorganized Debtors, the BB Operating Company and the BB Liquidating Subsidiary; (d) a first priority lien in all investment property including, but not limited to a pledge of all capital stock of the BB Liquidating Subsidiary; and (e) a junior lien in all remaining personal property of the Reorganized Debtors, the BB Operating Subsidiary and the BB Liquidating Subsidiary not pledged to secure the Exit Facility Loans (the "Lender Secured Term Loan Collateral"). The principal amounts of the Lender Secured Term Lender Secured Term Notes are as follows:

| Equipment Lender | Lender Secured Term Note Amount |
|---|---|
| AIG | $ 740,000 |
| KeyBank | $ 3,433,100 |
| Key Equipment Finance | $ 1,872,200 |
| Wachovia | $ 2,197,600 |
| Wells Fargo | $ 7,489,800 |

---

[3] The amount of the Lender Secured Senior Term Note, the Lender Secured Term Note and the Class 5A Claim shall be adjusted on or before the Effective Date to account for the sale of Equipment Collateral prior to the Effective Date.

[4] For purposes of the Plan, the Equipment Lease amounts payable to AIG Equipment Lender and WFEFI Equipment Lender shall be converted to debt. The conversion shall be made on the Effective Date in accordance with the following formula: All unpaid (pre- and postpetition) and future amounts due under each Equipment Lease between the Debtors and, respectively, AIG Equipment Lender and WFEFI Equipment Lender shall be discounted to present value at the rate of 5% per annum. The calculation of the AIG Equipment Lender Claim and WFEFI Equipment Lender Claim is attached hereto as **Exhibit F**.

| | |
|---|---|
| WFEFI | $16,724,700 |

The Reorganized Debtor, as a credit enhancement for the Lender Secured Senior Term Notes and the Lender Secured Term Notes, will issue to the BB Liquidating Trust one or more Warrants to acquire 100% of the New Common Stock (the "Warrant Shares") subject to dilution of up to a total of 34.3% (on a fully diluted basis) for: (a) Options to acquire up to 12% New Common Stock granted to management executives (referred to collectively as "Management" and individually as "Managers") under the 2011 Equity Incentive Plan; and (b) up to 22.3% for Holders of Class 5 Claims and Class 10 Claims that elect or are deemed to elect to participate in the beneficial interest in the Warrants under the Class 5 Enhanced Treatment or the Class 10 Enhanced Treatment as holders of the beneficial interests in the BB Liquidating Trust pursuant to the BB Liquidating Trust Agreement.

Warrant Shares, subject to dilution as set forth above, shall be allocated to the holders of Lender Secured Senior Term Notes and the Lender Secured Term Notes in accordance with the following chart:

| Equipment Lender | Percentage Interest in Warrant Shares |
|---|---|
| AIG | 7.7% |
| Comerica | 3.5% |
| KeyBank | 15.2% |
| Key Equipment Finance | 5.2% |
| People's Capital | 1.5% |
| Wachovia | 7.8% |
| Wells Fargo | 24.2% |
| WFEFI | 34.9% |

The values of the collateral for the secured loans and the leased equipment are substantially less than the values at the times the leases and loans were entered into. As a result, pursuant to section 506(a)(1) of the Bankruptcy Code, each Holder of a Class 1 Claim holds both a Secured Claim and an unsecured Lender Deficiency Claim. The unsecured Lender Deficiency Claims are treated under Class 5. The amounts of the Class 5 Claims of the Equipment Lenders are as follows:

| Equipment Lender | Class 5A Claim Amount |
|---|---|
| AIG | $ 5,955,577 |
| Comerica | $ 2,715,442 |
| KeyBank | $11,766,607 |
| Key Equipment Finance | $ 4,031,462 |
| People's Capital | $ 1,187,422 |
| Wachovia | $ 6,062,171 |
| Wells Fargo | $18,804,042 |
| WFEFI | $27,059,049 |

The Holders of Class 1 Claims shall also receive a release from the Debtor and the Reorganized Debtor of all Avoidance Actions against each Holder.

### 3. Class 2 — Brundage-Bone — Withdrawing Lenders Claims and CFS Secured Claim

Class 2 includes the Withdrawing Lenders: BofA Equipment Lender, CBI Leasing Equipment Lender, GE Commercial Finance Equipment Lender, PNC Equipment Lender, RBS Equipment Lender, and SunTrust Equipment Lender.  Except to the extent a Holder of a Class 2 Claim agrees to a less favorable treatment, the Holders of Class 2 Claims shall receive, in exchange for the full and final satisfaction, settlement, release and discharge of the Holder's Secured Claim against the Debtors, the following:

(a)     The surrender of the equipment subject to the Holder's security interest; and

(b)     To the extent there is a deficiency resulting from the treatment provided for in subsection (a), the deficiency shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

The Debtors' estimates of the amounts of the Withdrawing Lenders Class 5 Claims are as follows:

| Withdrawing Lender | Class 5 Claim Amount |
|---|---|
| BofA Capital | $2,734,000 |
| BofA Lease | $3,298,000 |
| CBI | $1,166,000 |
| GE | $4,462,000 |
| PNC | $5,131,000 |
| RBS | $4,912,000 |
| SunTrust | $5,136,000 |

Class 2 also includes the Disputed CFS Secured Claim in the amount of $1,172,544.71, which Claim will be objected to by the Debtors.  The Debtors also intend to file an adversary proceeding that may include, but shall not be limited to, claims under Sections 506, 547 and 548 of the Bankruptcy Code to determine the extent, validity and priority of the CFS Secured Claim and to seek a determination that the grant of CFS's purported security interest was a preferential transfer and/or fraudulent conveyance.  To the extent the CFS Secured Claim is Allowed, it shall be: (a) paid in cash, or in accordance with the obligation to CFS as determined by the Bankruptcy Court, on the later of the Effective Date or the date it is determined to be an Allowed Claim; or (b) the surrender of any collateral determined to secure the CFS Secured Claim; or (c) to the extent there is a deficiency resulting from the disallowance of the CFS Secured Claim and such deficiency is Allowed, it shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

4.        **Class 3 — Brundage-Bone — Real Estate Lenders Claims**

Holders of Claims arising from a security interest in real property owned by the Debtors are treated under Class 3.  To the extent the Debtors retain the property that is subject to a Real Estate Lender Secured Claim, the Holder of such Claim shall be paid in accordance with the loan documents between the Debtors and the lender, provided that in the event the promissory note secured by the real estate is due to be paid in full at any time during the pendency of the Plan, the promissory note shall be extended for a period of five (5) years at the same or an agreed upon interest rate and the principal balance due thereon shall be fully amortized over 20 years.

To the extent the Debtors surrender the property that is subject to a Real Estate Lender Secured Claim, the Holder of such Claim shall receive the surrendered property and, to extent there is a deficiency resulting from the surrender, the deficiency shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.  The Debtors estimate that the total Real Estate Lender Deficiency Claims will be approximately $513,000.

5.        **Class 4 — Brundage-Bone — GMAC Equipment Creditor Claim**

The Debtors shall surrender the motor vehicles financed by GMAC under the GMAC Equipment Loan Document.  GMAC shall receive the surrendered property and, to extent there is a deficiency resulting from the surrender, the deficiency shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

6.        **Class 5 — Brundage-Bone — General Unsecured Claims**

a.        **Holders of Class 5 Claims**

Class 5 is comprised of the Holders of Allowed General Unsecured Claims against Brundage-Bone, which shall include the following Claims: (i) Deficiency Claims; (ii) Claims of Brundage-Bone's trade creditors; (iii) others listed on Brundage-Bone's Schedule F or that have filed an Unsecured Proof of Claim with the Bankruptcy Court; (iv) Holders of ADR Tort Claims against Brundage-Bone who, after satisfying provisions of the ADR Process and receiving payments pursuant to the Insurance Policy Documents, are determined to have unpaid Allowed ADR Tort Claims; and (v) Class 5 Administrative Claims.  For purposes of voting on the Plan, all Class 5 Claims shall be treated as one Class.

With respect to potential section 502(b)(6) Claims, the Debtors provide the following disclosure: Prior to the Effective Date, the Debtors shall assume or reject each lease of nonresidential real property.  The Debtors are current on all pre- and postpetition nonresidential real property obligations.  In the event the Debtors reject real property leases on or before the Effective Date, counterparties to such rejected leases may have claims for unpaid rent under section 502(b)(6) of the Bankruptcy Code.  The Debtors have not completed an analysis of which nonresidential real property leases the Debtors intend to reject and therefore cannot estimate the potential section 502(b)(6) Claims.  The Debtors believe that the landlords of the properties where leases will not be assumed may relet those locations, thereby further mitigating and reducing their Allowed General Unsecured Claims against the Debtors.

With respect to potential Claims arising from rejected Executory Contracts, the Debtors provide the following disclosure: As of the Petition Date, the Debtors were parties to several Executory Contracts with vendors, landlords, equipment lessors, dealers, customers, and other like parties.  As reflected in Article V of the Plan, the Debtors will reject all Executory Contracts not assumed by separate motion.  The Debtors have not completed an analysis of which Executory Contracts they intend to reject and therefore cannot estimate the aggregate liability generated by those rejections.

With respect to potential Allowed ADR Tort Claims, the Debtors provide the following disclosure: ADR Tort Claims shall be allowed or disallowed in accordance with the ADR Procedure approved by the Bankruptcy Court.  Recovery of any settlement that is reached through the offer exchange or mediation process, or recovery of any judgment that is awarded after the automatic stay is lifted, shall (i) first be sought against the Debtors' applicable insurance policies, and (ii) to the extent the Debtors' insurance policies are not sufficient to pay the entire amount of such settlement or judgment (because of the Debtors' deductible obligations or otherwise), the Debtors and the Claimant shall enter into a stipulation granting the Claimant an Allowed General Unsecured Claim in the amount of any deficiency between the amount of such settlement or judgment and the insurance coverage.

### b.    Treatment of Class 5 Claims

Class 5 Base Treatment:  Each Holder of an Allowed Class 5 Claim shall receive a share of the BB Unsecured Class 5 Note equal to 5.4% of the amount of such Holder's Allowed Class 5 Claim and, except as provided in Article III.D.27.b.(ii)(cc)(II) of the Plan, any Avoidance Actions and any and all other Section 541 Claims against such Holder shall remain available for the Reorganized Debtor to pursue in its discretion.

Class 5 Enhanced Treatment:

(i)    Any Holder of an Allowed Class 5 Claim may elect to receive the Class 5 Enhanced Treatment by: (a) executing a ballot for itself and its related entities voting for the Plan; (b) accepting for itself and its related entities the treatment and valuation of their respective Claims as set forth in the Plan; and (c) satisfying one of the conditions set forth in subparagraph (ii) on or before the Balloting Deadline.

(ii)    In order to elect the Class 5 Enhanced Treatment, the Holder of an Allowed Class 5 Claim shall have satisfied one of the following additional conditions on or before the Balloting Deadline:

(a)    If the Holder holds a guaranty from one or both of the Guarantors, such Holder executes and delivers to Debtors' counsel the Guarantor Forbearance Agreement;

(b)    The Allowed Class 5 Claim of such Holder is an Unsecured Ongoing Vendor Claim[5];

---

[5] "Unsecured Ongoing Vendor Claim" means General Unsecured Claims held by Holders of Allowed Class 5 Claims and Allowed Class 10 Claims that elect the Enhanced Treatment provided for their Allowed Class 5 Claims

(c)     The Allowed Class 5 Claim of such Holder is a Class 5 Administrative Claim[6]; or

(d)     If the Allowed Class 5 Claim is an Allowed ADR Tort Claim, the Holder thereof agrees to limit the amount of its Allowed Class 5 Claim to the lesser of the amount of the Allowed Claim or $100,000.00.

(iii)     Each Holder of an Allowed Class 5 Claim who properly elects to receive the Class 5 Enhanced Treatment shall receive, in addition to the Class 5 Base Treatment provided in subparagraph (i), the following:

(a)     First, at such Holder's election, (I) a share of the BB Unsecured Enhanced Class 5 Note equal to either 2.7% or 1.3% of the amount of such Holder's Class 5 Allowed Claim or (II) such Holder's pro rata share (based upon the total of the Class 5 Claims and Class 10 Claims who receive Unsecured Warrants under Class 5 and Class 10) of up to 22.3% or 12.2% of the Unsecured Warrants held by the BB Liquidating Trust subject to the terms of the BB Liquidating Trust Agreement; provided that (x) if both Guarantors execute the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, the shares of the BB Unsecured Enhanced Class 5 Note and the Unsecured Warrants held by the BB Liquidating Trust to which such Holder shall be entitled shall be the greater amount listed in each of clauses (I) and (II) above, and (y) if only one Guarantor executes the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, such shares shall be the lesser amount so listed; provided further that the percentage of such Unsecured Warrants allocable to an electing Holder of an Allowed Class 5 Claim shall be reduced ratably based upon the amount of Allowed Class 5 Claims and Allowed Class 10 Claims whose Holders elect to receive a share in the BB Unsecured Enhanced Class 5 Note.  A Holder of an Allowed Class 5 Claim that fails to make such an election shall be deemed to have elected to receive its pro rata share of the Unsecured Warrants subject to the terms of the BB Liquidating Trust Agreement.  All Unsecured Warrants attributable to the Holders of Allowed Class 5 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee, and such Holders shall only be entitled to receive distributions from the BB Liquidating Trust attributable to the Unsecured Warrants; and

(b)     Second, a release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against such Holder.

---

and Allowed Class 10 Claims and vote in favor of the Plan and agree in writing to continue to provide goods and services to the Reorganized Debtor from and after the Effective Date on payment credit terms that are customarily given by the Holder of the Class 5 Claim and Holder of the Class 10 Claim to its customers; provided that Unsecured Ongoing Vender Claims shall not include Administrative Claims, Deficiency Claims, Priority Tax Claims, Section 510(b) Claims, or Interests.

[6] "Class 5 Administrative Claim" means an Administrative Claim that has not been Allowed as of the Balloting Deadline whose Holder agrees (i) that such Administrative Claim will be deemed to have arisen at the time of or before the order for relief concerning Brundage-Bone and (ii) to accept in full satisfaction of such Administrative Claim payment, without interest, over five (5) years in equal quarterly installments commencing on the first day of the first full calendar quarter after the Effective Date.

      **c.**      **BB Unsecured Class 5 Note and BB Unsecured Class 5 Enhanced Note**

The BB Unsecured Class 5 Note will be held by the BB Unsecured Trust for the benefit of the Holders of Allowed Class 5 Claims and Allowed Class 10 Claims and shall be payable by the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally, as follows: (i) interest shall accrue on the BB Unsecured Class 5 Note at the rate of 5% per annum; (ii) the principal amount of the BB Unsecured Class 5 Note shall be amortized over a five-year period from the Effective Date and paid in five equal installments (the "Annual Principal Payments"), along with interest (the "Annual Interest Payment"), on each anniversary of the Effective Date; (iii) on the First Anniversary, the Debtor shall pay the first Annual Interest Payment and shall also pay up to the full amount of the First Annual Principal Payment, provided that immediately following such payment, and after the Reorganized Debtor has also paid all scheduled amounts then owing on the Lender Secured Term Notes and the Lender Secured Senior Term Note, the availability on the Exit Facility Revolving Line of Credit is equal to or in excess of $3 million; (iv) on the Second Anniversary, the Reorganized Debtor shall pay the Annual Interest Payment and shall also make the second Annual Principal Payment, together with payment of any deferred outstanding principal amount owing on the first Annual Principal Payment; (v) on the Third Anniversary and the Fourth Anniversary, the Reorganized Debtor shall pay the Annual Interest Payments and the Annual Principal Payments then due and owing; (vi) all remaining amounts due and payable on the BB Unsecured Class 5 Note shall be due and payable in full on or before the Fifth Anniversary.

The BB Unsecured Enhanced Class 5 Note will be held by the BB Unsecured Trust for the benefit of the Holders of the Allowed Class 5 Claims and shall be paid with the same interest and payment terms as provided for the BB Unsecured Class 5 Note.

### 7.      Class 6 — Brundage-Bone — Intercompany Claims

Holders of Intercompany Claims against Brundage-Bone shall receive no distributions on account of their Intercompany Claims against Brundage-Bone.

### 8.      Class 7 — Brundage-Bone — Section 510(b) Claims

Holders of Section 510(b) Claims against Brundage-Bone shall receive no distribution on account of such Claims.

### 9.      Class 8 — Brundage-Bone — Equity Interests

On the Effective Date, all Equity Interests in Brundage-Bone shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

10.     **Class 9 — JLS — Secured Claims**

Class 9 consists of all Secured Claims against JLS, which are limited to Wells Fargo's Secured Claim against all of the assets of JLS and the Disputed CFS Secured Claim.  To the extent Class 9 Claims exist against JLS, they constitute Claims against Brundage-Bone and to the extent they are Allowed, they shall be treated and paid as Allowed Claims against Brundage-Bone in accordance with the treatment provided for Brundage-Bone Claims.

11.     **Class 10 — JLS — General Unsecured Claims**

Class 10 consists of all General Unsecured Claims against JLS and shall receive the same treatment as Class 5.  Parties should refer to the description of the treatment of Class 5 Claims for more information regarding treatment of Class 10 Claims.  The Debtors estimate that Class 10 Claims against JLS are approximately $19,370,000 (including the approximately $18,805,000.00 Wells Fargo Equipment Lender Deficiency Claim that is also a Deficiency Claim against Brundage-Bone).

12.     **Class 11 — JLS — Intercompany Claims**

Holders of Intercompany Claims against JLS shall receive no distributions on account of their Intercompany Claims against JLS.

13.     **Class 12 — JLS — Equity Interests**

On the Effective Date, all Equity Interests in JLS shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

E.     **Settlement Provisions for Class 5 and Class 10 Claims**

The Debtors have conducted a preliminary analysis of potential Preference Claims.  The results of this analysis are attached hereto as **Exhibit G**.[7]  For each Holder of a Claim subject to a potential Avoidance Action, **Exhibit G** identifies the total payments made by the Debtors to the Holder in the 90 days prior to the Petition Date and the value of the goods provided by the Holder to the Debtors in the 90 days prior to the Petition Date.

If the Debtors hold a potential Preference Claim against a Holder of a Class 5 or Class 10 Claim, the Plan provides that the Debtors shall waive any such Preference Claim against a Holder of a Class 5 Claim or a Holder of a Class 10 Claim who elects and satisfies the requirements to receive Class 5 Enhanced Treatment or Class 10 Enhanced Treatment.  The foregoing waiver includes all Avoidance Actions and all other Section 541 Claims and is available to all Holders of Class 5 Claims and Class 10 Claims, provided that a Holder that has Claims against both Brundage-Bone and JLS to receive the Enhanced Treatment must elect and satisfy the treatment criteria in both Bankruptcy Cases.

_____

[7] **Exhibit G** is a preliminary analysis only.  It is subject to change and is not in any way binding upon the Debtor.

**F.      Objections to Claims**

From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive authority to: (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Any objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court not later than 180 days after the Effective Date.  The failure of the Reorganized Debtor or any other party in interest to object to any claim for voting purposes will not be deemed a waiver of the Reorganized Debtor's right to object to, or re-examine, any such Claim in whole or in part.

**G.      Exculpation, Injunction and Term of Injunctions and Automatic Stay**

Article VIII of the Plan provides for exculpation and limitation of liability of various Persons in connection with the Plan and Disclosure Statement.

**1.      Exculpation**

Article VIII.E of the Plan provides as follows: The Exculpated Parties shall neither have, nor incur any liability to the Debtors or the Debtors' Estates for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.

**2.      Injunction**

Article VIII.F of the Plan provides as follows: Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or subject to exculpation pursuant to the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtor: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in

connection with or with respect to any such Claims or Interests except in accordance with Article VIII.K and Article L of the Plan; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Such injunction shall extend to any successors of the Debtors and the Reorganized Debtor and their respective properties and interests in properties.

### 3.      Claims Against Guarantors

Except as expressly agreed to by a Creditor in writing and notwithstanding anything to the contrary in the Plan (including the definition of "Cause of Action"; paragraph U of Article IV of the Plan ("Discharge of Debtors"); and paragraphs A ("Discharge of Claims and Termination of Interests"), E ("Exculpation"), F ("Injunction"), and G ("Injunction Against Interference with Plan of Reorganization") of Article VIII of the Plan), the Plan Documents, the Disclosure Statement, the Confirmation Order, or any other documents related to or arising out of any of the foregoing documents, nothing contained in any of the foregoing shall constitute (i) a release of the Guarantors under their respective guarantees of the Debtors' obligations; or (ii) an injunction or other legal prohibition that would, in any manner, prohibit any Creditor from enforcing any Creditor's rights against any Guarantor, including (a) commencing or continuing in any manner any action or other proceeding of any kind against any Guarantor, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Guarantor, or (c) creating, perfecting, or enforcing any encumbrance of any kind against any Guarantor.  To the extent any Creditor engages in any actions related to or arising out of (ii) above, no such actions shall be deemed in any manner to interfere with the implementation or consummation of the Plan.  Notwithstanding paragraph P of Article XIII of the Plan ("Conflicts and Interpretation of Plan"), to the extent that paragraph M of Article VIII of the Plan is inconsistent with the Confirmation Order, paragraph M of Article VIII of the Plan shall govern.

## VI.  PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.      Operations Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, all orders of the Bankruptcy Court that are then in full force and effect, and as set forth herein.

### B.      Sources of Consideration for Plan Distributions

The Reorganized Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations, existing assets, and proceeds from the Exit Facility.

### C.      Exit Facility

On the Effective Date, the Reorganized Debtor will enter into the Exit Facility. In accordance with the Exit Facility Agreement (a copy of the term sheet for which is attached as

Exhibit A to the Plan), the Reorganized Debtor will use proceeds of the Exit Facility Agreement to satisfy (1) the DIP Facility Claim, including (if agreed to by the beneficiaries) the substitution of the standby letters of credit issued under the DIP Credit Agreement (2) the Fee Claims and (3) the Administrative Claims, to the extent such Claims are not otherwise satisfied pursuant to the terms of the Plan. The Reorganized Debtor shall make payments of principal and interest in accordance with the terms of the Exit Facility Agreement. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the Exit Facility and, upon the Effective Date, the Exit Facility shall be deemed to become valid, binding, and enforceable in accordance with its terms.  The Exit Facility will provide the Reorganized Debtor with access to an Exit Facility Revolving Line of Credit, which is anticipated to be in the aggregate amount of $15,000,000, including a letter of credit facility in the amount of $4,500,000.  The Exit Facility Agreement is expected to contain standard and customary representations and borrowing base requirements, collateral requirements, warranties, affirmative and negative covenants, financial covenants, agency and closing conditions for a debt facility of this nature, type and size.  A copy of the Exit Facility Agreement will be included in the Plan Supplement Documents.  The Plan Supplement Documents shall be filed on the Notice, Claims and Solicitation Agent's Website (http://chapter11.epiqsystems.com/brundagebone) at least 15 days prior to the Balloting Deadlines.

### D.    New Notes

On the Effective Date, (1) the Reorganized Debtor and the BB Operating Subsidiary will enter into the Lender Secured Senior Term Notes jointly and severally as co-borrowers, (2) the BB Liquidating Subsidiary will enter into the Lender Senior Term Notes and the Reorganized Debtor and the BB Operating Subsidiary will guaranty the payment of the Lender Secured Term Notes, (3) the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally, will enter into the BB Unsecured Class 5 Note, and (4) the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally, will enter into the BB Unsecured Enhanced Class 5 Note.  If appropriate and necessary, the Reorganized Debtor shall issue secured promissory notes or amend the existing promissory notes they previously issued to each Holder of a Class 3 Claim whose real estate the Reorganized Debtor does not surrender or sell.  Each of the promissory notes referenced herein shall be deemed to become valid, binding, and enforceable in accordance with its terms.

The Reorganized Debtor and BB Operating Subsidiary shall be co-obligors on the total amount of the obligations owing on account of the Lender Secured Senior Term Notes, the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note.

The Equipment Lenders shall each hold their respective Lender Secured Senior Term Notes and Lender Secured Term Notes reflecting their respective share of said Lender Secured Claims and Lender Secured Excess Equipment Claims.  The Equipment Lenders shall appoint one or more collateral and administrative agent(s) (the "Collateral Agent") for purposes of working with the Reorganized Debtor and its subsidiaries on issues related to terms of the Lender Secured Senior Term Loan and the Lender Secured Term Loan, the perfection of the Equipment Lenders' security interest in and maintenance of the equipment in the Reorganized Debtor, the BB Operating Subsidiary and the BB Liquidating Subsidiary, for record keeping

purposes, and for calling meetings of the Equipment Lenders to discuss issues and determine future courses of action in relation to these loans.

The Reorganized Debtor and its subsidiaries shall engage the services of a title management company acceptable to the Collateral Agent (the "Title Management Company") to coordinate and manage the registration of each piece of titled equipment owned by the Reorganized Debtor and its subsidiaries and the issuance of certificates of title reflecting the proper owner and the lien of the Collateral Agent therein. The Reorganized Debtor and its subsidiaries shall be responsible for all fees, costs and expenses charged or incurred by the Title Management Company. The Reorganized Debtor and its subsidiaries shall be required, immediately following the transfer of any equipment from the BB Liquidating Subsidiary to either the Reorganized Debtor or the BB Operating Subsidiary, to effectuate the issuance of a new certificate of title reflecting ownership in the respective purchaser and the first priority lien in favor of the Collateral Agent working with the Title Management Company to effectuate such transfer.

The Lender Secured Senior Term Loan is a  the full recourse secured term loan facility granted to the Reorganized Debtor and the BB Operating Subsidiary in a total initial aggregate amount equal to the sum of all of the Lender Secured Claims with such sum increasing by the Fair Market Value of the Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary and decreasing by any amounts paid to the Lenders from the proceeds of the Retained Equipment sold prior to the Effective Date. The Lender Secured Senior Term Loan initially amortizes annually with the initial amortization set at $5 million payable pro rata to the holders of the Lender Secured Senior Term Notes; provided that the subsequent annual amortization amounts shall be increased on a pro rata basis for any Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary. The Reorganized Debtor shall make quarterly principal installments in the amount of $1,250,000 each commencing on July 31, 2011 and continuing, as increased from time to time for Excess Equipment transfers, until the Lender Secured Senior Term Loan Maturity Date. The Debtor shall commence making the Monthly Lender Interest Payments (Libor + 3.0%) on the first day of the first full month following the Effective Date and payable thereafter on the first day of each month until the Lender Secured Senior Term Loan Maturity Date. The Debtor shall also pay on a quarterly basis the accrued Annual Lender Interest Payment (1.69%) and principal reductions from Estimated Excess Cash Flow, commencing 45 days following the first fiscal quarter-end after the Effective Date. Any remaining unpaid amount of the respective year's Annual Lender Interest Payment and Excess Cash Flow for the fiscal year as determined by the Annual Audit shall be due 90 days after the respective fiscal year end (or such later time as set forth in the Lender Secured Senior Term Loan Documents); provided that the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be paid only to the extent that such payment does not reduce the Reorganized Debtor's availability on the Exit Facility Revolving Line of Credit  to an amount that is less than $3 million. Any deferred payment of the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be addressed as set forth in the Lender Secured Senior Term Loan Documents.. All principal amounts, interest, fees and other monetary obligations due and owing under the Lender Secured Senior Term Loan Documents shall be fully due and payable on the Lender Secured Senior Term Loan Maturity Date.

The Lender Secured Term Loan is a full recourse secured term loan facility granted to the BB Liquidating Subsidiary in an initial aggregate amount equal to the sum of all of the Lender Secured Excess Equipment Claims, which amount shall be reduced from time to time by the Fair Market Value of the Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary and decreasing by any amounts paid to the Lenders from the proceeds of the Excess Equipment sold prior to the Effective Date.  The Debtor shall commence making the Monthly Lender Interest Payments (Libor + 3.0%) on the first day of the first full month following the Effective Date and payable thereafter on the first day of each month until the Lender Secured Term Loan Maturity Date.  The Debtor shall also pay, on a quarterly basis from Estimated Excess Cash Flow, the accrued Annual Lender Interest Payment (3.84%), commencing 45 days following the first fiscal quarter-end after the Effective Date.  Any remaining unpaid amount of the respective year's Annual Lender Interest Payment shall be due 90 days after fiscal year end (or such later time as set forth in the Lender Secured Senior Term Loan Documents); provided that the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be paid only to the extent that such payment does not reduce the Reorganized Debtor's availability on the Exit Facility Revolving Line of Credit  to an amount that is less than $3 million.  Any deferred payment of the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be addressed as set forth in the Lender Secured Term Loan Documents.  All principal amounts, interest, fees and other monetary obligations due and owing under the Lender Secured Term Loan Documents shall be fully due and payable on the Lender Secured Term Loan Maturity Date.

The Lender Secured Senior Term Notes and Lender Secured Term Loan Notes issued to each Equipment Lender shall be secured by a first priority lien granted in favor of the Collateral Agent for the benefit of such Equipment Lender on all equipment provided to the Reorganized Debtor and its subsidiaries by such Lender, together with all products and proceeds of any of the foregoing (as to any Equipment Lender, such Equipment Lender's "Specific Equipment").

The holders of Lender Secured Senior Term Notes shall also hold any and all rights of the Reorganized Debtor as "lessor" under any lease of Specific Equipment from the Reorganized Debtor to the BB Operating Subsidiary, together with all products and proceeds of any of the foregoing, including any revenue resulting from any equipment leases thereof (collectively, the "Lender Specific Collateral").  Additionally, the Lender Secured Senior Term Notes shall be secured by the Lender Senior Term Loan Collateral.

The Reorganized Debtor shall also pledge the shares of the BB Operating Subsidiary and BB Liquidating Subsidiary to secure its obligations to pay the Lender Secured Senior Term Notes and Lender Secured Term Notes.

The Reorganized Debtor will guaranty the obligations of the BB Operating Subsidiary to pay: (1) the interest payments and the principal amount due on the Lender Secured Term Notes; and (2) the amounts due for the maintenance, insurance, storage and related duties of the equipment held at the BB Liquidating Subsidiary.  The BB Liquidating Subsidiary will guaranty the Lender Secured Senior Term Notes obligations.  Additionally, the Lender Senior Term Notes will be secured by the Lender Senior Term Loan Collateral.

The Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents shall include additional terms acceptable to the Equipment Lenders in their sole discretion and shall be included in the Plan Supplement Documents.

Both the Lender Secured Senior Term Notes and Lender Secured Term Notes shall include covenants to insure that the BB Operating Subsidiary looks first to the equipment in the BB Liquidating Subsidiary to satisfy any of its equipment needs prior to obtaining such additional equipment from other sources.  There will be affirmative covenants related to the maintenance and cannibalization and insurance for physical damage for the replacement value on a replacement cost basis with the Equipment Lenders (or the Collateral Agent).

Both the Lender Secured Senior Term Notes and Lender Secured Term Notes shall also require the continued role of the CTO as a part-time consultant to provide the Equipment Lenders with periodic financial and management reports on the Reorganized Debtor's actual and projected financial performance and other management related issues affecting such performance such as expansion or contraction issues, equipment and capital needs, in the form of and at such intervals as designated in the loan documents or as determined by the New Board.

The BB Unsecured Class 5 Notes and BB Unsecured Enhanced Class 5 Notes shall be held by the BB Unsecured Trust and the terms of said Notes are more fully described in Article VI.P.

### E.     Restated Articles

Pursuant to C.R.S. Section 7-110-108, in connection with the Confirmation of the Plan, the Reorganized Debtor, in conjunction with the merger of Reorganized Brundage-Bone and Reorganized JLS, will amend and restate its Articles of Incorporation, in their entirety, by filing with the Colorado Secretary of State Restated Articles of Incorporation, which will provide all information required by C.R.S. Section 7-101-101 *et. seq.* (the "Restated Articles"). Reorganized Brundage-Bone will be the surviving company after completion of the merger and will be permitted to engage in any lawful act or activity for which corporations may be organized under the Colorado Business Corporation Act, and will have perpetual existence.

The business and affairs of Reorganized Debtor will be managed by or under the direction of the New Board, which will have seven directors as established in the Amended and Restated Bylaws (the "Restated Bylaws") and the Shareholders' Agreement, which shall be included in the Plan Supplement Documents and shall be in a form and substance acceptable to the Equipment Lenders and the Debtor.   Subject to statutory power conferred on the shareholders, and subject to the Shareholders' Agreement, the New Board will have the power to amend the Restated Articles and the Amended Bylaws from time to time.  Directors will be entitled to indemnification to the fullest extent permitted under the Colorado Business Corporation Act.  Dividends payable in Cash or in stock may be declared and paid on account of the New Common Stock from funds lawfully available therefor, if when and as determined by the New Board.  The Restated Articles will be included in the Plan Supplement Documents.

**F.**     **Amended and Restated Bylaws**

In connection with the Confirmation of the Plan, Reorganized Brundage-Bone will adopt and approve its Restated Bylaws, which will establish, among other things, (1) the time, place and notice requirements and quorum requirements for shareholder meetings, (2) proxy voting rules, (3) actions taken by shareholders without a meeting, (4) the election and removal of directors and filling New Board vacancies (each subject to the Shareholders' Agreement), (5) the time, place and notice requirements and quorum requirements for New Board meetings, (6) actions taken by the New Board without a meeting, (7) the authority of the New Board to create committees, and the powers of such committees, (8) restrictions and limitations on the payment of compensation to directors, (9) the election/appointment, removal, term and duties of corporate officers, including a president, secretary, treasurer, one or more vice presidents and such other officers as the New Board may determine, (10) certificates representing shares of capital stock (and allowing lost certificate affidavits in lieu thereof), (11) the payment of dividends declared on capital stock by the New Board, (12) indemnification of employees, officers, directors and agents of Reorganized Brundage-Bone, and payment of expenses in connection therewith, (13) provision of directors and officers insurance, (14) the fiscal year of Reorganized Brundage-Bone, and (15) the corporate seal of Reorganized Brundage-Bone, all according to the laws of the State of Colorado.   To the extent a provision or term of the Shareholders' Agreement and the Amended and Restated Bylaws are in conflict, to the extent not prohibited by law, the provision or term set forth in the Shareholders' Agreement will govern.

**G.**     **New Common Stock**

The issuance by Reorganized Brundage-Bone of New Common Stock on or as soon as reasonably practicable following the Effective Date is hereby authorized without the need for any further corporate action or further order of the Bankruptcy Court.

The Restated Articles will create a single class of capital stock, which will be the New Common Stock.   The number of shares of New Common Stock initially authorized in the Restated Articles for issuance will be sufficient to cover (1) the shares issuable on the Effective Date, (2) the shares issuable upon exercise by the BB Liquidating Trust of the Lender and Unsecured Warrants; and (3) the shares issuable pursuant to the 2011 Equity Incentive Plan.

On the Effective Date, one share of New Common Stock shall be issuable to each of the members of the New Board.   Such shares shall be redeemable for a nominal sum upon exercise of the Warrants and shall be subject to the Voting Trust Agreement, which shall provide that said shares shall be voted by the New Board members in accordance with their board votes and the Shareholders' Agreement.   A copy of the Voting Trust Agreement will be included in the Plan Supplement Documents.

The holders of New Common Stock will have the exclusive right to vote for the election of directors and on all other matters requiring shareholder action, and will be entitled to one vote for each share of New Common Stock held on all matters presented to the shareholders for their vote and/or approval, subject to the voting requirements and director appointment rights granted to the holders of the Warrants set forth in the Shareholders' Agreement.   Holders of shares of

New Common Stock will vote together as a single class on all matters submitted to a vote of the shareholders; however, cumulative voting will not be permitted.

Preemptive rights will not exist with respect to the New Common Stock of Reorganized Brundage-Bone; provided, however, that the New Board shall have the power, by contract, to grant to some or all of Reorganized Brundage-Bone's shareholders or purchasers of New Common Stock preemptive rights to acquire shares of New Common Stock.

### H.    Warrants

The issuance by Reorganized Brundage-Bone of the Lender Warrants and the Unsecured Warrants to the BB Liquidating Trust on or as soon as reasonably practicable following the Effective Date is hereby authorized without the need for any further corporate action or further order of the Bankruptcy Court.

The Reorganized Debtor will issue to the BB Liquidating Trust, for the ratable benefit of the holders of Lender Secured Senior Term Notes and Lender Secured Term Notes, one or more Warrants to acquire 100% of the New Common Stock (the "Warrant Shares") subject to dilution of up to 34.3% (on a fully diluted basis) for Options to acquire up to 12% New Common Stock granted to management executives (referred to collectively as "Management" and individually as "Managers") under the 2011 Equity Incentive Plan and up to 22.3% for Holders of Allowed Class 5 Claims and Class 10 Claims that elect or are deemed to elect to receive the Unsecured Warrants under the Class 5 Enhanced Treatment or Class 10 Enhanced Treatment as Holders of the beneficial interests in the BB Liquidating Trust, pursuant to the BB Liquidating Trust Agreement.  All Unsecured Warrants attributable to the Holders of Class 5 Claims and Class 10 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee and the Holders of Class 5 Claims and Class 10 Claims that elect to receive the Unsecured Warrants as part of the Class 5 Enhanced Treatment and Class 10 Enhanced Treatment.  Holders who elect the Class 5 Enhanced Treatment or the Class 10 Enhanced Treatment shall only be entitled to receive distributions attributable to the Unsecured Warrants.

Warrant Shares, subject to dilution as set forth above, shall be allocated to the holders of Lender Secured Senior Term Notes and Lender Secured Term Notes in accordance with the following chart:

| Equipment Lender | Percentage Interest in Warrant Shares |
|---|---|
| AIG | 7.7% |
| Comerica | 3.5% |
| KeyBank | 15.2% |
| Key Equipment Finance | 5.2% |
| People's Capital | 1.5% |
| Wachovia | 7.8% |
| Wells Fargo | 24.2% |
| WFEFI | 34.9% |

The BB Liquidating Trust will have the right, exercisable at any time after the Second Anniversary and on or before the Fifth Anniversary, to require the Reorganized Debtor to purchase the Warrants at a price equal to their then fair market value based on a third party appraisal (the "Put Right").  If the BB Liquidating Trust exercises its Put Right and the Reorganized Debtor does not purchase all of the Warrants, said Trust can require that the Reorganized Debtor be sold ("Forced Sale").

The Warrants may be exercised at any time after the Second Anniversary (and on or before the Fifth Anniversary) or prior to such time if one of the following events occurs: (1) the sale, transfer or other disposition of all or substantially all of the assets of the Reorganized Debtor, (2) a merger or consolidation of the Reorganized Debtor with or into another entity (except in the case of a merger or consolidation in which the holders of capital stock of such company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the stock of the company or the surviving or acquiring entity); (3) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Reorganized Debtor's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of such company (or the surviving or acquiring entity), or (4) a liquidation, dissolution or winding up of the Reorganized Debtor (transactions described in clauses (1), (2), (3) and (4) are referred to herein as an "Exit Transaction"); or (5) any time after the occurrence of a material default with respect to the Lender Secured Senior Term Notes.[8]

Unless otherwise agreed by the BB Liquidating Trust, the Warrants must be exercised, reduced to cash and the cash distributed to the BB Liquidating Trust no later than the Fifth Anniversary – either by way of the exercise of the Put Right or a Forced Sale.  The strike price of the Warrants shall be $0.01 per share of New Common Stock.

## I.      Shareholders' Agreement and New Board

The New Board shall be made up of the CEO and CFO of the Reorganized Debtor and five additional board members selected by the BB Liquidating Trust Advisors and the BB Liquidating Trust Trustee as the holder of the Lender Warrants and the Unsecured Warrants. The BB Liquidating Trust, as the Warrant holder and the Reorganized Debtor through the New Board will execute a Shareholders' Agreement that is acceptable to the Equipment Lenders and the BB Liquidating Trustee.  The Shareholders' Agreement will be included in the Plan Supplement Documents.

## J.      Management Employment Agreements

Reorganized Brundage-Bone will enter into Management Employment Agreements (the "Employment Agreements") with the following 4 members of Management promptly following the Confirmation of the Plan: Bruce Young (CEO), John Hudek (CFO), Jeffrey Switzer (COO Union Operations) and Randy Waterman (COO Non-Union Operations).  A copy of the term

---

[8] Warrants shall not terminate upon transfers of Excess Equipment from the BB Liquidating Subsidiary to the BB Operating Subsidiary.

sheet describing the terms and conditions of the Employment Agreements is attached hereto as **Exhibit H**. The Employment Agreements include the following terms: (1) designation of title, duties and reporting responsibility, (2) one year employment term; (3) seat on the New Board for the CEO and CFO, (4) Base Salary; (5) the opportunity to participate in the Cash Bonus Plan; (6) the opportunity to participate in the grant of Options under the 2011 Equity Incentive Plan; (7) employee benefits, i.e. vacation, life insurance, health insurance, coverage under the Reorganized Debtor's directors and officers insurance policy, and other standard benefits extended to all similarly situated executives; (8) reimbursement of properly documented business expenses; (9) termination (by the Reorganized Debtor for cause, by the Reorganized Debtor not for cause, death, disability or termination by the executive with or without good reason) and severance, if applicable; (10) restrictive covenants applicable to the executive (e.g., covenant not to compete, non-solicitation of customers, employees, etc., non-disparagement, confidentiality, etc.), (11) dispute resolution procedures; and (12) general provisions (e.g., notice, governing law, withholding taxes, etc.). Management Base Salary and benefits shall be in accordance with their current 2010 base salaries and benefits until adjusted by the New Board.

Within 120 days immediately following the Effective Date, the New Board shall adopt an annual cash bonus plan ("Cash Bonus Plan") that provides for awards, in the discretion of the New Board, of annual cash bonuses to management ("Annual Cash Bonus(es)"). The New Board shall determine the dollar amount of such Annual Cash Bonuses, the members of Management entitled to receive Annual Cash Bonuses, and the conditions and restrictions on earning such Annual Cash Bonuses, including, but not limited to, annual individual performance targets and Reorganized Debtor annual performance targets.

The total amount of cash compensation payable to Managers in the form of Base Compensation, Annual Cash Bonuses, Option grants pursuant to the 2011 Equity Incentive Plan (see Section K below) and reimbursement for expenses (other than ordinary course business related travel and entertainment expenses such as airfare, meals and hotels for ordinary course travel expenses for business related travel and entertainment) shall be set by the New Board.

### K.      2011 Equity Incentive Plan and Management Options

Within 120 days immediately following the Effective Date, the New Board shall adopt an equity incentive plan (the "2011 Equity Incentive Plan") that provides for the granting, in the discretion of the New Board, of stock options (NQOs and ISOs) (the "Options"), restricted stock, restricted stock units, phantom units and cash awards (each an "Award") to Management. The total amount of equity subject to the 2011 Equity Plan will be 12% (on a fully diluted basis). The New Board shall determine, in its discretion, the members of Management entitled to receive Awards, the nature and amount of such Awards, the restrictions and limitations on the vesting and exercise of such Awards, acceleration of Awards, etc.

Options may not be exercised prior to an Exit Transaction. Holders of Options must be employed by the Reorganized Debtor at the time of the Exit Transaction, subject to accelerated vesting, as determined by the New Board, in its discretion, upon the occurrence of certain events (e.g., death, disability, termination without cause, etc.). The Management Options will vest as determined by the New Board in its discretion.

**L.    Brundage and Bone Lender Guaranties, and Guarantor Lock Up Agreement and Guarantor Forbearance Agreement**

The Debtors, Equipment Lenders and Bone have agreed upon the terms of the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement pursuant to which and subject to the satisfaction of the conditions precedent set forth below, the Equipment Lenders shall convert Bone's recourse personal guarantees (the "Recourse Guaranty Obligations") with respect to the equipment loans or lease obligations of the Debtor or their respective Affiliates to nonrecourse guarantees, so long as Bone performs each of the obligations set forth below (the "Guaranty Conversion Obligations").    Copies of the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement are attached hereto as **Exhibit I** and **Exhibit J**, respectively.   The Equipment Lenders are continuing to negotiate with Brundage regarding his Recourse Guaranty Obligations; however, as of the date of this Plan, they have not reached an agreement.  In the event Bone is the only Guarantor who executes the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement, the Holders of the Class 5 Claims will receive the BB Unsecured Enhanced Class 5 Notes and beneficial interests in Warrants in the reduced amounts as indicated in Article VI.H.  The conversion of the Recourse Guaranty Obligations is subject to Bone's satisfaction of the following Guaranty Conversion Obligations: (1) cooperate with the Debtors and the Equipment Lenders in insuring that the Plan gets confirmed, including assistance with the Debtors' tax issues and full participation in a stock buy-back program as directed by the Debtors; (2) do not violate the terms of his management non-compete agreements or otherwise interfere with the Reorganized Debtor's or any of its Affiliates' operations following the Effective Date; (3) support the expansion of Brundage-Bone's board of directors from four to five directors; (4) each of the Equipment Lenders receives, based on the amount of its respective Recourse Guaranty Obligation, its ratable share of any payment or other distribution from Bone (or any bankruptcy estate of Bone) for any of its Affiliates' operations following Guaranty Obligations owed to such Withdrawing Lender; and (5) depending upon whether all or fewer than all of the Holders of Bone's Recourse Guaranty Obligations execute and deliver the Guarantor Forbearance Agreement, Bone shall pay $400,000 or $200,000, representing the Bone Guaranty Cash Earn-Out Amount, respectively, to the Reorganized Debtor, which will distribute it on the Effective Date pro rata to the Holders of the Lender Claims and the Withdrawing Lender Deficiency Claims that execute and deliver the Guarantor Forbearance Agreement.   In the event a Withdrawing Lender agrees to the terms of the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement, the Withdrawing Lender shall be eligible to receive the Class 5 Enhanced Treatment accorded to Holders of Class 5 Claims.

The failure to satisfy any of the foregoing conditions precedent or the violation of the Guarantor Lock Up Agreement, the Guarantor Forbearance Agreement or any of the Guaranty Conversion Obligations shall result in the immediate reinstatement of all Recourse Guaranty Obligations owing to the Lenders.  Bone's Guaranty Conversion Obligations shall be deemed fully performed and his liability under the guarantees shall be fully discharged on the first to occur of the following: (a) the Plan is confirmed and the Lender Secured Senior Term Notes and Lender Secured Term Notes have been paid in full; (b) the Plan is confirmed and substantially all of the assets of the Reorganized Debtor and BB Operating Subsidiary are sold; or (c) the Plan is confirmed and the BB Liquidating Trust has sold the Warrants for the benefit of the Equipment Lenders.

## M.   Section 1145 and Other Exemptions

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated herein, including the New Common Stock and Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. To the extent that section 1145 of the Bankruptcy Code is not available, the New Common Stock will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the private placement exemption under section 4(2) of the Securities Act or Regulation D promulgated there under.

In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New Common Stock, will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

## N.   Corporate Existence

On or immediately prior to the Effective Date, the following corporate changes shall occur:

(1)   Reorganized Brundage-Bone and Reorganized JLS shall be merged and Reorganized Debtor operating under the name Brundage-Bone Concrete Pumping, Inc. shall be the surviving corporate entity under the laws of the State of Colorado.  The merger shall constitute a substantive consolidation of the two Debtors, such that the total assets and liabilities of both Debtors shall be combined.

(2)   Brundage-Bone shall terminate its election to be treated as an S corporation under the Internal Revenue Code and the Reorganized Debtor shall thereafter be treated as a C corporation for income tax purposes; and

(3)   The Reorganized Debtor shall form two new wholly-owned subsidiary corporations organized under the laws of the State of Colorado, BB Operating Subsidiary, Inc. and BB Liquidating Subsidiary, Inc., which corporations shall be treated as C corporations for income tax purposes and the boards of directors for each shall be selected by the New Board.

## O.   BB Liquidating Trust

On the Effective Date, the Reorganized Debtor shall cause the formation of the BB Liquidating Trust.  The BB Liquidating Trustee shall be Wilmington Trust Corporation.  The BB Liquidating Trust shall be formed for the purpose of holding the Warrants on behalf of the

holders of the Lender Secured Senior Term Notes, the Lender Secured Term Notes and the BB Unsecured Trustee on behalf of the Holders of Class 5 Claims and Class 10 Claims that elect to receive Unsecured Warrants in partial satisfaction of their Class 5 Claims or Class 10 Claims. The trust agreement establishing the BB Liquidating Trust shall be among the BB Liquidating Trustee, the Reorganized Debtor and the BB Liquidating Trust Advisor. A copy of the BB Liquidating Trust Agreement will be included in the Plan Supplement Documents.

The BB Liquidating Trust Beneficiaries shall be the holders of Lender Secured Senior Term Notes, the Lender Secured Term Notes and the BB Unsecured Trust on behalf of Holders of Allowed Class 5 Claims and Allowed Class 10 Claims that elect to receive an interest in distributions attributable to the Unsecured Warrants in partial satisfaction of such Allowed Claims. For purposes of exercising authority delegated under the BB Liquidating Trust Agreement to the BB Liquidating Trust Beneficiaries, each of the BB Liquidating Trust Beneficiary's beneficial interest in said Trust shall be equal to the beneficiary's pro rata share of the Warrant Shares (the "Trust Beneficial Interests"). The BB Unsecured Trustee shall vote its beneficial interest in the BB Liquidating Trust in accordance with the instructions of the Holders of a majority of the beneficial interest in the Unsecured Warrants held for their benefit by the BB Unsecured Trust.

The BB Liquidating Trust shall be managed by three trust advisors (the "BB Liquidating Trust Advisors"). The initial BB Liquidating Trust Advisors will be selected prior to the Effective Date of the Plan and approved as part of the Confirmation of the Plan. The BB Liquidating Trust Advisors will be appointed by, and be subject to removal and replacement by, holders of 75% of the Trust Beneficial Interests. The BB Liquidating Trust Advisors will act by majority vote of the BB Liquidating Trust Advisors.

Any cash proceeds realized by the BB Liquidating Trust from the exercise, sale or other disposition of the Warrants or the underlying common stock subject to the Warrants shall be paid pro rata to the BB Liquidating Trust Beneficiaries in proportion to their respective Warrant Shares in proportion to their respective Trust Beneficial Interests. In turn, the BB Unsecured Trust shall pay those BB Unsecured Trust Beneficiaries who elected to receive a beneficial interest in the Unsecured Warrants their pro rata share of any cash proceeds received.

The BB Liquidating Trust shall terminate and dissolve upon the earlier of (1) five years following the effective date of the Plan or (2) the exercise, sale or other disposition of the Warrants and distribution of all cash proceeds (after payment of all trust expenses) received by the BB Liquidating Trust in connection therewith to the BB Liquidating Trust Beneficiaries.

## P.    BB Unsecured Trust, BB Unsecured Class 5 Note and BB Unsecured Enhanced Class 5 Note

On the Effective Date, the Reorganized Debtor shall cause the formation of the BB Unsecured Trust, the Trustee of which shall be selected by the Committee. The BB Unsecured Trust shall be formed for the purpose of holding the BB Unsecured Class 5 Note and BB Unsecured Enhanced Class 5 Note, holding a beneficial interest in the Unsecured Warrants and making distributions to Holders of Allowed Class 5 Claims and Allowed Class 10 Claims. The

parties to the BB Unsecured Trust Agreement shall be (a) the Trustee, (b) the Reorganized Debtor as the trust grantor, and (c) the BB Unsecured Trust Beneficiaries (as defined below) will acknowledge and agree to be bound by the BB Unsecured Trust Agreement. A copy of the BB Unsecured Trust Agreement Term Sheet shall be included in the Plan Supplement Documents.

For purposes of exercising authority delegated under the BB Unsecured Trust Agreement to the BB Unsecured Trustee (other than with respect to the BB Liquidating Trust), each of the BB Unsecured Trust Beneficiary's beneficial interest in said Trust shall be equal to their pro rata share of the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note.

The principal amount of the BB Unsecured Class 5 Note shall be equal to 5.4% of the aggregate amount of Allowed Class 5 Claims and Allowed Class 10 Claims. 5.4% of the aggregate amount of said Claims is estimated to total $5,957,390, based upon the estimated total unsecured claims in the amount of $110,332,046. The principal amount of the BB Unsecured Enhanced Class 5 Note shall be equal to a maximum of 2.7% of the aggregate amount of Class 5 Claims and Class 10 Claims that properly elect to receive the Class 5 Enhanced Treatment and Class 10 Enhanced Treatment. 2.7% of the aggregate amount of said Claims is estimated to total $2,965,195 based upon estimated total unsecured claims in the amount of $110,332,046. The principal amount of the BB Unsecured Enhanced Class 5 Note will vary depending upon (1) whether one or both of the Guarantors executes the Guarantor Forbearance Agreement and Guarantor Lock-Up Agreement; and (2) the amount of Class 5 Claims and Class 10 Claims whose Holders elect to receive a share in the BB Unsecured Enhanced Class 5 Note. See Article VI.H. for information regarding the Warrants.

### Q. Vesting of Assets in the Reorganized Debtor

Except for the security interests of the Holders of Class 1 Claims, Class 2-A through Class 2-F Claims and Class 3 Claims (which security interests and Liens shall be retained by the Holders thereof) and as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by either of the Debtors pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### R. Cancellation of Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing any Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged.

### S.      Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors or managers of the Debtors or any other Entity (including the BB Operating Subsidiary, the BB Liquidating Subsidiary and the BB Liquidating Trust). Without limiting the foregoing, such actions may include: (1) the adoption, approval and filing of Restated Articles; (2) the adoption and approval of Restated Bylaws; (3) adoption, approval, execution and delivery of the Shareholders' Agreement; (4) the appointment of directors to the New Board and appointment and approval of the new officers of Reorganized Brundage-Bone; (5) execution and delivery of the Warrants; (6) execution and delivery of the Exit Facility Agreement and related documents; (7) execution and delivery of the Lender Secured Senior Term Notes and related documents; (8) execution and delivery of the Lender Secured Term Notes and related documents; (9) the execution and delivery of such certificates or other documents necessary to form the BB Operating Subsidiary; (10) the execution and delivery of such certificates or other documents necessary to form the BB Liquidating Subsidiary; (11) the execution and delivery of the Asset Management Agreement; (12) the execution and delivery of the BB Liquidating Trust formation, funding and related documents; (13) the execution and delivery of the BB Unsecured Trust formation, funding and related documents; and (14) such other documents, agreements, certificates and instruments as may be necessary or desirable to fully implement and effect the terms and conditions of the Plan.

### T.      Effectuating Documents and Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board, are authorized to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity except for those expressly required pursuant to the Plan, including, but not limited to, the following: (1) issuance, execution, delivery, filing, or recording such contracts, securities, instruments, releases, and other agreements or documents as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (2) execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (3) execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty, or obligation necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (4) the filing of appropriate certificates of incorporation, merger, consolidation, or reorganization with the appropriate governmental authorities pursuant to applicable law; (5) adoption approval, execution and delivery of the Employment Agreements; (6) within 120 days immediately following the Effective Date, adoption and approval of the Cash Bonus Plan and the 2011 Equity Incentive Plan and awards thereunder; and (7) all other actions that the Reorganized Debtor determine are necessary or appropriate.

### U.    Discharge of Debtors

Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date: (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete discharge of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be discharged, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtor, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

### V.    Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity in accordance with, in contemplation of, in connection with the Plan, or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other Interest in the Debtors or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### W.    Directors and Officers of the Reorganized Debtor

Pursuant to the Shareholders' Agreement and the Restated Articles, the New Board shall consist of seven members.  Five members of the New Board shall be selected by the BB Liquidating Trust and the other two members shall be selected by the Chief Executive Officer

and Chief Financial Officer of the Reorganized Debtor.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any individual proposed to serve as a director or an officer of the Reorganized Debtor shall be disclosed at or before the Confirmation Hearing, to the extent known.

From and after the Effective Date, the members of the New Board and members of the board of directors of its subsidiaries shall be selected and determined in accordance with the provisions of the Restated Articles, the Restated Bylaws, the Shareholders' Agreement and applicable law.

## X.     Employee and Retiree Benefits

Except as otherwise set forth in the Plan, on and after the Effective Date, the Reorganized Debtor may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of either of the Debtors who served in such capacity at any time; (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.  Except as otherwise specifically provided in the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtor's defenses, Claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all Retiree Benefits, if any, shall continue to be paid in accordance with applicable law.

## Y.     Preservation of Rights of Action

Except for Avoidance Actions and the other Section 541 Claims that are deemed to have been waived with respect to the Holders of Allowed Class 1 Claims, Allowed Class 5 Claims that properly elect to receive the Class 5 Enhanced Treatment, and Allowed Class 10 Claims that properly elect to receive the Class 10 Enhanced Treatment, the Reorganized Debtor may pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Disclosure Statement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Except as otherwise provided herein, the Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Confirmation Order to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtor expressly reserves all Causes of

Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of, the Confirmation or the Consummation.

Further, except for the actions released by the Debtors pursuant to Article VIII of the Plan and Avoidance Actions related to Holders of the Allowed Class 1 Claims, Allowed Class 5 Claims that properly elect to receive the Class 5 Enhanced Treatment, and Allowed Class 10 Claims that properly elect to receive the Class 10 Enhanced Treatment, the Reorganized Debtor reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Debtors or the Reorganized Debtor, as applicable, shall have the exclusive right, authority, and discretion, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## VII.  ACCEPTANCE OR REJECTION OF THE PLAN

### A.      Class Acceptance Requirement

Under the Bankruptcy Code, only Classes of Claims and Interests that are "Impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is Impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt).  Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Clams and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims or Equity Interests will have accepted a plan if the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two thirds in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan and the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than ONE-half in number of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan.

There are no Classes of Claims or Interests that are Unimpaired under the Plan would, therefore, be presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  If there are any Unimpaired Classes, they are not entitled to vote on the Plan and the acceptance of the Plan by any such Unimpaired Classes and by the Holders of Allowed Claims or Allowed Interests in such Classes is not required and shall not be solicited.

Each Holder of an Allowed Claim in each of Classes 1, 2, 3, 4, 5, 9, 10 and 12 are Impaired and shall be entitled to vote to accept or reject the Plan.

Holders of Class 6 Intercompany Claims against Brundage-Bone, Class 7 Section 510(b) Claims against Brundage-Bone, Class 8 Equity Interests in Brundage-Bone, Class 11 Intercompany Claims against JLS, and Class 12 Equity Interests in JLS shall receive no distributions under the Plan on account of their Claims or Interests and are, therefore, presumed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims or Interests in such Classes are not entitled to vote on the Plan and the vote of such Holders shall not be solicited.

### B.  Cramdown

The Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification.  Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if among other things, (1) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined by the Bankruptcy Code) and (2) the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.  To the extent all Impaired Classes do not vote to accept the Plan, the Debtors will seek confirmation pursuant to section 1129(b) of the Bankruptcy Code.

## VIII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as other provided in the Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all Executory Contracts to which the Debtors are parties, subject to the occurrence of the Effective Date, unless such contract or lease (a) previously was assumed or rejected by the Debtors; (b) previously expired or terminated by its own terms before the Effective Date; or (c) is the subject of a pending motion to assume or reject on the Effective Date.

## IX.  LITIGATION

In addition to the above-described pending litigation, the Reorganized Debtor will analyze certain facts and circumstances to determine whether any additional litigation, including Avoidance Actions, has any merit and should be pursued.

## X.  CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

### A.  Conditions to Effectiveness of the Plan

The following shall be satisfied or waived, in each case, as conditions precedent to the Effective Date:

1.     The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.     All of the schedules, documents, and exhibits contained in the Disclosure Statement, and all schedules, documents, supplements, and exhibits to the Plan shall have been Filed in form and substance acceptable to the Debtors.

3.     The Reorganized Debtor, the BB Operating Subsidiary and the BB Liquidating Subsidiary shall have executed all of the Lender Senior Secured Loan Documents and the Lender Secured Loan Documents in form and substance satisfactory to the Equipment Lenders in their discretion.

4.     The Reorganized Debtor shall have executed the BB Liquidating Trust Agreement in form and substance satisfactory to the BB Liquidating Trustee.

5.     The Reorganized Debtor shall have executed the BB Unsecured Trust Agreement in form and substance satisfactory to the BB Unsecured Trustee.

6.     The Reorganized Debtor shall have executed the Shareholder Agreement in form and substance satisfactory to the BB Liquidating Trustee and the BB Liquidating Trust Beneficiaries.

7.     The Reorganized Debtor shall have executed the Asset Management Agreement in form and substance satisfactory to the Equipment Lenders.

8.     The four go forward Managers of the Reorganized Debtor shall have executed the Management Employment, Non-Solicitation and Non-Compete Agreements as a condition of their continued employment with the Reorganized Debtor.

9.     The Tax Required Stock Transfers and Actions shall have occurred.

10.     The Exit Facility shall have become effective contemporaneously with the Effective Date.

11.     The New Board shall have been selected by the BB Liquidating Trustee and the Restated Articles and By-Laws of the Reorganized Debtor shall have been filed with the Secretary of State.

12.     The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated.

13.     The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in Article V of the Plan.

14.     All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose material adverse conditions on such transactions.

### B.     Extension of Effective Date

The Debtor or the Reorganized Debtor may seek an extension of the Effective Date by filing a motion in the Bankruptcy Court on notice to creditors.

### C.     Effect of Non-Occurrence of Conditions to the Effective Date

Each of the conditions to the Effective Date must be satisfied or waived pursuant to Article X.A of the Plan, and the Effective Date must occur within 180 days of Confirmation, or by such later date established by Final Order on motion to the Bankruptcy Court. If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided that notwithstanding the filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters a Final Order granting such motion to vacate the Confirmation Order. If the Confirmation Order is vacated pursuant to Article X.C of the Plan or otherwise, then except as provided in any Final Order vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, and rejections of Executory Contracts or Unexpired Leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of such Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

## XI.  LIQUIDATION ANALYSIS

The discussion set forth herein is a summary of the liquidation analysis prepared by CRG Partners and attached hereto as **Exhibit K** (the "Liquidation Analysis"). The Liquidation Analysis is premised on the assumption that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code. Additional assumptions are set forth in detail in the Liquidation Analysis.

CRG Partners estimates the gross recovery from the sale of all of the Debtors' assets in a forced liquidation would be approximately $111.86 million. The assets include cash, accounts receivable, inventories, deposits and other prepaid items, real estate and improvements,

machinery and equipment, and furniture and fixtures.  In calculating the value of the Debtors' assets, CRG assumed that the Trustee would avoid liens on the Debtors' equipment equal to 15% of the value of the equipment.  This assumption is based upon the Debtors' and its counsel's ongoing review of the Equipment Lenders and the Withdrawing Lenders perfection of their security interest in their equipment collateral.  Of the Withdrawing Lenders, only SunTrust was determined by the Debtors to have an issue with the perfection of its security interest in 19 pieces of equipment.  A review by the Debtors of the security interests claimed by Wells Fargo, WFEFI, Wachovia and KeyBank indicated that, because a portion of their loans and security interests had been acquired from other lenders, there may have been perfection issues with up to 15% of their collateral.  The Debtors, based upon this review, believe this number to be on the high side and does not apply across the board to all of the Equipment Lenders.  Therefore, the Debtors assert that for purposes of the Liquidation Analysis, 15% is reasonable.

The estimated liquidation costs total approximately $17.85 million.  Estimated liquidation costs include chapter 7 professional fees, chapter 7 trustee commissions, United States Trustee fees, liquidating agent commissions and costs, repair costs, employee costs, and storage and insurance costs.

After deducting liquidation costs, CRG Partners estimates a net recovery of approximately $94.01 million. The estimated amounts due secured creditors from this net recovery would be as follows:

| Claim | Amount |
|---|---|
| DIP Facility Claim | $10,966,930 |
| Real Estate Lenders | $10,535,650 |
| Equipment Lenders and Withdrawing Lenders | $70,734,450 |

After deducting the above estimated amounts due secured creditors, the recovery would be reduced to approximately $1.77 million.  CRG Partners estimates priority claims in a forced liquidation will total in excess of $3.67 million, as follows:

| Claim | Amount |
|---|---|
| Section 503(b)(9) Claims | $  371,190 |
| Postpetition Accounts Payable | $  828,630 |
| Postpetition Accrued Expenses | $1,620,083 |
| Unpaid Professional Fees | $  848,577 |

Based upon CRG Partners' analysis, therefore, in a forced liquidation the Debtors' chapter 7 estates would be administratively insolvent and unable to pay even 100% of priority claims.  Holders of General Unsecured Creditors would receive nothing in a liquidation.

## XII.CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together

herewith and/or incorporated by reference herein), including those items discussed in the exhibits attached hereto, before deciding whether to accept or reject the Plan.

As indicated in the Financial Exhibit, the Debtors lost over $10 million in fiscal year 2009 and project a loss in excess of $14 million for fiscal year 2010.  The Debtors project that they will not return to profitability on an annual basis until 2012.  The business plan that forms the basis of the Debtors' projections has only recently been completed, and the results of such plan are unknown.

Economic forces beyond the Debtors' control, including the general health of the economy and prolonged stagnation in the construction markets, among others, could have a material adverse effect upon the Reorganized Debtor's operations.

The cost of insurance is a significant expense of the Debtors.  The Debtors cannot control or predict the extent that insurance costs will increase in future years, and such increased costs may have a material adverse effect upon the Reorganized Debtor.

Replacement costs for equipment as well as repair and maintenance costs and other capital expenditures may exceed the Debtors' estimates.  In such event, the additional costs may have a material adverse effect upon the Reorganized Debtor.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidations.  The Debtors have no reason to believe that such a process would yield a return to creditors and Interest holders higher than the Plan, as reflected in the Liquidation Analysis.  It is possible that absent confirmation of the Plan, the result may be a lower purchase price for the Debtors' assets in Chapter 7 liquidation proceedings, or alternatively, piecemeal liquidation of estate assets.  If that were to occur, holders of Claims or Interests might see substantially lower recovery, or no recovery at all.

## XIII.  CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Interests (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtors have complied with applicable provisions of the Bankruptcy Code, (d) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors or interest holders (except to the extent "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims and Interests in each impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before confirmation in accordance with section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors are obligated itself to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" are entitled to vote to accept or reject the Plan.  A Class is impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt).  Under section 1126(f) of the Bankruptcy Code, Classes of Claims or Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An impaired Class of Claims or Interests will have accepted the Plan if (1) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two thirds in amount of the Allowed Claims or Interests actually voting in the Class have voted to accept the Plan and (2) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims or Equity Interests actually voting in such Class have voted to accept the Plan.

Each Debtor will separately tabulate all votes on the Plan in its respective Chapter 11 case for the purpose of determining whether the Plan with respect to each Debtor satisfies section 1129(a)(8) and (10) of the Bankruptcy Code.  All votes on account of Allowed Claims shall be counted as if Filed against the Debtor's Estate where the Claim resides.

### B.    Feasibility of the Plan and Projections

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  This is the so called "feasibility" test.

The Debtor, with the assistance of CRG, has prepared financial projections for the Reorganized Debtor's operations that demonstrate the Debtor's ability to perform under the Plan and its feasibility and the projected recoveries by the various Classes of creditors (the "Operating Projections").  The Operating Projections are attached to this Disclosure Statement as **Exhibit L** and have been prepared under four scenarios, including two "Base Case" and two "High Case" scenarios that are differentiated by whether one or both of the Guarantors executes the Guarantor Lock-Up Agreement and Guarantor Forbearance Agreement.  If only one Guarantor participates, the estimated step-up in tax basis of the equipment will be approximately $15,000,000; if both Guarantors participate, the step-up will be approximately $29,000,000.[9]  If both Guarantors

---

[9]  The Debtors' monthly reports filed with the Bankruptcy Court vary significantly from its projected EBITDA in the Operating Projections.  The reason for this variance is due to the inclusion of depreciation and amortization, plus the sale of real estate and equipment in the monthly reports, which items resulted in significant non-cash expenses and losses attributable to the difference between the book value of the asset and its sale price.  These sales are one-time events that do not affect the projected EBITDA.

participate, the Debtor and CRG estimate that the Reorganized Debtor will achieve additional tax savings, which should result in increased net revenue. The "Base Case" represents the Debtor's conservative estimate of its anticipated performance during the five-year period after the Effective Date. The Base Case utilized the Debtor's historical and forecasted operations during the 2008, 2009 and 2010 fiscal years, and assumes revenues and expenses increasing at an average rate of 8.6% and 6.6%, respectively, per year over the next five (5) years. The "High Case" assumes increases in revenues and expenses at an average rate of 12.9% and 9.6%, respectively, per year over the next five (5) years. The Reorganized Debtor's ability to achieve the High Case will be highly dependent upon the improvement of the national economy and building trades. The Projections have not been audited and actual operating results and recoveries may vary depending upon many factors beyond the Reorganized Debtor's control. Both the Operating Projections and the Recovery Projections should be read in conjunction with the notes and assumptions that are contained therein.

As such, confirmation of the Plan is very unlikely to be followed by further liquidation. Accordingly, the Debtors believe that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

### C.      Warrant Allocation and Credit Enhancement

Beneficial interests in Warrants will be allocated under the Plan to the Equipment Lenders and the BB Unsecured Trust on behalf of the Holders of Class 5 Claims and Class 10 Claims that properly elect to receive Unsecured Warrants in accordance with the Class 5 Enhanced Treatment or the Class 10 Enhanced Treatment. Management will be granted Options under the 2011 Equity Incentive Plan to acquire up to 12% of the Warrants based on the Reorganized Debtor achieving certain annual earnings projections. The remaining 88% of the Warrants will be held by the BB Liquidating Trust and allocated to the Equipment Lenders and the BB Unsecured Trust on behalf of the Holders of Class 5 and Class 10 Claims that properly elect to receive Unsecured Warrants in accordance with the Class 5 Enhanced Treatment and the Class 10 Enhanced Treatment. The Class 5 Creditors and Class 10 Creditors will have an option, respectively, of taking the Class 5 Enhanced Note or a share of the beneficial interests in the Unsecured Warrants. All Unsecured Warrants attributable to the Holders of Class 5 Claims and Class 10 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee and the Holders of Class 5 Claims and Class 10 Claims that properly elect the Warrant Treatment shall only be entitled to receive distributions attributable to the Unsecured Warrants.

The Equipment Lenders have agreed to provide the Reorganized Debtor with long term financing on the Retained Equipment at less than market interest rates. Under the Plan the Lender Secured Senior Term Notes and the Lender Senior Term Notes  will carry  interest rates of Libor+4.64% (including a 1.64% Annual Lender Interest Payment component) and Libor+6.69% (including a 3.69% Annual Lender Interest Payment component), respectively. Based on information obtained from Equipment Lenders, the current market rate for a comparable loan to a company emerging from Chapter 11 would be approximately Libor+9.5%. As such there is an annual interest rate differential of 4.86% and 2.81%, respectively; provided that the forgoing assumes the Annual Lender Interest Payment will be paid currently rather than accrued. This reduced interest rate provides substantial value to the Reorganized Debtor, the consideration for which is the issuance of the Lender Warrants to the BB Liquidating Trust for

the benefit of the Equipment Lenders.  The value of the Lender Warrants has been determined by calculating the present value of the Lender Warrants on an annual basis over the five years of the Plan in order to determine the total number of Lender Warrants that need to be issued to the Equipment Lenders so they receive a market rate of interest on the financing they have agreed to provide to the Reorganized Debtor.

The BB Liquidating Trust shall distribute the beneficial interest in up to a maximum of 22.3% of the remaining Warrants to the Class 5 Claims and Class 10 Claims that properly elect to receive Unsecured Warrants in accordance with Class 5 Enhanced Treatment or Class 10 Enhanced Treatment.  Beneficial interests in the Unsecured Warrants will be allocated pro rata based on the aggregate amount of the Class 5 Claims and Class 10 Claims.  The table below summarizes the distribution of the beneficial interests in Warrants.  The Debtor estimates that the recovery under the Warrants may be greater than the recovery under the Enhanced Note, but the Warrants may be riskier than the Enhanced Note since they constitute equity in the Reorganized Debtor that will only receive a distribution after all of the debt has been paid.

**Warrant Allocation Summary**

| Category | Warrants |
|---|---|
| *Equipment Lenders* | |
| Earned | 65.7% |
| Unsecured Share | 16.1% |
| - subtotal | **81.8%** |
| *Withdrawing Lenders* | **5.6%** |
| *Class 5 Trade Creditors* | **0.6%** |
| *Management* | **12.0%** |
| Total | 100.0% |

| POR Debt | | FY2011 | FY2012 | FY 2013 | FY 2014 | FY 2015 | Total |
|---|---|---|---|---|---|---|---|
| SECURED SENIOR TERM NOTE (SST) | $ | 78,539 $ | 77,632 $ | 71,645 $ | 62,288 $ | 51,143 | |
| SENIOR TERM NOTE (STN) | $ | 25,109 $ | 18,270 $ | 12,554 $ | 10,003 $ | 0 | |
| **POR Interest Rate** | | | | | | | |
| Interest SST | 4.89% $ | 3,841 $ | 3,796 $ | 3,503 $ | 3,046 $ | 2,501 | |
| Interest STN | 6.94% $ | 1,743 $ | 1,268 $ | 871 $ | 694 $ | 0 | |
| **Total Equipment Interest** | $ | 5,583 $ | 5,064 $ | 4,375 $ | 3,740 $ | 2,501 | $21,263 |
| **Market Rate (L+9.5)** | | | | | | | |
| Interest SST | 9.75% $ | 7,658 $ | 7,569 $ | 6,985 $ | 6,073 $ | 4,986 | |
| Interest STN | 9.75% $ | 2,448 $ | 1,781 $ | 1,224 $ | 975 $ | 0 | |
| **Total Equipment Interest** | $ | 10,106 $ | 9,350 $ | 8,209 $ | 7,048 $ | 4,986 | $39,700 |
| *Interest Difference (Mkt-POR)* | $ | 4,523 $ | 4,286 $ | 3,835 $ | 3,308 $ | 2,486 | $18,437 |
| **Equity Value @ 5X EBITDA** | | | | $ 26,229 $ | 46,967 $ | 70,436 | |
| *- base case, 1 founder* | | | | | | | |
| Yr 5 Equity PV (Discount Rate=30%) | | $18,973 | $24,664 | $32,062 | $41,679 | $54,182 | |
| *Percent of warrants earned - Equipment Lenders* | | *23.8%* | *17.4%* | *12.0%* | *7.9%* | *4.6%* | *65.7%* |

Attached as **Exhibit M** is a detailed calculation of the Warrant allocation, the risk factors utilized to determine the discount rate for purposes of determining the present value of the Warrants and the percentage of Warrants (and beneficial interests in Warrants) that will be issued to the various Classes.

### D.    Best Interests Test

Even if the Plan is accepted by each Class of holders of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court find the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (1) all members of an impaired class have voted to accept a plan, or (2) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each class of holders of claims or interests if a debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 debtor.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses of both the Chapter 7 cases and the Chapter 11 Cases.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would

include the compensation of the Chapter 7 Debtors, as well as counsel and other professionals retained by the Debtors, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys and advisors) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtors during the pendency of the cases.  The liquidation would also likely prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity interest holders from the remaining available proceeds of the liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity interest holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis, the Debtors believe that each member of each Class of Claims and Interests will receive significantly more under the Plan than they would receive if the Debtors were liquidated in chapter 7 cases.  Holders of General Unsecured Claims would receive nothing in a liquidation and Holders of Administrative Claims would receive less than 50% of their Allowed Claims.  In contrast, under the Plan, Holders of General Unsecured Claims will receive 5% of the amount of their Allowed Claims and Administrative Claims will be paid in full.  Accordingly it is clear that Holders of Claims and Interests will fare much better under the Plan than in a liquidation.  Liquidation clearly is not in the best interests of the estates' constituencies and the Plan therefore satisfies the best interests of creditors test.

### E.   Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

The Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and the Debtors reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification.  Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (1) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined in the Bankruptcy Code) and (2) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank.  A plan is fair and equitable as to a class of secured claims that rejects the plan, if amount other things, the plan provides (1)(a) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interests in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to liens securing the claims

included in the rejecting class, free and clear of liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (3) of this paragraph, or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (1) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (2) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides, among other things that (1) each holder of an interest of such class receives or retains on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that no holder of an interest that is junior to such class will receive or retain under the plan any property on account of such junior interest.

## XIV.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The purpose of this provision is to provide a discussion of the potential material federal income tax consequences of the plan to the Debtors and the hypothetical holders of Claims or Interests in the case that would enable such a hypothetical investor to make an informed judgment about the Plan, as contemplated in 11 U.S.C. § 1125(a)(1).

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only certain of the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims and Interests who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and occurrence of various events described in the Plan. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of Claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and

current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan. No representations or assurances are being made to the Holders of Claims with respect to the U.S. federal income tax consequences described in the Plan.

Any discussion of U.S. federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should consult his, her or its own independent tax advisors regarding the specific U.S. federal income tax, as well as state and local income and other tax, consequences of the Plan with respect to their particular circumstances.

This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the Federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, and tax-exempt organizations.)

**THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL CLAIMANTS AND EQUITY INTEREST HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, AS WELL AS STATE AND LOCAL TAX CONSEQUENCES AND FEDERAL ESTATE AND GIFT TAXES.**

A.    **Federal Income Tax Consequences to the Debtors.**

1.    **Treatment of JLS.**

Brundage-Bone is an S corporation for U.S. federal income tax purposes. JLS is a qualified Subchapter S subsidiary for federal income tax purposes. Accordingly, JLS is disregarded as a separate entity from Brundage-Bone for federal income tax purposes so long as Brundage-Bone maintains its status as an S corporation.

Immediately following the confirmation of the Plan, but prior to its Effective Date and while the S election of Brundage-Bone is in effect, JLS will be merged with and into Brundage-Bone. Brundage-Bone will be the surviving corporation to the merger under the laws of the State of Colorado. The merger of JLS into Brundage-Bone, while Brundage-Bone's S election is in effect, should have no federal income tax consequences to Brundage-Bone, JLS or the

shareholders of Brundage-Bone. Each of JLS's assets will retain its tax basis and holding period for federal income tax purposes in Brundage-Bone's hands after the merger.

### 2.        Termination of Subchapter S Corporation Status.

Brundage-Bone's S election has been in effect for more than 10 years prior to the beginning of its 2010 fiscal year. Brundage-Bone and JLS have no accumulated earnings and profits from any periods during which they were C corporations. As an S corporation, Brundage-Bone passes through to its shareholders its taxable income and loss, and each shareholder reports his share of Brundage-Bone's income, gain, loss deduction and credit on his own federal income tax return; provided, however, that the losses passed through to a shareholder are only useable by that shareholder to the extent of the shareholder's tax basis in his stock and debt investments in Brundage-Bone. Brundage-Bone pays no federal income tax on its earnings. Brundage-Bone also elected to treat its subsidiary, JLS, as a qualified subchapter S subsidiary. Accordingly, JLS is disregarded as an entity separate from Brundage-Bone for federal income tax purposes, and all of JLS' income, gain, loss, deduction and credits are reported by Brundage-Bone on its own federal income tax returns.

Immediately before the Effective Date of the Plan, Brundage-Bone intends to elect, with the consent of the holders of more than 50% of its shares, to terminate its S election, and in any event its S election will terminate when it has a shareholder that is not eligible to be a shareholder of an S corporation. Upon the effective date of the Plan, Brundage-Bone will cancel all of its outstanding shares of stock and Reorganized Brundage-Bone will issue one share of its New Common Stock to each member of the New Board. From and after the Effective Date, Reorganized Brundage-Bone and each of its subsidiaries will be C corporations and will be subject to entity-level tax on all of their income and gains at corporate income tax rates. As described below, Reorganized Brundage-Bone is not expected to have tax attributes carried over from any period prior to the Effective Date (such as net operating losses) that are available to offset future income and gains.

### 3.        Consolidated Return.

Following the Effective Date, Reorganized Brundage-Bone and its subsidiaries may elect to file a consolidated federal income tax return. If a consolidated federal income tax return is filed, the transfer of an asset between the parent corporation and any subsidiary, or between subsidiaries, will generally have no federal income tax consequences unless and until the asset is transferred outside of the consolidated group.

### 4.        Surrender of Equipment and Other Property.

Prior to the Effective Date, Brundage-Bone and JLS will surrender certain items of equipment or other property that serve as security for certain secured debt to the lenders (principally, the Withdrawing Lenders) holding such debt. To the extent of the fair market value of an item of equipment transferred to a lender, the debt is satisfied. To the extent the amount of the indebtedness exceeds the fair market value of the item of equipment, the lender will have a deficiency claim which shall be treated as a Class 5A General Unsecured Claim under the Plan.

The surrender of an item of equipment owned by Brundage-Bone and JLS to the lender holding the security interest on that equipment will constitute a taxable disposition of the equipment. For federal income tax purposes, each disposition of equipment is bifurcated into two components. Gain is recognized to the extent the fair market value of the equipment exceeds its adjusted tax basis on the date of the disposition. All of the gain should be considered ordinary income depreciation recapture ("Recapture Income"), as no item of equipment is expected to have a fair market value in excess of its original cost to Brundage-Bone. The excess of the outstanding balance of the debt to which an item of equipment is subject over its fair market value, to the extent not paid as a Class 5A General Unsecured Claim, will represent cancellation of indebtedness income to Brundage-Bone. See discussion below on Cancellation of Indebtedness Income.

### 5.        Transfer of Equipment to Subsidiaries.

Under the Plan, in addition to returning items of equipment to the Withdrawing Lenders, Brundage-Bone will convey a portion of its equipment, subject to certain indebtedness as described below, to two separate, wholly owned subsidiary corporations to be formed following the confirmation of the Plan but before its Effective Date.

One of the subsidiaries is BB Liquidating Subsidiary, Inc. ("Liquidating Subsidiary"). Brundage-Bone will convey to Liquidating Subsidiary the Excess Equipment. Each such item of equipment will be conveyed subject to its Lender Secured Term Note, which will have a principal amount stipulated to be equal to the fair market value of the Excess Equipment on the date of the transfer. To the extent that the outstanding indebtedness secured by each item of Excess Equipment exceeds its stipulated value, the excess amount will be added to that Lender's unsecured deficiency Class 5A Claim. Accordingly, when Brundage-Bone transfers the Excess Equipment to Liquidating Subsidiary subject to the Lender Secured Term Note, a provision of the Internal Revenue Code requires Brundage-Bone to recognize Recapture Income in an amount equal to such indebtedness in excess of the adjusted tax basis of the Excess Equipment on that date. Liquidating Subsidiary should take a stepped-up basis in the Excess Equipment equal to Brundage-Bone's basis of the Excess Equipment increased by the amount of Recapture Income recognized by it on the transfer.

The other subsidiary is BB Operating Subsidiary, Inc. ("Operating Subsidiary"). Brundage-Bone will convey to Operating Subsidiary a portion of the Retained Equipment to be selected by Brundage-Bone prior to the Effective Date. Each such item of Retained Equipment (the "Subsidiary Retained Equipment") will be conveyed subject to its Lender Secured Senior Term Note, each of which will have a principal amount stipulated to be equal to the fair market value of the Subsidiary Retained Equipment securing such note on the date of the transfer. To the extent that the outstanding indebtedness secured by each item of Subsidiary Retained Equipment exceeds its stipulated value, the excess amount will be added to that Lender's Class 5A unsecured deficiency claim. As discussed above, the holders of the Lender Secured Senior Term Notes will be entitled to receive a beneficial interest in the BB Liquidating Trust. Accordingly, when Brundage-Bone transfers the Subsidiary Retained Equipment to Operating Subsidiary subject to the Lender Secured Senior Term Note, Brundage-Bone should recognize Recapture Income in an amount equal to such indebtedness in excess of the adjusted tax basis of

the Subsidiary Retained Equipment on that date. Operating Subsidiary will take a stepped-up basis in the Subsidiary Retained Equipment equal to Brundage-Bone's basis in the Subsidiary Retained Equipment increased by the amount of Recapture Income recognized by it on the transfer.

To the extent provided in the Guarantor Forbearance Agreement and Lock Up Agreement, Brundage-Bone intends to transfer to Operating Subsidiary Retained Equipment subject to Lender Secured Senior Term Notes that will cause Brundage-Bone to recognize Recapture Income. As a result of the recognition of such Recapture Income at the Brundage-Bone level, the adjusted tax basis of the Subsidiary Retained Equipment in the hands of Operating Subsidiary will be stepped-up by the amount of the recognized Recapture Income.

The Recapture Income recognized in a fiscal year by Brundage-Bone on the equipment returned to certain lenders, the Excess Equipment transferred to Liquidating Subsidiary and the Subsidiary Retained Equipment transferred to Operating Subsidiary will pass through to the shareholders of Brundage-Bone and be included in income in their taxable years in which or with which Brundage-Bone's fiscal year ends. The shareholders will report such Recapture Income, along with their shares of Brundage-Bone's other tax items for such year, on their own individual federal, state and local income tax returns, subject to application of any suspended losses (losses carried forward from prior years that could not be used due to basis limitations) they may have.

It is anticipated that when the S election of Brundage-Bone is terminated, it will elect to file a consolidated federal income tax return with Operating Subsidiary and Liquidating Subsidiary. The determination to file a consolidated return will be made by the Board of Directors of Reorganized Brundage-Bone. Assuming the election is made, the overall taxable income of the consolidated group consisting of Reorganized Brundage-Bone, Operating Subsidiary, Liquidating Sub and its other subsidiaries (if any), will benefit from the reduction to taxable income by reason of depreciation deductions, including depreciation deductions to the extent that the basis in equipment used in the trade or business has been stepped-up.

Excess Equipment held in Liquidating Subsidiary is not initially expected to be utilized in a trade or business. If Reorganized Brundage-Bone determines that it (or Operating Subsidiary) can make use of Excess Equipment, it (or Operating Subsidiary) may reacquire that equipment in the manner described in the Plan. The transfer of an item of equipment from Liquidating Subsidiary to Reorganized Brundage-Bone (or Operating Subsidiary, as the case may be) should not have immediate federal income tax consequences assuming the transfer will be within a consolidated group. Following the reacquisition of the equipment by Reorganized Brundage-Bone (or Operating Subsidiary), and its placement in service, depreciation deductions on the Excess Equipment placed in service should be available.

### 6.    Cancellation of Debt and Reduction of Tax Attributes.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For this purpose, consideration includes the amount of cash and the fair market value of property, including stock or warrants of the debtor. COD Income does not include gain, including

Recapture Income, recognized by Brundage-Bone as a result of the transfer of equipment to lenders or to Operating Subsidiary or Liquidating Subsidiary. COD Income is not required to be included in taxable income, however, if the debtor is in bankruptcy (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of excluded COD Income after the determination of the debtor's income for the taxable year of the discharge, generally in the following order: net operating losses ("NOLs"), general business credit carryforwards, minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, passive activity loss or credit carryovers, and, finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax basis of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge if the discharge occurs while the debtor is in bankruptcy (the "Liability Floor Rule").

Brundage-Bone expects to realize substantial COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the Lender Warrants, which cannot be known with certainty and the fair market value of equipment being surrendered to lenders. Pursuant to the Bankruptcy Exception, this COD Income will not be included in the Debtor's taxable income, but it will reduce its Tax Attributes after calculating the federal income tax for the taxable year of discharge. To the extent the amount of COD Income exceeds the Tax Attributes, there are no further income tax consequences.

As an S corporation, Brundage-Bone does not currently have any NOLs or other significant Tax Attributes other than tax basis in its assets (and the assets of its subsidiary, JLS), losses for the current year, and suspended losses (which are losses that are personal to a shareholder and that the shareholder has been unable to use by reason of the limitation which permits a shareholder to utilize losses allocated to him only to the extent of his adjusted basis in his stock or debt of an S corporation). The reduction of operating and suspended losses occurs after the determination of the tax for the taxable year of the discharge. After reducing any operating losses, suspended losses, general business credits, minimum tax credits and capital losses (several of these are not attributes that an S corporation would ordinarily have), asset basis is then reduced subject to the Liability Floor Rule. Although the projected COD Income would otherwise result in a reduction of the Debtors' basis in their assets, they will not be required to reduce such basis below total liabilities after the discharge by reason of the Liability Floor Rule. Tax attributes are reduced as of the first day of the year following the year in which the COD Income is recognized. Suspended losses held by shareholders are reduced as they are considered to be net operating losses, but suspended losses following the termination of the S election of Brundage-Bone are eliminated and in any event have no value as they can be used only by shareholders while the S election is in effect, and not by the Reorganized Brundage-Bone.

### 7.    Adjusted Tax Basis of Assets of Reorganized Brundage-Bone.

As a result of the transfer of the Excess Equipment and the Subsidiary Retained Equipment to Liquidating Subsidiary and Operating Subsidiary, respectively, the adjusted tax basis of these assets should be stepped up to the amount of indebtedness to which they are subject. This step-up in basis is expected to permit taxable income in future years to be reduced

to the extent of allowable depreciation deductions on such equipment. If Reorganized Brundage-Bone is profitable, these depreciation deductions should increase the amount of after-tax cash flow that is available to pay the Lender Secured Senior Term Notes and the Lender Secured Term Notes. It is anticipated that the Excess Equipment in the Liquidating Subsidiary will not be depreciated unless and until it is retransferred to Reorganized Brundage-Bone (or Operating Subsidiary) and placed in service.

### B.  Federal Income Tax Consequences to Holders of Claims.

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (1) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (2) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (3) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim that is a United States Person. The general U.S. federal income tax consequences to Holders of Claims that are Non-United States Persons are not discussed in detail in this Disclosure Statement and Non-United States Persons should consult with their own advisors regarding the United States federal income tax consequences of the Plan.

The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a U.S. Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the U.S. Holder; (7) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (8) whether the Claim is a capital asset in the hands of the U.S. Holder. Certain holders of Claims or Interests (such as foreign persons, subchapter S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary.

There also may be state, local, and/or non-U.S. income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests that are not addressed in this discussion.

EACH U.S. HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN INDEPENDENT TAX ADVISORS REGARDING THE SPECIFIC FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

   1.   **General.**

A U.S. Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest.  A U.S. Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim.  In general, a U.S. Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.  Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtor may allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim.   Accordingly, in cases where a U.S. Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors may allocate the full amount of consideration transferred to such U.S. Holder to the principal amount of such obligation and take the position that no amount of the consideration to be received by such U.S. Holder is attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

A U.S. Holder that receives Lender Warrants in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of such Warrants or New Common Stock acquired pursuant to the exercise of the Lender Warrants as ordinary income to the extent of (a) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the U.S. Holder upon satisfaction of its Claim, and (b) any amounts which would have been included in the U.S. Holder's gross income if the U.S. Holder's Claim had been satisfied in full, but which were not included in income because of the application of the cash method of accounting.

Subject to the foregoing rules relating to accrued interest, a U.S. Holder of a Secured Claim that is transferred both the collateral and a Class 5A Claim for the deficiency in full and final satisfaction and discharge of the Claim will recognize loss (or income) equal to the positive (or negative) difference between the adjusted issue price of the Claim and the sum of (a) the value of the collateral on the date of the transfer and (b) the amount received for the deficiency, if any, pursuant to the Class 5A Claim under the Plan.  Gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by U.S. Holders of Claims that

hold their Claims as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim was held by the U.S. Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate U.S. Holder only to offset capital gains, and by an individual U.S. Holder only to the extent of capital gains plus $3,000 of other income.

### 2.      U.S. Holders of Equipment Loan Claims.

U.S. Holders of Allowed Claims with respect to Retained Equipment or Excess Equipment (or both) ("Allowed Equipment Claims") will receive a combination of one or more of Lender Secured Senior Term Notes (secured by Retained Equipment), Lender Secured Term Notes (secured by Excess Equipment), Lender Warrants, BB Unsecured Class 5 Notes, BB Unsecured Enhanced Class 5 Notes, and a pro rata share of the Bone Guaranty Cash Earn-Out Amount. Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (a) the fair market value of any Lender Warrants received, (b) the "issue price" of the Lender Secured Senior Term Note and the Lender Secured Term Note, in each case, if received, (c) the "issue price" of the BB Unsecured Class 5 Notes and the BB Unsecured Enhanced Class 5 Notes and (d) the Holder's share of the Bone Guaranty Cash Earn-Out Amount.

The U.S. federal income tax consequences to a U.S. Holder of an Allowed Equipment Claim depend on whether its Claim is a "security" for U.S. federal income tax purposes. The Lender Secured Senior Term Notes, Lender Secured Term Notes (collectively, the "Secured Notes"), and the BB Unsecured Class 5 Notes and the BB Unsecured Enhanced Class 5 Notes (collectively, the "Unsecured Notes") will likely not constitute securities for U.S. federal income tax purposes.  See "Definition of 'Security'" below.  The remainder of this discussion assumes that the Secured Notes and Unsecured Notes will not constitute securities for U.S. federal income tax purposes.

If the Allowed Equipment Claim does not constitute a security for U.S. federal income tax purposes, the exchange of the Allowed Equipment Claim for Lender Warrants, Secured Notes, Unsecured Notes and the Bone Guaranty Cash Earn-Out Amount, if received, will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange.  In such a case, a U.S. Holder's tax basis in the any Lender Warrants received in the exchange will equal their fair market value on the date received.  A U.S. Holder's tax basis in the Secured Notes and the Unsecured Notes, if received, will equal the issue price of the Secured Notes and Unsecured Notes.  A U.S. Holder's holding period in such assets will commence on the day after the date received.

### 3.      U.S. Holders of General Unsecured Claims.

U.S. Holders of Class 5B Claims will receive a share of the BB Unsecured Class 5 Note and, if Alternative 1 is elected, may in addition receive either a share of the BB Unsecured Enhanced Class 5 Note or a share of the Unsecured Warrants (at the election of the Holder) in

exchange for their Claims. Each U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss equal to the difference between (a) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (b) the amount of the "issue price" of the BB Unsecured Class 5 Note and either the amount of the "issue price" of the BB Unsecured Enhanced Class 5 Note or the fair market value of the Unsecured Warrants received in the exchange.

### 4. Definition of "Security."

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured (which, if so, tends to be evidence that the obligation is not a security), the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 5. Federal Income Tax Treatment of the Secured Notes and Unsecured Notes.

The issue price of the Secured Notes and Unsecured Notes is generally expected to equal their stated redemption price at maturity.

A U.S. Holder who receives a Secured Note or an Unsecured Note will generally be required to include stated interest on the Secured Note or Unsecured Note in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if a Secured Note or an Unsecured Note is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder will be required to include in income the amount of such original issue discount over its term based on the constant yield method. In such a case, a U.S. Holder will be required to include amounts in income before they are received. A U.S. Holder's tax basis in a Secured Note and an Unsecured Note will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the Secured Notes and Unsecured Notes.

### 6. Market Discount.

The market discount provisions of the IRC may apply to holders of certain Claims who acquired a debt obligation from the original holder at a discount to its face amount. Holders of

market discount claims should consult with their own tax advisors concerning the treatment for tax purposes of such claims.

### 7.      Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (a) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (b) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 8.      Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

### C.      Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### D.      Reservation of Rights.

This tax section is subject to change (possibly substantial) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Article and the other tax related sections of the Plan up to ten days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XV.  RECOMMENDATIONS AND CONCLUSION

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND CREDITORS.  FOR THESE REASONS THE DEBTORS URGE ALL INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE DEBTORS' NOTICE, CLAIMS AND SOLICITATION AGENT, EPIQ BANKRUPTCY SOLUTIONS, LLC, ON OR BEFORE MARCH 21, 2011.

Dated: February 2, 2011

BRUNDAGE-BONE CONCRETE PUMPING, INC.

By: */s/ Bruce F. Young*
Name: Bruce F. Young
Title: President

Dated: February 2, 2011

JLS CONCRETE PUMPING, INC.

By: */s/ Jeffrey L. Switzer*
Name: Jeffrey L. Switzer
Title: President

Dated this 2nd day of February, 2011.

                              SENDER & WASSERMAN, P.C.

                              */s/ John B. Wasserman*
                              Harvey Sender, #7546
                              John B. Wasserman, #10011
                              David V. Wadsworth, #32066
                              Matthew T. Faga, #41132
                              1660 Lincoln Street, Suite 2200
                              Denver, Colorado 80264
                              (303) 296-1999; (303) 296-7600 (fax)
                              jwass@sendwass.com
                              Attorneys for the Debtor in Possession