**Exhibit A**

**Debtors' Second Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code Dated February 2, 2011**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUNDAGE-BONE | ) | Case No. 10-10758 ABC |
| CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | Case No. 10-10760 ABC |
| JLS CONCRETE PUMPING, INC. | ) | Chapter 11 |
| EIN: 84-0972141 | ) | |
| | ) | *Jointly Administered Under* |
| Debtor. | ) | *Case No. 10-10758 ABC* |

---

**DEBTORS' SECOND AMENDED PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**
**DATED FEBRUARY 2, 2011**

---

# TABLE OF CONTENTS

ARTICLE I. ................................................................................................................. 1
    A.    Defined Terms ........................................................................................... 1
    B.    Rules of Interpretation, Computation of Time, Governing Law, and Reference to Monetary Figures ............................................................... 48
ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ................................. 49
    A.    DIP Facility Claim ................................................................................... 49
    B.    Administrative Claims ............................................................................. 49
    C.    Priority Tax Claims ................................................................................. 50
ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................................................................................ 50
    A.    Summary .................................................................................................. 50
    B.    Summary of Classification and Treatment of Classified Claims and Interests against Brundage-Bone. ............................................... 51
    C.    Summary of Classification and Treatment of Classified Claims and Interests against JLS. ...................................................................... 52
    D.    Classification and Treatment of Claims and Interests against Brundage-Bone ........................................................................................ 52
    E.    Classification and Treatment of Claims and Interests Against JLS ..................... 70
    F.    Acceptance or Rejection of the Plan ....................................................... 72
ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ............................. 73
    A.    Operations Between the Confirmation Date and the Effective Date ................... 73
    B.    Sources of Consideration for Plan Distributions ................................... 73
    C.    Exit Facility ............................................................................................ 73
    D.    New Notes ................................................................................................ 74
    E.    Restated Articles ..................................................................................... 76
    F.    Amended and Restated Bylaws ............................................................... 76
    G.    New Common Stock ................................................................................ 77
    H.    Warrants .................................................................................................. 78
    I.    Shareholders' Agreement and New Board. ............................................ 79
    J.    Management Employment Agreements ................................................... 79
    K.    2011 Equity Incentive Plan and Management Options............................ 80
    L.    Brundage and Bone Lender Guaranties, Guarantor Forbearance Agreement and Guarantor Lock Up Agreement ............................... 81
    M.    Section 1145 and Other Exemptions....................................................... 82
    N.    Corporate Existence ................................................................................ 82
    O.    BB Liquidating Trust .............................................................................. 82
    P.    BB Unsecured Trust, BB Unsecured Class 5 Note and BB Unsecured Enhanced Class 5 Note ....................................................... 83
    Q.    Vesting of Assets in the Reorganized Debtor ........................................ 84
    R.    Cancellation of Interests ......................................................................... 84
    S.    Corporate Action..................................................................................... 85
    T.    Effectuating Documents and Further Transactions................................ 85
    U.    Discharge of Debtors .............................................................................. 86
    V.    Exemption from Certain Transfer Taxes and Recording Fees................ 86

W.      Directors and Officers of the Reorganized Debtor ................................................ 86
X.      Employee and Retiree Benefits ................................................................................ 87
Y.      Preservation of Rights of Action .............................................................................. 87

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................................................. 88
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 88
B.      Insurance Policies ................................................................................................ 89
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 89
D.      Claims Based on Rejection of Executory Contracts and Unexpired Leases ........ 90
E.      Intercompany Contracts, Contracts, and Leases Entered into After the
Petition Date and Executory Contracts and Unexpired Leases Assumed ............ 91
F.      Modifications, Amendments, Supplements, Restatements, or Other
Agreements .......................................................................................................... 91
G.      Reservation of Rights ............................................................................................ 91
H.      Non-Occurrence of the Effective Date .................................................................. 92

ARTICLE VI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
INTERESTS ...................................................................................................................... 92
A.      Allowance of Claims ............................................................................................ 92
B.      Objections/Objection Deadline ............................................................................ 92
C.      Claims and Interests Administration Responsibilities ........................................ 92
D.      Estimation of Claims ............................................................................................ 93
E.      Adjustments to Claims Without Objection ............................................................ 93
F.      Disallowance of Claims or Interests .................................................................... 93
G.      Offer of Judgment ................................................................................................ 93
H.      Amendments to Claims ........................................................................................ 94
I.      ADR Tort Claims .................................................................................................. 94

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ....................................... 94
A.      Distributions on Account of Claims Allowed as of the Effective Date ............... 94
B.      Distributions on Account of Claims Allowed After the Effective Date ............. 94
C.      Delivery of Distributions ...................................................................................... 95
D.      Claims Paid or Payable by Third Parties ............................................................ 99

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
PROVISIONS ................................................................................................................... 99
A.      Discharge of Claims and Termination of Interests .............................................. 99
B.      Subordinated Claims .......................................................................................... 100
C.      Compromise and Settlement .............................................................................. 100
D.      Term of Injunctions or Stays .............................................................................. 101
E.      Exculpation ........................................................................................................ 101
F.      Injunction .......................................................................................................... 101
G.      Injunction Against Interference with Plan of Reorganization ........................... 101
H.      Protections Against Discriminatory Treatment ................................................. 102
I.      Setoffs ................................................................................................................ 102
J.      Recoupment ........................................................................................................ 102
K.      Document Retention .......................................................................................... 103
L.      Reimbursement or Contribution ........................................................................ 103

ARTICLE IX. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ...................................................................................................... 103
    A.    Professional Claims ................................................................................... 103
    B.    Other Administrative Claims ................................................................... 104
ARTICLE X. CONDITIONS PRECEDENT TO EFFECTIVE DATE ................... 104
    A.    Conditions Precedent to the Effective Date ............................................ 104
    B.    Extension of Effective Date ..................................................................... 106
    C.    Effect of Non-Occurrence of Conditions to the Effective Date .......................... 106
ARTICLE XI. ............................................................................................................ 106
    A.    Modification and Amendments................................................................. 106
    B.    Effect of Confirmation on Modifications ................................................ 106
ARTICLE XII. .......................................................................................................... 107
ARTICLE XIII. ......................................................................................................... 109
    A.    Immediate Binding Effect ........................................................................ 109
    B.    Substantial Consummation ....................................................................... 109
    C.    Additional Documents ............................................................................. 109
    D.    Payment of Statutory Fees ....................................................................... 110
    E.    Dissolution of Creditors Committee ........................................................ 110
    F.    Remaining Equipment in BB Liquidating Subsidiary ............................. 110
    G.    Reservation of Rights ............................................................................... 110
    H.    Successors and Assigns............................................................................. 110
    I.    Service of Documents ............................................................................... 110
    J.    Entire Agreement ..................................................................................... 111
    K.    Governing Law ......................................................................................... 112
    L.    Nonseverability of Plan Provisions.......................................................... 112
    M.    Votes Solicited in Good Faith................................................................... 112
    N.    Closing of Chapter 11 Cases .................................................................... 113
    O.    Waiver or Estoppel .................................................................................. 113
    P.    Conflicts and Interpretation of Plan ........................................................ 113

Exhibit A    Term Sheet for the Exit Facility
Exhibit B    Excess Equipment
Exhibit C    Retained Equipment

## INTRODUCTION

Brundage-Bone Concrete Pumping, Inc. and JLS Concrete Pumping, Inc., as debtors and debtors-in-possession in the above-captioned Chapter 11 Cases, hereby respectfully propose this Second Amended Plan of Reorganization for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

**A.      Defined Terms**

As used in the Plan, the capitalized terms below have the following meanings, unless the context otherwise requires.

1.      "2011 Equity Incentive Plan" has the meaning set forth in Article IV.K, hereof.

2.      "Accrued Professional Compensation" means at any given moment, all accrued, contingent, and/or unpaid fees and expenses (including success fees and Allowed Fee Claims) for legal, financial, advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a), 331 or 503 of the Bankruptcy Code or otherwise rendered prior to the Effective Date by any Professionals retained in the Chapter 11 Cases or Professionals whose claims have been Allowed by order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall no longer constitute Accrued Professional Compensation.

3.      "Administrative Claim" means any Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors; (b) the claims of creditors, equity security holders, committees (other than the Committee and any other committee appointed under section 1102 of the Bankruptcy Code), and Committee Members  in

1

making a substantial contribution to the Chapter 11 Cases; (c) Fee Claims; (d) all fees and charges assessed against the Estates under chapter 123 of Title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (e) Claims arising under section 503(b)(9) of the Bankruptcy Code.

4.      "Administrative Claim Bar Date" means the deadline for filing requests for payment of Administrative Claims, which shall be the first Business Day that is 45 days following the Effective Date, except as otherwise provided herein; provided that the Administrative Claim Bar Date shall not apply to Claims that may be entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code, which Claims shall be subject to the General Bar Date.

5.      "ADR Procedure" means the procedure approved by the Bankruptcy Court establishing an alternative dispute resolution for resolution of certain prepetition tort Claims against Debtors.

6.      "ADR Tort Claim" means a Claim relating to property damage, workmen's compensation, bodily injury or death arising from events that occurred prior to the Petition Date; provided that ADR Tort Claims does not include Workman's Compensation Claims under Texas law.

7.      "Affiliate" has the meaning set forth at section 101(2) of the Bankruptcy Code.

8.      "AIG" means AIG Commercial Equipment Finance, Inc. a pre-petition lessor of equipment to the Debtors under the terms of the AIG Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

9.      "AIG Equipment" means the construction equipment either owned by the Debtors or leased to the Debtors by AIG Equipment Lender under the AIG Equipment Loan Documents.

10.      "AIG Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to an AIG Equipment Loan Document, by assignment or otherwise.

11.      "AIG Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any AIG Equipment Loan Document, including the AIG Equipment Lender Secured Claim, the AIG Equipment Lender Secured Excess Equipment Claim and the AIG Equipment Lender Deficiency Claim.

12.      "AIG Equipment Lender Deficiency Claim" means the AIG Equipment Lender Claim after deducting the AIG Equipment Lender Secured Claim and the AIG Equipment Lender Secured Excess Equipment Claim under the applicable AIG Equipment Loan Document, which for the purposes of the Plan shall be $5,955,577.

13.      "AIG Equipment Lender Secured Claim" means the $8,404,500 Secured portion of any AIG Equipment Lender Claim derived from, based on, or arising under any AIG

Equipment Loan Document, which Claim is secured by Retained Equipment that is also AIG Equipment.

14.     "AIG Equipment Lender Secured Excess Equipment Claim" means the $740,000 Secured portion of any AIG Equipment Lender Claim under the AIG Equipment Loan Documents, which Claim is secured by Excess Equipment that is also AIG Equipment.

15.     "AIG Equipment Loan Document(s)" means each of those certain schedules to the GE Master Lease Agreement, by and sold, transferred and assigned to AIG Commercial Equipment Finance, Inc., each with an original aggregate principal amount of: (a) $1,486,939 with respect to construction equipment schedule number dated as of February 27, 2006; (b) $1,061,420 with respect to construction equipment schedule number 025, dated as of August 25, 2006; (c) $1,623,160 with respect to construction equipment schedule number 026, dated as of September 8, 2006; (d) $1,954,180 with respect to construction equipment schedule number 027, dated as of October 12, 2006; (e) $4,307,740 with respect to construction equipment schedule number 028, dated as of December 1, 2006; (f) $5,228,874 with respect to construction equipment schedule number 031, dated as of October 2002; (g) $3,330,758 with respect to construction equipment schedule number 033, dated as of November 14, 2007; and (h) that certain Forbearance Agreement by and among AIG Commercial Equipment Finance, Inc. as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a)-(h) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

16.     "Allowed" means with respect to a Claim or Interest, or any portion thereof: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Bankruptcy Code or Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is not listed in the Debtors' Schedules as contingent, unliquidated, or disputed, whether or not a Proof of Claim has been timely Filed; or (c) any Claim or Interest expressly deemed Allowed pursuant to the Plan; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court; (ii) it is agreed to pursuant to the terms of the Guarantor Lock Up Agreement or the Guarantor Forbearance Agreement and proof of which is timely Filed with the Court; or (iii) it is designated as an Allowed Claim in the Plan and, as to any objection which has been timely interposed, such objection has been overruled or otherwise determined by a Final Order in favor of the Holder of such Claim.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to or action, approval, or order of the Bankruptcy Court.

17.     "Annual Audit" means the financial audit of the Reorganized Debtor by their audit accounting firm which is required under the terms of the Lender Secured Term Loan Documents and the Lender Secured Senior Term Loan Documents.

18.     "Annual Cash Bonuses" has the meaning set forth in Article IV.J, hereof.

19.     "Annual Equipment Audit means the audits of the Equipment Collateral securing the Lender Secured Senior Term Loan and the Lender Secured Term Loan conducted by a nationally recognized equipment appraiser selected by the Collateral Agent(s) of the Lender Secured Senior Term Loan and the Lender Secured Term Loan commencing on the First Anniversary of the Effective Date.

20.     "Annual Class 5 Interest Payment" means the annual interest payments due and owing on account of Allowed Class 5 Unsecured Claims in the amount of 5% per annum as set forth in the BB Unsecured Class 5 Note.

21.     "Annual Class 5 Principal Payment" means the annual principal payments due and owing on account of Allowed Class 5 Unsecured Claims as set forth in the BB Unsecured Class 5 Note.

22.     "Annual Lender Interest Payment" means the annual interest payments due and owing on the Lender Secured Senior Term Loan and the Lender Secured Term Loan in the respective amounts of 1.69% and 3.84% as set forth herein and in the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents.  The Annual Lender Interest Payment is due and payable in full 90 days after each fiscal year end or such later date as set forth in the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents.

23.     "Annual Revised Fair Market Value" means the Fair Market Value as determined by the Annual Equipment Audit.

24.     Asset Management Agreement" means that agreement between the Reorganized Debtor, the BB Operating Subsidiary and the BB Liquidating Subsidiary that provides for the calculation and payment of the Asset Management Fee and sets forth the obligations to preserve, protect, store, maintain and insure the Excess Equipment held by the BB Liquidating Subsidiary, which agreement is a Plan Supplement Document.

25.     "Asset Management Fee" means the fee paid by the Reorganized Debtor or the BB Operating Subsidiary to pay all of the operating costs of the BB Liquidating Subsidiary including but not limited to, all costs related to the storage, appraisal, maintenance, insurance and other costs related to the protection of the Excess Equipment, fees and costs related to  the BB Liquidating Subsidiary Board Members plus all interest and tax reserves due and payable under the Lender Secured Term Loans, which Asset Management Fee is more fully described in the Asset Management Agreement.

26.     "Avoidance Actions" means any and all actual or potential claims or causes of action to avoid a transfer of property or of an obligation incurred by either of the Debtors pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code; provided that the foregoing excludes any parties' rights under section 506(a)(1) to determine the valuation of collateral unless otherwise agreed to by the parties.

27.     "Award" has the meaning set forth in Article IV.K, hereof.

28.     "BB Liquidating Subsidiary" means the wholly-owned subsidiary of the Reorganized Debtor that is established to hold the Excess Equipment transferred to it by the Reorganized Debtor and to be the issuer of the Lender Secured Term Notes on the Effective Date.

29.     "BB Liquidating Trust" means the trust established to hold the Warrants on behalf of the BB Liquidating Trust Beneficiaries.

30.     "BB Liquidating Trust Advisors" means the three trust advisors appointed by 75% of the Equipment Lenders to serve as the advisors of the BB Liquidating Trust approved in the Confirmation Order or such subsequent order entered prior to the Effective Date and any trust advisors subsequently appointed pursuant to the terms of the BB Liquidating Trust Agreement.

31.     "BB Liquidating Trust Agreement" means the agreement governing the terms of the BB Liquidating Trust executed by the BB Liquidating Trustee, the BB Liquidating Trust Advisors and the Reorganized Debtor, the material terms of which are described in the Disclosure Statement.

32.     "BB Liquidating Trust Beneficiaries" means the holders of the Lender Secured Senior Term Notes, Lender Secured Term Notes and the BB Unsecured Trust on behalf of those Holders of Allowed Class 5 Claims and Allowed Class 10 Claims that elect to receive a pro rata interest in distributions attributable to the Unsecured Warrants in partial satisfaction of such Allowed Claims.

33.     "BB Liquidating Trust Certificate" means the Certificate issued by the BB Liquidating Trustee to the BB Liquidating Trust Beneficiaries under the terms of the BB Liquidating Trust to represent their pro rata beneficial interest in the BB Liquidating Trust which entitles the BB Liquidating Trust Beneficiaries to an indirect interest in their pro rata share of the Warrants.

34.     "BB Liquidating Trustee" means Wilmington Trust Corporation or such other entity as approved by the BB Liquidating Trust Beneficiaries pursuant to the terms of the BB Liquidating Trust Agreement, and any trustee subsequently appointed pursuant to the terms of the BB Liquidating Trust Agreement.

35.     "BB Operating Subsidiary" means the wholly-owned subsidiary of the Reorganized Debtor that is established to own and operate that portion of the Retained

Equipment transferred to it by the Reorganized Debtor and the BB Liquidating Subsidiary on or after the Effective Date.

36.     "BB Unsecured Class 5 Note" means the Reorganized Debtor's and the BB Operating Subsidiary's joint and several promissory note in the aggregate principal amount equal to 5.4% of the Class 5 Allowed Unsecured Claims.  The BB Unsecured Class 5 Note shall be payable as follows: (a) interest shall accrue on the BB Unsecured Class 5 Note at the rate of 5% per annum; (b) the principal amount of the BB Unsecured Class 5 Note shall be amortized over a five-year period from the Effective Date and shall be paid in five equal Annual Class 5 Principal Payments, together with the Annual Class 5 Interest Payments, on each anniversary of the Effective Date; (c) on the First Anniversary, the Reorganized Debtor shall pay the first Annual Class 5 Interest Payment and shall also pay up to the full amount of the First Annual Class 5 Principal Payment, provided that immediately following such payment, and after the Reorganized Debtor has also paid all scheduled amounts then owing on the Lender Secured Term Note and the Lender Secured Senior Term Note, the availability on the Exit Facility Revolving Line of Credit is equal to or in excess of $3 million; (d) on the Second Anniversary, the Reorganized Debtor shall pay the Annual Class 5 Interest Payment and shall also make the second Annual Class 5 Principal Payment, together with payment of any deferred outstanding principal amount, if any, still owing on the first Annual Class 5 Principal Payment; (e) on the Third Anniversary and the Fourth Anniversary, the Reorganized Debtor shall pay the Annual Class 5 Interest Payments and the Annual Class 5 Principal Payments then due and owing; and (f) all remaining amounts due and payable on the BB Unsecured Class 5 Note shall be due and payable in full on or before the Fifth Anniversary.  The BB Unsecured Class 5 Note is described in more detail in Article III.D.27. (Class 5) and Article IV.P, hereof.

37.     "BB Unsecured Enhanced Class 5 Note" means the Reorganized Debtor's and the BB Operating Subsidiary's joint and several promissory note in the aggregate amount of either 2.7% or 1.3% (depending upon whether one or both of the Guarantors executes the Guarantor Forbearance Agreement and the Guarantor Lock Up Agreement) of the principal amount of the aggregate amount of Allowed Class 5 Claims and Allowed Class 10 Claims whose Holders elect to receive the Enhanced Treatment provided under Class 5 and Class 10 and elect in accordance with Article III.D.27. or Article III.D.32. to receive a share of the BB Unsecured Enhanced Class 5 Note.  The BB Unsecured Enhanced Class 5 Note will provide for the same interest and payment terms as provided for the BB Unsecured Class 5 Note.  The BB Unsecured Enhanced Class 5 Note is described in more detail in Article III.D.27. (Class 5), Article III.D.32 (Class 10) and Article IV.P hereof.

38.     "BB Unsecured Trust" means the trust established to hold the BB Unsecured Class 5 Note, the BB Unsecured Enhanced Class 5 Note for the ratable benefit of the BB Unsecured Trust Beneficiaries and a beneficial interest in the BB Liquidating Trust attributable to Holders of those Allowed Class 5 Claims and Allowed Class 10 Claims that are entitled to receive distributions on account of Unsecured Warrants.

39.     "BB Unsecured Trust Agreement" means the agreement governing the terms of the BB Unsecured Trust executed by the BB Unsecured Trustee and the Reorganized Debtor, the material terms of which are described in the Disclosure Statement.

6

40.    "BB Unsecured Trust Beneficiaries" means the Holders of Allowed Class 5 Claims that are entitled to receive payments under the BB Unsecured Class 5 Note and/or the BB Unsecured Enhanced Class 5 Note and/or a beneficial interest in distributions attributable to the Unsecured Warrants.

41.    "BB Unsecured Trustee" means the trustee of the BB Unsecured Trust selected by the Holders of a majority of the beneficial interests in the BB Unsecured Trust on or before the Effective Date.

42.    "Balloting Deadline" means the deadline set by the Bankruptcy Court for Holders of Claims or Interests that are Impaired under the Plan to return their ballots voting for or against the Plan.

43.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

44.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado.

45.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court.

46.    "Base Compensation" has the meaning set forth in Article IV.J, hereof.

47.    "BofA" means Bank of America, National Association, and its related entities and affiliates as pre-petition lessors of equipment held by the Debtors as of the Petition Date pursuant to the terms of the BofA Equipment Loan Documents.

48.    "BofA Equipment" means the construction equipment owned by BofA Equipment Creditor that as of the Petition Date was leased to the Debtors under the BofA Equipment Loan Documents and the construction equipment owned by the Debtors that is security for the BofA Equipment Claim.

49.    "BofA Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a BofA Equipment Loan Document, by assignment or otherwise.

50.    "BofA Equipment Claim" means any Claim derived from, based upon or arising under the BofA Equipment Loan Documents, including the BofA Equipment Secured Claim and BofA Equipment Unsecured Deficiency Claim.

51.    "BofA Equipment Unsecured Deficiency Claim" means the BofA Equipment Claim after deducting the BofA Equipment Secured Claim to the extent Allowed by the Bankruptcy Court.

52.    "BofA Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under the BofA Equipment Loan Documents, which Claim is secured by the BofA Equipment.

53.    "BofA Equipment Loan Document(s)" means each of (a) that certain master equipment lease agreement number 17102-90000 by and between Banc of America Leasing & Capital, LLC, as lessor and Brundage- Bone Concrete Pumping, Inc., as lessee, dated as of June 13, 2007 together with those certain schedules, entered into from time to time, by and between Banc of America Leasing & Capital LLC, as lessor, and Brundage-Bone Concrete Pumping, Inc., as lessee, described as: (i) schedule 90001, dated as of July 26, 2007, in an aggregate principal amount of $4,885,886; (ii) schedule 90002, dated as of October 3, 2007, in an aggregate principal amount of $991,880; and (iii) schedule 90003, dated as of December 3, 2007, in an aggregate principal amount of $1,122,610, and (b) that certain promissory note and loan and security agreement, each, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of December 6, 2005, in an original aggregate principal amount of $5,956,446, as sold, assigned and transferred to Banc of America Leasing & Capital LLC, pursuant to that assignment and specification of assigned contract by and between Fifth Third Bank and Banc of America Leasing & Capital LLC, dated as of December 7, 2005; and (c) that certain Forbearance Agreement by and among Banc of America Leasing & Capital, LLC as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated August 4, 2009, as each of the above documents listed or referred to in (a), (b) and (c) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

54.    "Bone" shall mean Dale Bone.

55.    "Bone Guaranty Cash Earn-Out Amount" means the amount of cash contributed by Bone for the release of his Recourse Guaranty Obligations by the Holders of Lender Deficiency Claims and Withdrawing Lender Deficiency Claims that execute and deliver the Guarantor Forbearance Agreement as set forth in Article IV.L. of the Plan.  In the event fewer than all of the Holders of Recourse Guaranty Obligations execute and deliver the Guarantor Forbearance Agreement, the Bone Guaranty Cash Earn-Out Amount shall be $200,000 and if all such Holders execute and deliver the Guarantor Forbearance Agreement, the amount shall be $400,000.

56.    "Brundage" shall mean Jack Brundage.

57.    "Brundage-Bone" means Brundage-Bone Concrete Pumping, Inc., a Colorado corporation one of the two Debtors in the Chapter 11 Cases.

58.    "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

8

59.     "Cash" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and Cash Equivalents.

60.     "Cash Bonus Plan" has the meaning set forth in Article IV.J, hereof.

61.     "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

62.     "Cash Equivalents" means equivalents of Cash in the form of readily marketable securities or instruments issued by an Entity, including readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "P2" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than $100,000,000 having maturities of not more than one year, at the then generally prevailing rates of interest for like amounts and like periods.

63.     "Cause of Action" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes any of the following either against or held by the Debtors: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; (f) any claim or cause of action of any kind against any Debtor Releasee or Exculpated Party based in whole or in part upon acts or omissions occurring before, on, or after the Petition Date; (g) any cause of action listed in the Disclosure Statement; and (j) any Avoidance Action.

64.     "CBI" means CBI Leasing, Inc., as the pre-petition lessor of equipment held by the Debtors as of the Petition Date pursuant to the terms of the CBI Equipment Loan Documents.

65.     "CBI Leasing Equipment" means the construction equipment owned by the Debtors that is security for the CBI Leasing Equipment Claim.

66.     "CBI Leasing Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a CBI Leasing Equipment Loan Document, by assignment or otherwise.

67.     "CBI Leasing Equipment Claim" means any Claim derived from, based upon or arising under the CBI Leasing Equipment Loan Documents, including the CBI Leasing Equipment Secured Claim and CBI Leasing Equipment Unsecured Deficiency Claim.

68.     "CBI Leasing Equipment Unsecured Deficiency Claim" means the CBI Equipment Lender Claim after deducting the CBI Equipment Lender Secured Claim to the extent Allowed by the Bankruptcy Court

69.     "CBI Leasing Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under any CBI Leasing Equipment Loan Document, which Claim is secured by the CBI Leasing Equipment.

70.     "CBI Leasing Equipment Loan Document(s)" means each of (a) that certain promissory note, dated as of December 8, 2006, and that certain loan and security agreement, dated as of August 9, 2006, each, by and among Wachovia Financial Services, Inc., as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, in an original aggregate principal amount of $2,974,000, as sold, assigned and transferred to CBI Leasing Inc., pursuant to that master assignment agreement, by and between CBI Leasing Inc. and Wachovia Financial Services, Inc., dated as of December 14, 2006 and (b) that certain Forbearance Agreement by and among CBI Leasing, Inc. as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 23, 2009, as each of the documents listed or referred to in (a) and (b) above has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

71.     "Certificate" means any instrument evidencing a Claim or an Interest.

72.     "CFS" means collectively Aurora Resurgence Management Partners LLC and Commercial Finance Services 110 LLC, which claim to have a Secured Claim and an Administrative Claim against the Debtors.

73.     "CFS Administrative Claim" means the $2,217,669.46 Disputed Claim asserted by CFS pursuant to Section 503(b)(3)(D) of the Bankruptcy Code, which for purposes of the Plan the Debtors value at $0.

74.     "CFS Deficiency Claim" means the Claim as determined by the Bankruptcy Court in the proceeding to be initiated by the Debtors in accordance with Article III.D.15. hereof.

75.     "CFS Secured Claim" means the $1,172,544 Disputed Claim represented by a proof of claim filed with the Bankruptcy Court (Claim Nos. 383 and 384), which for purposes of the Plan the Debtors value at $0.

76.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the

Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

77.     "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

78.     "Claims Bar Date" means, as applicable: (a) April 16, 2010, the General Bar Date; (b) the Governmental Claims Bar Date; (c) the Administrative Claim Bar Date; (d) the Rejection Bar Date or (e) such other period of limitation as was fixed in the Claims Bar Date Order or any other order of the Bankruptcy Court fixing the dates for filing proofs of such Claims or Interests.

79.     "Claims Bar Date Order" means the March 8, 2010 Order of the Bankruptcy Court setting the General Bar Date and the Rejection Bar Date.

80.     "Claims Register" means the official register of Claims maintained by the Notice, Claims and Solicitation Agent, or by the clerk of the Bankruptcy Court.

81.     "Class" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

82.     "Class 1" means Class 1-A, Class 1-B, Class 1-C, Class 1-D, Class 1-E, Class 1-F, Class 1-G and Class 1-H as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

83.     "Class 2" means Class 2-A, Class 2-B, Class 2-C, Class 2-D, Class 2-E, Class 2-F and Class 2-G as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

84.     "Class 3" means Class 3-A, Class 3-B, Class 3-C, Class 3-D, Class 3-E, Class 3-F, Class 3-G, Class 3-H, Class 3-I and Class 3-J as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

85.     "Class 5" means Class 5 as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

86.     "Class 5 Administrative Claim" means an Administrative Claim that has not been Allowed as of the Balloting Deadline whose Holder agrees (i) that such Administrative Claim will be deemed to have arisen at the time of or before the order for relief concerning Brundage-Bone and (ii) to accept in full satisfaction of such Administrative Claim payment, without interest, over five (5) years in equal quarterly installments commencing on the first day of the first full calendar quarter after the Effective Date.

87.     "Class 5 Base Treatment" means the treatment provided for all Holders of Allowed Class 5 Claims.

11

88.     "Class 5 Enhanced Treatment" means the treatment provided for the Holders of Allowed Class 5 Claims that voluntarily elect to receive a share in the Unsecured Enhanced Class 5 Note or a share of the distributions attributable to the Unsecured Warrants.

89.     "Class 10 Enhanced Treatment" means the treatment provided for the Holders of Allowed Class 10 Claims that voluntarily elect to receive a share in the Unsecured Enhanced Class 5 Note or a share of the distributions attributable to the Unsecured Warrants.

90.     "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

91.     "Collateral Agent" has the meaning set forth in Article IV.D, hereof.

92.     "Comerica" means Comerica Bank, National Association, a pre-petition secured creditor of the Debtor under the terms of the Comerica Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

93.     "Comerica Equipment" means the construction equipment owned by the Debtors that is security for the Comerica Equipment Lender Claim.

94.     "Comerica Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a Comerica Equipment Loan Document, by assignment or otherwise.

95.     "Comerica Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any Comerica Equipment Loan Document, including the Comerica Equipment Lender Secured Claim, the Comerica Equipment Lender Secured Excess Equipment Claim and the Comerica Equipment Lender Deficiency Claim.

96.     "Comerica Equipment Lender Deficiency Claim" means the Comerica Equipment Lender Claim after deducting the Comerica Equipment Lender Secured Claim and the Comerica Equipment Lender Secured Excess Equipment Claim under the Comerica Equipment Loan Document, which for purposes of the Plan shall be $2,715,442.

97.     "Comerica Equipment Lender Secured Claim" means the $3,857,500 Secured portion of any Comerica Equipment Lender Claim derived from, based on, or arising under any Comerica Equipment Loan Document, which Claim is secured by the Comerica Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

98.     "Comerica Equipment Lender Secured Excess Equipment Claim" means the Secured portion of any Comerica Equipment Lender Claim under the applicable Comerica Equipment Loan Document, which Claim is secured by the Comerica Equipment, if any, transferred to the BB Liquidating Subsidiary.

99.     "Comerica Equipment Loan Document(s)" means each of (a) that certain promissory note, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping,

Inc., as borrower, and the guarantors party thereto, dated as of June 15, 2005, in an original aggregate principal amount of $8,946,676, as sold, assigned and transferred to Comerica Corporation, pursuant to that notice and acknowledgement of assignment, dated as of June 15, 2005 and (b) that certain Forbearance Agreement by and among Comerica Leasing Corporation as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the documents listed or referred to above in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

100.    "Committee" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases, pursuant to section 1102 of the Bankruptcy Code, comprising the Committee Members, and as the same may have been reconstituted from time to time.

101.    "Committee Member" means a member of the Committee, as appointed by the United States Trustee in the Chapter 11 Cases.

102.    "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article X.A hereof having been: (a) satisfied; or (b) waived pursuant to Article X.B hereof.

103.    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, with respect to the Chapter 11 Cases.

104.    "Confirmation Hearing" means the hearing at which the Confirmation Order is first considered by the Bankruptcy Court.

105.    "Confirmation Hearing Notice" means the notice approved in the Solicitation Procedures Order that sets forth in detail the voting and objection deadlines with respect to the Plan.

106.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1 129 of the Bankruptcy Code.

107.    "Consent" as used in Section III.D means that the respective Equipment Lender has obtained the lender approvals required to authorize such Equipment Lender to be bound to accept the First Amended Plan and perform its obligations under the Guarantor Forbearance Agreement and the Guarantor Lock Up Agreement.

108.    "Consummation" means the occurrence of the Effective Date.

109.    "Creditor" means any creditor of a Debtor as defined in section 101(10) of the Bankruptcy Code.

110. "CTO" means William K. Snyder, a Managing Partner with CRG Partners Group LLC, in his capacity as the Chief Turnaround Officer of the Debtors, charged with primarily managing the reorganization process and whose appointment was authorized by order of the Bankruptcy Court dated March 18, 2010 and any successors thereto appointed to serve as a Chief Turnaround Officer of the Debtors or the Reorganized Debtors.

111. "Cure" means the distribution in the ordinary course of business following the later of (a) the Effective Date or (b) the date on which an Executory Contract or Unexpired Lease is assumed pursuant to an order of the Bankruptcy Court, of Cash or such other property as may be ordered by the Bankruptcy Court or agreed upon by the applicable non-debtor counterparty to such Executory Contract or Unexpired Lease and the Debtors or the Reorganized Debtor, as applicable, in an amount equal to all unpaid monetary obligations under applicable law (including, to the extent provided for under the applicable Executory Contract or Unexpired Lease assumed pursuant to section 365 of the Bankruptcy Code, post petition interest at the contract rate as agreed between the parties or determined by the Bankruptcy Court) or such lesser amount as may be agreed upon by the parties, under an Executory Contract or Unexpired Lease assumed pursuant to section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

112. "Cure Bar Date" means the deadline for filing requests for payment of Cure or otherwise objecting to assumption, which shall be the later of: (a) 30 days after the Effective Date; and (b) 30 days after the effectiveness of the assumption of the applicable Executory Contract or Unexpired Lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the counterparty to the applicable Executory Contract or Unexpired Lease and the Debtors.

113. "Debtor Releasees" means, collectively: (a) all current and former officers, directors, members, managers, and employees of the Debtors; and (b) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals and affiliates of the Debtors, their subsidiaries, and each of their respective predecessors and successors in interest, and all of their respective current and former members or shareholders (including ex officio members or shareholders), managers, officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals, and affiliates, each in their respective capacities as such.

114. "Debtors" means Brundage-Bone Concrete Pumping, Inc. and JLS Concrete Pumping, Inc., in their capacities as the debtors and debtors-in-possession in the Chapter 11 Cases.

115. "Deficiency Claims" means, collectively, the Lender Deficiency Claims, the Real Estate Lender Deficiency Claims, the Withdrawing Lender Deficiency Claims and the CFS Deficiency Claim.

116. "DIP Agent" means Wells Fargo Bank, N.A., the administrative agent under the DIP Credit Agreement or any successor agent appointed in accordance with such agreement.

14

117.    "DIP Credit Agreement" means that certain $15,000,000 super priority debtor-in-possession credit agreement, approved by order of the Bankruptcy Court dated March 1, 2010, by and among the Debtors, the DIP Agent, and the DIP Lenders named therein, as the same may have been subsequently modified, amended, or supplemented, together with all instruments and agreements related thereto.

118.    "DIP Facility" means that certain $15,000,000 super priority debtor-in-possession credit facility entered into pursuant to the DIP Credit Agreement.

119.    "DIP Facility Claim" means any and all Claims arising under or related to the DIP Facility or to the Debtors' use of Cash Collateral pursuant to orders of the Bankruptcy Court, including all fees and expenses of attorneys and financial advisors of the DIP Agent related to the negotiation and approval of the DIP Facility and the use of Cash Collateral, all of which have been Allowed pursuant to the Bankruptcy Court orders approving the DIP Facility, which includes the Wells Fargo Credit Facility Line of Credit Claim and shall include the Wells Fargo Swap Termination Fees as stipulated to by the parties or, if contested, as Allowed by the Bankruptcy Court.

120.    "DIP Lenders" means, collectively, the Lenders (as defined in the DIP Credit Agreement) party to the DIP Facility from time to time.

121.    "Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

122.    "Disputed" means with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

123.    "Distribution Agent" means any Entities chosen by the Reorganized Debtor, which Entities may include, without limitation, the Reorganized Debtor, the BB Liquidating Trustee, the BB Unsecured Trustee or the Notice, Claims and Solicitation Agent, to make or facilitate distributions required by the Plan.

124.    "Distribution Date" means the date not later than thirty days after the Effective Date when distributions under the Plan shall commence.

125.    "Distribution Record Date" means the date for determining which Holders of Allowed Claims are eligible to receive distributions pursuant to the Plan, which shall be the Confirmation Date or such other date as designated in the Plan, the Confirmation Order or other Final Order of the Bankruptcy Court.

126.    "Distribution Reserves" means Cash, Cash Equivalents, or some other consideration not otherwise inconsistent with the treatment of a Disputed Claim that would be provided pursuant to Article VII.B if such Disputed Claim were to become an Allowed Claim, which the Reorganized Debtors shall hold in reserve pursuant to Article VII.B.3 hereof, to satisfy

the Reorganized Debtors' obligations under the Plan, if any, with respect to Disputed Claims that become Allowed Claims on or after the Effective Date.

127.    "Effective Date" means the later of: the date on which all Plan Conditions Precedent as set forth in Article X herein have been satisfied or the first Business Day sixty (60) days after the Confirmation Date.

128.    "Entity" has the meaning set forth at section 101(15) of the Bankruptcy Code.

129.    "Equipment Collateral" means the Retained Equipment and the Excess Equipment, which will secure the Lender Secured Senior Term Loan and the Lender Secured Term Loan.

130.    "Equipment Leases" means the leases of construction equipment by and among Brundage-Bone as lessee and AIG Equipment Lender, BofA Equipment Creditor, GE Commercial Finance Equipment Creditor and WFEFI Equipment Lender as lessors.

131.    "Equipment Lender Term Loan Documents" means collectively the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents.

132.    "Equipment Lenders" means (a) AIG Equipment Lender, (b) Comerica Equipment Lender, (c) KeyBank Equipment Lender, (d) Key Equipment Finance Equipment Lender, (e) People's Capital Equipment Lender, (f) Wachovia Equipment Lender, (g) Wells Fargo Equipment Lender, and (h) WFEFI Equipment Lender.

133.    "Equity Security" means any equity security, as defined at section 101(16) of the Bankruptcy Code, in the Debtors.

134.    "Estate" means the estate created for each of the Debtors in its respective Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

135.    "Estimated Excess Cash Flow" means for any interim fiscal quarter, 80% of the Lender's Share of the Reorganized Debtor's fiscal year to date Excess Cash Flow as estimated by the Reorganized Debtor based upon the Reorganized Debtor's, the BB Operating Subsidiary's and the BB Liquidating Subsidiary's combined internally-prepared financial statements and payable 45 days after each fiscal quarter end as set forth in the Lender Secured Senior Term Loan Documents and Lender Secured Term Loan Documents. The payment order for the Estimated Excess Cash Flow shall be as follows: first, in payment of the accrued Annual Lender Interest Payment due on the Lender Secured Senior Term Loan; second, in payment of the accrued Annual Lender Interest Payment due on Lender Secured Term Loan; and third, in payment of outstanding principal amounts due on the Lender Secured Senior Term Loan.

136.    "Excess Cash Flow" means the following:

a.    the Reorganized Debtor's and BB Operating Subsidiary's combined net income;

plus

      b.     such Entities' combined non-cash amortization and depreciation;

minus

      c.     such Entities' combined working capital requirements (after giving effect to any working capital financing) as approved by the New Board;

minus

      d.     such Entities' combined capital expenditures; and

minus

      (v)     the aggregate principal payments due on the notes issued to Holders of Allowed Class 1, 3-A, 3-B, 3-C, 3-F, 3-H, 3-I, 3-J, 5 and 10 Claims under the Plan (including, but not limited to, the Lender Secured Senior Term Notes, the Lender Secured Term Notes, the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note) calculated and payable as set forth in this Plan and in the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents. In the event of a discrepancy between the method of calculation and payment of such amounts in (x) the Plan and (y) the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents, the provisions of the latter will control.

The Lenders' Share of Excess Cash Flow shall be used to reduce the principal balance owing on the Lender Secured Senior Term Notes after payment of all interest due and owing on such Notes, including the Monthly Lender Interest Payments and the Annual Lender Interest Payments. The payment order for the Lenders' Share of Excess Cash Flow shall be as follows:

      a.     *First*, in payment of the accrued Annual Lender Interest Payment due on the Lender Secured Senior Term Loan;

      b.     *Second*, in payment of the accrued Annual Lender Interest Payment due on the Lender Secured Term Loan; and

      c.     *Third*, in payment of outstanding principal amounts due on the Lender Secured Senior Term Loan.

137. "Excess Equipment" means any construction equipment transferred by the Reorganized Debtor to the BB Liquidating Subsidiary, a description of the Excess Equipment and the name of the Holder of the Secured Claim on each piece of Excess Equipment is attached hereto as **Exhibit B** or any amended Exhibit B provided as part of the Plan Supplement Documents which is approved by the affected Holder of such Excess Equipment.

138.    "Exculpated Parties" means each of: (a) the Debtors and the Reorganized Debtor;
(b) the Committee; (c) all current and former Committee Members; (d) the DIP Agent and the
DIP Lenders, in each of the foregoing cases, solely in their capacity as such; (e) the Exit Facility
Lenders in each of the foregoing cases, solely in their capacity as such; and (f) with respect to
each of the foregoing Entities identified above in (a) through (e), all of the current and former
members (including ex officio members), officers, directors, employees, partners, attorneys,
financial advisors, accountants, managed funds, investment bankers, investment advisors,
actuaries, professionals, agents, affiliates, and representatives of each of the foregoing Entities
(whether current or former, in each case in his, her or its capacity as such).

139.    "Executory Contract" means a contract to which one or more of the Debtors is a
party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy
Code.

140.    "Exit Facility" means that senior, secured credit facility to be entered into
pursuant to the Exit Facility Agreement to pay off the DIP Facility (including the standby letters
of credit) and provide the Reorganized Debtor with an operating revolving line of credit.

141.    "Exit Facility Agreement" means that certain loan agreement and other
documents to be entered into by the Reorganized Debtor and the Exit Facility Lenders on the
Effective Date, substantially consistent with the term sheet attached as **Exhibit A** hereto and
substantially in the form of the Exit Facility Agreement set forth in the Plan Supplement
Documents.

142.    "Exit Facility Lenders" means the lender or lenders party to the Exit Facility
Agreement from time to time, which shall be Bank of America, N.A. or its designee, which
designee may be any Entity.

143.    "Exit Facility Revolving Line of Credit" means the revolving line of credit
provided to the Reorganized Debtor by the Exit facility Lender pursuant to the Exit Facility
Agreement.

144.    "Exit Transaction" has the meaning given to it in Article IV.H, hereof.

145.    "Federal Judgment Rate" means the federal judgment rate in effect as of the
Petition Date, which was 0.35% per annum.

146.    "Fee Claim" means any Allowed Claim arising under sections 328, 330(a), 331,
363, or 503 of the Bankruptcy Code for Accrued Professional Compensation.

147.    "Fifth Anniversary" means the first Business Day following the fifth anniversary
of the Effective Date.

148.    "First Anniversary" means the first Business Day that is one year after the
Effective Date.

149.   "File" means to file with the Bankruptcy Court in the Chapter 11 Cases or, in the case of Proofs of Claim, to file with the Notice, Claims and Solicitation Agent.

150.   "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

151.   "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

152.   "Forced Sale" has the meaning given to it in Article IV.H, hereof.

153.   "Fourth Anniversary" means the first Business Day following the fourth anniversary of the Effective Date.

154.   "GE Commercial Finance" means a GE Commercial Finance, which is a division of GE Capital, as the pre-petition lessor of equipment held by the Debtors as of the Petition Date pursuant to the terms of the GE Commercial Finance Equipment Loan Documents.

155.   "GE Commercial Finance Equipment" means the construction equipment owned by GE Commercial Finance that is leased to the Debtors under the GE Commercial Finance Equipment Loan Documents.

156.   "GE Commercial Finance Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a GE Commercial Finance Equipment Loan Document, by assignment or otherwise.

157.   "GE Commercial Finance Equipment Claim" means any Claim derived from, based upon or arising under the GE Commercial Finance Equipment Loan Documents, including the GE Commercial Finance Equipment Secured Claim and GE Commercial Finance Equipment Unsecured Deficiency Claim.

158.   "GE Commercial Finance Equipment Unsecured Deficiency Claim" means the GE Commercial Finance Equipment Claim after deducting the GE Commercial Finance Equipment Secured Claim to the extent Allowed by the Bankruptcy Court

159.   "GE Commercial Finance Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under and GE Commercial Finance Equipment Loan Document, which Claim is secured by the GE Commercial Finance Equipment.

160.   "GE Commercial Finance Equipment Loan Document(s)" means each of (a) the GE Master Lease Agreement, the obligations of which are secured by certain specific equipment collateral as evidenced by those certain construction equipment schedules and (b) each of those certain construction equipment schedules to which General Electric Capital Corporation is the incumbent, successor, or otherwise lender party thereto, each with an original aggregate principal amount of: (i) $515,350 with respect to construction equipment schedule number 007, dated as of September 22, 2004; (ii) $515,350 with respect to construction equipment schedule number 009, dated as of September 22, 2004; (iii) $515,350 with respect to construction equipment schedule number 010, dated as of September 22, 2004; (vi) $515,350 with respect to construction equipment schedule number 011, dated as of October 21, 2004; (v) $709,520 with respect to construction equipment schedule number 012, dated as of October 21, 2004; (vi) $515,350 with respect to construction equipment schedule number 013, dated as of October 21, 2004; (vii) $709,520 with respect to construction equipment schedule number 014, dated as of October 21, 2004; (viii) $709,520 with respect to construction equipment schedule number 015, dated as of October 21, 2004; (ix) $ 1.186 million with respect to construction equipment schedule number 016, dated as of October 21, 2004; (x) $488,965 with respect to construction equipment schedule number 018, dated as of November 18, 2005; (xi) $488,965 with respect to construction equipment schedule number 019, dated November 18, 2005; $486,865 with respect to construction equipment schedule number 020, dated November 18, 2005; $625,648 with respect to construction equipment schedule number 021, dated November 18, 2005; $1,127,292 with respect to construction equipment schedule number 023, dated as of March 13, 2006; $4,835,280 with respect to construction equipment schedule number 029, dated as of December 11, 2006; $665,200 with respect to construction equipment schedule number 040, dated as of May 1, 2008, as each of the above documents listed or referred to in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

161.   "GE Commercial Finance Real Estate" means real estate located at 6461 & 6475 Downing Street, Denver, CO 80229 and 350 West 700 South, Pleasant Grove, UT 84062.

162.   "GE Commercial Finance Real Estate Lender" means each successor or incumbent lender, as applicable, currently a party to a GE Commercial Finance Real Estate Loan Document, by assignment or otherwise.

163.   "GE Commercial Finance Real Estate Lender Claim" means any Claim derived from, based upon, or arising under any GE Commercial Finance Real Estate Loan Document.

164.   "GE Commercial Finance Real Estate Lender Secured Claim" means the amounts due and owing under the GE Commercial Finance Real Estate Loan Document, which is secured by a first mortgage on the GE Commercial Finance Real Estate.

165.   "GE Commercial Finance Real Estate Loan Document" means each of (a) that certain promissory note, by and between GE Commercial Finance Business Property Corporation, as lender, and Brundage-Bone Concrete Pumping, Inc., as borrower, dated on or around August, 2005, in an original aggregate principal amount of $1.826 million, secured by

20

that certain real estate collateral located at 6461 & 6475 Downing Street, Denver, CO, 80229, and (b) that certain promissory note, by and between GE Commercial Finance Business Property Corporation, as lender, and Brundage-Bone Concrete Pumping, Inc., as borrower, dated on or around August, 2005, in an original aggregate principal amount of $1.072 million, secured by that certain real estate collateral located at 350 West 700 South, Pleasant Grove, UT, 84062, as each of the above documents listed or referred to in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

166.   "GE Master Lease Agreement" means that certain master lease agreement, by and among General Electric Capital Corporation, as lessor, Brundage-Bone Concrete Pumping, Inc. as lessee, and the guarantors, party thereto, dated as of October 23, 2002, as has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

167.   "General Bar Date" means April 16, 2010, the date set by the Bankruptcy Court in the Claims Bar Date Order pursuant to which all Proofs of Claim except Administrative Claims, Rejection Claims and Governmental Claims against any of the Debtors must be Filed; provided that all Proofs of Claim based on Administrative Claims that may be entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code must be filed by the General Bar Date pursuant to the terms of the Claims Bar Date Order.

168.   "General Unsecured Claim" means any unsecured Claim against any Debtor that is not a/an: (a) DIP Facility Claim; (b) Administrative Expense Claim; (c) Fee Claim; (d) Priority Tax Claim; (e) Other Priority Claim; (f) Lender Secured Claim; (g) Real Estate Lender Secured Claim; (h) Intercompany Claim; (i) Section 510(b) Claim; or (j) Interest.

169.   "GMAC" means General Motors acceptance Corporation as the pre-petition lessor of equipment held by the Debtors as of the Petition Date pursuant to the terms of the GMAC Equipment Loan Documents.

170.   "GMAC Equipment" means the vehicles either owned by the Debtors or leased to the Debtors under the GMAC Equipment Loan Documents.

171.   "GMAC Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a GMAC Equipment Loan Document, by assignment or otherwise.

172.   "GMAC Equipment Claim" means any Claim derived from, based upon, or arising under any GMAC Equipment Loan Document.

173.   "GMAC Equipment Unsecured Deficiency Claim" means the GMAC Equipment Lender Claim after deducting the GMAC Equipment Secured Claim to the extent Allowed by the Bankruptcy Court.

174.    "GMAC Equipment Secured Claim" means the Secured portion of any GMAC Equipment Claim under the GMAC Equipment Loan Document.

175.    "GMAC Equipment Loan Document(s)" means each of (a) that certain ComTRAC lease agreement, by and between General Motors Acceptance Corporation, as lessor, and Brundage-Bone Concrete Pumping, Inc., as lessee, dated as of February 7, 2006, in an original aggregate principal amount of $41,345 and (b) that certain retail installment sale contract GMAC flexible finance plan, by and between Westfall GMC, as creditor/seller, and Brundage-Bone Concrete Pumping Inc., as buyer, dated as of May 30, 2007, in an original aggregate principal amount of $40,651, as each of the above documents listed or referred to in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

176.    "Governmental Claim" means any Claim held by any Governmental Unit against either of the Debtors.

177.    "Governmental Claims Bar Date" means the date set by the Bankruptcy Court in the Claims Bar Date Order pursuant to which all Government Claims must be Filed.

178.    "Governmental Unit" has the meaning set forth at section 101(27) of the Bankruptcy Code.

179.    "Guarantor" and "Guarantors" means either Brundage or Bone individually or collectively, as the case may be.

180.    "Guarantor Forbearance Agreement" means the Forbearance, Guaranty Earn-Out and Non-Competition Agreement entered into by and among the Debtors, the Guarantors, the Equipment Lenders and certain of the Withdrawing Lenders pursuant to which the Equipment Lenders and Withdrawing Lenders executing the agreement agree to forbear from exercising their rights against one or both of the Guarantors under certain circumstances described in more detail in Article IV.L hereof.

181.    "Guarantor Lock Up Agreement" means the Stock Acquisition, Guaranty Modification and Plan Lock-Up Agreement entered into by and among the Debtors, the Guarantors and the Equipment Lenders pursuant to which the Guarantors, among other things, agree to assist the Debtors by acquiring shares of Brundage-Bone Common Stock from other shareholders of Brundage-Bone, as more fully described in Article IV.L, hereof.

182.    "Guaranty Conversion Obligations" has the meaning given to it in Article IV.L, hereof.

183.    "Holder" means any Person or Entity holding a Claim or an Interest.

184. "Impaired" means, with respect to any Class of Claims or Interests, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

185. "Initial Equipment Fair Market Value" means the going concern values of the Equipment Collateral as set forth in the appraisals prepared by High Tower and Taylor Martin issued in their reports issued in January of 2010.

186. "Insider" has the meaning set forth at section 101(31) of the Bankruptcy Code.

187. "Insurance Policy Documents" means all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto maintained by the Debtors as of the Petition Date, including all insurance policies for directors' and officers' liability maintained by the Debtors as of the Petition Date.

188. "Intercompany Claim" means any Claim of a Debtor against another Debtor.

189. "Intercompany Contract" means any contract between two or more Debtors.

190. "Intercompany Interest" means any Interest held by a Debtor in another Debtor.

191. "Interest" means any Equity Security of a Debtor including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto.

192. "Interim Compensation Order" means the Bankruptcy Court's Order Establishing Interim Compensation Procedure for Professionals dated January 21, 2010 and entered in the Chapter 11 Cases, allowing Professionals to seek interim compensation in accordance with the compensation procedures approved therein, as may have been modified by a Final Order approving the retention of any particular Professional.

193. "JLS" means JLS Concrete Pumping, Inc., a California corporation.

194. "KeyBank" means KeyBank National Association, a pre-petition secured creditor of the Debtors under the terms of the KeyBank Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

195. "KeyBank Equipment" means the construction equipment that is owned by the Debtors that is security under the KeyBank Equipment Loan Documents.

196. "KeyBank Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a KeyBank Equipment Loan Document, by assignment or otherwise.

197. "KeyBank Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any KeyBank Equipment Loan Document, including

the KeyBank Equipment Lender Secured Claim, the KeyBank Equipment Lender Secured Excess Equipment Claim and the KeyBank Equipment Lender Deficiency Claim.

198.    "KeyBank Equipment Lender Deficiency Claim" means the KeyBank Equipment Lender Claim after deducting the KeyBank Equipment Lender Secured Claim and the KeyBank Equipment Lender Secured Excess Equipment Claim under the applicable KeyBank Equipment Loan Document, which for purposes of the Plan shall be $11,766,607.

199.    "KeyBank Equipment Lender Secured Claim" means the $9,059,700 Secured portion of any KeyBank Equipment Lender Claim derived from, based upon, or arising under any KeyBank Equipment Loan Document, which Claim is secured by KeyBank Equipment Lender's Retained Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

200.    "KeyBank Equipment Lender Secured Excess Equipment Claim" means the $3,433,100 Secured portion of any KeyBank Equipment Lender Claim derived from, based upon, or arising under any KeyBank Equipment Loan Document, which Claim is secured by KeyBank's Excess Equipment transferred to the BB Liquidating Subsidiary.

201.    "KeyBank Equipment Loan Documents(s)" means each of (a) that certain promissory note and revolving credit agreement by and among KeyBank National Association, as lender, Brundage-Bone Concrete Pumping Inc., as borrower, and the guarantors party thereto, dated as of November 30, 2006, in the maximum principal amount of $25 million and (b) that certain Forbearance Agreement by and among KeyBank National Association and Key Equipment Finance Inc. as lenders, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 31, 2009, as each of the above documents has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

202.    "Key Equipment Finance" means Key Equipment Finance Inc., a pre-petition secured creditor of the Debtors under the terms of the Key Equipment Finance Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

203.    "Key Equipment Finance Equipment" means the construction equipment that is owned by the Debtors that is security under the Key Equipment Finance Equipment Loan Documents.

204.    "Key Equipment Finance Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a Key Equipment Finance Equipment Loan Document, by assignment or otherwise.

205.    "Key Equipment Finance Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any Key Equipment Finance Equipment Loan Document, including the Key Equipment Finance Equipment Lender Secured Claim, the

Key Equipment Finance Equipment Lender Secured Excess Equipment Claim and the Key Equipment Finance Equipment Lender Deficiency Claim.

206.   "Key Equipment Finance Equipment Lender Deficiency Claim" means the Key Equipment Finance Equipment Lender Claim after deducting the Key Equipment Finance Equipment Lender Secured Claim and the Key Equipment Finance Equipment Lender Secured Excess Equipment Claim under the applicable Key Equipment Finance Equipment Loan Document, which for purposes of the Plan shall be $4,031,462.

207.   "Key Equipment Finance Equipment Lender Secured Claim" means the $4,170,600 Secured portion of any Key Equipment Finance Equipment Lender Claim derived from, based upon, or arising under any Key Equipment Finance Equipment Loan Document, which Claim is secured by Key Equipment Finance Equipment Lender's Retained Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

208.   "Key Equipment Finance Equipment Lender Secured Excess Equipment Claim" means the $1,872,200 Secured portion of any Key Equipment Finance Equipment Lender Claim derived from, based upon, or arising under any Key Equipment Finance Equipment Loan Document, which Claim is secured by Excess Equipment that is also Key Equipment Finance Equipment.

209.   "Key Equipment Finance Equipment Loan Documents(s)" means each of (a) that certain promissory note, dated September 26, 2006, and that certain loan and security agreement, dated September 26, 2006, each, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, in an aggregate principal amount of $6,488,887, as sold, assigned, and transferred to Key Equipment Finance Inc., pursuant to that certain specification of assigned interest, entered into by and between Fifth Third Bank and Key Equipment Finance Inc., on or around September 26, 2006; (b) that certain promissory note, dated as of March 28, 2007, and that certain master security agreement, dated as of March 28, 2007, each, by and among Key Equipment Finance Inc., as lender, Brundage-Bone Concrete Pumping Inc., as borrower, and the guarantors, party thereto, in an aggregate principal amount of $5,427,250 and (c) that certain Forbearance Agreement by and among KeyBank National Association and Key Equipment Finance Inc. as lenders, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 31, 2009, as each of the above documents has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

210.   "Lease Modification Formula" means the following described formula by which lease payments under the Equipment Leases held by AIG and WFEFI are being converted on the Effective Date to a secured recourse loan amount for purposes of the Plan and determining the respective amounts of the AIG and WFEFI under the Lender Secured Senior Term Notes and Lender Secured Term Notes:  All unpaid (pre- and post petition) and future amounts due under each Equipment Lease shall be discounted to present value at the rate of 5% per annum and the

amount derived from such calculation shall represent the amount of each Lessor Equipment Lender Claim.

211.   "Lender Deficiency Claims" means the Allowed Claims of the Equipment Lenders as of June 17, 2010 in the following Amounts:  (a) AIG Equipment Lender Deficiency Claim in the amount of $5,955,577, (b) Comerica Equipment Lender Deficiency Claim in the amount of $2,715,442, (c) KeyBank Equipment Lender Deficiency Claim in the amount of $11,766,607, (d) Key Equipment Finance Equipment Lender Deficiency Claim in the amount of $4,031,462, (e) People's Capital Equipment Lender Deficiency Claim in the amount of $1,187,422, (f) Wachovia Equipment Lender Deficiency Claim in the amount of $6,062,171, (g) Wells Fargo Lender Deficiency Claim in the amount of $18,804,042, (h) the Wells Fargo Real Estate Lender Deficiency Claims in the amount of $881,000,and (i) WFEFI Equipment Lender Deficiency Claim in the amount of $27,059,050.

212.   "Lender Secured Excess Equipment Claims" means the Allowed Claims of the Equipment Lenders as of June 17, 2010 in the following amounts: (a) AIG Equipment Lender Secured Excess Equipment Claim in the amount of $740,000, (b) Comerica Equipment Lender Secured Excess Equipment Claim in the amount of $0, (c) KeyBank Equipment Lender Secured Excess Equipment Claim in the amount of $3,433,100, (d) Key Equipment Finance Equipment Lender Secured Excess Equipment Claim in the amount of $1,872,200, (e) People's Capital Equipment Lender Secured Excess Equipment Claim in the amount of $0, (f) Wachovia Equipment Lender Secured Excess Equipment Claim in the amount of $2,197,600, (g) Wells Fargo Equipment Lender Secured Excess Equipment Claim in the amount of $7,489,800, and (h) WFEFI Equipment Lender Secured Excess Equipment Claim in the amount of $16,724,700.

213.   "Lender Secured Claims" means collectively the Allowed Claims of the Equipment Lenders as of June 17, 2010 in the following amounts: (a) AIG Equipment Lender Secured Claim in the amount of $8,404,500, (b) Comerica Equipment Lender Secured Claim in the amount of $3,857,500, (c) KeyBank Equipment Lender Secured Claim in the amount of $9,059,700, (d) Key Equipment Finance Equipment Lender Secured Claim in the amount of $4,170,600, (e) People's Capital Equipment Lender Secured Claim in the amount of $2,703,300, (f) Wachovia Equipment Lender Secured Claim in the amount of $5,728,100, (g) Wells Fargo Equipment Lender Secured Claim in the amount of $9,184,200, and (h) WFEFI Equipment Lender Secured Claim in the amount of $30,831.000.

214.   "Lender Secured Term Loan" means  the full recourse secured term loan facility granted to the BB Liquidating Subsidiary in an initial aggregate amount equal to the sum of all of the Lender Secured Excess Equipment Claims, which amount shall be reduced from time to time by the Fair Market Value of the Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary and decreasing by any amounts paid to the Equipment Lenders from the proceeds of the Excess Equipment sold prior to the Effective Date. The Debtor shall commence making the Monthly Lender Interest Payments on the first day of the first full month following the Effective Date and payable thereafter on the first day of each month until the Lender Secured Term Loan Maturity Date.  The Debtor shall also pay, on a quarterly basis from Estimated Excess Cash Flow, the accrued Annual Lender Interest Payment, commencing 45 days following the first fiscal quarter-end after the Effective Date.  Any

remaining unpaid amount of the respective year's Annual Lender Interest Payment shall be due 90 days after fiscal year end (or such later time as set forth in the Lender Secured Senior Term Loan Documents); provided that the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be paid only to the extent that such payment does not reduce the Reorganized Debtor's availability on the Exit Facility Revolving Line of Credit to an amount that is less than $3 million. Any deferred payment of the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be addressed as set forth in the Lender Secured Term Loan Documents. All principal amounts, interest, fees and other monetary obligations due and owing under the Lender Secured Term Loan Documents shall be fully due and payable on the Lender Secured Term Loan Maturity Date. The Lender Secured Term Loan is secured by the Lender Secured Term Loan Collateral and shall be guaranteed by the BB Operating Subsidiary and Reorganized Debtor.

215. "Lender Secured Term Loan Collateral" means: (a) a first priority lien on all of the Equipment Collateral held by the BB Liquidating Subsidiary; (b) a second priority lien in all of the Equipment Collateral held at the Reorganized Debtor and the BB Operating Subsidiary; (c) a lien junior in priority only to any lien held by the Exit Facility Lenders and the Lender Secured Senior Term Loan in the accounts receivable, chattel paper, equipment rentals, inventory and general intangibles of the Reorganized Debtors, the BB Operating Company and the BB Liquidating Subsidiary; (d) a first priority lien in all investment property including, but not limited to a pledge of all capital stock of the BB Liquidating Subsidiary; and (e) a junior lien in all remaining personal property of the Reorganized Debtors, the BB Operating Subsidiary and the BB Liquidating Subsidiary not pledged to secure the Exit Facility Loans.

216. "Lender Secured Term Loan Documents" means the loan agreements, the Lender Secured Term Notes, the security agreements, UCC-1s, corporate resolutions and other related documents that set forth the terms of the Lender Secured Term Loan which documents shall be acceptable to the Equipment Lenders in their discretion.

217. "Lender Secured Term Loan Maturity Date" means the earlier of: (a) the date of the occurrence of an uncured event of default as defined under the terms of the Lender Secured Term Loan Documents; (b) the date of a change in control as that term is defined under the Lender Secured Term Loan Documents including, but not limited to, a merger or consolidation of the Reorganized Debtor with or into another entity (except the merger or consolidation in which the holders of capital stock of such company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the stock of the company or the surviving or acquiring entity) or the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Reorganized Debtor's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of such company (or the surviving or acquiring entity); (c) the sale, transfer or other disposition of all or substantially all of the assets of the Reorganized Debtor; or (d) the Fifth Anniversary as defined herein.

218. "Lender Secured Term Notes" means collectively the full recourse promissory notes issued by the BB Liquidating Subsidiary issued in payment of the Lender Secured Excess

Equipment Claims which notes shall be guaranteed by the Reorganized Debtor and the BB Operating Subsidiary and shall be payable in accordance with the terms of the Lender Secured Term Loan Documents and shall be secured by the Lender Secured Term Loan Collateral.

219.    "Lender Secured Senior Term Loan" means  the full recourse secured term loan facility granted to the Reorganized Debtor and the BB Operating Subsidiary in a total initial aggregate amount equal to the sum of all of the Lender Secured Claims with such sum increasing by the Fair Market Value of the Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary and decreasing by any amounts paid to the Equipment Lenders from the proceeds of the Retained Equipment sold prior to the Effective Date.    The Lender Secured Senior Term Loan shall amortize annually with the initial amortization set at $5 million payable pro rata to the holders of the Lender Secured Senior Term Notes; provided that the subsequent annual amortization amounts shall be increased on a pro rata basis for any Excess Equipment transferred from the BB Liquidating Subsidiary to the BB Operating Subsidiary. The Reorganized Debtor shall make quarterly principal installments in the amount of $1,250,000 each commencing on July 31, 2011 and continuing, as increased from time to time for Excess Equipment transfers, until the Lender Secured Senior Term Loan Maturity Date.  The Debtor shall commence making the Monthly Lender Interest Payments on the first day of the first full month following the Effective Date and payable thereafter on the first day of each month until the Lender Secured Senior Term Loan Maturity Date.  The Debtor shall also pay on a quarterly basis the accrued Annual Lender Interest Payment and principal reductions from Estimated Excess Cash Flow, commencing 45 days following the first fiscal quarter-end after the Effective Date.  Any remaining unpaid amount of the respective year's Annual Lender Interest Payment and Excess Cash Flow for the fiscal year as determined by the Annual Audit shall be due 90 days after the respective fiscal year end (or such later time as set forth in the Lender Secured Senior Term Loan Documents); provided that the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be paid only to the extent that such payment does not reduce the Reorganized Debtor's availability on the Exit Facility Revolving Line of Credit  to an amount that is less than $3 million.  Any deferred payment of the Annual Lender Interest Payment due for the fiscal year ending October 31, 2011 shall be addressed as set forth in the Lender Secured Senior Term Loan Documents.  All principal amounts, interest, fees and other monetary obligations due and owing under the Lender Secured Senior Term Loan Documents shall be fully due and payable on the Lender Secured Senior Term Loan Maturity Date.  The Lender Secured Senior Term Loan is secured by the Lender Secured Senior Term Loan Collateral.

220.    "Lender Secured Senior Term Loan Collateral" means (a) a first priority lien on all of the Equipment Collateral held by the Reorganized Debtor and the BB Operating Subsidiary; (b) a second priority lien in all of the Equipment Collateral held at the BB Liquidating Subsidiary; (c) a lien junior in priority only to any lien held by the Exit Facility Lenders in the accounts receivable, chattel paper, rents, inventory and general intangibles of the Reorganized Debtors, the BB Operating Company and the BB Liquidating Subsidiary; (d) a first priority lien in all investment property including, but not limited to a pledge of all capital stock of the BB Operating Company; and (e) a first priority lien in all remaining personal property of the Reorganized Debtors, the BB Operating Subsidiary and the BB Liquidating Subsidiary not pledged to secure the Exit Facility Loans.

221.    "Lender Secured Senior Term Loan Documents" means the loan agreements, the Lender Secured Senior Term Notes, the security agreements, UCC-1s, corporate resolutions and other related documents that set forth the terms of the Lender Secured Senior Term Loan which documents shall be acceptable to the Equipment Lenders in their discretion.

222.    "Lender Secured Senior Term Loan Maturity Date" means the earlier of: (a) the date of the occurrence of an uncured event of default as defined under the terms of the Lender Secured Senior Term Loan Documents; (b) the date of a change in control as that term is defined under the Lender Secured Senior Term Loan Documents including, but not limited to, a merger or consolidation of the Reorganized Debtor with or into another entity (except the merger or consolidation in which the holders of capital stock of such company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the stock of the company or the surviving or acquiring entity) or the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Reorganized Debtor's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of such company (or the surviving or acquiring entity); (c) the sale, transfer or other disposition of all or substantially all of the assets of the Reorganized Debtor; or (d) the Fifth Anniversary as defined herein.

223.    "Lender Secured Senior Term Notes" means collectively the full recourse secured promissory notes issued by the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally as co-borrowers to each of the Equipment Lenders in the amount of and subject to the terms of the Lender Secured Senior Term Loans set forth herein which notes shall be secured by the Lender Secured Senior Term Loan Collateral.

224.    "Lender Specific Collateral" has the meaning set forth in Article IV.D, hereof.

225.    "Lender Warrants" means warrants for 100% of the common stock of the Reorganized Debtor subject to dilution of up to 12% (on a fully diluted basis) as more fully described in Article IV.H. herein for the Management Options and up to a maximum of 22.3% (on a fully diluted basis) of the Warrants that may be allocated to the Unsecured Warrants. The Lender Warrants shall be held by BB Liquidating Trust on behalf of the holders of Lender Secured Senior Term Notes and the Lender Secured Term Notes pursuant to the terms of the BB Liquidating Trust Agreement. The Lender Warrants shall be represented by BB Liquidating Trust Certificates and shall be allocated to the Equipment Lenders in accordance with the chart in Article IV.H.   The Lender Warrants are in compensation of the Equipment Lenders for making available the Lender Secured Senior Term Loan, the Lender Secured Term Loan Equipment Collateral on terms that are less favorable to the Equipment Lenders than current market terms.

226.    "Lenders' Share" means seventy-five percent (75%) of the Excess Cash Flow.

227.    "Lessor Equipment Lender Claim" means collectively the (a) AIG Equipment Lender Claim and (b) WFEFI Equipment Lender Claim.

228.   "LIBOR" means the London Interbank Offering Rate, adjusted for any statutory reserves as set forth in the Equipment Term Loan Documents, available for one month maturities.

229.   "Lien" has the meaning set forth at section 101(37) of the Bankruptcy Code.

230.   "Loan Document(s)" means collectively the (a) AIG Equipment Loan Documents, (b) BofA Equipment Loan Documents, (c) CBI Leasing Equipment Loan Documents, (d) Comerica Equipment Loan Documents, (e) GE Commercial Finance Equipment Loan Documents, (f) KeyBank Equipment Loan Documents, (g) Key Equipment Finance Equipment Loan Documents, (h) People's Capital Equipment Loan Documents, (i) PNC Equipment Loan Documents, (j) RBS Equipment Loan Documents, (k) SunTrust Equipment Loan Documents, (l) Wachovia Equipment Loan Documents, (m) Wells Fargo Equipment Loan Documents, and (n) WFEFI Equipment Loan Documents, or any other documentation evidencing any loans, indebtedness, advances, or other financial accommodations or any other obligation owing from the Debtors to any other party, which obligation is secured by any property of the Debtors that consists of equipment, equipment materials, instruments, tools, devices, vehicles, machines, supplies, appurtenances or improvements to any of the foregoing, any other similar physical object utilized in the course of the debtors' businesses or any other like personal property, as all such foregoing documentation has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

231.   "Loan Star" means Loan Star Bank, a Texas state savings bank, a prepetition creditor of the Debtors secured by the Debtors' real estate as more fully described herein.

232.   "Loan Star Real Estate" means the real estate located at 4707 West OST, Houston, TX 77015.

233.   "Loan Star Real Estate Lender" means each successor or incumbent lender, as applicable, currently a party to a Loan Star Real Estate Loan Document, by assignment or otherwise.

234.   "Loan Star Real Estate Lender Claim" means any Claim derived from, based upon, or arising under any Loan Star Real Estate Loan Document.

235.   "Loan Star Real Estate Lender Secured Claim" means the Secured portion of the Loan Star Real Estate Lender Claim under the Loan Star Real Estate Loan Document, which is secured by a first mortgage on the Loan Star Real Estate.

236.   "Loan Star Real Estate Loan Document(s)" means each of (a) that certain real estate lien note, by and among Lone Star Bank, as payee, Brundage-Bone Concrete Pumping, Inc., as maker, and the guarantors party thereto, dated as of December 5, 2006, in an original aggregate principal amount of $1.32 million, secured by that certain real estate collateral located

at 101 Precision Drive, Buda, TX, 78610, and (b) that certain real estate lien note, by and among Loan Star Bank, as beneficiary, Brundage-Bone Concrete Pumping, Inc., as grantor, and the guarantors party thereto, dated as of December 5, 2007, in an original aggregate principal amount of $704,000, secured by that certain real estate collateral located at 4707 West OST, Houston, TX, 77015, as each of the above documents listed or referred to in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

237.   "Managers" and "Management" have the meanings set forth in Article IV.H, hereof.

238.   "Management Employment, Non-Solicitation and Non-Compete Agreements" or "Employment Agreements" means the agreements that the Reorganized Debtor will enter with the four senior Managers to be retained by the Reorganized Debtor as more fully described in Article IV. J. hereof.

239.   "Management Options" means the stock options that Management may become eligible to receive pursuant to the 2011 Equity Incentive Plan which shall provide the Management with the option to acquire up to 12% (on a fully diluted basis) of the New Common Stock issued by the Reorganized Debtor.

240.   "M&I Marshall means M&I Marshall & Ilsley Bank, a Wisconsin corporation, a prepetition creditor of the Debtors secured by real estate pursuant to the M&I Marshall Real Estate Loan Documents.

241.   "M&I Marshall Real Estate" means the real estate located at 1025 South 48th Street, Tempe, AZ 85282.

242.   "M&I Marshall Real Estate Lender" means each successor or incumbent lender, as applicable, currently a party to an M&I Marshall Real Estate Loan Document, by assignment or otherwise.

243.   "M&I Marshall Real Estate Lender Claim" means any Claim derived from, based upon, or arising under any M&I Marshall Real Estate Loan Document.

244.   "M&I Marshall Real Estate Lender Secured Claim" means the Secured portion of the M&I Marshall Real Estate Lender Claim under the M&I Marshall Real Estate Loan Document, which is secured by a first mortgage on the M&I Marshall Real Estate.

245.   "M&I Marshall Real Estate Loan Document(s)" means that certain loan document by and between M&I Marshall & Ilsley Bank, as lender, and Brundage-Bone Concrete Pumping, Inc., as borrower, dated as of May 28, 1999, in an original aggregate principal amount of $757,600, secured by that certain real estate collateral located at 1025 South 48th Street, Tempe, AZ, 85282, as has been or may be further amended, restated, supplemented, or otherwise

31

modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

246.    "Monthly Lender Interest Payment" means the monthly interest payments due and owing on the Lender Secured Senior Term Loan and the Lender Secured Term Loan in the respective amounts of LIBOR plus 3% as set forth herein and in the Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents.  The Monthly Lender Interest Payment is due on the first day of each month.

247.    "New Board" means the initial seven-member board of directors of Reorganized Brundage-Bone, five of whom shall be selected by the BB Liquidating Trust pursuant to the terms of BB Liquidating Trust Agreement and two of whom shall be the CEO and the CFO of the Reorganized Debtor.

248.    "New Common Stock" means newly-issued common stock, par value $.01, of Reorganized Brundage-Bone to be distributed pursuant to the Plan, as authorized by the articles of incorporation or organization of Reorganized Brundage-Bone.

249.    "Notice, Claims, and Solicitation Agent" means Epiq Bankruptcy Solutions, LLC, retained as the Debtors' notice, claims, and solicitation agent.

250.    "Notice of Confirmation" means that certain notice pursuant to Bankruptcy Rule 3020(c)(2) notifying Holders of Claims and Interests and parties in interest that the Bankruptcy Court has confirmed the Plan.

251.    "First Anniversary" means the first Business Day following the first anniversary of the Effective Date.

252.    "Options" has the meaning set forth in Article IV.K, hereof.

253.    "Peoples Capital" means People's Capital and Leasing Corp., a pre-petition secured lender of the Debtor under the terms of the People's Capital Loan Documents and an Equipment Lender to the Debtor pursuant to the terms of the Plan.

254.    "People's Capital Equipment" means the construction equipment owned by the Debtors that is security under the People's Capital Equipment Loan Documents.

255.    "People's Capital Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a People's Capital Equipment Loan Document, by assignment or otherwise.

256.    "People's Capital Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any People's Capital Equipment Loan Document, including the People's Capital Equipment Lender Secured Claim, the People's

Capital Equipment Lender Secured Excess Equipment Claim and the People's Capital Equipment Lender Deficiency Claim.

257.   "People's Capital Equipment Lender Deficiency Claim" means the People's Capital Equipment Lender Claim after deducting the People's Capital Equipment Lender Secured Claim and the People's Capital Equipment Lender Secured Excess Equipment Claim under the People's Capital Equipment Loan Document, which for purposes of the Plan shall be $1,187,422.

258.   "People's Capital Equipment Lender Secured Claim" means the $2,703,300 Secured portion of any People's Capital Equipment Lender Claim under the People's Capital Equipment Loan Document, which Claim is secured by the People's Capital Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

259.   "People's Capital Equipment Lender Secured Excess Equipment Claim" means the Secured portion of any People's Capital Equipment Lender Claim under the People's Capital Equipment Loan Document, which is secured by the People's Capital Equipment, if any, transferred to the BB Liquidating Subsidiary.

260.   "People's Capital Equipment Loan Document(s)" means each of (a) that certain promissory note, dated as of December 8, 2006, and that certain loan and security agreement, dated as of August 9, 2006, each, by and among Wachovia Financial Services, Inc., as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, in an original aggregate principal amount of $4,899,600, as sold, assigned and transferred to People's Capital and Leasing Corp., pursuant to that master assignment agreement dated as of December 12, 2006, by and between Wachovia Financial Services, Inc. and People's Capital and Leasing Corp. and (b) that certain Forbearance Agreement by and among People's Capital and Leasing Corp. as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the documents listed or referred to above has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

261.   "Periodic Distribution Date" means the first Business Day that is as soon as reasonably practicable occurring approximately 90 days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately 90 days after the immediately preceding Periodic Distribution Date.

262.   "Person" means a person as defined in section 101(41) of the Bankruptcy Code.

263.   "Petition Date" means January 18, 2010, the date on which the Debtors commenced the Chapter 11 Cases.

264.    "Plan" means this First Amended joint plan of reorganization and any subsequent amendments thereto.

265.    "Plan Supplement Documents" means those documents identified in the Plan and the Disclosure Statement as Plan Supplement Documents.  The Plan Supplement Documents generally relate to the operation of the Reorganized Debtor and are documents that are subject to the approval of the New Board, the Equipment Lenders, the BB Liquidating Trustee, the BB Liquidating Trustee Beneficiaries, the BB Unsecured Trustee or the BB Unsecured Trust Beneficiaries as applicable as set forth in the Plan, including but not limited to: (a) the BB Liquidating Trust Agreement; (b) the Shareholder Agreement; (c) the Lender Secured Senior Term Loan Documents; (d) the Lender Secured Term Loan Documents; (e) the Lender Warrants; (f) the BB Unsecured Trust Agreement; (g) the Unsecured Warrants; (h) the 2011 Equity Incentive Plan; (i) the 2010 Management Bonus Plan; (j) the Asset Management Agreement; and (k) the Restated By-Laws and Articles of the Reorganized Debtor.  Forms of the Plan Supplement Documents shall be filed on the Noticing Claims Agent's Website at least 15 days prior to the Balloting Deadlines.

266.    "PNC" means PNC Equipment Finance LLC a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral pursuant to the terms of the PNC Equipment Loan Documents.

267.    "PNC Equipment" means the construction equipment owned by the Debtors that is security for the PNC Equipment Secured Claim.

268.    "PNC Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a PNC Equipment Loan Document, by assignment or otherwise.

269.    "PNC Equipment Claim" means any Claim derived from, based upon or arising under the PNC Equipment Loan Documents, including the PNC Equipment Secured Claim and PNC Equipment Unsecured Deficiency Claim.

270.    "PNC Equipment Loan Document(s)" means each of (a) that certain promissory note, dated as of February 29, 2008, and that certain master security agreement dated as of March 15, 2007, each, by and among PNC Equipment Finance, Inc., as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, in an original aggregate principal amount of $5,103,822, as sold, assigned and transferred to PNC Equipment Finance LLC, pursuant to that master assignment agreement dated as of May 20, 2005 and that certain specification of assigned interest dated as of March 6, 2008, by and between Key Equipment Finance Inc. and PNC Equipment Finance LLC; (b) that certain promissory note, dated as of February 29, 2008, and that certain master security agreement dated as of March 15, 2007, each, by and among PNC Equipment Finance Inc., as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, in an original aggregate principal amount of $4,936,614, as sold, assigned and transferred to PNC Equipment Finance LLC, pursuant to that master assignment agreement dated as of May 20, 2005 and that certain specification of assigned interest dated as of March 6, 2008, by and between Key Equipment Finance Inc. and PNC Equipment Finance LLC and (c) that certain Forbearance Agreement by and among PNC Equipment Finance, LLC as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 25, 2009, as each of the above documents listed or referred to

in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

271.    "PNC Equipment Unsecured Deficiency Claim" means the PNC Equipment Claim after deducting the PNC Equipment Secured Claim to the extent Allowed by the Bankruptcy Court.

272.    "PNC Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under any PNC Equipment Loan Document, which Claim is secured by the PNC Equipment.

273.    "Preference Claim" means any Claim for recovery of a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.

274.    "Priority Tax Claim" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

275.    "Professional" means an Entity: (a) employed pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by a Final Order pursuant to section 503(b)(4) of the Bankruptcy Code.

276.    "Professional Claims" means Claims incurred by Professionals through the Effective Date.

277.    "Proof of Claim" means any proof of Claim Filed against either of the Debtors in the Chapter 11 Cases.

278.    "Put Right" has the meaning given to it in Article IV.H, hereof.

279.    "RBS" means Royal Bank of Scotland, National Association, a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral pursuant to the terms of the RBS Equipment Loan Documents.

280.    "RBS Equipment" means the construction equipment owned by the Debtors that is security for the RBS Equipment Claim.

281.    "RBS Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a RBS Equipment Loan Document, by assignment or otherwise.

282.    "RBS Equipment Lender Claim" means any Claim derived from, based upon or arising under the RBS Equipment Loan Documents, including the RBS Equipment Secured Claim and RBS Equipment Unsecured Deficiency Claim.

283.   "RBS Equipment Unsecured Deficiency Claim" means the RBS Equipment Claim after deducting the RBS Equipment Secured Claim to the extent Allowed by the Bankruptcy Court.

284.   "RBS Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under any RBS Equipment Loan Document which Claim is secured by the RBS Equipment.

285.   "RBS Equipment Loan Documents(s)" means (a) that certain loan and security agreement, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of June 21, 2006; (b) that certain promissory note, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of June 21, 2006, in an original aggregate principal amount of $10,627,058, as sold, assigned and transferred to RBS Asset Finance, Inc., pursuant to that notice and acknowledgement of assignment, dated as of June 21, 2006; and (c) that certain Forbearance Agreement by and among RBS Asset Finance, Inc. as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a), (b) and (c) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

286.   "Real Estate Lender Deficiency Claims" means Wells Fargo Real Estate Lender Deficiency Claims and the claims of any other Real Estate Lender where their real estate collateral is being surrendered or is being sold by the Debtors or the Reorganized Debtors for less than the outstanding amount owing on account of the Real Estate Lender Secured Claim.

287.   "Real Estate Lender Secured Claim" means collectively the (a) GE Commercial Finance Real Estate Lender Secured Claim, (b) Loan Star Real Estate Lender Secured Claim, (c) M&I Marshall Real Estate Lender Secured Claim, and (d) Wells Fargo Real Estate Lender Secured Claims.

288.   "Real Estate Loan Document" means collectively the (a) GE Commercial Finance Real Estate Loan Document, (b) Loan Star Real Estate Loan Document, (c) M&I Marshall Real Estate Loan Document, and (d) Wells Fargo Real Estate Loan Document, or any other documentation evidencing any loans, indebtedness, advances, or other financial accommodations or any other obligation owing from the Debtors to any other party, which obligation is secured by any property owned by the Debtors that consists of real estate, land, structures, minerals, riparian rights or interests, appurtenances or improvements to any of the foregoing, or any other like real property or real property rights or interests, as all such foregoing documentation has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

289.    "Recourse Guaranty Obligations" has the meaning given to it in Article IV.L, hereof.

290.    "Rejection Bar Date" means 30 days after the effective date of the rejection of an executory contract or lease as set forth in the Claims Bar Date Order.

291.    "Rejection Damages Claim" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease to which a Debtor is a party pursuant to section 365 of the Bankruptcy Code.

292.    "Releasing Party" means the DIP Agent, the DIP Lenders, the Wells Fargo Credit Facility Lender, the Committee, the Committee Members, and all other Holders of Claims or Interests.

293.    "Reorganized Brundage-Bone" means either (a) Brundage-Bone Concrete Pumping Inc., as reorganized pursuant to and under the Plan, on or after the Effective Date, or (b) any successor thereto, by merger, consolidation or otherwise.

294.    "Reorganized Debtor" means Reorganized Brundage-Bone, on and after the Effective Date, as reorganized pursuant to and under the Plan, and the merger with Reorganized JLS,  including any successor by merger, consolidation, or otherwise.

295.    "Reorganized Debtor's Bylaws or Amended and Restated Bylaws" means the bylaws of Reorganized Debtor.

296.    "Reorganized Debtor's Charter or Restated Articles of Incorporation" means the certificate of incorporation or organization of Reorganized Debtor.

297.    "Reorganized Debtor's Distribution Reserves" has the meaning set forth in Article VII.B.3, hereof.

298.    "Reorganized JLS" means JLS Pumping Inc., as reorganized and merged into the Reorganized Brundage-Bone pursuant to and under the Plan, on or contemporaneously with the Effective Date.

299.    "Retained Equipment" means any construction equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary, a description of which Retained Equipment and the name of the Holder of the Secured Claim on each piece of Retained Equipment is attached hereto as **Exhibit C** or any amended Exhibit C provided as part of the Plan Supplement Documents which is approved by the affected Holder of such Retained Equipment.

300.    "Retiree Benefits" has the meaning set forth at section 1114(a) of the Bankruptcy Code.

301.   "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

302.   "Section 510(b) Claim" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code, including, without limitation, any Claim that arises from the rescission of a purchase or sale of a security of either of the Debtors, or for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification or contribution on account of such Claim; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

303.   "Section 541 Claim" means any and all causes of action or claims held by the Debtors as of the Petition Date against a Creditor, including without limitation all Avoidance Actions.

304.   "Secured" means, when referring to a Claim secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or as otherwise agreed to, in writing, by the Debtors or the Reorganized Debtor, as applicable, and the Holder of such Claim.

305.   "Secured Claim" means a Claim that is Secured.

306.   "Securities Act" means the United States Securities Act of 1933, as amended.

307.   "Security" means a security as defined in section 2(a) (1) of the Securities Act.

308.   "Servicer" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

309.   "Shareholder Party" has the meaning given to it in Article IV.I, hereof.

310.   "Shareholders' Agreement" means the Shareholders' Agreement, substantially in the form of agreement executed by the Reorganized Debtor that is acceptable to the BB Liquidating Trustee and the BB Liquidating Trust Beneficiaries in their reasonable discretion which shall be part of the Plan Supplement Documents.

311.   "Specific Equipment" means the individual pieces of equipment provided to the Reorganized Debtor by each Equipment Lender as set forth on the schedules to their respective Lender Senior Secured Term Notes and Lender Secured Term Notes, together with all products and proceeds derived from said equipment.

312.    "SunTrust" means SunTrust Equipment Finance & Leasing Corporation a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral pursuant to the terms of the SunTrust Equipment Loan Documents.

313.    "SunTrust Equipment" means the construction equipment owned by the Debtors that is security for the SunTrust Equipment Lender Claim.

314.    "SunTrust Equipment Creditor" means each successor or incumbent lender, as applicable, currently a party to a SunTrust Equipment Loan Document, by assignment or otherwise.

315.    "SunTrust Equipment Claim" means any Claim derived from, based upon or arising under the SunTrust Equipment Loan Documents, including the SunTrust Equipment Secured Claim and SunTrust Equipment Unsecured Deficiency Claim.

316.    "SunTrust Equipment Unsecured Deficiency Claim" means the SunTrust Equipment Claim after deducting the SunTrust Equipment Secured Claim to the extent Allowed by the Bankruptcy Court.

317.    "SunTrust Equipment Secured Claim" means the Secured portion of any Claim derived from, based on, or arising under the SunTrust Equipment Loan Document, which Claim is secured by the SunTrust Equipment.

318.    "SunTrust Equipment Loan Documents(s)" means each of (a) that certain promissory note, by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of September 26, 2006, in an original aggregate principal amount of $5,316,798, and that certain loan and security Agreement by and among Fifth Third Bank, as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, dated as of September 26, 2006, each as sold, assigned and transferred to SunTrust Equipment Finance & Leasing Corporation, as successor by assignment to SunTrust Leasing Corporation, pursuant to that notice and acknowledgement of assignment, dated as of September 28, 2006; (b) that certain promissory note, by and between Key Equipment Finance Inc., as lender, and Brundage-Bone Concrete Pumping, Inc., as borrower, dated as of March 28, 2007, in an original aggregate principal amount of $5,622,750, and that certain master security agreement by and between Key Equipment Finance Inc., as lender, and Brundage-Bone Concrete Pumping, Inc., as borrower, dated as of March 15, 2007, each as sold, assigned and transferred to SunTrust Equipment Finance & Leasing Corporation, as successor by assignment to SunTrust Leasing Corporation, pursuant to that notice and acknowledgement of assignment, dated as of April 6, 2007 and (c) that certain Forbearance Agreement by and among SunTrust Equipment Finance & Leasing Corporation as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a), (b) and (c) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

319. "Tax Required Stock Transactions" means the stock transfers that will maximize the Debtors tax attributes in the manner most beneficial to the future operations of the Reorganized Debtor.

320. "Title Management Company" has the meaning set forth in Article IV.D, hereof.

321. "Trust Beneficial Interests" means the interests of the BB Liquidating Trust Beneficiaries in the BB Liquidating Trust and interests of the BB Unsecured Trust Beneficiaries in the BB Unsecured Trust as applicable herein.

322. "Trust Management Fees" means the fee paid by the Reorganized Debtor or the BB Operating Subsidiary to pay all of the operating costs of the BB Liquidating Trust and the BB Unsecured Trust including, but not limited to, the fees of the respective trust advisors and the trustees of these respective trusts.

323. "Unexpired Lease" means a lease to which one or both of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

324. "Unimpaired" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

325. "Unsecured Ongoing Vendor Claim" means General Unsecured Claims held by Holders of Allowed Class 5 Claims and Allowed Class 10 Claims that elect the Enhanced Treatment provided for their Allowed Class 5 Claims and Allowed Class 10 Claims and vote in favor of the Plan and agree in writing to continue to provide goods and services to the Reorganized Debtor from and after the Effective Date on payment credit terms that are customarily given by the Holder of the Class 5 Claim and Holder of the Class 10 Claim to its customers; provided that Unsecured Ongoing Vender Claims shall not include Administrative Claims, Deficiency Claims, Priority Tax Claims, Section 510(b) Claims, or Interests.

326. "Unsecured Warrants" means the Warrants being held by the BB Liquidating Trustee for the benefit of the BB Unsecured Trust that holds the right to receive distributions attributable to the Unsecured Warrants on behalf of the Class 5 Holders and Class 10 Holders that elect to participate in the Warrants to acquire up to 22.3% (on a fully diluted basis) of the New Common Stock subject to the terms of the BB Liquidating Trust Agreement as more fully described herein and in the BB Liquidating Trust Agreement.

327. "Voting Trust Agreement" the agreement executed between the BB Liquidating Trustee and the holders of the New Common Stock issued on the Effective Date to the New Board, which agreement shall be part of the Plan Supplement Documents.

328. "Wachovia" means "Wachovia Financial Services, Inc." as successor by merger of First Union Commercial Corporation, a division of Wells Fargo, a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral

pursuant to the terms of the Wachovia Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

329.     "Wachovia Equipment" means the construction equipment owned by the Debtors that is security for the Wachovia Equipment Lender Claim.

330.     "Wachovia Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a Wachovia Equipment Loan Document, by assignment or otherwise.

331.     "Wachovia Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any Wachovia Equipment Loan Document, including the Wachovia Equipment Lender Secured Claim, the Wachovia Equipment Lender Secured Excess Equipment Claim and the Wachovia Equipment Lender Deficiency Claim.

332.     "Wachovia Equipment Lender Deficiency Claim" means the Wachovia Equipment Lender Claim after deducting the Wachovia Equipment Lender Secured Claim and the Wachovia Equipment Lender Secured Excess Equipment Claim under the Wachovia Equipment Loan Document, which for purposes of the Plan shall be $6,062,171.

333.     "Wachovia Equipment Lender Secured Claim" means the $5,728,100 Secured portion of any Wachovia Equipment Lender Claim under the Wachovia Equipment Loan Document, which Claim is secured by the Wachovia Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

334.     "Wachovia Equipment Lender Secured Excess Equipment Claim" means the $2,197,600 Secured portion of any Wachovia Equipment Lender Claim under the Wachovia Equipment Loan Document, which Claim is secured by the Wachovia Equipment transferred to the BB Liquidating Subsidiary.

335.     "Wachovia Equipment Loan Documents(s)" means each of (a) that certain loan and security agreement, by and among First Union Commercial Corporation (a subsidiary of Wachovia Bank, National Association), as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of September 30, 2005 and August 9, 2006; (b) an equipment loan (Loan No. 2030082-00 1) evidenced by that certain promissory note, by and among First Union Commercial Corporation (a subsidiary of Wachovia Bank, National Association), as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of December 26, 2003, in an original aggregate principal amount of up to $10 million, (c) an equipment loan (Loan No. 2050060-00 1) evidenced by that certain promissory note, by and among First Union Commercial Corporation (a subsidiary of Wachovia Bank, National Association), as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of September 30, 2005, in an original aggregate principal amount of up to $10 million; (c) an equipment loan (Loan No. 9060005-001) evidenced by that certain promissory note no. 1, by and among Wachovia Financial Services, Inc. (a subsidiary of Wachovia Bank, National Association), as lender, Brundage-Bone Concrete Pumping, Inc., as borrower, and the guarantors party thereto, dated as of December 8, 2006, in

41

an original aggregate principal amount of up to $4,896,780; and (d) that certain Forbearance Agreement by and among Wachovia Financial Services, Inc. as lender, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a), (b), (c) and (d) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

336.    "Warrants" means the Lender Warrants and the Unsecured Warrants.

337.    "Warrant Shares" has the meaning given to it in Article IV.H, hereof.

338.    "Wells Fargo" means Wells Fargo Bank, National Association, a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral pursuant to the terms of the Wells Fargo Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

339.    "Wells Fargo Additional Real Estate" means the real property located at 1025 S. 48th Street, Tempe, AZ, 786 N. Miller Avenue, Springfield, MO and 2001 Hinton Drive, Irving, TX.

340.    "Wells Fargo Credit Agreement" means that certain amended and restated credit agreement, dated as of June 25, 2008, by and among Brundage-Bone, Wells Fargo, and the guarantors party thereto, as has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

341.    "Wells Fargo Credit Facility" means that certain senior secured credit facility issued pursuant to the Wells Fargo Credit Agreement, consisting of any loans, obligations, indebtedness, advances, or other financial accommodations provided for pursuant thereto, including, but not limited to: (a) a line of credit, including any letters of credit issued hereunder or pursuant thereto, not to exceed the aggregate principal amount of $23,700,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008; (b) an equipment line of credit not to exceed the aggregate principal amount of $34,000,000, evidenced by that certain promissory note executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of April 7, 2006; (c) a Term Loan A, in the original principal amount of $7,812,500, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of April 7, 2006; (d) a Term Loan B, in the original principal amount of $15,000,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of March 10, 2005; (e) a Term Loan C, in the original principal amount of $2,100,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of January 5, 2006, secured by that certain real estate collateral located at 2410 E. Gowan Rd., North Las Vegas, NV 89030; (f) a Term Loan D

in the original principal amount of $1,177,500, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008, secured by that certain real estate collateral located at 1893 Brown Ave., Riverside, CA 92509; (g) a Term Loan E in the original principal amount of $1,104,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008, secured by that certain real estate collateral located at 1037 and 1055 4th Ave. North, Kent, WA 98032; (h) a Term Loan F in the original principal amount of $795,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of February 12, 2007, secured by that certain real estate collateral located at 301 North Cloverdale Rd., Boise ID 83713; (i) a Term Loan G in the original principal amount of $1,650,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of February 18, 2008, secured by that certain real estate collateral located at 1627 N.E. Argyle Dr., Portland, OR 97211; (j) a Term Loan H in the original principal amount of $750,000, evidenced by that certain promissory note executed by Brundage-Bone Concrete Pumping, Inc. as borrower in favor of Wells Fargo dated August 1, 2004, secured by certain real estate collateral located at 1037 and 1055 4th Avenue North, Kent, WA 98032; (k) certain other letters of credit issued pursuant to that certain Application and Agreement for Standby Letter of Credit dated as of June 18, 2007; (l) that certain overadvance loan of up to $3,000,000; and (m) that certain Forbearance Agreement by and among Wells Fargo Bank, National Association and Wells Fargo Equipment Finance, Inc. as lenders, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l) and (m) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

342.   "Wells Fargo Credit Facility Line of Credit Claim" means any Claim derived from, based upon, or arising under that portion of that certain line of credit, including any letters of credit issued thereunder or pursuant thereto, not to exceed the aggregate principal amount of $23,700,000, evidenced by that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008, as has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, swap agreements and any other agreements delivered pursuant thereto or in connection therewith, which Claim is a portion of and included in the DIP Facility Claim.

343.   "Wells Fargo Equipment" means the construction equipment owned by the Debtors that is security for the Wells Fargo Equipment Lender Claim.

344.   "Wells Fargo Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under that portion of the Wells Fargo Credit Facility evidenced by a Wells Fargo Equipment Loan Document, including the Wells Fargo Equipment Lender Secured Claim, the Wells Fargo Equipment Lender Secured Excess Equipment Claim and the Wells Fargo Equipment Lender Deficiency Claim.

345. "Wells Fargo Equipment Lender Deficiency Claim" means the Wells Fargo Equipment Lender Claim after deducting the Wells Fargo Equipment Lender Secured Claim and the Wells Fargo Equipment Lender Secured Excess Equipment Claim under the Wells Fargo Equipment Loan Document, which for purposes of the Plan shall be $18,804,042.

346. "Wells Fargo Equipment Lender Secured Claim" means the $9,184,200 Secured portion of any Wells Fargo Equipment Lender Claim under the Wells Fargo Equipment Loan Document, which Claim is secured by the Wells Fargo Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

347. "Wells Fargo Equipment Lender Secured Excess Equipment Claim" means the $7,489,800 Secured portion of any Wells Fargo Equipment Lender Claim under the Wells Fargo Equipment Loan Document, which Claim is secured by the Wells Fargo Equipment transferred to the BB Liquidating Subsidiary.

348. "Wells Fargo Equipment Loan Documents(s)" means each of (a) that certain promissory note executed by Brundage-Bone Concrete Pumping, Inc., as borrower, in favor of Wells Fargo dated as of April 7, 2006 in the principal amount of $34,000,000; (b) that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower, in favor of Wells Fargo dated as of April 7, 2006 in the original principal amount of $7,812,500, evidencing Term Loan A; and (c) that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower, in favor of Wells Fargo dated as of March 10, 2005, in the original principal amount of $15,000,000, evidencing Term Loan B, as each of the above documents listed or referred to in (a), (b), and (c) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

349. "WFEFI" means Wells Fargo Equipment Finance, Inc. a prepetition secured creditor of the debtor that as of the Petition Date held certain of the Debtors' equipment as collateral pursuant to the terms of the Wells Fargo Equipment Loan Documents and an Equipment Lender under the terms of the Plan.

350. "WFEFI Equipment" means the construction equipment owned by WFEFI Equipment Lender that is leased to the Debtors under the WFEFI Loan Document.

351. "WFEFI Equipment Lender" means each successor or incumbent lender, as applicable, currently a party to a WFEFI Equipment Loan Document, by assignment or otherwise.

352. "WFEFI Equipment Lender Claim" means any Claim as of June 17, 2010 derived from, based upon, or arising under any WFEFI Equipment Loan Document, including the WFEFI Equipment Lender Secured Claim, the WFEFI Equipment Lender Secured Excess Equipment Claim and the WFEFI Equipment Lender Deficiency Claim.

353. "WFEFI Equipment Lender Deficiency Claim" means the WFEFI Equipment Lender Claim after deducting the WFEFI Equipment Lender Secured Claim and the WFEFI Equipment Lender Secured Excess Equipment Claim under the WFEFI Equipment Loan Document, which for purposes of the Plan shall be $27,059,049.

354. "WFEFI Equipment Lender Secured Claim" means the $30,831,000 Secured portion of any WFEFI Equipment Lender Claim under the WFEFI Equipment Loan Document, which Claim is secured by the WFEFI Equipment retained by the Reorganized Debtor or transferred to the BB Operating Subsidiary.

355. "WFEFI Equipment Lender Secured Excess Equipment Claim" means the $16,724,700 Secured portion of any WFEFI Equipment Lender Claim under the WFEFI Equipment Loan Document, which Claim is secured by the WFEFI Equipment transferred to the BB Liquidating Subsidiary.

356. "WFEFI Equipment Loan Documents(s)" means each of (a) that certain amended and restated revolving loan agreement, by and among Wells Fargo Equipment Finance, Inc., as lender, Brundage-Bone Concrete Pumping, Inc. as borrower, and the guarantors, party thereto, dated as of June 14, 2004, in an original maximum principal amount of $75 million, secured by certain concrete pump equipment as evidenced by those certain promissory notes and security agreements, each with an aggregate principal amount of: (i) $621,648 with respect to promissory note contract number 21877-701; (ii) $385,680 with respect to promissory note contract number 21877- 702; (iii) $385,680 with respect to promissory note contract number 21877-703; (iv) $441,000 with respect to promissory note contract number 21877-704; (v) $630,148 with respect to promissory note contract number 21877- 705; (vi) $441,000 with respect to promissory note contract number 21877-707; (vii) $441,000 with respect to promissory note contract number 21877-708; (viii) $621,648 with respect to promissory note contract number 21877-709; (ix) $354,100 with respect to promissory note contract number 21877-710; (x) $438,040 with respect to promissory note contract number 21877-711; and (xi) $4,334,296 with respect to promissory note contract number 21877-712; (b) that certain construction equipment schedule number 024 to the GE Master Lease Agreement, sold, transferred and assigned to Wells Fargo Equipment Finance, Inc., in an original aggregate principal amount of $3,052,707 and (c) that certain Forbearance Agreement by and among Wells Fargo Bank, National Association and Wells Fargo Equipment Finance, Inc. as lenders, Brundage-Bone Concrete Pumping, Inc. as borrower and the guarantors party thereto dated July 24, 2009, as each of the above documents listed or referred to in (a) and (b) has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, security agreements, financing statements, and any other agreements delivered pursuant thereto or in connection therewith.

357. "Wells Fargo Real Estate" means the real estate located at 2410 East Gowan Road, North Las Vegas, NV 89030; 1893 Brown Avenue, Riverside, CA 92509; 1037 and 1055 4th Avenue North, Kent, WA 98032; 301 North Cloverdale Road, Boise, ID 83713; and 1627 N.E. Argyle Drive, Portland, OR 97211.

358.   "Wells Fargo Real Estate Deficiency Claim" means the deficiency claim based upon the estimated value to be received by Wells Fargo in foreclosure or sale of the Wells Fargo Real Estate.

359.   "Wells Fargo Real Estate Lender" means each successor or incumbent lender, as applicable, currently a party to a Wells Fargo Real Estate Loan Document, by assignment or otherwise.

360.   "Wells Fargo Real Estate Lender Additional Secured Claim" means any claim derived from, based upon or arising under the Wells Fargo Credit Facility against the Wells Fargo Additional Real Estate.

361.   "Wells Fargo Real Estate Lender Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Document.

362.   "Wells Fargo Real Estate Lender Term Loan C Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 2410 East Gowan Road, North Las Vegas, NV 89030.

363.   "Wells Fargo Real Estate Lender Term Loan D Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 1893 Brown Avenue, Riverside, CA 92509.

364.   "Wells Fargo Real Estate Lender Term Loan E Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 1037 and 1055 4th Avenue North, Kent, WA 98032.

365.   "Wells Fargo Real Estate Lender Term Loan F Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 301 North Cloverdale Road, Boise, ID 83713.

366.   "Wells Fargo Real Estate Lender Term Loan G Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 1627 N.E. Argyle Drive, Portland, OR 97211.

367.   "Wells Fargo Real Estate Lender Term Loan H Secured Claim" means any Claim derived from, based upon, or arising under any Wells Fargo Real Estate Loan Documents, which is secured by that certain real estate collateral located at 1037 and 1055 4th Avenue North, Kent, WA 98032.

368. "Wells Fargo Real Estate Loan Documents" means each of the loan documents evidencing (a) Term Loan C in the original principal amount of $2,100,000, including that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of January 5, 2006, secured by that certain real estate collateral located at 2410 E. Gowan Rd., North Las Vegas, NV 89030; (b) Term Loan D in the original principal amount of $1,177,500, including that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008, secured by that certain real estate collateral located at 1893 Brown Ave., Riverside, CA 92509; (c) Term Loan E in the original principal amount of $1,104,000, including that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of June 25, 2008, secured by that certain real estate collateral located at 1037 and 1055 4th Ave. North, Kent, WA 98032; (d) Term Loan F in the original principal amount of $795,000, including that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of February 12, 2007, secured by that certain real estate collateral located at 301 North Cloverdale Rd., Boise ID 83713; (e) Term Loan G in the original principal amount of $1,650,000, including that certain promissory note with attached addendum executed by Brundage-Bone Concrete Pumping, Inc., as borrower in favor of Wells Fargo dated as of February 18, 2008, secured by that certain real estate collateral located at 1627 N.E. Argyle Dr., Portland, OR 97211; and (f) Term Loan H in the original principal amount of $750,000, evidenced by that certain promissory note executed by Brundage-Bone Concrete Pumping, Inc. as borrower in favor of Wells Fargo dated August 1, 2004, secured by that certain real estate collateral located at 1037 and 1055 4th Avenue North, Kent, WA 98032, as each of the above documents listed or referred to in (a), (b), (c), (d), (e) and (f), has been or may be further amended, restated, supplemented, or otherwise modified from time to time, including all agreements, documents, guarantees, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

369. "Wells Fargo Swap Termination Fees" means the termination fees arising from the settlement of these obligations following the termination of the two interest rate swap agreements between the Debtors and Wells Fargo and Wachovia in the respective amounts of $94,243 and $201,456 for a total of $295,699 or such other amounts as may be Allowed by the Bankruptcy Court.

370. "Withdrawing Lenders" means (a) BofA Equipment Creditor, (b) CBI Leasing Equipment Creditor, (c) GE Commercial Finance Equipment Creditor, (d) PNC Equipment Creditor, (e) RBS Equipment Creditor, and (f) SunTrust Equipment Creditor.

371. "Withdrawing Lender Deficiency Claims" means collectively the (a) BofA Equipment Unsecured Deficiency Claim, (b) CBI Leasing Equipment Unsecured Deficiency Claim, (c) GE Commercial Finance Equipment Unsecured Deficiency Claim, (d) PNC Equipment Unsecured Deficiency Claim, (e) RBS Equipment Unsecured Deficiency Claim, and (f) SunTrust Equipment Unsecured Deficiency Claim.

372.    "Working Capital" means the accounts and inventory and any proceeds thereof used as the borrowing base for the DIP Credit Facility and for the Exit Facility provided by the Exit Facility Lenders.

**B.    Rules of Interpretation, Computation of Time, Governing Law, and Reference to Monetary Figures**

1.    <u>Rules of Interpretation</u>:  For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references in the Plan to Articles are references to Articles of the Plan or to the Plan; (f) unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Disclosure Statement; (g) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan and the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (j) unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Additionally, except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtor shall mean the Debtors and the Reorganized Debtor, as applicable, to the extent the context requires.

2.    <u>Computation of Time</u>:  In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If the date on which a transaction may

occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

3.  Reference to Monetary Figures: All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, the DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A.    DIP Facility Claim

The Allowed DIP Facility Claim shall be paid in full in Cash on the Effective Date and the standby letters of credit issued under the DIP Credit Agreement shall (if agreed to by the beneficiaries) be cancelled and returned to Wells Fargo in full, final, and complete satisfaction of such Claim, and the DIP Lenders shall, thereafter, release any security interests that they may have pursuant to the DIP Credit Agreement in the Debtors' Working Capital and any specific security deposits securing the standby letters of credit.  The cancellation and return of the letters of credit contemplates the replacement of letters of credit by the Exit Facility Lenders.

### B.    Administrative Claims

On the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter (but not more than twenty (20) days), each Holder of an Allowed Administrative Claim shall be paid in full in Cash for the unpaid portion of such Allowed Administrative Claim, in full, final, and complete satisfaction of such Claim; provided that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

All requests for payment of an Administrative Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or the Reorganized Debtor, as applicable, on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim that is not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court or other Entity. The Reorganized Debtor may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for

payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to section 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or the Reorganized Debtor, as applicable, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

## C.   Priority Tax Claims and Secured Tax Claims

On the later of the Effective Date or the date on which a Priority Tax Claim or a Secured Tax Claim becomes an Allowed Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim or Holder of an Allowed Secured Tax Claim due and payable on or prior to the Effective Date shall receive, in full, final, and complete satisfaction of such Claims, one of the following to be determined in the sole discretion of the Debtors, or the Reorganized Debtor, as applicable: (1) Cash in an amount equal to the amount of such Allowed Claim; (2) Cash in an amount agreed to by the Debtors or the Reorganized Debtor, as applicable, and such Holder; provided that such parties may further agree for the payment of such Allowed Claim at a later date; (3) in the sole discretion of the Debtors or the Reorganized Debtor, as applicable, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; or (4) such other treatment as the Debtors or the Reorganized Debtor, as applicable, and the Holder of a Priority Tax Claim or Holder of a Secured Tax Claim may otherwise agree; provided further that nothing contained herein shall impair the lien securing a Priority Tax Claim or Secured Tax Claim, but to the extent a Priority Tax Claim or Secured Tax Claim is fully secured by equipment or real property that is not retained by the Reorganized Debtor or transferred to the BB Equipment Trust, the Holder of the Priority Tax Claim or Secured Tax Claim will be entitled to assert its Claim against the surrendered collateral and will not receive any cash in accordance with this Section C on account of its Priority Tax Claim or Secured Tax Claim.  Interest in Priority Tax Claims and Secured Tax Claims related to equipment or real property retained by the Reorganized Debtor shall be paid at the rate determined under applicable non-bankruptcy law.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A.   Summary

All Claims and Interests against Brundage-Bone and JLS, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other

Classes. A Claim or Interest against Brundage-Bone or JLS, as applicable, is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest against Brundage-Bone or JLS, as applicable, in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.    Summary of Classification and Treatment of Classified Claims and Interests against Brundage-Bone.**

| Class | Claim Against Brundage Bone | Status | Voting Right |
|-------|-----------------------------|--------|--------------|
| 1-A | AIG Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-B | Comerica Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-C | KeyBank Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-D | Key Equipment Finance Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-E | People's Capital Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-F | Wachovia Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-G | Wells Fargo Equipment Lender Claim | Impaired | Entitled to Vote |
| 1-H | WFEFI Equipment Lender Claim | Impaired | Entitled to Vote |
| 2-A | BofA Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-B | CBI Leasing Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-C | GE Commercial Finance Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-D | PNC Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-E | RBS Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-F | SunTrust Equipment Secured Claim | Impaired | Entitled to Vote |
| 2-G | CFS Secured Claim | Impaired | Entitled to Vote |
| 3-A | GE Commercial Finance Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-B | Loan Star Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-C | M&I Marshall Real Estate Lender Secured Claim | Impaired | Entitled to Vote |
| 3-D | Wells Fargo Real Estate Lender Term Loan C Secured Claim | Impaired | Entitled to Vote |
| 3-E | Wells Fargo Real Estate Lender Term Loan D Secured Claim | Impaired | Entitled to Vote |
| 3-F | Wells Fargo Real Estate Lender Term Loan E Secured Claim | Impaired | Entitled to Vote |
| 3-G | Wells Fargo Real Estate Lender Term Loan F Secured Claim | Impaired | Entitled to Vote |
| 3-H | Wells Fargo Real Estate Lender Term Loan G Secured Claim | Impaired | Entitled to Vote |
| 3-I | Wells Fargo Real Estate Lender Term Loan H Secured Claim | Impaired | Entitled to Vote |
| 3-J | Wells Fargo Real Estate Lender Additional Secured Claim | Impaired | Entitled to Vote |
| 4 | GMAC Equipment Creditor Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claim Against Brundage Bone | Status | Voting Right |
|-------|------------------------------|--------|--------------|
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

**C.    Summary of Classification and Treatment of Classified Claims and Interests against JLS.**

| Class | Claim against JLS | Status | Voting Right |
|-------|-------------------|--------|--------------|
| 9 | Secured Claims | Impaired | Entitled to Vote |
| 10 | General Unsecured Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Claims | Impaired | Deemed to Reject |
| 12 | Equity Interests | Impaired | Deemed to Reject |

**D.            Classification and Treatment of Claims and Interests against Brundage-Bone**

1.    Class 1-A AIG Equipment Lender Claim Against Brundage-Bone

a.    <u>Classification</u>: Class 1-A consists of AIG Equipment Lender Claim against Brundage-Bone.

b.    <u>Treatment</u>:  In consideration of the Consent that the Holder of the Class 1-A Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)    A Lender Secured Senior Term Note in the principal amount of $8,404,500 or such other amount that is equal to the Initial Equipment Fair Market Value of AIG Equipment Lender's Retained Equipment which is to be secured by: (A) a first priority security interest in AIG Equipment Lender's Retained Equipment; (B) a second priority security interest in AIG Equipment Lender's Excess Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and which shall be payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)    A Lender Secured Term Note in the principal amount of $740,000 or such other amount that is equal to the Initial Equipment Fair Market Value of AIG Equipment Lender's Excess Equipment which is to be secured by: (A) a first priority security interest in AIG Equipment Lender's Excess Equipment; (B) a second priority security interest in AIG Equipment Lender's Retained Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Term Note payable in accordance with the definition of Lender Secured Term Loan;

(iii)    The allowance of the AIG Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $5,955,577, which shall be treated as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iv)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.; and

(v)    A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-A Claim.

2.    Class 1-B Comerica Equipment Lender Claim Against Brundage-Bone

a.    Classification:  Class 1-B consists of Comerica Equipment Lender Claim against Brundage-Bone.

b.    Treatment:  In consideration of the Consent that the Holder of the Class 1-B Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)    A Lender Secured Senior Term Note in the principal amount of $3,857,500 or such other amount that is equal to the Initial Equipment Fair Market Value of Comerica Equipment Lender's Retained Equipment which is to be secured by: (A) a first priority security interest in Comerica Equipment Lender's Retained Equipment; (B) a second priority security interest in Comerica Equipment Lender's Excess Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)    The allowance of the Comerica Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $2,715,442, which shall be treated as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iii)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.; and

(iv)    A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-B Claim.

3.    Class 1-C KeyBank Equipment Lender Claim Against Brundage-Bone

a.    Classification:  Class 1-C consists of KeyBank Equipment Lender Claim against Brundage-Bone.

b.    Treatment:  In consideration of the Consent that the Holder of the Class 1-C Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)    A Lender Secured Senior Term Note in the principal amount of $9,059,700, or such other amount that is equal to the Initial Equipment Fair Market Value of

KeyBank Equipment Lender's Retained Equipment, which is to be secured by: (A) a first priority security interest in KeyBank Equipment Lender's Retained Equipment (B) a second priority security interest in KeyBank Equipment Lender's Excess Equipment, and (C) security interests in the other Lender Secured Senior Term Loan Collateral identified in the definition of such term and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)     A Lender Secured Term Note in the principal amount of $3,433,100, or such other amount that is equal to the Initial Equipment Fair Market Value of KeyBank Equipment Lender's Excess Equipment which is to be secured by (A) a first priority security interest in KeyBank Equipment Lender's Excess Equipment, (B) a second priority security interest in KeyBank Equipment Lender's Retained Equipment, and (C) security interests in the other Lender Secured Term Loan Collateral identified in the definition of such term and payable in accordance with the definition of Lender Secured Term Loan;

(iii)    The allowance of the KeyBank Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $11,766,607, which shall be treated as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iv)     A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.; and

(v)     A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-C Claim.

4.     Class 1-D Key Equipment Finance Equipment Lender Claim Against Brundage-Bone

a.     Classification:  Class 1-D consists of Key Equipment Finance Equipment Lender Claim against Brundage-Bone.

b.     Treatment:  In consideration of the Consent that the Holder of the Class 1-D Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)     A Lender Secured Senior Term Note in the principal amount of $4,170,600, or such other amount that is equal to the Initial Equipment Fair Market Value of Key Equipment Finance Equipment Lender's Retained Equipment which is to be secured by: (A) a first priority security interest in Key Equipment Finance Equipment Lender's Retained Equipment, (B) a second priority security interest in Key Equipment Finance Equipment Lender's Excess Equipment, and (C) security interests in the other Lender Secured Senior Term Loan Collateral identified in the definition of such term and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)     A Lender Secured Term Note in the principal amount of $1,872,200, or such other amount that is equal to the Initial Equipment Fair Market Value of Key

Equipment Finance Equipment Lender's Excess Equipment which is to be secured by (A) a first priority security interest in Key Equipment Finance Equipment Lender's Excess Equipment, (B) a junior priority security interest in Key Equipment Finance Equipment Lender's Retained Equipment, and (C) security interests in the other Lender Secured Term Loan Collateral identified in the definition of such term and payable in accordance with the definition of Lender Secured Term Loan;

(iii)    The allowance of the Key Equipment Finance Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $4,031,462 which shall be treated as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iv)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.; and

(v)    A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-D Claim.

5.    Class 1-E People's Capital Equipment Lender Claim Against Brundage-Bone

a.    Classification:  Class 1-E consists of People's Capital Equipment Lender Claim against Brundage-Bone.

b.    Treatment: In consideration of the Consent that the Holder of the Class 1-E Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)    A Lender Secured Senior Term Note in the principal amount of $2,703,300 or such other amount that is equal to the Initial Equipment Fair Market Value of People's Capital's Retained Equipment which is to be secured by: (A) a first security priority security interest in People's Capital Lender's Retained Equipment; (B) a second priority security interest in People's Capital Lender's Excess Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)    The allowance of the People's Capital Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $1,187,422, which shall be treated as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iii)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.; and

(iv)   A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-E Claim.

6.      Class 1-F Wachovia Equipment Lender Claim Against Brundage-Bone

a.      Classification:  Class 1-F consists of Wachovia Equipment Lender Claim against Brundage-Bone.

b.      Treatment:  In consideration of the Consent that the Holder of the Class 1-F Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)   A Lender Secured Senior Term Note in the principal amount of $5,728,100 or such other  amount that is equal to the Initial Equipment Fair Market Value of Wachovia's Retained Equipment on the Effective Date which is to be secured by: (A) a first priority security interest in  Wachovia Lender's Retained Equipment; (B) a second priority security interest in Wachovia Lender's Excess Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)   A Lender Secured Term Note in the principal amount of $2,197,600 or such other amount that is equal to the Initial Equipment Fair Market Value of Wachovia's Excess Equipment which is to be secured by: (A) a first priority security interest in Wachovia Lender's Excess Equipment; (B) a second priority security interest in Wachovia Lender's Retained Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Term Note payable in accordance with the definition of Lender Secured Term Loan;

(iii)   The allowance of the Wachovia Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $6,062,171, which shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iv)   A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.;

(v)   The net proceeds from the sale of all Wachovia equipment sold by the Debtor prior to the Effective Date, including, but not limited to the two pieces of equipment sold to date; and

(vi)   A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-F Claim.

     7.    <u>Class 1-G Wells Fargo Equipment Lender Claim Against Brundage-Bone</u>

        a.    <u>Classification</u>:  Class 1-G consists of Wells Fargo Equipment Lender Claim against Brundage-Bone.

        b.    <u>Treatment</u>:  In consideration of the Consent that the Holder of the Class 1-G Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

        (i)    A Lender Secured Senior Term Note in the principal amount of $9,184,200 or such other amount that is equal to the Initial Equipment Fair Market Value of Wells Fargo's Retained Equipment which is to be secured by: (A) a first priority security interest in Wells Fargo Equipment Lender's Retained Equipment; (B) a second priority security interest in the Wells Fargo Equipment Lender's Retained Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and payable in accordance with the definition of Lender Secured Senior Term Loan;

        (ii)    A Lender Secured Term Note in the principal amount of $7,489,800 or such other amount that is equal to the Initial Equipment Fair Market Value of Wells Fargo Equipment Lender's Excess Equipment which is to be secured by:(A) a first priority security interest in the Wells Fargo Lender's Excess Equipment; (B) a second priority security interest in the Wells Fargo Lender's Retained Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Term Note payable in accordance with the definition of Lender Secured Term Loan;

        (iii)    The allowance of the Wells Fargo Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $18,804,942, which shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

        (iv)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.;

        (v)    The net proceeds from the sale of all Wells Fargo equipment sold by the Debtor prior to the Effective Date, including, but not limited to, the approximately twelve (12) pieces of pumping equipment sold to date; and

        (vi)    A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-G Claim.

     8.    <u>Class 1-H WFEFI Equipment Lender Claim Against Brundage-Bone</u>

        a.    <u>Classification</u>:  Class 1-H consists of WFEFI Equipment Lender Claim against Brundage-Bone.

b.    Treatment:  In consideration of the Consent that the Holder of the Class 1-G Claim will execute prior to the Balloting Deadline, such Holder shall receive the following treatment under the Plan:

(i)    A Lender Secured Senior Term Note in the principal amount of $30,831,000 or such other amount that is equal to the Initial Equipment Fair Market Value of WFEFI's Retained Equipment which is to be secured by: (A) a first priority security interest in the WFEFI Equipment Lender's Retained Equipment; (B) a second priority security interest in the WFEFI Equipment Lender's Excess Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Senior Term Note and payable in accordance with the definition of Lender Secured Senior Term Loan;

(ii)    A Lender Secured Term Note in the principal amount of $16,724,700 or such other amount that is equal to the Initial Equipment Fair Market Value of WFEFI's Excess Equipment which is to be secured by: (A) a first priority security interest in the WFEFI Equipment Lender's Excess Equipment; (B) a second priority security interest in the WFEFI Equipment Lender's Retained Equipment; and (C) security interests in the other Collateral identified in the definition of the Lender Secured Term Note payable in accordance with the definition of Lender Secured Term Loan;

(iii)    The allowance of the WFEFI Equipment Lender Deficiency Claim as an Allowed General Unsecured Claim in the amount of $27,059,049, which shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim;

(iv)    A share of the Lender Warrants represented by a BB Liquidating Trust Certificate in the amount set forth in Article IV.H.;

(v)    The net proceeds from the sale of all WFEFI equipment sold by the Debtor prior to the Effective Date, including, but not limited to, the approximately nine (9) pieces of pumping equipment; and

(vi)    A release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against the Holder of the Class 1-H Claim.

9.    Class 2-A BofA Equipment Secured Claim Against Brundage-Bone

a.    Classification:  Class 2-A consists of BofA Equipment Secured Claim against Brundage-Bone.

b.    Treatment:  The Class 2-A Holder of the BofA Equipment Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the BofA Equipment Secured Claim against Brundage-Bone, the following:

58

(i)     The surrender of the BofA Equipment securing such Holder's Allowed BofA Equipment Lender Secured Claim; and

(ii)     To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the BofA Equipment Deficiency Claim shall be paid the Allowed amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

10.     <u>Class 2-B CBI Leasing Equipment Secured Claim Against Brundage-Bone</u>

a.     <u>Classification</u>:  Class 2-B consists of CBI Leasing Equipment Secured Claim against Brundage-Bone.

b.     <u>Treatment</u>:  The Class 2-B Holder of the CBI Leasing Equipment Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the CBI Leasing Equipment Secured Claim against Brundage-Bone, the following:

(i)     The surrender of the CBI Leasing Equipment securing such Holder's Allowed CBI Leasing Equipment Secured Claim; and

(ii)     To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the CBI Leasing Equipment Deficiency Claim shall be paid the Allowed amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

11.     <u>Class 2-C GE Commercial Finance Equipment Secured Claim Against Brundage-Bone</u>

a.     <u>Classification</u>:  Class 2-C consists of GE Commercial Finance Equipment Secured Claim against Brundage-Bone.

b.     <u>Treatment Option 1</u>:  The Class 2-C Holder of the GE Commercial Finance Equipment Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the GE Commercial Finance Equipment Secured Claim against Brundage-Bone, the following:

(i)     The surrender of the GE Commercial Finance Equipment securing such Holder's Allowed GE Commercial Finance Equipment Secured Claim; and

(ii)     To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the GE Commercial Finance Equipment Deficiency Claim shall be paid the Allowed Amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

12.    Class 2-D PNC Equipment Secured Claim Against Brundage-Bone

a.    Classification:   Class 2-D consists of PNC Equipment Secured Claim against Brundage-Bone.

b.    Treatment:  The Class 2-D Holder of the PNC Equipment Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the PNC Equipment Secured Claim against Brundage-Bone, the following:

(i)    The surrender of the PNC Equipment securing such Holder's Allowed PNC Equipment Secured Claim; and

(ii)    To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the PNC Equipment Deficiency Claim shall be paid the Allowed amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

13.    Class 2-E RBS Equipment Secured Claim Against Brundage-Bone

a.    Classification:   Class 2-E consists of RBS Equipment Secured Claim against Brundage-Bone.

b.    Treatment:  The Class 2-E Holder of the RBS Equipment Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the RBS Equipment Secured Claim against Brundage-Bone, the following:

(i)    The surrender of the RBS Equipment securing such Holder's Allowed RBS Equipment Secured Claim; and

(ii)    To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the RBS Equipment Deficiency Claim shall be paid the Allowed amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

14.    Class 2-F SunTrust Equipment Secured Claim Against Brundage-Bone

a.    Classification:  Class 2-F consists of SunTrust Equipment Secured Claim against Brundage-Bone.

b.    Treatment:  The Class 2-F Holder of the SunTrust Equipment Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the SunTrust Equipment Claim against Brundage-Bone, the following:

(i)    The surrender of the SunTrust Equipment securing such Holder's Allowed SunTrust Equipment Secured Claim; and

(ii)    To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the SunTrust Equipment Deficiency Claim shall be paid the Allowed amount of such claim as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

15.    <u>Class 2-G CFS Secured Claim Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 2-G consists of the CFS Secured Claim against Brundage-Bone, which claim is Disputed.

b.    <u>Treatment</u>:  For purposes of the Plan, the value of the Class 2-G CFS Secured Claim has been estimated to be $0 because, as of the Petition Date, all of the Debtors' assets (other than certain parcels of real estate on which no deed of trust was recorded) were fully encumbered and there was no value for the Class 2-G CFS Secured Claim.  The Debtors will file an adversary proceeding under Sections 547 and 548 of the Bankruptcy Code to avoid any security interest granted to CFS as preferential and/or fraudulent conveyance and under Section 506 of the Bankruptcy Code to determine the extent, validity and priority of any Secured Claim.  The Class 2-G Holder of the CFS Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for full and final satisfaction, settlement, release and discharge of the CFS Secured Claim against Brundage-Bone, the following:

(i)    To the extent the CFS Secured Claim is Allowed, it shall be paid in cash, or in accordance with the obligation to CFS as determined by the Bankruptcy Court, on the later of the Effective Date or the date it is determined to be an Allowed Claim; or

(ii)    The surrender of any collateral determined to secure the CFS Secured Claim; and

(iii)    To the extent there is a deficiency resulting from the disallowance of the CFS Secured Claim, and such CFS Deficiency Claim is Allowed, it shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

16.    <u>Class 3-A GE Commercial Finance Real Estate Lender Secured Claim Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 3-A consists of the GE Commercial Finance Real Estate Lender Secured Claim against Brundage-Bone.

b.    <u>Treatment</u>:  On the later of the Effective Date or the date on which GE Commercial Finance Real Estate Lender Secured Claim against Brundage-Bone becomes an Allowed GE Commercial Finance Real Estate Lender Secured Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a GE Commercial Finance Real Estate Lender Secured Claim against Brundage-Bone agrees to a less favorable treatment

for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each GE Commercial Finance Real Estate Lender Secured Claim against Brundage-Bone, each Holder of a GE Commercial Finance Real Estate Lender Secured Claim shall receive the following: The Allowed GE Commercial Finance Real Estate Lender Secured Claim shall be paid in accordance with the GE Commercial Finance Real Estate Loan Documents; provided that the maturity date of the Promissory Note shall be amended to extend it to August 31, 2015, the interest rate shall be 6.25% per annum and the principal balance due thereon shall be fully amortized over 20 years.

17.     Class 3-B Loan Star Real Estate Lender Claim Against Brundage-Bone

a.     Classification:  Class 3-B consists of the Loan Star Real Estate Lender Claim against Brundage-Bone.

b.     Treatment:  On the later of the Effective Date or the date on which Loan Star Real Estate Lender Claim against Brundage-Bone becomes an Allowed Loan Star Real Estate Lender Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a Loan Star Real Estate Lender Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Loan Star Real Estate Lender Claim against Brundage-Bone, each Holder of a Loan Star Real Estate Lender Claim shall receive the following: The Allowed Loan Star Real Estate Lender Claim shall be paid in accordance with the Loan Star Real Estate Loan Documents; provided that the maturity date of the Promissory Note shall be on the Fifth Anniversary date of the Effective Date with interest at the rate of 6.00% per annum and the principal balance due thereon shall be fully amortized over 20 years.

18.     Class 3-C M&I Marshall Real Estate Lender Claim Against Brundage-Bone

a.     Classification:  Class 3-C consists of the M&I Marshall Real Estate Lender Claim against Brundage-Bone.

b.     Treatment:  On the later of the Effective Date or the date on which M&I Marshall Real Estate Lender Claim against Brundage-Bone becomes an Allowed M&I Marshall Real Estate Lender Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a M&I Marshall Real Estate Lender Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each M&I Marshall Real Estate Lender Claim against Brundage-Bone, each Holder of a M&I Marshall Real Estate Lender Claim shall receive the following: The Allowed M&I Marshall Real Estate Lender Claim shall be paid in accordance with the M&I Marshall Real Estate Loan Documents; provided that in the event the Promissory Note that is secured by the M&I Marshall Real Estate is due to be paid in full at any time during the pendency of the Plan, the Promissory Note shall be extended at the same interest rate and the principal balance due thereon shall be fully amortized over 30 years.

19.     Class 3-D Wells Fargo Real Estate Lender Term Loan C Secured Claim Against Brundage-Bone

  a. Classification:  Class 3-D consists of the Wells Fargo Real Estate Lender Term Loan C Secured Claim against Brundage-Bone.

  b. Treatment:  The Class 3-D Holder of the Wells Fargo Real Estate Lender Term Loan C Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the Wells Fargo Real Estate Lender Term Loan C Secured Claim against Brundage-Bone, the following:

  (i) Either the surrender or, with the consent of the Class 3-D Holder, the sale free and clear of liens of 2410 East Gowan Road, North Las Vegas, NV 89030, provided that the net proceeds of any such sale shall be paid to the Class 3-D Holder; and

  (ii) To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the Wells Fargo Real Estate Lender Deficiency Claim shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

20.     Class 3-E Wells Fargo Real Estate Lender Term Loan D Secured Claim Against Brundage-Bone

  a. Classification:  Class 3-E consists of the Wells Fargo Real Estate Lender Term Loan D Secured Claim against Brundage-Bone.

  b. Treatment:  The Class 3-E Holder of the Wells Fargo Real Estate Lender Term Loan D Secured Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the Wells Fargo Real Estate Lender Term Loan D Secured Claim against Brundage-Bone, the following:

  (i) Either the surrender or, with the consent of the Class 3-E Holder, the sale free and clear of liens of 1893 Brown Avenue, Riverside, CA 92509, provided that the net proceeds of any such sale shall be paid to the Class 3-E Holder; and

  (ii) To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the Wells Fargo Real Estate Lender Deficiency Claim shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

21.     Class 3-F Wells Fargo Real Estate Lender Term Loan E Secured Claim Against Brundage-Bone

  a. Classification:  Class 3-F consists of the Wells Fargo Real Estate Lender Term Loan E Secured Claim against Brundage-Bone.

b.      Treatment:  On the later of the Effective Date or the date on which Wells Fargo Real Estate Lender Term Loan E Secured Claim against Brundage-Bone becomes an Allowed Wells Fargo Real Estate Lender Term Loan E Secured Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a Wells Fargo Real Estate Lender Term Loan E Secured Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Wells Fargo Real Estate Lender Term Loan E Secured Claim against Brundage-Bone, each Holder of a Wells Fargo Real Estate Lender Term Loan E Secured Claim shall receive the following: The Allowed Wells Fargo Real Estate Lender Term Loan E Secured Claim shall be paid in accordance with the Wells Fargo Real Estate Documents governing such Secured Claim; provided that in the event the Promissory Note that is secured by the Wells Fargo Real Estate located at 1037 and 1055 4th Ave. North, Kent, WA 98032 is due to be paid in full at any time during the pendency of the Plan, the Promissory Note and Deed of Trust shall be amended in form satisfactory to Wells Fargo in its sole discretion to provide that the maturity date of the Wells Fargo Real Estate Lender Term Loan E Secured Claim shall be extended to the earlier of: (i) the Fifth Anniversary;(ii) the date of any default under the Lender Secured Senior Term Loan, the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust provided that the Reorganized Debtor and the BB Operating Subsidiary continue to make the monthly payments provided for under the terms of the Term E Promissory Note and Deed of Trust and otherwise complies with the terms of such loan documents.

22.      Class 3-G Wells Fargo Real Estate Lender Term Loan F Secured Claim Against Brundage-Bone

a.      Classification:  Class 3-G consists of the Wells Fargo Real Estate Lender Term Loan F Secured Claim against Brundage-Bone.

b.      Treatment:  On the later of the Effective Date or the date on which Wells Fargo Real Estate Lender Term Loan F Secured Claim against Brundage-Bone becomes an Allowed Wells Fargo Real Estate Lender Term Loan F Secured Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a Wells Fargo Real Estate Lender Term Loan F Secured Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Wells Fargo Real Estate Lender Term Loan F Secured Claim against Brundage-Bone, each Holder of a Wells Fargo Real Estate Lender Term Loan F Secured Claim shall receive the following: The Allowed Wells Fargo Real Estate Lender Term Loan F Secured Claim shall be paid in accordance with the Wells Fargo Real Estate Documents governing such Secured Claim; provided that in the event the Promissory Note that is secured by the Wells Fargo Real Estate located at 301 North Cloverdale Road, Boise, ID 83713 is due to be paid in full at any time during the pendency of the Plan, the Promissory Note and Deed of Trust shall be amended in form satisfactory to Wells Fargo in its sole discretion to provide that the maturity date of the Wells Fargo Real Estate Lender Term Loan F Secured Claim shall be extended to the earlier of: (i) the Fifth Anniversary;(ii) the date of any default under the Lender Secured Senior Term Loan,

64

the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust provided that the Reorganized Debtor and the BB Operating Subsidiary continue to make the monthly payments provided for under the terms of the Term F Promissory Note and Deed of Trust and otherwise complies with the terms of such loan documents.

23.     <u>Class 3-H Wells Fargo Real Estate Lender Term Loan G Secured Claim Against Brundage-Bone</u>

a.     <u>Classification</u>:  Class 3-H consists of the Wells Fargo Real Estate Lender Term Loan G Secured Claim against Brundage-Bone.

b.     <u>Treatment</u>:  On the later of the Effective Date or the date on which Wells Fargo Real Estate Lender Term Loan G Secured Claim against Brundage-Bone becomes an Allowed Wells Fargo Real Estate Lender Term Loan G Secured Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a Wells Fargo Real Estate Lender Term Loan G Secured Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Wells Fargo Real Estate Lender Term Loan G Secured Claim against Brundage-Bone, each Holder of a Wells Fargo Real Estate Lender Term Loan G Secured Claim shall receive the following: The Allowed Wells Fargo Real Estate Lender Term Loan G Secured Claim shall be paid in accordance with the Wells Fargo Real Estate Documents governing such Secured Claim; provided that in the event the Promissory Note that is secured by the Wells Fargo Real Estate located at 1627 N.E. Argyle Drive, Portland, OR 97211 is due to be paid in full at any time during the pendency of the Plan, the Term G Promissory Note and the related Deed of Trust shall be amended in form satisfactory to Wells Fargo in its sole discretion to provide that the maturity date of the Wells Fargo Real Estate Lender Term Loan G Secured Claim shall be extended to the earlier of: (i) the Fifth Anniversary;(ii) the date of any default under the loan documents related to the Wells Fargo Real Estate Term Loan G, the Lender Secured Senior Term Loan, the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust provided that the Reorganized Debtor and the BB Operating Subsidiary continue to make the monthly payments provided for under the terms of the Term G Promissory Note and Deed of Trust and otherwise complies with the terms of such loan documents.

24.     <u>Class 3-I Wells Fargo Real Estate Lender Term Loan H Secured Claim Against Brundage-Bone</u>.

a.     <u>Classification</u>:  Class 3-I consists of the Wells Fargo Real Estate Lender Term Loan H Secured Claim against Brundage-Bone.

b.     Treatment:  On the later of the Effective Date or the date on which Wells Fargo Real Estate Lender Term Loan H Secured Claim against Brundage-Bone becomes an Allowed Wells Fargo Real Estate Lender Term Loan H Secured Claim, or, in each such case, as soon as practicable thereafter, except to the extent that a Holder of a Wells Fargo Real Estate Lender Term Loan H Secured Claim against Brundage-Bone agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Wells Fargo Real Estate Lender Term Loan H Secured Claim against Brundage-Bone, each Holder of a Wells Fargo Real Estate Lender Term Loan H Secured Claim shall receive the following: The Allowed Wells Fargo Real Estate Lender Term Loan H Secured Claim shall be paid in accordance with the Wells Fargo Real Estate Documents governing such Secured Claim; provided that in the event the Promissory Note that is secured by the Wells Fargo Real Estate located at 1037 and 1055 4th Avenue North, Kent, WA 98032 is due to be paid in full at any time during the pendency of the Plan, Wells Fargo Real Estate Lender Term H Note and related Deed of Trust shall be amended in form satisfactory to Wells Fargo in its sole discretion to provide that the maturity date of the Wells Fargo Real Estate Lender Term Loan E Secured Claim shall be extended to the earlier of: (i) the Fifth Anniversary; (ii) the date of any default under the loan documents related to the Wells Fargo Real Estate Term Loan H, the Lender Secured Senior Term Loan, the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust provided that the Reorganized Debtor and the BB Operating Subsidiary continue to make the monthly payments provided for under the terms of the Term H Promissory Note and Deed of Trust and otherwise complies with the terms of such loan documents.

25.     Class 3-J Wells Fargo Real Estate Lender Additional Secured Claim Against Brundage-Bone

a.     Classification:  Class 3-J consists of the Wells Fargo Real Estate Lender Additional Secured Claims against Brundage-Bone.

b.     Treatment:  Class 3-J which consists of the Wells Fargo Real Estate Lender Additional Secured Claims shall be treated as follows:

(i)     A $1,430,000 Secured promissory note (representing the fair market value of the Wells Fargo Additional Real Estate located at 1025 S. 48th Street, Tempe, AZ as of the Confirmation Date) together with a deed of trust and other related loan documents subject to the approval of Wells Fargo with interest payable monthly in arrears at the rate of 4% per annum, plus principal, amortized over 30 years with a balloon payment of the remaining principal balance due on the earlier of: (i) the Fifth Anniversary; (ii) the date of any default under the loan documents related to the such property, the Lender Secured Senior Term Loan, the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust.  The new Secured Note will be secured by such Wells Fargo Additional Real Estate.

(ii)    A $1,225,000 Secured promissory note (representing the fair market value of the Wells Fargo Additional Real Estate located at 786 N. Miller Avenue, Springfield, MO as of the Confirmation Date) together with a deed of trust and other related loan documents subject to the approval of Wells Fargo with interest payable monthly in arrears at the rate of 4% per annum, plus principal, amortized over 30 years with a balloon payment of the remaining principal balance due on the earlier of: (i) the Fifth Anniversary; (ii) the date of any default under the loan documents related to the such property, the Lender Secured Senior Term Loan, the Senior Secured Term Loan, the BB Liquidating Trust or the Plan which has not been cured as provided for in the respective Loan Documents, Trust Document or the Plan; (iii) a sale of substantially all of the assets of the Debtor has been consummated; or (iv) a Termination Event has occurred under the terms of the BB Liquidating Trust.  The new Secured Note will be secured by such Wells Fargo Additional Real Estate.

26.    <u>Class 4 GMAC Equipment Creditor Claim Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 4 consists of GMAC Equipment Creditor Claim against Brundage-Bone.

b.    <u>Treatment</u>:  The Class 4 Holder of the GMAC Equipment Creditor Claim shall, except to the extent it agrees to a less favorable treatment, receive in exchange for the full and final satisfaction, settlement, release and discharge of the GMAC Equipment Creditor Claim against Brundage-Bone, the following:

(i)    The surrender of the GMAC Equipment securing such Holder's Allowed GMAC Equipment Creditor Secured Claim; or

(ii)    To the extent there is a deficiency resulting from the treatment provided for in subsection (i), the GMAC Equipment Creditor Deficiency Claim shall be paid as a Class 5 General Unsecured Claim and shall be entitled to vote as a Class 5 Claim.

27.    <u>Class 5 General Unsecured Claims Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 5 consists of all Allowed General Unsecured Claims against Brundage-Bone, which shall include the following Claims: (i) Deficiency Claims; (ii) Claims of Brundage-Bone's trade creditors; (iii) others listed on Brundage-Bone's Schedule F or that have filed an Unsecured Proof of Claim; (iv) ADR Tort Claims against Brundage-Bone of Holders who, after satisfying provisions of the ADR Process and receiving payments pursuant to the Insurance Policy Documents, are determined to have unpaid Allowed ADR Tort Claims; and (v) Class 5 Administrative Claims.  For purposes of voting on the Plan, all Class 5 Claims shall be treated as one Class.

b.    <u>Treatment</u>:

(i)    <u>Class 5 Base Treatment</u>:  Each Holder of an Allowed Class 5 Claim shall receive a share of the BB Unsecured Class 5 Note equal to 5.4% of the amount of

such Holder's Allowed Class 5 Claim and, except as provided in Article III.D.27.b.(ii)(cc)(II), any Avoidance Actions and any and all other Section 541 Claims against such Holder shall remain available for the Reorganized Debtor to pursue in its discretion.

(ii)   <u>Class 5 Enhanced Treatment</u>:

(aa)   Any Holder of an Allowed Class 5 Claim may elect to receive the Class 5 Enhanced Treatment by: (I) executing a ballot for itself and its related entities voting for the Plan; (II) accepting for itself and its related entities the treatment and valuation of their respective Claims as set forth in the Plan; and (III) satisfying one of the conditions set forth in subparagraph (bb) on or before the Balloting Deadline.

(bb)   In order to elect the Class 5 Enhanced Treatment, the Holder of an Allowed Class 5 Claim shall have satisfied one of the following additional conditions on or before the Balloting Deadline:

(I)   If the Holder holds a guaranty from one or both of the Guarantors, such Holder executes and delivers to Debtors' counsel the Guarantor Forbearance Agreement;

(II)   The Allowed Class 5 Claim of such Holder is an Unsecured Ongoing Vendor Claim;

(III)   The Allowed Class 5 Claim of such Holder is a Class 5 Administrative Claim; or

(IV)   If the Allowed Class 5 Claim is an Allowed ADR Tort Claim, the Holder thereof agrees to limit the amount of its Allowed Class 5 Claim to the lesser of the amount of the Allowed Claim or $100,000.00.

(cc)   Each Holder of an Allowed Class 5 Claim who properly elects to receive the Class 5 Enhanced Treatment shall receive, in addition to the Class 5 Base Treatment provided in subparagraph (b)(i), the following:

(I)   First, at such Holder's election, (i) a share of the BB Unsecured Enhanced Class 5 Note equal to either 2.7% or 1.3% of the amount of such Holder's Class 5 Allowed Claim or (ii) such Holder's pro rata share (based upon the total of the Class 5 Claims and Class 10 Claims who receive Unsecured Warrants under Class 5 and Class 10) of up to 22.3% or 12.2% of the Unsecured Warrants held by the BB Liquidating Trust subject to the terms of the BB Liquidating Trust Agreement; provided that (x) if both Guarantors execute the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, the shares of the BB Unsecured Enhanced Class 5 Note and the Unsecured Warrants held by the BB Liquidating Trust to which such Holder shall be entitled shall be the greater amount listed in each of clauses (i) and (ii) above, and (y) if only one Guarantor executes the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, such shares shall be the lesser amount so listed; provided further that the percentage of such Unsecured Warrants allocable to an electing Holder of an Allowed

Class 5 Claim shall be reduced ratably based upon the amount of Allowed Class 5 Claims and Allowed Class 10 Claims whose Holders elect to receive a share in the BB Unsecured Enhanced Class 5 Note.  A Holder of an Allowed Class 5 Claim that fails to make such an election shall be deemed to have elected to receive its pro rata share of the Unsecured Warrants subject to the terms of the BB Liquidating Trust Agreement.  All Unsecured Warrants attributable to the Holders of Allowed Class 5 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee, and such Holders shall only be entitled to receive distributions from the BB Liquidating Trust attributable to the Unsecured Warrants; and

(II)    Second, a release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against such Holder.

28.    <u>Class 6 Intercompany Claims Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 6 consists of the Intercompany Claims against Brundage-Bone.

b.    <u>Treatment</u>:  Holders of Intercompany Claims against Brundage-Bone shall receive no distributions on account of their Intercompany Claims against Brundage-Bone.

c.    <u>Voting</u>:  Class 6 is Impaired, and Class 6 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

29.    <u>Class 7 Section 510(b) Claims Against Brundage-Bone</u>

a.    <u>Classification</u>:  Class 7 consists of all Section 510(b) Claims against Brundage-Bone.

b.    <u>Treatment</u>:  Holders of Section 510(b) Claims against Brundage-Bone will receive no distribution on account of such Claims.

c.    <u>Voting</u>:  Class 7 is Impaired, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

30.    <u>Class 8 Equity Interests in Brundage-Bone</u>

a.    <u>Classification</u>:  Class 8 consists of all Equity Interests in Brundage-Bone.

b.    <u>Treatment</u>:  On the Effective Date, all Equity Interests in Brundage-Bone shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

c.    Voting:  Holders of Equity Interests in Brundage-Bone are Impaired, and the Holders of Class 8 Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 8 Equity Interests will not be entitled to vote to accept or reject the Plan.

**E.    Classification and Treatment of Claims and Interests Against JLS**

31.    Class 9 Secured Claims Against JLS

a.    Classification:  Class 9 consists of all Secured Claims against JLS, which are limited to the Secured Claims of Wells Fargo under the Wells Fargo Credit Facility and the Disputed CFS Secured Claim.

b.    Treatment:  To the extent Class 9 Claims exist against JLS, they constitute Claims against Brundage-Bone and to the extent they are Allowed, they shall be treated and paid as Allowed Claims against Brundage-Bone in accordance with the treatment provided for Brundage-Bone Claims.

32.    Class 10 General Unsecured Claims Against JLS

a.    Classification:   Class 10 consists of all Allowed General Unsecured Claims against JLS, which are estimated to be approximately $19,370,000.00 (including the approximately $18,805,000.00 Wells Fargo Equipment Lender Deficiency Claim).

b.    Treatment:

(i)    Class 10 Base Treatment:  Each Holder of an Allowed Class 10 Claim shall receive a share of the BB Unsecured Class 5 Note equal to 5.4% of the amount of such Holder's Allowed Class 10 laim and, except as provided in Article III.D.32.(b)(ii)(cc)(II), any Avoidance Actions and any and all other Section 541 Claims against such Class 10 Claimant shall remain available for the Reorganized Debtor to pursue in its discretion.

(ii)    Class 10 Enhanced Treatment:

(aa)    Any Holder of an Allowed Class 10 Claim may elect to receive the Class 10 Enhanced Treatment by: (I) executing for itself and its related entities a ballot voting for the Plan; (II) accepting for itself and its related entities the treatment and valuation of their respective Claims as set forth in the Plan; (III) and satisfying one of the conditions set forth in subparagraph (bb) on or before the Balloting Deadline.

(bb)    In order to elect the Class 10 Enhanced Treatment, the Holder of an Allowed Class 10 Claim shall have satisfied one of the following additional conditions on or before the Balloting Deadline:

(I)     If the Holder holds a guaranty from one or both of the Guarantors, such Holder executes and delivers to Debtors' counsel the Guarantor Forbearance Agreement;

(II)     The Allowed Class 10 Claim of such Holder is an Unsecured Ongoing Vendor Claim;

(III)     The Allowed Class 10 Claim of such Holder is a Class 10 Administrative Claim; or

(IV)     If the Allowed Class 10 Claim is an Allowed ADR Tort Claim, the Holder thereof agrees to limit the amount of its Allowed Class 10 Claim to the lesser of the amount of the Allowed Claim or $100,000.00.

(cc)     Each Holder of an Allowed Class 10 Claim who properly elects to receive the Class 10 Enhanced Treatment shall receive, in addition to the Class 10 Base Treatment provided in subparagraph (b)(i), the following:

(I)     First, at such Holder's election, (i) a share of the BB Unsecured Enhanced Class 5 Note equal to either 2.7% or 1.3% of the amount of such Holder's Class 10 Allowed Claim or (ii) such Holder's pro rata share (based upon the total of the Class 5 Claims and Class 10 Claims who receive Unsecured Warrants under Class 5 and Class 10) of up to 22.3% or 12.2% of the Unsecured Warrants held by the BB Liquidating Trust subject to the terms of the BB Liquidating Trust Agreement; provided that (x) if both Guarantors execute the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, the shares of the BB Unsecured Enhanced Class 5 Note and the Unsecured Warrants held by the BB Liquidating Trust to which such Holder shall be entitled shall be the greater amount listed in each of clauses (i) and (ii) above, and (y) if only one Guarantor executes the Guarantor Forbearance Agreement and the Guarantor Lock-Up Agreement, such shares shall be the lesser amount so listed; provided further that the percentage of such Unsecured Warrants allocable to an electing Holder of an Allowed Class 10 Claim shall be reduced ratably based upon the amount of Allowed Class 5 Claims and Allowed Class 10 Claims whose Holders elect to receive a share in the BB Unsecured Enhanced Class 5 Note.  A Holder of an Allowed Class 10 Claim that fails to make such an election shall be deemed to have elected to receive its pro rata share of the Unsecured Warrants subject to the terms of the BB Liquidating Trust Agreement.  All Unsecured Warrants attributable to the Holders of Allowed Class 10 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee, and such Holders shall only be entitled to received distributions from the BB Liquidating Trust attributable to the Unsecured Warrants; and

(II)     Second, a release from the Debtors and Reorganized Debtor of all Avoidance Actions and any and all other Section 541 Claims against such Holder.

71

33.     Class 11 Intercompany Claims Against JLS

     a.     <u>Classification</u>: Class 11 consists of the Intercompany Claims against JLS.

     b.     <u>Treatment</u>: Holders of Intercompany Claims against JLS shall receive no distributions on account of their Intercompany Claims against JLS.

     c.     <u>Voting</u>: Class 11 is Impaired, and Class 11 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 11 Claims will not be entitled to vote to accept or reject the Plan.

34.     Class 12 Equity Interests in JLS

     a.     <u>Classification</u>:  Class 12 consists of all Equity Interests in JLS.

     b.     <u>Treatment</u>:  On the Effective Date, all Equity Interests in JLS shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

     c.     <u>Voting</u>:  Holders of Equity Interests in JLS are Impaired, and the Holders of Class 12 Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 12 Equity Interests will not be entitled to vote to accept or reject the Plan.

## F.     Acceptance or Rejection of the Plan

     1.     <u>Presumed Acceptance of Plan</u>:  There are no Classes of Claims or Interests that are Unimpaired under the Plan and would, therefore, be presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  If there are any Unimpaired Classes, they are not entitled to vote on the Plan and the acceptance of the Plan by any such Unimpaired Classes and by the Holders of Allowed Claims or Allowed Interests in such Classes is not required and shall not be solicited.

     2.     <u>Voting Classes</u>:  Each Holder of an Allowed Claim in each of Classes 1, 2, 3, 4, 5, 9, 10 and 12 shall be entitled to vote to accept or reject the Plan.

     3.     <u>Presumed Rejection of the Plan</u>:  Holders of Class 11 Intercompany Claims against JLS, Class 12 Equity Interests in JLS, Class 6 Intercompany Claims against Brundage-Bone, Class 7 Section 510(b) Claims against Brundage-Bone, and Class 8 Equity Interests in Brundage-Bone shall receive no distributions under the Plan on account of their Claims or Interests and are, therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims or Interests in such Classes are not entitled to vote on the Plan and the vote of such Holders shall not be solicited.

     4.     <u>Acceptance by Impaired Classes of Claims</u>:  Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code,

an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.      Elimination of Vacant Classes:  Any Class of Claims that has no Holders of any Allowed Claims or any Claims temporarily Allowed under Bankruptcy Rule 3018 due to no ballots having been cast in such Class entitled to vote on the Plan shall be deemed eliminated from the Plan for purposes of voting and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.      Tabulation of Ballots:  Each Debtor will separately tabulate all votes on the Plan in its respective Chapter 11 case for the purpose of determining whether the Plan with respect to each Debtor satisfies section 1129(a)(8) and (10) of the Bankruptcy Code.  All votes on account of Allowed Claims shall be counted as if Filed against the Debtor's Estate where the Claim resides.

7.      Confirmation Pursuant to section 1129(a)(10) and 1129(b) of the Bankruptcy Code:   Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

8.      Controversy Concerning Impairment:  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      Operations Between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, all orders of the Bankruptcy Court that are then in full force and effect, and as set forth herein.

**B.      Sources of Consideration for Plan Distributions**

The Reorganized Debtor shall fund distributions under the Plan with Cash on hand, including Cash from operations, existing assets, and proceeds from the Exit Facility.

**C.      Exit Facility**

On the Effective Date, the Reorganized Debtor will enter into the Exit Facility. In accordance with the Exit Facility Agreement, the Reorganized Debtor will use proceeds of the Exit Facility Agreement to satisfy in full: (1) the DIP Facility Claim, including (if agreed to by

the beneficiaries) the substitution of standby letters of credit issued under the DIP Credit Agreement (2) the Fee Claims and (3) the Administrative Claims, to the extent such Claims are not otherwise satisfied pursuant to the terms of the Plan. The Reorganized Debtor shall make payments of principal and interest in accordance with the terms of the Exit Facility Agreement. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the Exit Facility and, upon the Effective Date, the Exit Facility shall be deemed to become valid, binding, and enforceable in accordance with its terms.  The Exit Facility will provide the Reorganized Debtor with access to an Exit Facility Revolving Line of Credit, which is anticipated to be in the aggregate amount of $15,000,000, including a letter of credit facility in the estimated amount of $4,500,000.   The Exit Facility Agreement is expected to contain standard and customary representations and borrowing base requirements, collateral requirements, warranties, affirmative and negative covenants, financial covenants, agency and closing conditions for a debt facility of this nature, type and size.

## D.    New Notes

On the Effective Date, (1) the Reorganized Debtor and the BB Operating Subsidiary will enter into the Lender Secured Senior Term Notes jointly and severally as co-borrowers, (2) the BB Liquidating Subsidiary will enter into the Lender Secured Term Notes and the Reorganized Debtor and the BB Operating Subsidiary will guaranty the payment of the Lender Secured Term Notes, (3) the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally, will enter into the BB Unsecured Class 5 Note, and (4) the Reorganized Debtor and the BB Operating Subsidiary, jointly and severally, will enter into the BB Unsecured Enhanced Class 5 Note.  If appropriate and necessary, the Reorganized Debtor shall issue secured promissory notes or amend the existing promissory notes and deeds of trust it previously issued to each Holder of a Class 3 Claim whose real estate the Reorganized Debtor does not surrender or sell.  Each of the promissory notes referenced herein shall be deemed to become valid, binding, and enforceable in accordance with its terms.

The Reorganized Debtor and BB Operating Subsidiary shall be co-obligors on the total amount of the obligations owing on account of the Lender Secured Senior Term Notes, the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note.

The Equipment Lenders shall each hold their respective Lender Secured Senior Term Notes and Lender Secured Term Notes reflecting their respective share of said Lender Secured Claims and Lender Secured Excess Equipment Claims.  The Equipment Lenders shall appoint one or more collateral and administrative agent(s) (the "Collateral Agent") for purposes of working with the Reorganized Debtor and subsidiaries on issues related to terms of the Lender Secured Senior Term Loan and the Lender Secured Term Loan, the perfection of the Equipment Lenders' security interest in and maintenance of the equipment in the Reorganized Debtor, the BB Operating Subsidiary and the BB Liquidating Subsidiary, for record keeping purposes, and for calling meetings of the Equipment Lenders to discuss issues and determine future courses of action in relation to these loans.

The Reorganized Debtor and its subsidiaries shall engage the services of a title management company acceptable to the Collateral Agent (the "Title Management Company") to

coordinate and manage the registration of each piece of titled equipment owned by the Reorganized Debtor and its subsidiaries and the issuance of certificates of title reflecting the proper owner and the lien of the Collateral Agent for the benefit of the Equipment Lenders therein.  The Reorganized Debtor and its subsidiaries shall be responsible for all fees, costs and expenses charged or incurred by the Title Management Company. The Reorganized Debtor and its subsidiaries shall be required, immediately following the transfer of any equipment from the BB Liquidating Subsidiary to either the Reorganized Debtor or the BB Operating Subsidiary, to effectuate the issuance of a new certificate of title reflecting ownership in the respective purchaser and the first priority lien in favor of the Collateral Agent working with the Title Management Company to effectuate such transfer.

The Lender Secured Senior Term Notes issued to each Equipment Lender shall be secured by, amount other things, (i) a first priority lien granted in favor of the Collateral Agent for the benefit of the Equipment Lenders in the Retained Equipment and (ii) a second priority lien granted in favor of the Collateral Agent for the benefit of the Equipment Lenders in the Excess Equipment.  The Lender Secured Term Notes issued to each Equipment Lender shall be secured by a first priority lien granted in favor of the Collateral Agent in the Excess Equipment and a second priority lien in the Retained Equipment for the benefit of such Equipment Lender, together with all products and proceeds of any of the foregoing (as to any Equipment Lender, such Equipment Lender's "Specific Equipment").

The holders of Lender Secured Senior Term Notes shall also hold any and all rights of the Reorganized Debtor as "lessor" under any lease of Specific Equipment from the Reorganized Debtor to the BB Operating Subsidiary, together with all products and proceeds of any of the foregoing, including any revenue resulting from any equipment leases thereof (collectively, the "Lender Specific Collateral").  Additionally, the Lender Secured Senior Term Notes shall be secured by the Lender Senior Term Loan Collateral.

The Reorganized Debtor shall also pledge the shares of the BB Operating Subsidiary and BB Liquidating Subsidiary to secure its obligations to pay the Lender Secured Senior Term Notes and Lender Secured Term Notes.

The Reorganized Debtor and the BB Operating Subsidiary will guaranty the obligations of the BB Liquidating Subsidiary to pay:  (1) the interest payments and the principal amount due on the Lender Secured Term Notes; (2) the Asset Management Fees, including the amounts due for the maintenance, appraisal, insurance, storage and related duties of the equipment held at the BB Liquidating Subsidiary; and (3) the Trust Management Fees including the amounts due for the fees of the BB Liquidating Trust Advisors and the trustees of the BB Liquidating Trust and the BB Unsecured Trust.  The BB Liquidating Subsidiary will guaranty the Lender Secured Senior Term Notes obligations.  Additionally, the Lender Senior Term Notes shall be secured by the Lender Senior Term Loan Collateral.

The Lender Secured Senior Term Loan Documents and the Lender Secured Term Loan Documents shall include additional terms acceptable to the Equipment Lenders in their sole discretion and shall be included in the Plan Supplement Documents.

75

Both the Lender Secured Senior Term Notes and Lender Secured Term Notes shall include covenants to insure that the BB Operating Subsidiary looks first to the equipment in the BB Liquidating Subsidiary to satisfy any of its equipment needs prior to obtaining such additional equipment from other sources. There also will be affirmative covenants related to the maintenance and cannibalization and insurance for physical damage for the replacement value on a replacement cost basis with the Equipment Lenders (or the Collateral Agent).

Both the Lender Secured Senior Term Notes and Lender Secured Term Notes shall also require the continued role of the CTO as a part-time consultant to the Reorganized Debtor to provide the Equipment Lenders with periodic financial and management reports on the Reorganized Debtors' actual and projected financial performance and other management related issues affecting such performance such as expansion or contraction issues, equipment and capital needs, in the form of and at such intervals as designated in the loan documents or as determined by the New Board. The Reorganized Debtor shall pay the fees of the CTO for such services.

The BB Unsecured Class 5 Notes and BB Unsecured Enhanced Class 5 Notes shall be held by the BB Unsecured Trust and the terms of said Notes are more fully described in Article I and Article III.

## E.    Restated Articles

Pursuant to C.R.S. Section 7-110-108, in connection with the Confirmation of the Plan, Reorganized Brundage-Bone will amend and restate its Articles of Incorporation, in their entirety, by filing with the Colorado Secretary of State Restated Articles of Incorporation, which will provide all information required by C.R.S. Section 7-101-101 et. seq. (the "Restated Articles"). Reorganized Brundage-Bone will be permitted to engage in any lawful act or activity for which corporations may be organized under the Colorado Business Corporation Act, and will have perpetual existence.

The business and affairs of Reorganized Brundage-Bone will be managed by or under the direction of the New Board, which will have seven directors as established in the Amended and Restated Bylaws (the "Related Bylaws") and the Shareholders' Agreement which shall be included in the Plan Supplement Documents and shall be in form and substance acceptable to the Equipment Lenders and the Debtors. Subject to statutory power conferred on the shareholders, and subject to the Shareholders' Agreement, the New Board will have the power to amend the Restated Articles and the Restated Bylaws from time to time. Directors will be entitled to indemnification to the fullest extent permitted under the Colorado Business Corporation Act. Dividends payable in Cash or in stock may be declared and paid on account of the New Common Stock from funds lawfully available therefore as and when determined by the New Board. The Restated Articles and the Shareholders' Agreement will be included in the Plan Supplement Documents.

## F.    Amended and Restated Bylaws

In connection with the Confirmation of the Plan, Reorganized Brundage-Bone will adopt and approve its Restated Bylaws, which will establish, among other things, (1) the time, place

and notice requirements and quorum requirements for shareholder meetings, (2) proxy voting rules, (3) actions taken by shareholders without a meeting, (4) the election and removal of directors and filling New Board vacancies (each subject to the Shareholders' Agreement), (5) the time, place and notice requirements and quorum requirements for New Board meetings, (6) actions taken by the New Board without a meeting, (7) the authority of the New Board to create committees, and the powers of such committees, (8) the restrictions and limitations on payment of compensation to directors, (9) the election/appointment, removal, term and duties of corporate officers, including a president, secretary, treasurer, one or more vice presidents and such other officers as the New Board may determine, (10) certificates representing shares of capital stock (and allowing lost certificate affidavits in lieu thereof), (11) the payment of dividends declared on capital stock by the New Board, (12) indemnification of employees, officers, directors and agents of Reorganized Brundage-Bone, and payment of expenses in connection therewith, (13) provision of directors and officers insurance, (14) the fiscal year of Reorganized Brundage-Bone, and (15) the corporate seal of Reorganized Brundage-Bone, all according to the laws of the State of Colorado.  To the extent a provision or term of the Shareholders' Agreement and the Amended and Restated Bylaws are in conflict, to the extent not prohibited by law, the provision or term set forth in the Shareholders' Agreement will govern. The Amended and Restated Bylaws will be included in the Plan Supplement Documents.

## G.     New Common Stock

The issuance by Reorganized Brundage-Bone of New Common Stock on or as soon as reasonably practicable following the Effective Date is hereby authorized without the need for any further corporate action or further order of the Bankruptcy Court.

The Restated Articles will create a single class of capital stock, which will be the New Common Stock.  The number of shares of New Common Stock initially authorized in the Restated Articles for issuance will be sufficient to cover (1) the shares issuable on the Effective Date, (2) the shares issuable upon exercise of the Lender and Unsecured Warrants; and (3) the shares issuable pursuant to the 2011 Equity Incentive Plan.

On the Effective Date one share of New Common Stock shall be issuable to each of the members of the New Board.  Such shares shall be redeemable for a nominal sum upon exercise of the Warrants and shall be subject to the Voting Trust Agreement which shall provide that said shares shall be voted in accordance with the vote of the New Board and the Shareholders' Agreement. The Voting Trust Agreement will be included in the Plan Supplement Documents.

The holders of New Common Stock will have the exclusive right to vote for the election of directors and on all other matters requiring shareholder action, and will be entitled to one vote for each share of New Common Stock held on all matters presented to the shareholders for their vote and/or approval, subject to the voting requirements, director appointment rights and other rights granted to the holders of the Warrants set forth in the Shareholders' Agreement.  Holders of shares of New Common Stock will vote together as a single class on all matters submitted to a vote of the shareholders; however, cumulative voting will not be permitted.

Preemptive rights will not exist with respect to the New Common Stock of Reorganized Brundage-Bone; provided, however, that the New Board shall have the power, by contract, to grant to some or all of Reorganized Brundage-Bone's shareholders or purchasers of New Common Stock preemptive rights to acquire shares of New Common Stock.

## H.     Warrants

The issuance by Reorganized Brundage-Bone of the Lender Warrants and the Unsecured Warrants to the BB Liquidating Trust on or as soon as reasonably practicable following the Effective Date is hereby authorized without the need for any further corporate action or further order of the Bankruptcy Court.

The Reorganized Debtor will issue to the BB Liquidating Trust, for the benefit of the holders of Lender Secured Senior Term Notes and the Lender Secured Term Notes, one or more Warrants to acquire 100% of the New Common Stock (the "Warrant Shares") subject to dilution of up to 34.3% (on a fully diluted basis) for Options to acquire up to 12% New Common Stock granted to management executives (referred to collectively as "Management" and individually as "Managers") under the 2011 Equity Incentive Plan and up to 22.3% for Holders of Allowed Class 5 Claims and Class 10 Claims that elect or are deemed to elect to receive the Unsecured Warrants under the Class 5 Enhanced Treatment or Class 10 Enhanced Treatment as holders of the beneficial interests in the BB Liquidating Trust pursuant to the BB Liquidating Trust Agreement.  All Unsecured Warrants attributable to the Holders of Class 5 Claims and Class 10 Claims shall be held by the BB Liquidating Trust for the benefit of the BB Unsecured Trustee and the Holders of Class 5 Claims and Class 10 Claims that elect to receive the Unsecured Warrants as part of the Class 5 Enhanced Treatment and Class 10 Enhanced Treatment.  Holders who elect the Class 5 Enhanced Treatment or Class 10 Enhanced Treatment shall only be entitled to receive distributions attributable to the Unsecured Warrants.

Warrant Shares, subject to dilution as set forth above, shall be allocated to the holders of Lender Secured Senior Term Notes and the Lender Secured Term Notes in accordance with the following chart:

| Equipment Lender | Percentage Interest in Warrant Shares |
|---|---|
| AIG | 7.7% |
| Comerica | 3.5% |
| KeyBank | 15.2% |
| Key Equipment Finance | 5.2% |
| People's Capital | 1.5% |
| Wachovia | 7.8% |
| Wells Fargo | 24.2% |
| WFEFI | 34.9% |

The BB Liquidating Trust will have the right, exercisable at any time after the Second Anniversary, to require the Reorganized Debtor to purchase the Warrants at a price equal to their then fair market value based on a third party appraisal (the "Put Right").  If the BB Liquidating

Trust exercises its Put Right and the Reorganized Debtor does not purchase all of the Warrants, said Trust can require that the Reorganized Debtor be sold ("Forced Sale").

The Warrants may be exercised at any time after the Second Anniversary or prior to such time if one of the following events occurs: (1) the sale, transfer or other disposition of all or substantially all of the assets of the Reorganized Debtor, (2) a merger or consolidation of the Reorganized debtor with or into another entity (except in the case of a merger or consolidation in which the holders of capital stock of such company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the stock of the company or the surviving or acquiring entity); (3) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Reorganized Debtor's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of such company (or the surviving or acquiring entity), or (4) a liquidation, dissolution or winding up of the Reorganized Debtor (transactions described in clauses (1), (2), (3) and (4) are referred to herein as an "Exit Transaction"); or (5) any time after the occurrence of an event of default with respect to the Lender Secured Senior Term Notes.

The Warrants must be exercised, reduced to cash and the cash distributed to the BB Liquidating Trust no later than the Fifth Anniversary either by way of Put Right or Forced Sale. The strike price of the Warrants shall be $0.001 per share of New Common Stock. The form of Warrants will be included in the Plan Supplement Documents.

**I.      Shareholders' Agreement and New Board.**

The New Board shall be made up of the CEO and CFO of the Reorganized Debtor and five additional board members selected by the BB Liquidating Trust Advisors and the BB Liquidating Trust Trustee as the holder of the Lender Warrants and the Unsecured Warrants. The BB Liquidating Trust, as the Warrant holder and the Reorganized Debtor through the New Board will execute a Shareholders' Agreement that is acceptable to the Equipment Lenders and the BB Liquidating Trustee. The Shareholders' Agreement will be included in the Plan Supplement Documents.

**J.      Management Employment Agreements**

Reorganized Brundage-Bone will enter into the Management Employment, Non-Solicitation and Non-Compete Agreements (the "Employment Agreements") with the following 4 members of Management promptly following the Confirmation of the Plan: Bruce Young (CEO), John Hudek (CFO), Jeffrey Switzer (COO Union Operations) and Randy Waterman (COO Non-Union Operations).  The material terms of the Employment Agreements are described in the Disclosure Statement. The Employment Agreements include the following terms: (1) designation of title, duties and reporting responsibility, (2) one year employment term; (3) seat on the New Board for the CEO and CFO, (4) Base Salary; (5) the opportunity to participate in the Cash Bonus Plan; (6) the opportunity to participate in the grant of Options under the 2011 Equity Incentive Plan; (7) employee benefits, i.e. vacation, life insurance, health insurance, coverage under the Reorganized Debtor's directors and officers insurance policy, and

other standard benefits extended to all similarly situated executives; (8) reimbursement of properly documented business expenses; (9) termination (by the Reorganized Debtor for cause, by the Reorganized Debtor not for cause, death, disability or termination by the executive with or without good reason) and severance, if applicable; (10) restrictive covenants applicable to the executive (e.g., covenant not to compete, non-solicitation of customers, employees, etc., non-disparagement, confidentiality, etc.), (11) dispute resolution procedures; and (12) general provisions (e.g., notice, governing law, withholding taxes, etc.). Management Base Salary and benefits shall be in accordance with their current 2010 base salaries and benefits until adjusted by the New Board. The Employment Agreements will be included in the Plan Supplement Documents.

Within 120 days immediately following the Effective Date, the New Board shall adopt an annual cash bonus plan ("Cash Bonus Plan") that provides for awards, in the discretion of the New Board, of annual cash bonuses to management ("Annual Cash Bonus(es)"). The New Board shall determine the dollar amount of such Annual Cash Bonuses, the members of Management entitled to receive Annual Cash Bonuses, and the conditions and restrictions on earning such Annual Cash Bonuses, including, but not limited to, annual individual performance targets and Reorganized Debtor annual performance targets.

The total amount of cash compensation payable to Managers in the form of Base Compensation, Annual Cash Bonuses, Option grants pursuant to the 2011 Equity Incentive Plan (see Article IV.K.) or reimbursement for expenses (other than ordinary course business related travel and entertainment expenses such as airfare, meals and hotels for ordinary course travel expenses for business related travel and entertainment) shall be set by the New Board.

## K.     2011 Equity Incentive Plan and Management Options

Within 120 days immediately following the Effective Date, the New Board shall adopt an equity incentive plan (the "2011 Equity Incentive Plan") that provides for the granting, in the discretion of the New Board, stock options (NQOs and ISOs) (the "Options"), restricted stock, restricted stock units, phantom units and cash awards (each an "Award") to Management. The total amount of equity subject to the 2011 Equity Incentive Plan will be 12% (on a fully diluted basis). The New Board shall determine, in its discretion, the members of Management entitled to receive Awards, the nature and amount of such Awards, the restrictions and limitations on the vesting and exercise of such Awards, acceleration of Awards, etc.

Options may not be exercised prior to an Exit Transaction or prior to exercise of the Lender Warrants. Holders of Options must be employed by the Reorganized Debtor at the time of an Exit Transaction, subject to accelerated vesting, as determined by the New Board, in its discretion, upon the occurrence of certain events (e.g., death, disability, termination without cause, etc.). The Management Options will vest as determined by the New Board in its discretion.

**L.      Brundage and Bone Lender Guaranties, Guarantor Forbearance Agreement and Guarantor Lock Up Agreement**

The Debtors, Equipment Lenders and Bone have agreed upon the terms of the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement pursuant to which and subject to the satisfaction of the conditions precedent set forth below, the Equipment Lenders shall convert Bone's recourse personal guarantees (the "Recourse Guaranty Obligations") with respect to the equipment loans or lease obligations of the Debtor or their respective Affiliates to nonrecourse guarantees, so long as Bone performs each of the obligations set forth below (the "Guaranty Conversion Obligations"). Copies of the form of Guarantor Lock Up Agreement and Guarantor Forbearance Agreement are attached to the Disclosure Statement. Brundage may subsequently elect to participate similarly regarding his Recourse Guaranty Obligations but as of the date of this Plan has not agreed to do so. In the event Bone is the only Guarantor who executes the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement, the Holders of the Class 5 Claims will receive the BB Unsecured Enhanced Class 5 Notes and Warrants in the reduced amounts as indicated in Article III.D.27. of the Plan. The conversion of the Recourse Guaranty Obligations is subject to Bone's (and Brundage's to the extent he participates in the future) satisfaction of the following Guaranty Conversion Obligations: (1) cooperate with the Debtors and the Equipment Lenders in insuring that the Plan gets confirmed, including assistance with the Debtors' tax issues and full participation in a stock buy-back program as directed by the Debtors; (2) does not violate the terms of his management non-compete agreements or otherwise interfere with the Reorganized Debtor's or any of its Affiliates' operations following the Effective Date; (3) support the expansion of Brundage-Bone's board of directors from four to five directors; (4) each of the Equipment Lenders receives, based on the amount of its respective Recourse Guaranty Obligation, its ratable share of any payment or other distribution from Bone (or any bankruptcy estate of Bone) to a Withdrawing Lender on account of any Recourse Guaranty Obligations owed to such Withdrawing Lender; and (5) depending upon whether all or fewer than all of the Holders of Bone's Recourse Guaranty Obligations execute and deliver the Guarantor Forbearance Agreement, Bone shall pay $400,000 or $200,000, representing the Bone Guaranty Cash Earn-Out Amount, respectively, to the Reorganized Debtor, which will distribute it on the Effective Date pro rata to the Holders of the Lender Deficiency Claims and the Withdrawing Lender Deficiency Claims that execute and deliver the Guarantor Forbearance Agreement. In the event a Withdrawing Lender agrees to the terms of the Guarantor Lock Up Agreement and Guarantor Forbearance Agreement, the Withdrawing Lender shall be eligible to receive the Class 5 Enhanced Treatment accorded to Holders of Class 5 Claims.

The failure to satisfy any of the foregoing conditions precedent or the violation of the Guarantor Lock Up Agreement, the Guarantor Forbearance Agreement or any of the Guaranty Conversion Obligations shall result in the immediate reinstatement of all Recourse Guaranty Obligations owing to the Equipment Lenders. Bone's Guaranty Conversion Obligations shall be the terms that shall govern his liability under the guarantees which shall become operable subject to the terms of the Guarantor Lock Up Agreement, the Guarantor Forbearance Agreement. The Guarantor Lock Up Agreement, the Guarantor Forbearance Agreement shall be included in the Plan Supplement Documents.

## M.  Section 1145 and Other Exemptions

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated herein, including the New Common Stock and Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. To the extent that section 1145 of the Bankruptcy Code is not available, the New Common Stock will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the private placement exemption under section 4(2) of the Securities Act or Regulation D promulgated there under.

In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New Common Stock, will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

## N.  Corporate Existence

Prior to the Effective Date, the following corporate changes shall occur:

(1)     Reorganized Brundage-Bone and Reorganized JLS shall be merged and Reorganized Debtor operating under the name Brundage-Bone Concrete Pumping, Inc. shall be the surviving corporate entity under the laws of the State of Colorado.  The merger shall constitute a substantive consolidation of the two Debtors, such that the total assets and liabilities of both Debtors shall be combined.

(2)     Brundage-Bone shall terminate its election to be treated as an S corporation under the Internal Revenue Code and the Reorganized Debtor shall thereafter be treated as a C corporation for income tax purposes; and

(3)     The Reorganized Debtor shall form two new wholly-owned subsidiary corporations organized under the laws of the State of Colorado, BB Operating Subsidiary, Inc. and BB Liquidating Subsidiary, Inc., which corporations shall be treated as C corporations for income tax purposes and the boards of directors for each shall be selected by the New Board.

## O.  BB Liquidating Trust

On the Effective Date, the Reorganized Debtor shall cause the formation of the BB Liquidating Trust.  The BB Liquidating Trustee shall be Wilmington Trust Corporation.  The BB Liquidating Trust shall be formed for the purpose of holding the Warrants on behalf of the holders of the Lender Secured Senior Term Notes, the Lender Secured Term Notes and the BB

Unsecured Trustee on behalf of the Holders of Class 5 Claims and Class 10 Claims that elect to receive Unsecured Warrants in partial satisfaction of their Class 5 Claims or Class 10 Claims. The trust agreement establishing the BB Liquidating Trust shall be among the BB Liquidating Trustee, the Reorganized Debtor and the BB Liquidating Trust Advisors. A copy of the BB Liquidating Trust Agreement shall be included in the Plan Supplement Documents.

The BB Liquidating Trust Beneficiaries shall be the holders of Lender Secured Senior Term Notes, the Lender Secured Term Notes and the BB Unsecured Trust on behalf of Holders of Allowed Class 5 Claims and Allowed Class 10 Claims that elect to receive an interest in distributions attributable to the Unsecured Warrants in partial satisfaction of such Allowed Claims. For purposes of exercising authority delegated under the BB Liquidating Trust Agreement to the BB Liquidating Trust Beneficiaries, each of the BB Liquidating Trust Beneficiary's beneficial interest in said Trust shall be equal to the beneficiary's pro rata share of the Warrant Shares (the "Trust Beneficial Interests"). The BB Unsecured Trustee shall vote its beneficial interest in the BB Liquidating Trust in accordance with the instructions of the Holders of a majority of the beneficial interest in the Unsecured Warrants held for their benefit by the BB Unsecured Trust.

The BB Liquidating Trust shall be managed by three trust advisors (the "BB Liquidating Trust Advisors"). The initial BB Liquidating Trust Advisors will be selected prior to the Effective Date of the Plan and approved as part of the Confirmation of the Plan. The BB Liquidating Trust Advisors will be appointed by, and be subject to removal and replacement by, holders of 60% of the Trust Beneficial Interests, which must include at least two Holders of Trust Beneficial Interests other than the BB Unsecured Trustee. The BB Liquidating Trust Advisors will act by majority vote of the BB Liquidating Trust Advisors.

Any cash proceeds realized by the BB Liquidating Trust from the exercise, sale or other disposition of the Warrants or the underlying common stock subject to the Warrants shall be paid pro rata to the BB Liquidating Trust Beneficiaries in proportion to their respective Trust Beneficial Interests. In turn, the BB Unsecured Trust shall pay those BB Unsecured Trust Beneficiaries who elected to receive a beneficial interest in the Unsecured Warrants their pro rata share of any cash proceeds received.

The BB Liquidating Trust shall terminate and dissolve upon the earlier of (1) five years following the effective date of the Plan or (2) the exercise, sale or other disposition of the Warrants and distribution of all cash proceeds (after payment of all trust expenses) received by the BB Liquidating Trust in connection therewith to the BB Liquidating Trust Beneficiaries.

## P.    BB Unsecured Trust, BB Unsecured Class 5 Note and BB Unsecured Enhanced Class 5 Note

On the Effective Date, the Reorganized Debtor shall cause the formation of the BB Unsecured Trust, the Trustee of which shall be selected by the Committee. The BB Unsecured Trust shall be formed for the purpose of holding the BB Unsecured Trust Note and making distributions to Holders of Allowed Class 5 Claims and Allowed Class 10 Claims. The parties to the BB Unsecured Trust Agreement shall be (1) the BB Unsecured Trustee, and (2) the

Reorganized Debtor as the trust grantor (as defined below) will acknowledge and agree to be bound by the BB Unsecured Trust Agreement. The BB Unsecured Trust Beneficiaries shall be the Holders of Allowed Class 5 Claims.

For purposes of exercising authority delegated under the BB Unsecured Trust Agreement to the BB Unsecured Trustee (other than with respect to the BB Liquidating Trust), each of the BB Unsecured Trust Beneficiary's beneficial interest in said Trust shall be equal to their pro rata share of the BB Unsecured Class 5 Note and the BB Unsecured Enhanced Class 5 Note.

The principal amount of the BB Unsecured Class 5 Note shall be equal to 5.4% of the aggregate amount of Allowed Class 5 Claims and Allowed Class 10 Claims. 5.4% of the aggregate amount of said Claims is estimated to total $5,957,390 based upon the estimated total unsecured claims in the amount of $110,332,046.

The principal amount of the BB Unsecured Enhanced Class 5 Note shall be equal to a maximum of 2.7% of the aggregate amount of Class 5 Claims and Class 10 Claims that properly elect to receive the Class 5 Enhanced Treatment and Class 10 Enhanced Treatment. 2.7% of the aggregate amount of said Claims is estimated to total $2,965,195 based upon estimated total unsecured claims in the amount of $110,332,046. The principal amount of the BB Unsecured Enhanced Class 5 Note will vary depending upon (1) whether one or both of the Guarantors executes the Guarantor Forbearance Agreement and Guarantor Lock-Up Agreement; and (2) the amount of Class 5 Claims and Class 10 Claims whose Holders elect to receive a share in the BB Unsecured Enhanced Class 5 Note.

## Q.   Vesting of Assets in the Reorganized Debtor

Except for the security interests of the Holders of Class 1 Claims, Class 2-A through Class 2-F Claims and Class 3 Claims (which security interests and Liens shall be retained by the Holders thereof) and as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by either of the Debtors pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

## R.   Cancellation of Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing any Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged.

## S.      Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors or managers of the Debtors or any other Entity (including the BB Operating Subsidiary, the BB Liquidating Subsidiary and the BB Liquidating Trust). Without limiting the foregoing, such actions may include: (1) the adoption, approval and filing of Restated Articles; (2) the adoption and approval of Restated Bylaws; (3) adoption, approval, execution and delivery of the Shareholders' Agreement; (4) the appointment of directors to the New Board and appointment and approval of the new officers of Reorganized Brundage-Bone; (5) execution and delivery of the Warrants; (6) execution and delivery of the Exit Facility Agreement and related documents; (7) execution and delivery of the Lender Secured Senior Term Loan Documents; (8) execution and delivery of the Lender Secured Term Loan Documents; (9) the execution and delivery of such certificates or other documents necessary to form the BB Operating Subsidiary; (10) the execution and delivery of such certificates or other documents necessary to form the BB Liquidating Subsidiary; (11) the execution and delivery of the Asset Management Agreement; (12) the execution and delivery of the BB Liquidating Trust formation and funding documents and related documents; (13) the execution and delivery of the BB Unsecured Trust documents and related documents; and (14) such other documents, agreements, certificates and instruments as may be necessary or desirable to fully implement and effect the terms and conditions of the Plan.

## T.      Effectuating Documents and Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board, are authorized to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity except for those expressly required pursuant to the Plan, including, but not limited to, the following: (1) issuance, execution, delivery, filing, or recording such contracts, securities, instruments, releases, and other agreements or documents as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (2) execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (3) execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty, or obligation necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (4) the filing of appropriate certificates of incorporation, merger, consolidation, or reorganization with the appropriate governmental authorities pursuant to applicable law; (5) adoption, approval, execution and delivery of the Employment Agreements; (6) within 120 days immediately following the Effective Date, adoption and approval of the Cash Bonus Plan and the 2011 Equity Incentive Plan and awards thereunder; and (7) all other actions that the Reorganized Debtor determine are necessary or appropriate.

## U.  Discharge of Debtors

Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date: (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete discharge of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be discharged, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtor, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

## V.  Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity in accordance with, in contemplation of, in connection with the Plan, or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other Interest in the Debtors or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## W.  Directors and Officers of the Reorganized Debtor

Pursuant to the Shareholders' Agreement and the Restated Articles, the New Board shall consist of seven members.  Five members of the New Board shall be selected by the BB Liquidating Trust and two members shall be the CEO and CFO of the Reorganized Debtor.  In

accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any individual proposed to serve as a director or an officer of the Reorganized Debtor shall have been disclosed at or before the Confirmation Hearing, to the extent known.

From and after the Effective Date, the members of the New Board and members of the board of directors of its subsidiaries shall be selected and determined in accordance with the provisions of the Restated Articles, the Restated Bylaws, the Shareholders' Agreement and applicable law.

## X.    Employee and Retiree Benefits

Except as otherwise set forth in the Plan, on and after the Effective Date, the Reorganized Debtor may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of either of the Debtors who served in such capacity at any time; (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.  Except as otherwise specifically provided in the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtor's defenses, Claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all Retiree Benefits, if any, shall continue to be paid in accordance with applicable law.

## Y.    Preservation of Rights of Action

Except for Avoidance Actions and the other Section 541 Claims that are deemed to have been waived and released with respect to the Holders of Allowed Class 1 Claims, Allowed Class 5 Claims that properly elect to receive the Class 5 Enhanced Treatment, and Allowed Class 10 Claims that properly elect to receive the Class 10 Enhanced Treatment, the Reorganized Debtor may pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Disclosure Statement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Except as otherwise provided herein, the Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Confirmation Order to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtor expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of

res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of, the Confirmation or the Consummation.

Further, except for the actions released by the Debtors pursuant to Article VIII and Avoidance Actions and all other Section 541 Claims related to Holders of the Allowed Class 1 Claims, Allowed Class 5 Claims that properly elect to receive the Class 5 Enhanced Treatment, and Allowed Class 10 Claims that properly elect to receive the Class 10 Enhanced Treatment, the Reorganized Debtor reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Debtors or the Reorganized Debtor, as applicable, shall have the exclusive right, authority, and discretion, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.        Assumption and Rejection of Executory Contracts and Unexpired Leases

1.        Except as otherwise provided in the Plan, the Debtors' Executory Contracts or Unexpired Leases not assumed or rejected pursuant to a Final Order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases: (a) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Disclosure Statement; (b) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Final Order); (c) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (d) that are otherwise expressly assumed or rejected pursuant to the Plan.

2.        Except as otherwise provided in the Plan, the Debtors' Executory Contracts that constitute collective bargaining agreements not assumed, modified or rejected pursuant to a Final Order prior to the Effective Date shall be deemed assumed pursuant to section 1113 of the Bankruptcy Code; provided that: (a) any such assumption, modification or rejection shall be accomplished in compliance with section 1113 of the Bankruptcy Code and (b) any such collective bargaining agreement that is subject to a motion to assume or reject that is pending on the Effective Date, the assumption or rejection thereof shall remain subject to and shall become effective as set forth in the Final Order.

3.        Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

4.      Except as expressly provided otherwise in this Article V, entry of the Confirmation Order shall constitute a Final Order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Confirmation Order or other Final Order but not assigned to a third party prior to the Effective Date shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the Plan or such Final Order. Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtor, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of Executory Contracts or Unexpired Leases identified in Article V hereof and in the Disclosure Statement at any time through and including the later of (a) 30 days after the Effective Date and (b) the entry of the Final Order or Confirmation Order assuming such Executory Contract or Unexpired Lease or entry of the Final Order or Confirmation Order establishing the Cure for such Executory Contract or Unexpired Lease.

## B.      Insurance Policies

Notwithstanding anything contained in the Plan to the contrary, unless specifically listed on the schedule of "Rejected Insurance Policies" in the Disclosure Statement as being rejected or specifically rejected by order of the Bankruptcy Court, or unless subject to a motion for approval of rejection that has been Filed and served prior to the Confirmation Date, all Insurance Policy Documents that have not expired or terminated on or before the Effective Date are treated as Executory Contracts under the Plan and will be assumed pursuant to the Plan. Nothing contained in this Article V.B shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under either of the Debtors' insurance policies. Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of the Debtors or the Reorganized Debtor with respect to any Insurance Policy Documents. The rights and obligations of the Debtors, the Reorganized Debtor, and insurers shall be determined under the Insurance Policy Documents and under applicable non-bankruptcy law.

## C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

1.      With respect to each of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure. Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of such Cure. Except with respect to Executory Contracts and Unexpired Leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the

Notice, Claims and Solicitation Agent on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided that nothing shall prevent the Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to timely File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.      If the Debtors or the Reorganized Debtor, as applicable, object to any Cure, or any other matter related to assumption as disputed, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter relating to assumption, then payment of the Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. The Debtors or the Reorganized Debtor, as applicable, reserve the right either to reject, or nullify the assumption of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure, any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, and any other matter related to assumption.

3.      Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## D.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

As set forth in the Claims Bar Date Order any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be Filed within 30 days following the date of the effective date of rejection. For any claim that has not been rejected prior to entry of the Confirmation Order the effective date of rejection shall be the Effective Date. Any Proofs of Claim arising from the

rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as Rejection Damages Claims and shall be treated in accordance with Article III of the Plan.

**E.     Intercompany Contracts, Contracts, and Leases Entered into After the Petition Date and Executory Contracts and Unexpired Leases Assumed**

Intercompany Contracts, contracts, and leases entered into after the Petition Date by either Debtor, and any Executory Contracts and Unexpired Leases assumed by either Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements**

1.      Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

2.      Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.     Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Disclosure Statement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtor, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### H.     Non-Occurrence of the Effective Date

Pending the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

### A.     Allowance of Claims

1.     After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action, other than those expressly excluded under the Plan, referenced in Article IV. hereof.

2.     Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### B.     Objections/Objection Deadline

1.     Objections to all Claims against the Debtors may be Filed and prosecuted only by the Debtors and the Reorganized Debtor, as applicable.

2.     The Reorganized Debtor shall be entitled to object to any Claim through and after the Effective Date. Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (a) 180 days after the Effective Date, as such time may be extended by order of the Bankruptcy Court, and (b) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.

### C.     Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtor shall have the sole and exclusive authority to: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**D.       Estimation of Claims**

Before the Effective Date, the Debtors or the Reorganized Debtor, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason.

**E.       Adjustments to Claims Without Objection**

After the Effective Date, any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**F.       Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Entity has paid the amount or turned over the property for which such Entity is liable under sections 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**G.       Offer of Judgment**

The Reorganized Debtor is authorized to serve upon a Holder of a Claim to which an objection has been filed an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Rule 68 of the Federal Rules of Civil Procedure shall apply to such offer of judgment. To the extent the Holder of a Claim must pay the costs incurred by the Reorganized Debtor after the making of such offer, the Reorganized Debtor is entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Nothing contained herein shall alter the rights of a Holder of a Claim to serve upon the Reorganized Debtor an offer of judgment pursuant to Bankruptcy Rules 7068 and 9014 and Rule 68 of the Federal Rules of Civil Procedure.

## H.     Amendments to Claims

On or after the Effective Date, except as provided herein, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## I.     ADR Tort Claims

ADR Tort Claims shall be Allowed or disallowed in accordance with the ADR Procedure set forth in the Debtors' Motion Establishing Alternative Dispute Resolution Procedure for Resolution of Tort Claims approved by order of the Bankruptcy Court dated September 2, 2010.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.     Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date and pursuant to the terms of the BB Liquidating Trust and BB Unsecured Trust.

## B.     Distributions on Account of Claims Allowed After the Effective Date

1.     Payments and Distributions on Disputed Claims:  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made within 60 days after the Disputed Claim becomes an Allowed Claim; provided that Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

2.     Special Rules for Distributions to Holders of Disputed Claims:  Notwithstanding any provision in the Plan, except as otherwise agreed by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

3.     Reserve:  On the Effective Date, the Reorganized Debtor shall maintain reserves (the "Reorganized Debtor's Distribution Reserves") to make distributions pursuant to the terms of the Plan. The amount withheld as a part of each Reorganized Debtor's Distribution Reserves for the benefit of a Holder of a Disputed Claim shall be equal to the lesser of the amount set forth in the following clause (a) and the amount set forth in the following clause (b): (a) (i) if no

estimation is made by the Bankruptcy Court pursuant to Article VI.D hereof, the amount necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code as of the Distribution Record Date, (ii) the amount necessary to satisfy the distributions required to be made pursuant to the Plan for such Disputed Claim based on an amount as estimated by and set forth in a Final Order for purposes of allowance and distributions; and (b) the amount necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtor. As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, the appropriate consideration to Holders of Allowed Claims, and the appropriate Reorganized Debtor's Distribution Reserves shall be adjusted accordingly.

4.      <u>BB Liquidating Trust and BB Unsecured Trust</u>:  Notwithstanding anything in this Article VII, the BB Liquidating Trust and BB Unsecured Trust shall be authorized to utilize the distribution procedures as set forth in this Article VII with respect to all Allowed Claims and Disputed Claims to be paid or withheld by the Trusts.

5.      <u>Tax Reporting Matters</u>:  Subject to definitive guidance from the Internal Revenue Service or an applicable court to the contrary (including the receipt by the Reorganized Debtor of a private letter ruling or the receipt of an adverse determination by the Internal Revenue Service upon audit, if not contested by the Reorganized Debtor), the Reorganized Debtor shall treat each Reorganized Debtor's Distribution Reserve as a single trust, consisting of separate and independent forms of consideration to be established with respect to each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code, and, to the extent permitted by law, shall report consistently with the foregoing for federal, state, and local tax purposes.

**C.      Delivery of Distributions**

1.      <u>Record Date for Distributions</u>:  On the Distribution Record Date, the Claims Register shall be closed and any Distribution Agent shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred at any time or on any day that is after the day that is 20 days before the Distribution Record Date, and the relevant transfer form is provided to the Reorganized Debtor and the Distribution Agent at least five Business Days prior to any distribution and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor, the Distribution Agent shall make distributions to the transferee.

2.      <u>Delivery of Distributions in General</u>:  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address);

(c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; provided that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer may be deposited by the Debtors with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. The Debtors, the Reorganized Debtor, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

3. <u>Distributions by Distribution Agents</u>:  The Debtors or the Reorganized Debtor, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder on conditions satisfactory to the Debtors or the Reorganized Debtor, as applicable. As a condition to serving as a Distribution Agent, a Distribution Agent must: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required hereunder that are to be distributed by such Distribution Agent. The Reorganized Debtor shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without any further notice to or action, order, or approval by the Bankruptcy Court or any other Entity.

4. <u>Compliance with Tax Requirements and Allocations</u>:  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, including any Distribution Agent, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

5. <u>Foreign Currency Exchange Rate</u>:  Except as otherwise provided in the Plan or a Final Order, as of the Effective Date, any General Unsecured Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern Time), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the first Business Day after the Petition Date.

6.    <u>Fractional, Undeliverable, and Unclaimed Distributions</u>:

a.    <u>Fractional Distributions</u>:  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be required.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, with half dollars being rounded down.

b.    <u>Undeliverable Distributions of Cash and Cash Equivalents</u>:

(i)    <u>Holding of Certain Undeliverable Distributions</u>:  If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtor (or the Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtor until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any interest, dividends, or other accruals of any kind.

(ii)    <u>Failure to Claim Undeliverable Distributions</u>:  No later than 90 days after the first Distribution Date, the Reorganized Debtor shall File with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Debtors' Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtor of such Holder's then current address in accordance herewith within the latest of (aa) 180 days after the first Distribution Date, (bb) 60 days after the attempted delivery of the undeliverable distribution, or (cc) 180 days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and expunged and shall be forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtor or its property. In such cases, any Cash, Cash Equivalents, or otherwise held for distribution on account of such Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim. The provisions of the Plan regarding undeliverable distributions and unclaimed distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

(iii)    <u>Failure to Present Checks</u>:  Checks issued by a Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 120 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their

allocated distributions, no later than 120 days after the issuance of such checks, the Reorganized Debtor shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Debtors' Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and expunged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtor or its property. In such cases, any Cash held for payment on account of such Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtor, free of any Claims of such Holder or any such entity with respect thereto notwithstanding any otherwise applicable federal or state escheat, abandonment or unclaimed property law. Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

7. <u>Manner of Payment Pursuant to the Plan</u>:  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtor by check or by wire transfer.

8. <u>Surrender of Canceled Instruments or Other Certificates</u>:  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors and the non-Debtor guarantors under the Loan Documents and Real Estate Loan Documents, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate, other than as provided under the Plan. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

9. <u>Timing and Calculation of Amounts to Be Distributed</u>:  On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of a Claim Allowed as of the Effective Date shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII.C hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## D.     Claims Paid or Payable by Third Parties

1.     <u>Claims Paid by Third Parties</u>:  The Notice, Claims and Solicitation Agent shall reduce, in full or in part, a Claim, and such Claim shall be disallowed or reduced, as applicable, without a Claim objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment, either in full or in part, on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate at such time on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.     <u>Claims Payable by Third Parties</u>:  To the extent that one or more third parties agrees to satisfy, in full or in part, a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be reduced or expunged, as applicable, to the extent of any agreed upon full or partial satisfaction on the Claims Register by the Notice, Claims and Solicitation Agent without a Claim objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

## A.     Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and complete discharge effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent or liquidated or non-liquidated liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or

99

not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or was deemed to accept or reject the Plan. Any default by the Debtors with respect to any Claim or Interest that existed immediately prior to the Petition Date or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged. Upon the Effective Date, all persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtors, the Estates, or any successor thereto. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

## B.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Subject to the requirements of section 1129(b) of the Bankruptcy Code (as applicable), no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

## C.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Reorganized Debtor and Causes of Action against other Entities.

### D.      Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order provided for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### E.      Exculpation

The Exculpated Parties shall neither have, nor incur any liability to the Debtors or the Debtors' Estates for any prepetition or post petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.

### F.      Injunction

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or subject to exculpation pursuant to the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtor: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests except in accordance with Article VIII.I and Article VIII.J. hereof; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Such injunction shall extend to any successors of the Debtors and the Reorganized Debtor and their respective properties and interests in properties.

### G.      Injunction Against Interference with Plan of Reorganization

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties-in-interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## H.     Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because one of the Debtors has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## I.     Setoffs

Except as otherwise expressly provided for in the Plan, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Allowed Claim (other than DIP Facility Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

## J.     Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**K.      Document Retention**

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor without further notice.

**L.      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged except as provided in sections 502(e)(2) and 502(j) of the Bankruptcy Code.

**M.      Claims Against Guarantors**

Except as expressly agreed to by a Creditor in writing and notwithstanding anything to the contrary in the Plan (including the definition of "Cause of Action"; paragraph U of Article IV of the Plan ("Discharge of Debtors"); and paragraphs A ("Discharge of Claims and Termination of Interests"), E ("Exculpation"), F ("Injunction"), and G ("Injunction Against Interference with Plan of Reorganization") of Article VIII of the Plan), the Plan Documents, the Disclosure Statement, the Confirmation Order, or any other documents related to or arising out of any of the foregoing documents, nothing contained in any of the foregoing shall constitute (i) a release of the Guarantors under their respective guarantees of the Debtors' obligations; or (ii) an injunction or other legal prohibition that would, in any manner, prohibit any Creditor from enforcing any Creditor's rights against any Guarantor, including (a) commencing or continuing in any manner any action or other proceeding of any kind against any Guarantor, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Guarantor, or (c) creating, perfecting, or enforcing any encumbrance of any kind against any Guarantor.  To the extent any Creditor engages in any actions related to or arising out of (ii) above, no such actions shall be deemed in any manner to interfere with the implementation or consummation of the Plan.  Notwithstanding paragraph P of Article XIII of the Plan ("Conflicts and Interpretation of Plan"), to the extent that this paragraph M is inconsistent with the Confirmation Order, this paragraph M shall govern.

**ARTICLE IX.**
**ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS**

**A.      Professional Claims**

1.      Final Fee Applications:  All final requests for payment of Professional Claims shall be Filed no later than the Administrative Claim Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Final Orders, the Allowed amounts of the Professional Claims shall be determined by the Bankruptcy Court. All Allowed Professional Claims shall be paid by the Reorganized Debtor within ten (10) days after such claim is Allowed by Final Order.

2.     Payment of Interim Amounts:  Except as otherwise provided in the Plan and subject to Article IX.A.1, Professionals shall be paid pursuant to the Interim Compensation Order.

3.     Post-Effective Date Fees and Expenses:   Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**B.     Other Administrative Claims**

All requests for payment of an Administrative Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or the Reorganized Debtor, as applicable, on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to Article II.B hereof that is not timely Filed and served shall be disallowed automatically without the need for any objection by the Debtors or the Reorganized Debtor. The Reorganized Debtor may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

# ARTICLE X.
# CONDITIONS PRECEDENT TO EFFECTIVE DATE

**A.     Conditions Precedent to the Effective Date**

The following shall be satisfied or waived, in each case, as conditions precedent to the Effective Date:

1.     The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.     All of the schedules, documents, and exhibits contained in the Disclosure Statement, and all schedules, documents, supplements, and exhibits to the Plan shall have been Filed in form and substance acceptable to the Debtors.

3.      The Reorganized Debtor, the BB Operating Subsidiary and the BB Liquidating Subsidiary shall have executed all of the Lender Senior Secured Loan Documents and the Lender Secured Loan Documents in form and substance satisfactory to the Equipment Lenders in their discretion.

4.      The Reorganized Debtor shall have executed the BB Liquidating Trust Agreement in form and substance satisfactory to the BB Liquidating Trustee.

5.      The Reorganized Debtor shall have executed the BB Unsecured Trust Agreement in form and substance satisfactory to the BB Unsecured Trustee.

6.      The Reorganized Debtor shall have executed the Shareholder Agreement in form and substance satisfactory to the BB Liquidating Trustee and the BB Liquidating Trust Beneficiaries.

7.      The Reorganized Debtor shall have executed the Asset Management Agreement in form and substance satisfactory to the Equipment Lenders.

8.      The four go forward Managers of the Reorganized Debtor shall have executed the Management Employment, Non-Solicitation and Non-Compete Agreements as a condition of their continued employment with the Reorganized Debtor.

9.      The Tax Required Stock Transfers and Actions shall have occurred.

10.     The Exit Facility shall have become effective contemporaneously with the Effective Date.

11.     The New Board shall have been selected by the BB Liquidating Trustee and the Restated Articles and By-Laws of the Reorganized Debtor shall have been filed with the Secretary of State.

12.     The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated.

13.     The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in Article V hereof.

14.     All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose material adverse conditions on such transactions.

**B.      Extension of Effective Date**

The Debtor or the Reorganized Debtor may seek an extension of the Effective Date by filing a motion in the Bankruptcy Court on notice to creditors.

**C.      Effect of Non-Occurrence of Conditions to the Effective Date**

Each of the conditions to the Effective Date must be satisfied or waived pursuant to Article X.A hereof, and the Effective Date must occur within 180 days of Confirmation, or by such later date established by Final Order on motion to the Bankruptcy Court. If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided that notwithstanding the filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters a Final Order granting such motion to vacate the Confirmation Order. If the Confirmation Order is vacated pursuant to Article X.C hereof or otherwise, then except as provided in any Final Order vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, and rejections of Executory Contracts or Unexpired Leases pursuant to Article V, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of such Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.      Modification and Amendments**

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan..

**B.      Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising there from, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan; resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any and all cases, controversies, suits, disputes, or Causes of Action, with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.     Adjudicate any and all disputes arising from or relating to payments or distributions under the Plan;

16.     Consider any and all modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Final Order, including the Confirmation Order;

17.     Hear and determine requests for the payment or distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine any and all disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine any and all disputes arising under sections 525 or 543 of the Bankruptcy Code;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Hear and determine any and all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the

termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Determine any other matters that may arise in connection with or relate to the interpretation, implementation, or enforcement of the Plan, the Disclosure Statement, or the Confirmation Order, including disputes arising under agreements, contracts, instruments, releases, indentures, or other agreement or document created in connection with the Plan or the Disclosure Statement;

23.     Enforce any orders previously entered by the Bankruptcy Court; and

24.     Hear any and all other matters not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.     Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Disclosure Statement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether any such Holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all Non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### B.     Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### C.     Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court the Plan Supplement Documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtor, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## D.      Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

## E.      Dissolution of Creditors Committee

Upon the Effective Date, the Creditors Committee shall dissolve automatically, and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

## F.      Remaining Equipment in BB Liquidating Subsidiary

Any equipment remaining in the BB Liquidating Subsidiary at the time of (a) an Exit Transaction; (b) major default under the Lender Secured Senior Term Notes; or (c) the expiration of the five year term of the Warrants shall be liquidated by the Collateral Agent or shall be voluntarily surrendered to the individual Equipment Lenders at the respective Equipment Lenders' option or as otherwise provided in the Lender Secured Term Loan Documents.

## G.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by either Debtor with respect to the Plan or the Disclosure Statement shall be deemed to be an admission or waiver of any rights of either Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

## H.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, if any, of such Entity.

## I.      Service of Documents

1.      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtor shall be sent by overnight mail, postage prepaid to:

> Bruce F. Young
> President & CEO
> Brundage-Bone Concrete Pumping, Inc.
> 6461 Downing Street
> Denver, Colorado 80229

with a copy to:

Harvey Sender
John B. Wasserman
Sender & Wasserman, P.C.
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264
Counsel to the Debtors

John L. Ruppert
Michele J. Rowland
Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO 80202-5596
Special Counsel to the Debtors

After the Effective Date, the Reorganized Debtor has authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002, requesting that each such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

2.      In accordance with Bankruptcy Rules 2002 and 3020(c), no later than 10 Business Days after the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by hand, by overnight courier service, or by United States mail, first class postage prepaid, to all Entities having been served with the Confirmation Hearing Notice; provided that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, no later than 20 days after the date of the Confirmation Order, the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

## J.      Entire Agreement

Except as otherwise indicated, the Plan and the Disclosure Statement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### K.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Colorado, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided that corporate governance matters relating to the Debtors or the Reorganized Debtor, as applicable, not incorporated in Colorado shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

### L.      Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

### M.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**N.      Closing of Chapter 11 Cases**

The Reorganized Debtor shall promptly after the full administration of the Debtors' Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**O.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Creditors Committee or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

**P.      Conflicts and Interpretation of Plan**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. To the extent that a term in the Plan is ambiguous, the Debtors before the Effective Date and the Reorganized Debtor after the Effective Date, may jointly interpret such term in their exclusive discretion or seek clarification from the Bankruptcy Court. To the extent that there may be any inconsistencies between the terms of the Plan on the one hand and the Confirmation Order on the other, the terms of the Confirmation Order shall govern.

Dated: February 2, 2011

BRUNDAGE-BONE CONCRETE PUMPING, INC.

By: */s/ Bruce F. Young*
Name: Bruce F. Young
Title: President

Dated: February 2, 2011

JLS CONCRETE PUMPING, INC.

By: */s/ Jeffrey L. Switzer*
Name: Jeffrey L. Switzer
Title: President

Dated this 2nd day of February, 2011.

SENDER & WASSERMAN, P.C.

*/s/ John B. Wasserman*

_____

Harvey Sender, #7546
John B. Wasserman, #10011
David V. Wadsworth, #32066
Matthew T. Faga, #41132
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264
(303) 296-1999; (303) 296-7600 (fax)
jwass@sendwass.com
Attorneys for the Debtor in Possession

## Exhibit A

## Term Sheet for the Exit Facility

| EXIT FINANCING PROPOSALS | Bank of America | PNC |
|---|---|---|
| Borrower/Guarantors | | Reorganized Debtor is borrower and parent, if any, and all subs are guarantors |
| Amount | $15,000,000 ($7,500,000 sublimit for LOCs) | $15,000,000 ($8,000,000 sublimit for LOCs) |
| Term | 3 yrs | 3 yrs |
| Rate | L+375 - 425 (starting at +400) or Base Rate+275 - 325 (starting at +300) (default rate is 3% over the applicable rate) | L + 375 or Base Rate + 250 (default rate is 3% over the applicable rate) |
| Base Rate | Prime | Greater of : Prime or (Fed Funds + .5) or (Libor + 100) |
| Libor Floor | No | 100 bp |
| Required opening loan availability | $6,000,000 | $1.250M availability plus $1.0M block |
| Blocking rights if availability less than | $3,000,000 | Not clear |
| | | |
| | | |
| Due Diligence Deposit | $25,000 | $50,000 non-refundable |
| Commitment Fee | $0 | $150,000 non-refundable |
| Closing fee | $187,500 | $150,000 (less credit for unused diligence and commitment fee) |
| Unused line fee | 0.50% | 0.50% |
| Letter of credit fees | .125% fronting + applicable spread over L | .25% fronting + applicable spread over L |
| Collateral mgm't fees | None | $3,000/ mo + exam fees |
| Prepayment fee | 1.0% year one (no early termination fee if Borrower refinances the facility with another department of BofA) | 3%-2%-1% years 1-2-3 |
| | | |
| Working Capital Availability | | |
| | | |
| A/R | 85% (ineligible after outstanding for more than 90 days after invoice or 60 days after due date) | 85% (ineligible after outstanding for more than 90 days after invoice or 60days after due date; cross aged on more than 50% past due) |
| Inventory | 50% | Lesser of 50% of book value or 85% of NOL value |
| Real Estate | 50% of appraised value limited to $5,000,000 (repay SL over 20 qtrs) | No advances |
| Ineligible A/R provisions | 50% cross-age | 50% cross-age |
| Inventory Appraisal | No | Yes |
| | | |
| Field Exams | Up to 4x yr | Up to 4x yr |
| | | |
| Additional Collateral | All encumbered assets plus capital stock. | All unencumbered assets. No mention of RE or stock (references property and plant and stock of subsidiaries, but not stock of Borrower) |
| | | |
| Financial Covenants | FCC of not less than 1.1 to 1.0 on a TTMB | TBD. Probably FCC or EBITDA |
| | If not in compliance with FCC, then an alternative minimum EBITDA covenant and an amortization block | |
| | | |
| Other Affirmative Covenants | Yes, including using the Bank as Borrower's principal depository bank | Yes |
| Governing Law | TX | NY |

**Exhibit B**

**Excess Equipment**

## EXHIBIT B - EXCESS EQUIPMENT

| | | | |
|---|---|---|---|
| 2023 | 41SX | '06/'06M | AIG/LEASE |
| 2293 | 47 | '06/'07M | AIG/LEASE |
| 2554 | 47 | '07/'07M | AIG/LEASE |
| 1121 | 26 | '99/'00M | KEY BANK |
| 2407 | 61 | '07/'07TOR | KEY BANK |
| 2412 | 47Z | '07/'07M | KEY BANK |
| 2416 | 36 | '07/'07M | KEY BANK |
| 2427 | 36 | '07/'07M | KEY BANK |
| 2441 | TB130 | '07/'07M | KEY BANK |
| 2493 | TB110 | '07/'07M | KEY BANK |
| 2527 | TB130 | '07/'07M | KEY BANK |
| 2530 | 36 | '07/'07M | KEY BANK |
| 2081 | 47 | '06/'06M | KEY EQUIP. FNCE. |
| 2135 | 61SX | '06/'07M | KEY EQUIP. FNCE. |
| 2140 | 32XL | '06/'07M | KEY EQUIP. FNCE. |
| 2163 | 41SX | '06/'07M | KEY EQUIP. FNCE. |
| 2169 | 41SX | '06/'07M | KEY EQUIP. FNCE. |
| 2177 | 41SX | '06/'07M | KEY EQUIP. FNCE. |
| 550 | 42 | 97/97M | WACHOVIA |
| 728 | 45SX | 98/98M | WACHOVIA |
| 733 | 34 | 98/99M | WACHOVIA |
| 747 | 52 | 99/98TOR | WACHOVIA |
| 760 | 52 | 99/99TOR | WACHOVIA |
| 761 | 32 | 99/99M | WACHOVIA |
| 780 | 45 | 99 | WACHOVIA |
| 781 | 47SX | 99/99M | WACHOVIA |
| 1026 | 47 | '99/'99M | WACHOVIA |
| 1200 | 47 | 00/00M | WACHOVIA |
| 1201 | 52 | 00/00TOR | WACHOVIA |
| 1327 | 58 | '01/'02TOR | WACHOVIA |
| 1366 | 39XPB | '02 | WACHOVIA |
| 1956 | TB110 | '06/'06M | WACHOVIA |
| 2230 | 40 | '06/'07M | WACHOVIA |
| 2 | 31PB | 01/ | WELLS |
| 77 | 3000 | '80 | WELLS |
| 182 | 42 | 91/91M | WELLS |
| 209 | 3001T | 91/ | WELLS |
| 221 | 28PB | 92/ | WELLS |
| 270 | 31PB | 82/ | WELLS |
| 280 | 42 | 93/93M | WELLS |
| 288 | 2000BPL | 93/93H | WELLS |
| 298 | 8000T | 93/ | WELLS |
| 332 | 31 | '84/99M | WELLS |
| 374 | 42 | 94/94M | WELLS |

| | | | |
|---|---|---|---|
| 446 | 31PB | 84/ | WELLS |
| 460 | 26 | 95/95M | WELLS |
| 476 | 750 | '85/ | WELLS |
| 483 | 32SPB | '96 | WELLS |
| 511 | 32 | 96/96M DS | WELLS |
| 517 | 42 | 96/96M | WELLS |
| 567 | 5000T | 88/88M | WELLS |
| 603 | 2000BPL | 97/97V | WELLS |
| 611 | 52 | 97/97TOR | WELLS |
| 629 | 5T - MOUNT TO UD | 90/ /'05NIS | WELLS |
| 643 | 32PB | 93/ | WELLS |
| 661 | BPL500 | '98/'98G | WELLS |
| 684 | 32 | '98/'99M | WELLS |
| 699 | 2000 | 87/ | WELLS |
| 758 | 32 | 99/99M | WELLS |
| 803 | 4000 | 98/99FL | WELLS |
| 804 | 1000 | 95/ | WELLS |
| 805 | TK50 | '98/ | WELLS |
| 806 | 26 | 98/98M | WELLS |
| 809 | 28 | 92/92M | WELLS |
| 823 | 42 | 92/91M | WELLS |
| 827 | 52 | 97/97TOR | WELLS |
| 828 | 52 | 98/98TOR | WELLS |
| 855 | 42 | 95/95M | WELLS |
| 861 | 32XL | '97/'97M | WELLS |
| 862 | 28 | PB | WELLS |
| 874 | TB | 99/99 | WELLS |
| 876 | 28PB | ?? | WELLS |
| 895 | 3001 | 83/ | WELLS |
| 1014 | 28PB | '01/ | WELLS |
| 1047 | 750 | 84/89N | WELLS |
| 1073 | TB | 99/99M | WELLS |
| 1107 | 14050B | 90/90G | WELLS |
| 1210 | 31PB | 00/ | WELLS |
| 1219 | 36 | '95/'96M | WELLS |
| 1243 | 3500 | '99/ | WELLS |
| 1269 | 8000 | '96/ | WELLS |
| 1287 | LSCR | '01/ | WELLS |
| 1288 | LSCR | '01/ | WELLS |
| 1310 | 37 | '00/'00M | WELLS |
| 1453 | TB | '00/'00M | WELLS |
| 1455 | 36 | '00/'00M | WELLS |
| 1512 | TRL45 | '97/ | WELLS |
| 1513 | TRL45 | '99/ | WELLS |
| 1514 | TRL55 | '99/ | WELLS |
| 1515 | TRL | ?? | WELLS |
| 1518 | TB105 | '01/'01M | WELLS |

| 1524 | 47SX | '99/'99M | WELLS |
|------|------|----------|-------|
| 1527 | 650 | '00/ | WELLS |
| 1528 | 650 | '01/ | WELLS |
| 1529 | 50 - MOUNT TO UD | '89/ | WELLS |
| 1530 | TA470 | 02/07UD | WELLS |
| 1531 | MOUNT TO UD | | WELLS |
| 1532 | MOUNT TO UD | | WELLS |
| 1533 | MOUNT TO UD | | WELLS |
| 1534 | TA650 | 02/04UD | WELLS |
| 1535 | MOUNT TO UD | | WELLS |
| 1536 | MOUNT TO UD | | WELLS |
| 1537 | MOUNT TO UD | | WELLS |
| 1563 | MOUNT TO UD | | WELLS |
| 1569 | 39X | '03/'03M | WELLS |
| 1574 | MOUNT TO UD | | WELLS |
| 1630 | 39xPB | '02/ | WELLS |
| 1634 | 8000 | '04/ | WELLS |
| 1638 | 28PB | | WELLS |
| 1653 | 2000 | '04 | WELLS |
| 1723 | 36 | '99/'99M | WELLS |
| 1746 | 31PB | '04/ | WELLS |
| 1748 | 32 | '95/'94M | WELLS |
| 1750 | 36 | '95/'95M | WELLS |
| 1775 | 31SPB | '04 | WELLS |
| 1785 | 39SPB | '04/ | WELLS |
| 1812 | 36 | '99/'99M | WELLS |
| 1831 | LSCR | '05/ | WELLS |
| 1832 | LSCR | '05/ | WELLS |
| 1905 | HBV-260 | '05/ | WELLS |
| 1919 | PPK | | WELLS |
| 1920 | PPK | | WELLS |
| 1921 | PPK | | WELLS |
| 1963 | BPL | '03/'01G | WELLS |
| 1965 | MOUNT TO UD | /'07NIS | WELLS |
| 1966 | 750 | '05 | WELLS |
| 1967 | 39X | '05/'05M | WELLS |
| 1978 | 8800 | '05/ | WELLS |
| 1987 | Trailer Pump | '91 | WELLS |
| 2027 | 5000 | '85/ | WELLS |
| 2042 | 32 | '93/'93M | WELLS |
| 2083 | 160 | '06/ | WELLS |
| 2098 | 32SPB | '06/ | WELLS |
| 2106 | 39SPB | '05 | WELLS |
| 2151 | 32SPB | '06/ | WELLS |
| 2176 | LSCR | '06/ | WELLS |
| 2178 | 39SPB | '06/ | WELLS |
| 2186 | 36SPB | '06/ | WELLS |

| | | | |
|---|---|---|---|
| 2194 | 28 | '99/'99M | WELLS |
| 2198 | 45SX | '99/'99M | WELLS |
| 2226 | 40SPB | '06/ | WELLS |
| 2237 | PPK | | WELLS |
| 2243 | LSCR | '06/ | WELLS |
| 2244 | 40SPB | '06/ | WELLS |
| 2271 | 39SPB | '06/ | WELLS |
| 2272 | 39SPB | '06/ | WELLS |
| 2273 | PPK | | WELLS |
| 2279 | PPK | | WELLS |
| 2310 | 42 | '97/'97M | WELLS |
| 2312 | 3001 | '85/ | WELLS |
| 2317 | 1418 | '06/'07K | WELLS |
| 2361 | PPK | | WELLS |
| 2385 | 1000 | '99/'99FL | WELLS |
| 2403 | PPK | | WELLS |
| 2410 | 39SPB | '07/ | WELLS |
| 2413 | 39SPB | '07/ | WELLS |
| 2439 | PPK | | WELLS |
| 2457 | PPK | | WELLS |
| 2479 | 40PB | '07/ | WELLS |
| 2480 | 40PB | '07/ | WELLS |
| 2483 | PPK | | WELLS |
| 2494 | PPK | | WELLS |
| 2524 | 32PB | '07/ | WELLS |
| 2525 | 32PB | '07/ | WELLS |
| 2533 | 40SPB | '07/ | WELLS |
| 2534 | PPK | | WELLS |
| 2535 | 40SPB | '07/ | WELLS |
| 2536 | PPK | | WELLS |
| 2540 | 40SPB | '07 | WELLS |
| 2545 | 40SPB | '07 | WELLS |
| 2546 | PPK | | WELLS |
| 2566 | 14000 | '07 | WELLS |
| 2569 | PPK | | WELLS |
| 2570 | PPK | | WELLS |
| 2571 | 40SPB | '07 | WELLS |
| 2572 | PPK | | WELLS |
| 2573 | PPK | | WELLS |
| 2574 | PPK | | WELLS |
| 2588 | 40SPB | '07 | WELLS |
| 2592 | 40SPB | '07 | WELLS |
| 2593 | PPK | | WELLS |
| 2594 | PPK | | WELLS |
| 2599 | 40SPB | | WELLS |
| 2600 | PPK | | WELLS |
| 2601 | PPK | | WELLS |

| 2604 | BSA14000 |  | WELLS |
| 2610 | 585T | '07/ | WELLS |
| 2617 | BPA2000 | '05/ | WELLS |
| 2618 | 750 | '05/ | WELLS |
| 2625 | 500 | '03/'99I | WELLS |
| 2626 | 500 | '99/'96F | WELLS |
| 2653 | PPK |  | WELLS |
| 215 | 42 | '90/'90M | WFEFI |
| 325 | 2000 | 94/94H | WFEFI |
| 394 | 32PB | 95/ | WFEFI |
| 430 | 32 | 95/95M | WFEFI |
| 467 | 42 | 96/96M | WFEFI |
| 695 | 32 | 94/94M | WFEFI |
| 750 | TB | 99/99M | WFEFI |
| 755 | 32PB | 99/ | WFEFI |
| 756 | 32PB | 99/ | WFEFI |
| 824 | 42 | 96/96M | WFEFI |
| 856 | 28 | 97/96M | WFEFI |
| 1024 | 42 | '97/'98M | WFEFI |
| 1135 | 32 | 94/94M | WFEFI |
| 1195 | 47SX | '00/'00M | WFEFI |
| 1336 | 31 | '83(RB)/'02M | WFEFI |
| 1357 | LSCR | '02/ | WFEFI |
| 1358 | 39XPB | '02 | WFEFI |
| 1363 | LSCR | '02/ | WFEFI |
| 1392 | TK50 | '00/ | WFEFI |
| 1421 | 61 | '03/'02TOR | WFEFI |
| 1489 | 47SX | '03/'03M | WFEFI |
| 1572 | 39 | '03/'03M | WFEFI |
| 1600 | 39x | '03/'04M | WFEFI |
| 1648 | 39X | '04/'04M | WFEFI |
| 1658 | TB130 | '04/'04M | WFEFI |
| 1661 | 47 | '04/'04M | WFEFI |
| 1665 | 39 | '04/'04M | WFEFI |
| 1680 | 39 | '04/'04M | WFEFI |
| 1693 | 61 | '04/'04TOR | WFEFI |
| 1711 | 61 | '04/'04TOR | WFEFI |
| 1776 | 39X | '04/'05M | WFEFI |
| 1780 | 39X | '04/'05M | WFEFI |
| 1794 | 39X | '05/'05M | WFEFI |
| 1797 | 31 | '05/'05M | WFEFI |
| 1829 | 41SX | '05/'05M | WFEFI |
| 1845 | 41SX | '05/'05M | WFEFI |
| 1880 | TB130 | '05/'05M | WFEFI |
| 1881 | TB110 | '05/'05M | WFEFI |
| 1882 | TB110 | '05/'05M | WFEFI |
| 1887 | 47SX | '05/'05M | WFEFI |

| | | | |
|---|---|---|---|
| 1889 | 32XL | '05/'05M | WFEFI |
| 1898 | 41SX | '05/'06M | WFEFI |
| 1922 | TB110 | '06/'06M | WFEFI |
| 1924 | 41SX | '05/'06M | WFEFI |
| 1926 | 41SX | '05/'06M | WFEFI |
| 1928 | 32 | '05/'06M | WFEFI |
| 1934 | TB110 | '06/'06M | WFEFI |
| 1953 | 41SX | '05/'06M | WFEFI |
| 1999 | 41SX | '06/'06M | WFEFI |
| 2000 | 41SX | '06/'06M | WFEFI |
| 2003 | 41SX | '06/'06M | WFEFI |
| 2012 | 39X | '06/'06M | WFEFI |
| 2013 | 41SX | '06/'06M | WFEFI |
| 2015 | TB130 | '06/'06M | WFEFI |
| 2040 | 36 | '96/'96M | WFEFI |
| 2045 | 42 | '97/'97M | WFEFI |
| 2047 | 36 | '96/'96M | WFEFI |
| 2048 | 1408 | '98/'98M | WFEFI |
| 2050 | 42 | '99/'99M | WFEFI |
| 2052 | 32 | '97/'97M | WFEFI |
| 2061 | TB110 | '06/'06M | WFEFI |
| 2077 | 39X | '06/'06M | WFEFI |
| 2079 | 39X | '06/'07M | WFEFI |
| 2080 | 39X | '06/'06M | WFEFI |
| 2084 | 41SX | '06/'07M | WFEFI |
| 2085 | 41SX | '06/'07M | WFEFI |
| 2086 | 47SX | '06/'07M | WFEFI |
| 2114 | 41SX | '06/'07M | WFEFI |
| 2124 | 4000 | '06/'07M | WFEFI |
| 2129 | 39X | '06/'07M | WFEFI |
| 2133 | 32XL | '06/'07M | WFEFI |
| 2141 | 41SX | '06/'07M | WFEFI |
| 2147 | TB130 | '06/'07M | WFEFI |
| 2148 | TB110 | '06/'06M | WFEFI |
| 2159 | TB130 | '06/'07M | WFEFI |
| 2421 | 40Z | '07/'07M | WFEFI |
| 2435 | VS2112 | '07/'07M | WFEFI |
| 2442 | 38Z | '06/'06M | WFEFI |
| 2444 | 33X | '05/'05M | WFEFI |
| 2445 | 40X | '04/'04M | WFEFI |
| 2462 | VS2116 | '07/'07M | WFEFI |
| 2478 | 40 | '06/'06M | WFEFI |
| 2507 | 38 | '04/'04M | WFEFI |
| 2509 | 36 | '07/'07M | WFEFI |
| 2510 | TK100 | '03/'98IZ | WFEFI |
| 2213 | 32XL | '06/'07M | WFEFI/LEASE |
| 2218 | 41SX | '06/'07M | WFEFI/LEASE |

**<u>Exhibit C</u>**

**<u>Retained Equipment</u>**

## EXHIBIT C - RETAINED EQUIPMENT

| | | | |
|---|---|---|---|
| 2021 | 39X | '06/'06M | AIG/LEASE |
| 2037 | 41SX | '06/'07M | AIG/LEASE |
| 2214 | 32XL | '06/'07M | AIG/LEASE |
| 2236 | 61SX | '06/'07M | AIG/LEASE |
| 2247 | 32XL | '06/'07M | AIG/LEASE |
| 2268 | 52 | '06/'07M | AIG/LEASE |
| 2277 | 61 | '06/'07M | AIG/LEASE |
| 2282 | 32XL | '06/'07M | AIG/LEASE |
| 2289 | 52 | '06/'07M | AIG/LEASE |
| 2291 | 32XL | '06/'07M | AIG/LEASE |
| 2297 | 36 | '07/'07M | AIG/LEASE |
| 2302 | 32XL | '06/'07M | AIG/LEASE |
| 2303 | 32XL | '06/'07M | AIG/LEASE |
| 2313 | 52 | '06/'07M | AIG/LEASE |
| 2329 | 55 | '06/'07M | AIG/LEASE |
| 2460 | 47 | '07/'07M | AIG/LEASE |
| 2473 | 61 | '07/'07M | AIG/LEASE |
| 2476 | 32 | '07/'07M | AIG/LEASE |
| 2495 | 47 | '07/'07M | AIG/LEASE |
| 2520 | 52 | '07/'07M | AIG/LEASE |
| 2528 | 47 | '07/'07M | AIG/LEASE |
| 2532 | 61 | '07/'07M | AIG/LEASE |
| 2541 | TB110 | '07/'07M | AIG/LEASE |
| 2542 | 32 | '07/'07M | AIG/LEASE |
| 2551 | TB110 | '07/'07M | AIG/LEASE |
| 2555 | 58 | '07/'07M | AIG/LEASE |
| 2586 | 36 | '07/'07M | AIG/LEASE |
| 1761 | 39X | '04/'05M | COMERICA |
| 1830 | 41SX | '05/'05M | COMERICA |
| 1847 | 47SX | '05/'05M | COMERICA |
| 1848 | 47SX | '05/'05M | COMERICA |
| 1849 | 61 | '05/'05TOR | COMERICA |
| 1853 | 41SX | '05/'05M | COMERICA |
| 1854 | 41SX | '05/'05M | COMERICA |
| 1856 | 34 | '05/'05M | COMERICA |
| 1857 | 41SX | '05/'05M | COMERICA |
| 1858 | 61 | '05/'05M | COMERICA |
| 1864 | 61 | '05/'05M | COMERICA |
| 1866 | 34X | '05/'05M | COMERICA |
| 1867 | 34X | '05/'05M | COMERICA |
| 1871 | 61 | '05/'05M | COMERICA |
| 605 | 42 | 97/97M | KEY BANK |
| 721 | 45SX | 98/99M | KEY BANK |

| 730 | 34 | 98/99M | KEY BANK |
|-----|----|--------|----------|
| 731 | 34 | 98/99M | KEY BANK |
| 745 | 34X | 99/99M | KEY BANK |
| 746 | 45 | 98/98M | KEY BANK |
| 771 | 34 | 99/99M | KEY BANK |
| 1226 | 52 | 00/00TOR | KEY BANK |
| 1326 | 31 | '01/'02M | KEY BANK |
| 1354 | 58 | '02/'02TOR | KEY BANK |
| 1360 | 34 | '02/'02M | KEY BANK |
| 1396 | 31 | '02/'02M | KEY BANK |
| 1502 | 39X | '03/'03M | KEY BANK |
| 1692 | 34 | '04/'04M | KEY BANK |
| 2001 | 41SX | '06/'06M | KEY BANK |
| 2399 | 47Z | '07/'07M | KEY BANK |
| 2402 | 40 | '07/'07M | KEY BANK |
| 2418 | 36Z | '07/'07M | KEY BANK |
| 2422 | 40Z | '07/'07M | KEY BANK |
| 2423 | 20Z | '07/'07G | KEY BANK |
| 2425 | 47Z | '07/'07M | KEY BANK |
| 2428 | 52Z | '07/'07M | KEY BANK |
| 2433 | 36Z | '07/'07M | KEY BANK |
| 2434 | 36Z | '07/'07M | KEY BANK |
| 2440 | TB110 | '07/'07M | KEY BANK |
| 2453 | 36Z | '07/'07M | KEY BANK |
| 2454 | 36Z | '07/'07M | KEY BANK |
| 2455 | 31Z | '07/'07M | KEY BANK |
| 2459 | 52 | '07/'07M | KEY BANK |
| 2461 | 63 | '07/'07M | KEY BANK |
| 2468 | 32 | '07/'07M | KEY BANK |
| 2469 | 40Z | '07/'07M | KEY BANK |
| 2472 | 58 | '07/'07M | KEY BANK |
| 2474 | 40Z | '07/'07M | KEY BANK |
| 2475 | 36 | '07/'07M | KEY BANK |
| 2477 | 47 | '07/'07M | KEY BANK |
| 2490 | 40 | '07/'07M | KEY BANK |
| 2492 | 32 | '07/'07M | KEY BANK |
| 2499 | 36 | '07/'07M | KEY BANK |
| 2526 | 52 | '07/'07M | KEY BANK |
| 2529 | 36 | '07/'07M | KEY BANK |
| 2531 | 32 | '07/'07M | KEY BANK |
| 2538 | 31 | '07/'07M | KEY BANK |
| 2559 | 36 | '08/'07M | KEY BANK |
| 2567 | 36 | '08/'07M | KEY BANK |
| 1426 | 34 | '02/'02M | KEY EQUIP. FNCE. |
| 1719 | 47SX | '04/'05M | KEY EQUIP. FNCE. |
| 1763 | 39X | '04/'05M | KEY EQUIP. FNCE. |
| 1989 | 32XL | '05/'06M | KEY EQUIP. FNCE. |

| | | | |
|---|---|---|---|
| 1994 | 41SX | '05/'06M | KEY EQUIP. FNCE. |
| 2031 | 40 | '06/'06M | KEY EQUIP. FNCE. |
| 2032 | 40 | '06/'06M | KEY EQUIP. FNCE. |
| 2033 | 40 | '06/'06M | KEY EQUIP. FNCE. |
| 2137 | 39X | '06/'07M | KEY EQUIP. FNCE. |
| 2172 | 41SX | '06/'07M | KEY EQUIP. FNCE. |
| 2179 | 47SX | '06/'07M | KEY EQUIP. FNCE. |
| 2216 | 39X | '06/'07M | KEY EQUIP. FNCE. |
| 2221 | 32XL | '06/'07M | KEY EQUIP. FNCE. |
| 2223 | 32XL | '06/'07M | KEY EQUIP. FNCE. |
| 2248 | 32XL | '06/'07M | KEY EQUIP. FNCE. |
| 2249 | 32XL | '06/'07M | KEY EQUIP. FNCE. |
| 2250 | 39X | '06/'07M | KEY EQUIP. FNCE. |
| 2251 | 39X | '06/'07M | KEY EQUIP. FNCE. |
| 2261 | 39X | '06/'07M | KEY EQUIP. FNCE. |
| 2074 | 28 | '06/'06M | PEOPLES |
| 2075 | 40 | '06/'06M | PEOPLES |
| 2076 | 40 | '06/'06M | PEOPLES |
| 2094 | 40 | '06/'06M | PEOPLES |
| 2095 | 31 | '06/'06M | PEOPLES |
| 2096 | 40 | '06/'06M | PEOPLES |
| 2132 | 40 | '06/'06M | PEOPLES |
| 2142 | 52 | '06/'07M | PEOPLES |
| 2278 | 47 | '07/'07M | PEOPLES |
| 2283 | 47 | '07/'07M | PEOPLES |
| 523 | 52 | 96/96TOR | WACHOVIA |
| 656 | 32 | 98/98M | WACHOVIA |
| 723 | 34 | 98/99M | WACHOVIA |
| 727 | 42 | 98/99M | WACHOVIA |
| 732 | 52 | 98/99TOR | WACHOVIA |
| 766 | 47SX | 99/99M | WACHOVIA |
| 767 | 47SX | 99/99M | WACHOVIA |
| 774 | 52 | 99/99TOR | WACHOVIA |
| 910 | 47 | '99/99M | WACHOVIA |
| 1025 | 45 | '98/'98M | WACHOVIA |
| 1192 | 47 | 00/00M | WACHOVIA |
| 1231 | 39 | 00/'01M | WACHOVIA |
| 1239 | 55 | '01/'01TOR | WACHOVIA |
| 1242 | 39X | '00/'01M | WACHOVIA |
| 1304 | 58 | '01/'01TOR | WACHOVIA |
| 1364 | 34X | '02/'02M | WACHOVIA |
| 1391 | 31 | '02/'02M | WACHOVIA |
| 1395 | 31 | '02/'02M | WACHOVIA |
| 1594 | 47 | '03/03M | WACHOVIA |
| 1664 | 34 | '04/'04M | WACHOVIA |
| 1686 | 47 | '04/'04M | WACHOVIA |
| 1697 | 47 | '04/'04M | WACHOVIA |

| 1786 | 61SX | '05/'05TOR | WACHOVIA |
|------|------|------------|----------|
| 2153 | 32 | '06/'07M | WACHOVIA |
| 2154 | 32 | '06/'07M | WACHOVIA |
| 2155 | 28 | '06/'07M | WACHOVIA |
| 2184 | 40 | '06/'07M | WACHOVIA |
| 2185 | 40 | '06/'07M | WACHOVIA |
| 2239 | 36 | '06/'07M | WACHOVIA |
| 2253 | 40 | '07/'07M | WACHOVIA |
| 2254 | 52 | '06/'07M | WACHOVIA |
| 2269 | 40 | '07/'07M | WACHOVIA |
| 2296 | 36 | '07/'07M | WACHOVIA |
| 2351 | 20 | '07/'07G | WACHOVIA |
| 105 | 750 | '89/'89H | WELLS |
| 111 | 750 | 89/89H | WELLS |
| 195 | 2000BPL | 92/92H | WELLS |
| 264 | 32 | 93/93M DS | WELLS |
| 285 | 32 | 93/93M DS | WELLS |
| 339 | 23 | 94/94M | WELLS |
| 347 | 42 | 94/94M | WELLS |
| 386 | 32 | 94/94M D | WELLS |
| 387 | 32 | 94/94M D | WELLS |
| 395 | 4000BPL | 95/95V | WELLS |
| 422 | 36 | 95/94M | WELLS |
| 458 | 24 | 95/95M | WELLS |
| 562 | 36 | 95/95M | WELLS |
| 563 | 36 | 94/94M | WELLS |
| 602 | 2000BPL | 97/97V | WELLS |
| 621 | 42 | 97/98M | WELLS |
| 638 | 32 | 97/98M | WELLS |
| 640 | 2000BPL | 98/98G | WELLS |
| 674 | 42 | '98/'98M | WELLS |
| 703 | 36 | 96/96M | WELLS |
| 819 | 42 | '99/'99M | WELLS |
| 822 | 42 | 94/94M | WELLS |
| 825 | 42 | 93/94M | WELLS |
| 826 | 42 | 98/99M | WELLS |
| 1132 | 36 | 99/99M | WELLS |
| 1172 | 47 | 00/00M | WELLS |
| 1190 | 32 | 95/'95M | WELLS |
| 1191 | 45 | 00/00M | WELLS |
| 1206 | 52 | 00/00TOR | WELLS |
| 1220 | 36 | 95/96M | WELLS |
| 1254 | 34X | '01/'01M | WELLS |
| 1270 | 28X | '01/'01M | WELLS |
| 1272 | 55 | '01/'00M | WELLS |
| 1274 | 17 | '01/'00G | WELLS |
| 1282 | LSCR | '01/ | WELLS |

| 1298 | 47 | '01/'02M | WELLS |
| 1321 | 17 | '01/'02FL | WELLS |
| 1322 | 31 | '01/'01M | WELLS |
| 1342 | 58 | '02/'02TOR | WELLS |
| 1394 | 31 | '02/'02 | WELLS |
| 1402 | 32X | '98/'98M | WELLS |
| 1420 | 39X | '02/'03M | WELLS |
| 1427 | TB | '02/'02M | WELLS |
| 1452 | 36 | '01/'01M | WELLS |
| 1454 | 36 | '00/'00M | WELLS |
| 1457 | 17 | '96/'96M | WELLS |
| 1458 | 28 | '97/'97M | WELLS |
| 1471 | 32 | '99/'98M | WELLS |
| 1472 | 34 | '00/'00M | WELLS |
| 1504 | TB130 | '03/'03M | WELLS |
| 1519 | 28 | '00/'00M | WELLS |
| 1520 | 34 | '01/'01M | WELLS |
| 1525 | 47SX | '02/'03M | WELLS |
| 1621 | 33 | '00/'00M | WELLS |
| 1622 | 28 | '00/'99M | WELLS |
| 1673 | 750 | 00/'04NIS | WELLS |
| 1681 | 4000 | '02/'03FL | WELLS |
| 1690 | 39 | '04/'04M | WELLS |
| 1698 | 39 | '04/'04M | WELLS |
| 1699 | 39 | '04/'04M | WELLS |
| 1700 | 34 | '04/'04M | WELLS |
| 1701 | 34 | '04/'04M | WELLS |
| 1705 | 31 | '04/'04M | WELLS |
| 1724 | 32 | '02/'03M | WELLS |
| 1815 | MOUNT TO UD | /'07NIS | WELLS |
| 1892 | 4000 | '05/'06M | WELLS |
| 1964 | RB/MOUNT | /'07NIS | WELLS |
| 2007 | LSCR | '05/ | WELLS |
| 2008 | LSCR | '05/ | WELLS |
| 2035 | 32XL | '99/'99M | WELLS |
| 2175 | LSCR | '06/ | WELLS |
| 2197 | 28 | '99/'99V | WELLS |
| 2199 | 32XL | '99/'00M | WELLS |
| 2200 | 32XL | '99/'99M | WELLS |
| 2215 | 32XL | '06/'07M | WELLS |
| 2275 | 1418 | '06/'06K | WELLS |
| 2276 | 1418 | '06/'06K | WELLS |
| 2308 | 34X | '99/'99M | WELLS |
| 2311 | 45SX | '00/'01M | WELLS |
| 2319 | 32XL | '04/'04M | WELLS |
| 2377 | 40 | '07/'07M | WELLS |
| 2486 | 20 | | WELLS |

| | | | |
|---|---|---|---|
| 2547 | 36 | '07/'08M | WELLS |
| 2606 | 63 | '07/'07M | WELLS |
| 2608 | 42 | '08/'07M | WELLS |
| 2620 | 1000X | '05 | WELLS |
| 2622 | 1000X | '06 | WELLS |
| 516 | 32 | 96/96M | WFEFI |
| 522 | 32 | 96/96M DS | WFEFI |
| 734 | 42 | 98/99M | WFEFI |
| 779 | 34X | 99/99M | WFEFI |
| 785 | 4000 | 99/99G | WFEFI |
| 814 | 32 | 98/98M | WFEFI |
| 830 | 34X | 99/99M | WFEFI |
| 846 | 34X | 99/99M | WFEFI |
| 849 | 34X | 99/99M | WFEFI |
| 850 | 34X | 99/99M | WFEFI |
| 859 | 26 | 97/96M | WFEFI |
| 872 | 34 | 98/98M | WFEFI |
| 961 | 34X | 99/99M | WFEFI |
| 966 | 28 | 93/93M | WFEFI |
| 968 | 32 | 98/98M | WFEFI |
| 970 | 42 | 97/96M | WFEFI |
| 988 | 28 | 97/97M | WFEFI |
| 990 | 34 | 98/98M | WFEFI |
| 996 | 42 | 97/97M | WFEFI |
| 997 | 26 | 98/99M | WFEFI |
| 1020 | 32 | '98/'99M | WFEFI |
| 1045 | 36 | 96/96M | WFEFI |
| 1133 | 36 | 98/98M | WFEFI |
| 1295 | 39X | '01/01M | WFEFI |
| 1296 | 47 | '01/01M | WFEFI |
| 1316 | 17 | '01/'02FL | WFEFI |
| 1319 | 47 | '01/02M | WFEFI |
| 1320 | 47 | '01/02M | WFEFI |
| 1323 | 17 | '01/'02FL | WFEFI |
| 1328 | 17 | '01/'02K | WFEFI |
| 1329 | 58 | '02/02TOR | WFEFI |
| 1330 | 17 | '01/'02K | WFEFI |
| 1340 | 31 | '02/'02M | WFEFI |
| 1353 | 31 | '02/'02M | WFEFI |
| 1356 | 17 | '02/'02K | WFEFI |
| 1378 | 47 | '02/'02M | WFEFI |
| 1410 | 39X | '02/'03M | WFEFI |
| 1411 | 39X | '03/'03M | WFEFI |
| 1412 | 61 | '02/'02TOR | WFEFI |
| 1418 | 58 | '03/'02TOR | WFEFI |
| 1419 | 39X | '02/'03M | WFEFI |
| 1424 | 61 | '03/'03TOR | WFEFI |

| | | | |
|------|------|----------|------|
| 1429 | 17 | '02/'03K | WFEFI |
| 1430 | 17 | '02/'03K | WFEFI |
| 1498 | TK50 | 01/'04UD | WFEFI |
| 1503 | 31 | '02/'03M | WFEFI |
| 1507 | 39X | '03/'03M | WFEFI |
| 1562 | TB130 | '03/'03M | WFEFI |
| 1588 | 32 | '99/'99M | WFEFI |
| 1595 | 61 | '03/'03M | WFEFI |
| 1603 | 34x | '03/'04M | WFEFI |
| 1613 | 39x | '03/'04M | WFEFI |
| 1635 | 61 | '04/'04TOR | WFEFI |
| 1662 | 31 | '04/'04M | WFEFI |
| 1663 | 31 | '04/'04M | WFEFI |
| 1666 | 47 | '04/'04M | WFEFI |
| 1670 | 39 | '04/'04M | WFEFI |
| 1674 | 39 | '04/'04M | WFEFI |
| 1675 | 47 | '04/'04M | WFEFI |
| 1677 | 32 | '04/'04M | WFEFI |
| 1687 | 31 | '04/'04M | WFEFI |
| 1691 | 47 | '04/'04M | WFEFI |
| 1710 | 39 | '04/'04M | WFEFI |
| 1716 | 39 | '04/'05M | WFEFI |
| 1717 | 39 | '04/'05M | WFEFI |
| 1720 | 47SX | '04/'05M | WFEFI |
| 1721 | 61SX | '04/'04TOR | WFEFI |
| 1722 | 39 | '04/'05M | WFEFI |
| 1734 | 39X | '04/'05M | WFEFI |
| 1737 | 39X | '04/'05M | WFEFI |
| 1741 | 34X | '04/'05M | WFEFI |
| 1756 | TB | '05/'05M | WFEFI |
| 1758 | 47SX | '04/'05M | WFEFI |
| 1759 | 47SX | '04/'05M | WFEFI |
| 1760 | 47SX | '04/'05M | WFEFI |
| 1762 | 39X | '04/'05M | WFEFI |
| 1765 | 39X | '04/'05M | WFEFI |
| 1777 | 39X | '04/'05M | WFEFI |
| 1778 | 39X | '04/'05M | WFEFI |
| 1779 | 39X | '04/'05M | WFEFI |
| 1787 | 39X | '05/'05M | WFEFI |
| 1788 | 47SX | '05/'05M | WFEFI |
| 1790 | 39X | '05/'05M | WFEFI |
| 1791 | 39X | '05/'05M | WFEFI |
| 1795 | 41SX | '05/'05M | WFEFI |
| 1796 | 47SX | '05/'05M | WFEFI |
| 1799 | 31EZ | '05/'05M | WFEFI |
| 1800 | 31EZ | '05/'05M | WFEFI |
| 1802 | 47SX | '05/'05M | WFEFI |

| 1803 | 61 | '05/'05TOR | WFEFI |
|------|------|------------|-------|
| 1822 | 34 | '05/'05M | WFEFI |
| 1823 | 45SX | '05/'05M | WFEFI |
| 1824 | 41SX | '05/'05M | WFEFI |
| 1825 | 34X | '05/'05M | WFEFI |
| 1838 | 39X | '05/'05M | WFEFI |
| 1841 | 32XL | '05/'05M | WFEFI |
| 1842 | 32XL | '05/'05M | WFEFI |
| 1843 | 32XL | '05/'05M | WFEFI |
| 1844 | TB130 | '05/'05M | WFEFI |
| 1846 | 34X | '05/'05M | WFEFI |
| 1850 | 47SX | '05/'05M | WFEFI |
| 1852 | 32XL | '05/'05M | WFEFI |
| 1859 | 32XL | '05/'05M | WFEFI |
| 1860 | 32XL | '05/'05M | WFEFI |
| 1862 | 32XL | '05/'05M | WFEFI |
| 1884 | 32XL | '05/'05M | WFEFI |
| 1888 | 32XL | '05/'05M | WFEFI |
| 1893 | TB110 | '05/'05M | WFEFI |
| 1899 | TB110 | '05/'05M | WFEFI |
| 1902 | 61 | '05/'05TOR | WFEFI |
| 1903 | TB130 | '05/'06M | WFEFI |
| 1906 | 39X | '05/'06M | WFEFI |
| 1909 | 39X | '05/'06M | WFEFI |
| 1910 | 32XLD | '05/'05M | WFEFI |
| 1911 | 32XL | '05/'06M | WFEFI |
| 1912 | 39X | '05/'06M | WFEFI |
| 1913 | 32XL | '05/'06M | WFEFI |
| 1914 | 32XL | '05/'06M | WFEFI |
| 1915 | 32XL | '05/'06M | WFEFI |
| 1917 | 41SX | '05/'06M | WFEFI |
| 1923 | TB110 | '06/'06M | WFEFI |
| 1927 | 32 | '05/'06M | WFEFI |
| 1935 | TB110 | '06/'06M | WFEFI |
| 1951 | 32XL | '05/'06M | WFEFI |
| 1952 | 41SX | '05/'06M | WFEFI |
| 1960 | 32D | '05/'06M | WFEFI |
| 1993 | 31EZ | '05/'06M | WFEFI |
| 1996 | 61SX | '06/'06M | WFEFI |
| 2004 | 61SX | '06/'06M | WFEFI |
| 2010 | 32XL | '06/'06M | WFEFI |
| 2011 | 32XL | '06/'06M | WFEFI |
| 2014 | 41SX | '06/'06M | WFEFI |
| 2044 | 28 | '98/'98M | WFEFI |
| 2073 | TB110 | '06/'06M | WFEFI |
| 2099 | 32XL | '06/'07M | WFEFI |
| 2122 | TB110 | '06/'06M | WFEFI |

| 2136 | 39X | '06/'07M | WFEFI |
| 2150 | 4000 | '06/'07M | WFEFI |
| 2157 | 4000 | '06/'07M | WFEFI |
| 2161 | 39X | '06/'07M | WFEFI |
| 2167 | 32XL | '06/'07M | WFEFI |
| 2170 | 39X | '06/'07M | WFEFI |
| 2180 | 34X | '06/'07M | WFEFI |
| 2219 | 32XL | '06/'07M | WFEFI |
| 2234 | 52 | '06/'07M | WFEFI |
| 2255 | 28 | '06/'07M | WFEFI |
| 2284 | 52 | '06/'07M | WFEFI |
| 2287 | 39X | '06/'07M | WFEFI |
| 2318 | 55 | '06/'07M | WFEFI |
| 2379 | 47 | '07/'07M | WFEFI |
| 2381 | 47 | '07/'07M | WFEFI |
| 2386 | 28 | '07/'07M | WFEFI |
| 2405 | TB110 | '07/'07M | WFEFI |
| 2420 | 28Z | '07/'07M | WFEFI |
| 2424 | 40Z | '07/'07M | WFEFI |
| 2426 | 28Z | '07/'07M | WFEFI |
| 2432 | 47Z | '07/'07M | WFEFI |
| 2463 | 40 | '07/'07M | WFEFI |
| 2503 | 28 | '96/'96M | WFEFI |
| 2504 | 36 | '99/'99M | WFEFI |
| 2505 | 46 | '00/'00M | WFEFI |
| 2506 | 32 | '01/'01M | WFEFI |
| 2508 | 40 | '06/'06M | WFEFI |
| 2512 | TK50 | '06/'06NIS | WFEFI |
| 2548 | 63 | '08/'07M | WFEFI |
| 2553 | 20 | '08/'08K | WFEFI |
| 2166 | 32XL | '06/'07M | WFEFI/LEASE |
| 2168 | 31EZ | '06/'07M | WFEFI/LEASE |
| 2220 | 32XL | '06/'07M | WFEFI/LEASE |
| 2235 | 61SX | '06/'07M | WFEFI/LEASE |